# SCHAFKOPF LAW, LLC
### ATTORNEYS AT LAW

December 4, 2018

U.S. District Court, ED of PA
Office of the Clerk of Court
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

**Re: Angelo Ardo et al v Officer Eddie Pagan et al**

To Whom It May Concern:

  Enclosed please find one (1) original and one (1) copy of Plaintiff's Civil Action Complaint, along with a CD containing a pdf version of same and a check in the amount of $400.00, in regards to the above captioned matter.

  Kindly file the original Complaint and return a time-stamped copy to the undersigned along with the Civil Action Summonses.

Sincerely,

Gary Schafkopf, Esq.

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Angelo Ardo and Jean Monaghan, individually and as the personal representative of the Estate of her son Anthony Ardo

**(b)** County of Residence of First Listed Plaintiff   Lehigh County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Schafkopf Law LLC, 11 Bala Ave Bala Cynwyd PA 19004; 610-664-5200
Weisberg Law, 7 S. Morton Ave Morton PA 19107; 610-690-0801

## DEFENDANTS

Officer Eddie Pagan and Officer Jay Spalin individually and in their official capacity as Pennsylvania State Troopers

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fourth, Eighth and Fourteenth Amendments and 42 USC section 1983

Brief description of cause:
Wrongful Death; Excessive Force /Assault and Battery

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*   JUDGE                    DOCKET NUMBER

DATE
12/04/2018

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 3665 Windy Rd Orefield, PA 18069 _____

Address of Defendant: _____ 1800 Elmerton Ave Harrisburg PA 17110 _____

Place of Accident, Incident or Transaction: _____ 1382 Good Rd Bangor PA 18013 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __12/04/2018__ _____*(signature)*_____ __83362__
*Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**    **Federal Question Cases:**      **B.**    **Diversity Jurisdiction Cases:**

| | |
|---|---|
| ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts | ☐ 1. Insurance Contract and Other Contracts |
| ☐ 2. FELA | ☐ 2. Airplane Personal Injury |
| ☐ 3. Jones Act-Personal Injury | ☐ 3. Assault, Defamation |
| ☐ 4. Antitrust | ☐ 4. Marine Personal Injury |
| ☐ 5. Patent | ☐ 5. Motor Vehicle Personal Injury |
| ☐ 6. Labor-Management Relations | ☐ 6. Other Personal Injury *(Please specify):* ___ |
| ☑ 7. Civil Rights | ☐ 7. Products Liability |
| ☐ 8. Habeas Corpus | ☐ 8. Products Liability – Asbestos |
| ☐ 9. Securities Act(s) Cases | ☐ 9. All other Diversity Cases |
| ☐ 10. Social Security Review Cases |     *(Please specify):* ___ |
| ☐ 11. All other Federal Question Cases | |
|     *(Please specify):* ___ | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Gary Schafkopf _____, counsel of record *or pro se plaintiff*, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: __12/04/2018__ _____*(signature)*_____ __83362__
*Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Angelo Ardo et al | : | CIVIL ACTION |
| v. | : | |
| Officer Eddie Pagan et al | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.           (X)


| | | |
|---|---|---|
| 12-4-18 | Gary Schafkopf, Esq | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610-664-5200 | 888-283-1334 | gary@schaflaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

WEISBERG LAW
Matthew B. Weisberg, Attorney ID No.: 85570
7 South Morton Ave.
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
**Attorney for Plaintiffs**

SCHAFKOPF LAW, LLC
Gary Schafkopf, Attorney ID No. 83362
11 Bala Ave
Bala Cynwyd, PA 19004
610-664-5200 Ext 104
Fax: 888-238-1334
**Attorney for Plaintiffs**

### IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **ANGELO ARDO** <br> 3665 Windy Rd. <br> Orefiled PA 18069 | : <br> : <br> : <br> : | **No.** |
| and | : <br> : | **JURY TRIAL OF TWELVE (12) DEMANDED** |
| **JEAN MONAGHAN, individually and as personal representative/administrator of the Estate of her son, ANTHONY ARDO** <br> 1382 Good Road, <br> Bangor, PA 18013 | : <br> : <br> : <br> : <br> : <br> : | |
| Plaintiff(s), <br> **v.** | : <br> : <br> : | |
| **OFFICER EDDIE PAGAN in his individual capacity as a Pennsylvania State Police Trooper** <br> 1800 Elmerton Ave. <br> Harrisburg, PA 17110; | : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| **OFFICER JAY SPLAIN in his individual capacity as a Pennsylvania State** Police Trooper <br> 1800 Elmerton Ave. <br> Harrisburg, PA 17110; | : <br> : <br> : <br> : <br> : | |
| Defendant(s) | : <br> : <br> : | |

### CIVIL ACTION COMPLAINT

## JURISDICTION AND VENUE

1. Jurisdiction in this Honorable Court is based on federal question 28 U.S.C. §1331; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

2. Venue is proper in the Eastern District of Pennsylvania, as the facts and transactions involved in the discrimination complained of herein occurred in large part in this judicial district at Northampton County, Pennsylvania.

## PARTIES

3. Plaintiff, Angelo Ardo, is an adult individual residing at the above-captioned address and is the father of Anthony Ardo, deceased.

4. Plaintiff, Jean Monaghan, is an adult individual residing at the above-captioned address and is the mother of Anthony Ardo, deceased.

5. Plaintiffs Ardo and Monaghan are the beneficiaries of Anthony Ardo's estate.

6. Monaghan was granted letters of administration on April 24, 2018. **Exhibit A**

7. Defendant, Jay Splain, is an adult individual, who at all times material herein formerly acted individually, and/or as an agent, servant, workman, and/or employee of the Pennsylvania State Police, acting under the color of state law.

8. Defendant, Eddie Pagan, is an adult individual, who at all times material herein formerly acted individually, and/or as an agent, servant, workman, and/or employee of the Pennsylvania State Police, acting under the color of state law.

## OPERATIVE FACTS

9. On or about May 20, 2017, Angelo Ardo received a text message from Anthony Ardo, his son stating that he was going to kill himself.

10. Anthony was in a state of distraught after a fallout with Monaghan, his mother, due to his continued drug use.

11. Anthony lived with Monaghan at her home and worked on her farm.

12. The previous day, May 19, 2017, Monaghan received a temporary protection from abuse order removing Anthony from the home.

13. On the morning of May 20 2017, Anthony went to Monaghan's home to collect some personal items and left without incident.

14. Anthony soon began texting suicidal pleas to Ardo.

15. Ardo's wife, Patricia Ardo, called the Suicide Prevention Hotline concerning Anthony.

16. Patricia thereafter contacted Monaghan regarding Anthony's texts.

17. Monaghan in turn contacted Defendant Pennsylvania State Police (hereinafter referred to as "PSP").

18. State Troopers, Defendants Splain and Pagan arrived at Monaghan's home at approximately 8:51 am.

19. While at the residence, Anthony and Monaghan spoke on the phone.

20. Anthony was still in a state of distress and continued making threats of self-harm, stating he would "shoot anti-freeze into his veins", "get a gun and shoot himself" and "blow himself up with fire crackers".

21. Defendants Splain and Pagan were present and overheard Anthony make threats of self-harm.

22. Over an hour later, at 10:09 a.m., Anthony arrived at the property at which point he remained in his vehicle.

23. Plaintiff Monaghan overheard Defendant Splain/Pagan state "I have to make it home to see my family tonight" before exiting the home to approach Anthony.

24. Defendants Splain and Pagan then approached Anthony's vehicle.

25. Defendants Splain and Pagan did not attempt any suicide prevention techniques or negotiations.

26. Rather, Defendants Pagan and Splain shot Anthony eleven (11) times while his was still in his vehicle, hitting him six (6) times, which Plaintiff Monaghan witnessed.

27. The Defendants did not have their vehicle camera on during the approach or initial interaction with Anthony. See Northampton County Investigating Grand Jury (2016) Report No-2, (Misc.  No. 434-2016, GJ Case No. C-15)). Attached as **Exhibit "B."**

28. At 10:11 am, just two minutes after Ardo arrived, Defendant Pagan radioed to the Belfast Barracks that there had been a police shooting. **See p. 2 Exhibit "B."**

29. Shortly thereafter, Northampton County District Attorney John Morganelli ("hereinafter "DA") received a phone call from Defendant PSP. **See p. 4 Exhibit "B"**

30. PSP informed DA that there was a police officer involved shooting and inquired if PSP or the DA's office should investigate.  **See p. 4 of Exhibit "B"**

31. The DA relayed to PSP that its office would be the lead agency to investigate the shooting. **See p. 3-8 of Exhibit "B"**

32. Thereafter, PSP contacted the DA again to advise PSP would not yield the criminal investigation despite their own officer's involvement in the shooting. Id.

33. The DA did not agree with this posturing and later convened a grand jury to investigate independently and without bias. Id.

34. The Grand Jury released two reports concerning its investigation of Defendants Splain and Pagan's deadly use of force.

35. The Grand Jury found, in part, as follows:

    i.   PSP gave conflicting inconsistent statements concerning its policy for investigating deadly police shootings; **see p. 18-19 of Exhibit "B."**

    ii.   PSP policy for investigating deadly police shootings fails to adopt the Association of Prosecuting Attorneys recommendation that independent agencies are to lead officer involved shootings; **see p. 18-21 and 31 of Exhibit "B."**

    iii.   PSP has inconsistent and contrary positions as to how potential conflicts of interest are handled in deadly police shootings; **see p. 21-23 and 33-34 of Exhibit "B."**

    iv.   PSP practices are inconsistent with best practices guidelines for police involved shootings; **see p. 25 of Exhibit "B."**

    v.   PSP's position is recalcitrant with respect to re-evaluating PSP policies as it relates to police involved shootings; **see p. 26 of Exhibit "B"**

    vi.   PSP cameras failed to capture the initial moments of the contact between the Defendants Splain and Pagan and Ardo; including but not limited to: the verbal commands given by troopers to Ardo prior to engaging in the use of deadly force; **see p. 27 of Exhibit "B"**

    vii.   PSP has an arrogant view of superiority relative to other law enforcement agents; **see p. 30 of Exhibit "B"**

    viii.  PSP is not above the law and they are not immune from public

scrutiny; **see p. 36 of Exhibit "B"**

36. The Grand Jury's findings, included, in part, that Defendants Splain and Pagan received

preferential treatment during the investigation of Anthony's homicide as follows:

    i.  PSP waited almost *30 days* before taking Defendants Splain and Pagan's statements regarding the deadly shooting; **see p. 23 and 35 of Exhibit "B"**

    ii.  PSP allowed Defendants Splain and Pagan to review the police dashcam video of the shooting prior to making their statements; **see p. 24 of Exhibit "B"**

    iii.  PSP did not ask questions to the officers investigating the police shooting concerning potential conflicts of interest despite being from the same barracks. **See p. 21-2 of Exhibit "B"**

37. The Grand Jury gave recommendations to PSP including, but not limited to:

    iv.  PSP consider the use of body cameras for all state troopers, in light of the deficiencies associated with the present motor vehicle recording devices. PSP ignored a similar recommendation made by a grand jury in Dauphin County in 2014; **See p. 37 of Exhibit "B"**

    v.  PSP strongly consider adopting the PA District Attorney's Best Practices protocol with respect to officer involved shootings; **See p. 36 of Exhibit "B"**

    vi.  PSP leadership clarify its written policies and practices with respect to officer involved shootings and assure that all commanders throughout…Pennsylvania have a full and complete understanding of same. **See p. 37 of Exhibit "B."**

38. Defendants failed to use best practices in their investigation of the shooting of Anthony,

failed to cooperate with other law enforcement bodies, failed to uphold PSP's core values

and "Call of Honor" and ultimately failed to serve and protect; to wit: preventing

Anthony's suicide.

39. After the death of Anthony, Patricia Ardo again called the Suicide Prevention Hotline to discuss what happened to Anthony and it was clear this suicide prevention attempt was inappropriately handled by PSP.

40. In fact, law enforcement officers are tasked with de-escalating situations with persons in crisis or suffering from mental illnesses.   Pa. Gen. Ass. House Bill 221, PN 0464 & PN 039 (2015).

41. The actions of the Defendants were undertaken knowingly, intentionally, negligently, recklessly, maliciously and/or with reckless disregard for Anthony's safety.

42. The actions taken by PSP as it relates to the investigation of this matter and the lack of video footage during the initial encounter with Anthony, allowed Defendants Splain and Pagan the ability to craft their statements in a way that would allow for a finding of justified use of deadly force.

43. As a direct and proximate result of Defendants' actions and misconduct, Plaintiffs suffered physical injury, severe emotional distress, psychological damage, lost wages, and lost earning capacity.

## COUNT I
## Wrongful Death and Survival Action

44. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth at length herein.

45. Defendants failed to serve and protect Anthony, failed to prevent his suicide attempt, failed to engage him in any suicide prevention techniques and used deadly force on him effectuating his death.

46. The Defendants knowingly, willfully, recklessly and maliciously refused to yield the investigation to the DA and, as such, benefitted from their preferential treatment.

47. Due to Defendants negligence, unlawful violence, and wrongful acts, as described *inter alia,* Plaintiffs have suffered economic loss and loss of future earnings caused by Anthony's death.

48. Plaintiffs have suffered harm due to Defendants conduct.

## COUNT II

### Excessive Force/Assault and Battery

49. The above paragraphs are incorporated herein by reference.

50. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

51. At the time of Defendants' conduct, Plaintiff had not committed any infraction otherwise to legally justify the force used by Defendants.

52. Defendants' actions stated above, inter alia, were committed under color of state law and were violations of Plaintiff's clearly established and well settled Constitutional and other legal rights.

53. Defendants placed Plaintiff in fear of physical harm and contact and then physically harmed and contacted Plaintiff without justification. Plaintiff suffered excessive force by their wrongful conduct all in violation of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, actionable through 42 U.S.C. §1983, et seq., and at Common Law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request this Honorable Court enter judgment in their favor and against Defendants, individually, jointly and severally, in an amount in excess of

seventy-five thousand dollars ($75,000.00), plus such other and further relief as this Honorable

Court deems necessary and just, and to Order the following relief:

    a.  Statutory Damages;

    b.  Punitive Damages;

    c.  Compensatory Damages, including:

    d.  Actual Damages for financial and physical injuries, including but not limited to wage loss and loss of earning capacity, and emotional distress;

    e.  Attorneys' fees and expenses, costs of suit, and equitable relief.

    f.  Injunctive relief, to wit: educational training.


Respectfully Submitted,


WEISBERG LAW

/s/: Matthew Weisberg
Matthew Weisberg, Esquire
Attorney for Plaintiff
DATED: 12-4-18

SCHAFKOPF LAW, LLC

Gary Schafkopf, Esquire
Attorney for Plaintiff
DATED: 12-4-18

# EXHIBIT A

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY PENNSYLVANIA
## REGISTER OF WILLS

### SHORT CERTIFICATE

**ESTATE OF**          ANTHONY P. ARDO

**FILE**               2018-0529

**STATE FILE NO.**     4818-0529

**S.S.N.**             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

---

I, Gina X. Gibbs , Register of Wills in and for the County of Northampton, do hereby certify that on the 24th of April, 2018, LETTERS OF ADMINISTRATION on the Estate of:

### ANTHONY P. ARDO,

Deceased, were granted to:

### JEAN ROSE MONAGHAN

Having first been qualified well and truly to administer the same.
I further Certify that no revocation of said letters appears of record in my office.

**DATE OF DEATH:**  May 20, 2017
**S.S.N:**          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



In testimony whereof, I have hereunto set my hand and seal this **24th** day of **April, 2018**.

Gina X. Gibbs, Register of Wills

Michele L. Gubish, Deputy

NOT VALID WITHOUT ORIGINAL SIGNATURE
AND IMPRESSED SEAL

# EXHIBIT B

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

IN RE:                                      )
NORTHAMPTON COUNTY                          )
INVESTIGATING GRAND JURY 2016               )      Misc. No. 434-2016
                                            )      GJ Case No. C-15

ORDER ACCEPTING AND FILING
INVESTIGATING GRAND JURY REPORT NO. 2 - PART TWO OF TWO REPORTS

AND NOW, this **27** day of **Dec.**, 2017, upon review of Investigating

Grand Jury Report No. 2-Part two of two reports, and finding that said report properly proposes

recommendations for action in the public interest based upon stated findings, and further finding

that said report is based upon facts received in the course of an investigation and authorized by

the Investigating Grand Jury Act, 42 Pa.C.S.A. §§4552 *et seq.*, and is supported by the

preponderance of the evidence, it is hereby

ORDERED

1.      That Investigating Grand Jury Report No. 2-Part Two of two reports, is accepted

by the Court with the direction that it be filed as a public record with the Court of Common Pleas

of Northampton County.

2.      It is further ordered that the district attorney of Northampton County may also

forward a copy of the report to Governor Tom Wolf, Governor of the Commonwealth of

Pennsylvania, Josh Shapiro, the Attorney General of the Commonwealth of Pennsylvania and to

the majority and minority leaders of the Pennsylvania Senate and the Pennsylvania House of

Representatives as directed by the grand jury.

BY THE COURT:

STEPHEN G. BARATTA
Supervising Judge

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

IN RE:                              )
NORTHAMPTON COUNTY                  )
INVESTIGATING GRAND JURY 2012       )        Misc. No. 434-2016
                                    )        GJ Case No. C-15

**TO THE HONORABLE STEPHEN G. BARATTA, SUPERVISING JUDGE:**

<u>REPORT NO. 2- PART TWO OF TWO REPORTS</u>

We, the members of the Northampton County Investigating Grand Jury, based upon facts

received in the course of an investigation and as authorized by the Investigating Grand Jury Act,

42 Pa.C.S.A. § 4552(a), recommend action in the public interest.  So finding, we do hereby adopt

this Report No. 2 of two reports for submission to the Supervising Judge.

FOREPERSON
NORTHAMPTON COUNTY
INVESTIGATING GRAND JURY

DATED: *12/14/17*

*17* Jurors voted FOR Report
*0* Jurors voted AGAINST Report
*6* Jurors Absent

## IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| NORTHAMPTON COUNTY | : | Misc. No.: 434-2016 |
| INVESTIGATING GRAND JURY 2016 | : | GJ Case No.: C-15 |

## NORTHAMPTON COUNTY INVESTIGATING GRAND JURY REPORT PART TWO

### I.    INTRODUCTION

On or about February 8, 2016, pursuant to and based upon the application of John M. Morganelli, the district attorney of Northampton County, an Order of Court was entered by the Honorable Stephen G. Baratta, President Judge of the Northampton County Court of Common Pleas, summoning a county investigating grand jury for the purpose of investigating matters including, but not limited to criminal acts in and about the county of Northampton, Commonwealth of Pennsylvania.

President Judge Baratta assigned himself as the Supervising Judge of the grand jury. The members of the Northampton County Investigating Grand Jury of 2016 were selected and seated on April 21, 2016, and charged by the court with respect to their duties and responsibilities. The aforesaid proceedings were conducted pursuant to 42 Pa.C.S.A. §4541, et seq. known as the Investigating

Grand Jury Act. A Notice of Submission for the instant investigation was filed by the District Attorney of Northampton County on or about June 14, 2017.

## II.    BACKGROUND

On May 20, 2017 at approximately 7:55 a.m., Jean Monaghan contacted the Pennsylvania State Police, Troop M – Belfast Barracks *via* telephone to report that Anthony Ardo, her son, had sent a text message to his father stating that he was going to kill himself. Mr. Ardo was an adult individual, 47 years of age who had been residing with his mother at 1382 Good Road, Lower Mount Bethel Township, Northampton County, Pennsylvania. At approximately 8:51 a.m. and 8:58 a.m., Troopers Eddie Pagan and Jay Splain of Pennsylvania State Police (PSP), Troop M – Belfast Barracks, respectively, arrived on the scene at 1382 Good Road, Lower Mount Bethel Township to meet with Jean Monaghan. This location is an area in which there is no municipal police department and in which Pennsylvania State Police provides primary police coverage. While the aforesaid troopers were at the residence, Ms. Monaghan had a number of short conversations with her son on the telephone. During one of the conversations, Anthony Ardo told Ms. Monaghan that he was going to blow himself up in front of her. He specifically threatened to blow himself up if he saw any police officers. At approximately 9:37 a.m., Trooper Splain made a radio transmission to the Belfast Barracks stating that Anthony Ardo had threatened to have an improvised explosive device with nails

2

strapped to his neck and that he would light it if he saw any police officers.

Anthony Ardo arrived at the aforesaid location at approximately 10:09 a.m. and, at

approximately 10:11 a.m., Trooper Eddie Pagan made a radio transmission saying

that shots had been fired.  Subsequent investigation determined that Anthony Ardo

was shot multiple times inside his vehicle and was pronounced deceased later that

morning.  Anthony Ardo's death was ruled a homicide.

At approximately 10:51 a.m. on May 20, 2017 District Attorney John

Morganelli received the following message on his cell phone's voice message from

Lieutenant Joseph Sokolofski of the Pennsylvania State Police, Troop M:

> **"Hey, good morning John, it's Lieutenant Sokolofski from PSP.  I
> don't have too many details, I just got a call though that the
> troopers from Belfast shot someone that was apparently a suicidal
> male and they shot him and he's down.  I don't know if he's
> deceased or what the situation is yet.  I wanted to give you the
> heads up to see if you wanted our guys to investigate it or how you
> want to handle it.  When you get the chance, call me back at
> _____ . Thanks."**

District Attorney Morganelli returned his call at approximately 10:55 a.m.

Lieutenant Sokolofski advised the district attorney that a member of the

Pennsylvania State Police, Belfast Barracks, had to use deadly force in an incident

in Lower Mount Bethel Township.  At that time Lieutenant Sokolofski did not

have any details other than that the matter may have involved a domestic matter

which precipitated a State Police response to a home on Good Road in Lower

Mount Bethel Township. He also advised that the victim allegedly was threatening to ignite some type of explosive device which precipitated the police response.

District Attorney Morganelli advised Lieutenant Sokolofski to keep him closely informed and to let him know immediately if the victim died. At 11:13 a.m. District Attorney Morganelli called Northampton County Detective Gerard Walsh, an employee of the Northampton County District Attorney's Office to alert him of the situation. At approximately 11:22 a.m., Lieutenant Sokolofski called District Attorney Morganelli again to inform him that the victim was deceased. At that time the District Attorney indicated to him that it would be better to have the Northampton County District Attorney's Office take the lead in the investigation and that he would assign a county detective, most likely, Detective Gerard Walsh, who would be in touch with him. District Attorney Morganelli indicated to the Lieutenant that Pennsylvania State Police could still continue with their internal investigation but that the District Attorney would be declared the lead agency of the criminal investigation of the shooting. Lieutenant Sokolofski stated that that was satisfactory.

At approximately 11:26 a.m. District Attorney Morganelli made contact with Northampton County Detective Walsh to advise him of the situation and to inform him that he would lead the investigation of the police shooting. Detective Walsh said he was available and would be in touch with Lieutenant Sokolofski.

4

At approximately 11:40 a.m. on May 20, 2017, District Attorney Morganelli received the following voice message from Lieutenant Sokolofski on his cell phone's voice message:

> **"John, hey it's Joe Sokolofski here.   When you get a chance could you give me a call back at _____.   Thanks."**

District Attorney Morganelli made a phone call to Lieutenant Sokolofski at 11:41 a.m. at which time the lieutenant advised that his superiors and the higher up brass of Pennsylvania State Police would not yield the criminal investigation of the shooting to the District Attorney's Office.   District Attorney Morganelli indicated to him that he thought this was a mistake and asked how PSP could investigate their own officers.   Lieutenant Sokolofski indicated that he felt he was in a difficult spot, between the DA and his superiors.   District Attorney Morganelli indicated to him that his superiors should contact him and that he was not agreeing or consenting to this posture.

Thereafter, District Attorney Morganelli received two phone calls from Captain Richard D'Ambrosio of the Pennsylvania State Police, Troop M at 11:55 a.m. and 11:57 a.m. both calls which he missed.

At approximately 11:58 a.m. on May 20, 2017, District Attorney Morganelli received the following voice message on his cell phone's voice message system from Captain Richard D'Ambrosio:

"Mr. Morganelli, Captain Rich D'Ambrosio of the Pennsylvania State Police of Bethlehem. It's right around noon on Saturday morning. I hate to have to meet you under these circumstances here and I was just to do lunch with you on Tuesday coming up. Could you give me a call reference to a shooting up there in Bangor? My cell is _____. I wanted to try and, reach, touch base with you here and explain our position on why we want to handle it, the direction that I'm getting from my superiors on this. Thank you John. See you."

DA Morganelli did not return Captain D'Ambrosio's phone call but he did

text him at 12:32 p.m. the following message:

"Captain, thanks for the call but I see no need to talk. I made my position clear that the DA's Office should be doing this investigation of a homicide by a PSP officer. PSP has advised me that they refuse to relinquish the investigation and want to do their own. I disagree with that posture particularly in this current atmosphere of distrust of the police in general. But I have no authority over PSP. I'm inclined to just let them go – let them deal with the press and later explain why they would not want an independent investigation conducted by the DA. I called off my county detective Jerry Walsh. He will not be on scene or interfere with PSP's investigation of their own guys.

Captain, I have only advised the press that I am aware of the use of deadly force by a PSP officer that has resulted in the death of a male individual. I told them that I was advised that police had been called to that location and some threat of harm to police precipitated the use of deadly force.

I am referring all press to call PSP and I have advised the press that the DA's Office is not involved in the investigation."

Thereafter Captain D'Ambrosio responded to District Attorney Morganelli

*via* a text as follows:

**"Ok, heck of a way to start off our relationship ... hopefully I can meet with you soon and explain our thought process on this ..."**

DA Morganelli responded to Captain D'Ambrosio's text as follows:

**"I think it is a mistake to shut us out and run the investigation of a homicide by a PSP officer but, again, I can't tell PSP what to do. When we are involved we can make determinations as the investigation unfolds. Now I will wait for months to go by until PSP is all done. Then I may have to start all over by grilling witnesses and investigators in front of a grand jury. Whether the use of deadly force was justified or not, whether the investigation was done right, etc. Better left up to a DA or 23 citizens of a grand jury?"**

Captain D'Ambrosio responded as follows *via* a text:

**"Never wanted county excluded ... just wanted to be primary. Still very early in the investigation ... county detectives are welcome to assist."**

District Attorney Morganelli contacted Northampton County Detective Walsh at 11:44 a.m. and indicated to him that Pennsylvania State Police wanted to conduct their own investigation and, therefore, it was not necessary for him to go to the scene.

On May 22, 2017, District Attorney Morganelli announced that his office would conduct a separate and independent investigation of the shooting of Mr. Ardo. On or about June 22, 2017 the district attorney announced that he would utilize the Northampton County Investigating Grand Jury to insure an independent and non-bias investigation into the matter. The submission filed by the district attorney with respect to this investigation states as follows:

7

> "**.... The Investigating Grand Jury shall inquire into circumstances surrounding the shooting death of Anthony Ardo, on or about the date of May 20, 2017, in the area of Lower Mount Bethel Township, Northampton County, Pennsylvania <u>and</u> the investigation of same.**"

On August 31, 2017, we issued Report No. 1, Part 1 of two reports which addressed the use of deadly force by the two Pennsylvania State Police troopers. In that regard we found the use of deadly force by the state troopers to be justified. We then proceeded to address the investigation conducted by Pennsylvania State Police, the Pennsylvania State Police's refusal to relinquish the investigation to the district attorney, and Pennsylvania State Police's policies and practices relative to officer involved shootings. However, on October 13, 2017, the Pennsylvania State Police and Commissioner Tyree Blocker of the Pennsylvania State Police filed a Motion To Discharge the Northampton County Investigating Grand Jury of 2016 and/or in the alternative, to have an order issued Denying the Acceptance and Filing of the Grand Jury's Second Report.  On November 17, 2017, the supervising judge, the Honorable Stephen G. Baratta ruled that we could proceed to issue a second report, and issued a formal opinion and order of court dated November 20, 2017.

We viewed the filing by the Pennsylvania State Police and Commissioner Blocker as an attempt to obstruct the grand jury and obstruct our statutory authority to conduct and conclude this investigation.  The filing represented an arrogant

attempt to intimidate the grand jury. This brought more suspicion and made it even more important that we completed our work.

## III.   EXHIBITS

During the course of this investigation, the grand jury received and reviewed the following exhibits:

**Exhibit 1**    The Pennsylvania State Police Use of Force Guidelines dated October 31, 2011

**Exhibit 2**    The autopsy report of Anthony Ardo prepared by Zhongxue Hau, MD date July 12, 2017

**Exhibit 3**    The toxicology report regarding Anthony Ardo dated June 20, 2017

**Exhibit 4**    A time line of the events of May 20, 2017 compiled from Pennsylvania State Police documents and radio recordings

**Exhibit 5**    Protection from Abuse petition captioned Jean R. Monaghan, Plaintiff, v. Anthony Ardo, Defendant dated May 19, 2017

**Exhibit 6**    Letter dated July 21, 2017 from Watch Guard, Inc. to Lieutenant Joseph Sokolofski

**Exhibit 7**    Pennsylvania District Attorneys' Association Officer Involved Shootings Investigation Best Practices dated November 2016

**Exhibit 8**    Association of Prosecuting Attorneys letter dated March 9, 2017 and 21st Century Principles of Prosecution – Peace Officer Use of Force Project

**Exhibit 9**    Report of Kenneth R. Davis, Law Enforcement Training Consultant dated August 23, 2017

**Exhibit 10**   Pennsylvania State Police Policy in re:  Officer Involved Shootings dated November 25, 2014

**Exhibit 11**  Copy of Morning Call Newspaper article dated 11/1/2017

**Exhibit 12**  Dauphin County Investigating Grand Jury Report
No.:  08-2013-11

## IV.   SUMMARY OF SELECTED TESTIMONY

### Chester County District Attorney Thomas P. Hogan

On August 24, 2017 the grand jury heard testimony from Chester County,

Pennsylvania District Attorney Thomas P. Hogan.  Mr. Hogan has been the district

attorney of Chester County, Pennsylvania since 2012.  Prior to that he also served

as a federal prosecutor.

Mr. Hogan and District Attorney Edward Marsico of Dauphin County were

the co-chairs of the Best Practices Committee for the Pennsylvania District

Attorney's Association (PDAA) which was a committee established to look at the

issue of police officer involved shootings.[1]  Mr. Hogan testified that the committee

identified a number of issues.  First, there was an agreement that law enforcement

needed a standard set of protocols.  He stated that inconsistent approaches lead to

bad results.  Secondly, Mr. Hogan stated there was a need to address the

tremendous amount of distrust present in communities where there were

---

[1] The Pennsylvania District Attorneys' Association (PDAA) is the recognized organization of all elected district attorneys in Pennsylvania.

investigations of officer involved shootings.  Community distrust was identified as a huge problem.

In order to address these issues, Mr. Hogan stated that the committee reviewed policies from throughout Pennsylvania and from other states that already existed for officer-involved shootings.  Mr. Hogan stated that they were surprised that there were not many written policies on this subject.  He said the committee also received feedback and ideas from the communities.

Once the work of the committee was concluded, a proposed protocol was prepared and presented to PDAA where it was debated internally.  Modifications were made to it and thereafter it was adopted by PDAA.  Mr. Hogan stated that it was first adopted by the PDAA Executive Committee and after they approved it, it then went to the general membership and was approved by the association as a whole.

Mr. Hogan stated the "best practices" protocol of PDAA was released during a series of press conferences in regions across the state and that it was extremely well-received.  It was also presented to the National District Attorney's Association Best Practices and since then various places across the United States.[2] One major agreement that emerged was that the police department whose officer did the shooting could <u>not</u> be the lead investigating agency.  Essentially, everyone

---

[2] The grand jury received and reviewed a copy of the Pennsylvania District Attorneys' Association Officer Involved Shootings Investigations Best Procedures dated November, 2016 as Exhibit 7.

11

agreed that police departments should not investigate their own police officer involved shootings. Mr. Hogan stated that the two guiding principles of the Officer-Involved Shooting Investigation Best Practices are:

1. There should be an <u>independent agency</u> that does the investigations; and
2. The <u>District Attorney's Office needs to direct the investigation</u>.

Mr. Hogan testified that the <u>independent agency</u> requirement exists for two reasons. The first reason is that the public does not trust when an agency investigates itself particularly in a homicide of a civilian citizen. He stated that you cannot have the perception of bias or prejudice involved in the investigation, and the only way to avoid or diminish this is to have an independent agency investigate. The second reason to have an independent agency is that a law enforcement agency is like any other workplace in that there exists grievances, petty disputes and internal disagreements. The fact that someone received a promotion over somebody else, or that somebody is going out with somebody else's girlfriend can all lead to bias. Mr. Hogan stated you cannot have this exist in high stake cases such as an officer involved shooting.

The other issue addressed by Mr. Hogan, that of the <u>district attorney directing the investigation</u>, is to assure that the district attorney has every question answered. District attorneys have to decide, ultimately, if a killing is justified or whether a police officer should be charged with a crime. Mr. Hogan stated that to

make this decision you need prosecutors involved from the beginning directing the investigation. The prosecutor should decide who should be interviewed and how they should be interviewed. Mr. Hogan testified that the district attorney is the chief law enforcement officer in the county, and it is essential that the district attorney direct the investigation.

Mr. Hogan stated that under the protocol, it is appropriate in a Third Class County such as Northampton County for the district attorney to be the independent agency in a situation involving a state police shooting. Mr. Hogan also noted that the PDAA policy contains a footnote regarding small counties where the district attorney may need to rely upon an independent group of investigators from within PSP but from outside the barracks involved in the shooting. Mr. Hogan stated that the footnote was put in specifically to address the very small counties of Pennsylvania where only the state police provides police coverage.

Mr. Hogan also stated that he is familiar with the protocol that was adopted by the Association of Prosecuting Attorneys. He explained that the Association of Prosecuting Attorneys is a national organization of prosecuting attorneys including big city district attorneys and state attorneys from all across the United States. Mr. Hogan testified that on March 9th, 2017, the Association of Prosecuting Attorneys sent out a letter with their recommendations for officer-involved shootings which also provides for the following.

First:        That there should be an independent agency involved

Second:       The prosecutor needs to be directing the investigation[3]

## Report of Kevin R. Davis

On August 31, 2017 the grand jury received into evidence the report of

Kevin R. Davis a law enforcement trainer and consultant who was retained by the

Commonwealth's attorney to review this matter.  (Exhibit 9) Mr. Davis, in addition

to being a full time sworn police officer in Ohio, has served as a deputy sheriff, a

city police officer, a narcotics detective, an undercover narcotics investigator, a

swat team member and a full time instructor assigned to the training bureau.  Mr.

Davis is a certified instructor in police use of force related matters.  In addition, he

is the author of several hundred articles regarding police tactics, firearms, civil

self-defense, and use of force investigations.  He has served as an adjunct

instructor for the Ohio Peace Officer Training Academy in Richfield Ohio and

personally developed curriculum for hundreds of law enforcement officers in other

states regarding use of force.  He has also lectured at international police training

conferences and symposiums including the American Society of Law Enforcement

Trainers, the International Law Enforcement and Educators Training Association

and the Performance Institute Use of Force Summit.  He has served for seven years

as a member of the Panel of Deadly Force Experts for the International Law

---

[3] The grand jury also received and reviewed the Association of Prosecuting Attorneys letter dated March 9, 2017 and 21st Century Principles of Prosecution – Peace Officer Use of Force Project, Exhibit No. 8.

Enforcement and Educators Training Association.  He has written a leading book on the investigation of deadly and non-deadly force entitled "Use of Force Investigation:  A Manual for Law Enforcement" which was published in 2012.

Mr. Davis's report notes that the use of deadly force by law enforcement officers within the United States is under intense scrutiny.  As such, Mr. Davis notes that the investigative process cannot be professionally accomplished by one agency without oversight and involvement of outside entities.  Mr. Davis states that the best processes for investigating the use of deadly force involving law enforcement is when those processes are codified in writing.  These processes, whether detailed in a policy or a memorandum of understanding, should establish the members of the officer involved shooting team (O.I.S.) and the exact method and steps to be applied in the investigation of an officer involved shooting.  Mr. Davis further stated that an investigation completed by only the employing agency, without oversight or checks and balances, is subject to public scrutiny.

## V.    THE PENNSYLVANIA STATE POLICE INVESTIGATION, POLICIES AND PRACTICES

Although we concluded that the use of deadly force by Troopers Splain and Pagan was justified, we had serious concerns and questions regarding the Pennsylvania State Police investigation, its policies and practices.  Those concerns and questions are now addressed below.

- **<u>Inconsistent and Contradictory Positions Regarding PSP Policies</u>**

From the outset of this matter, Pennsylvanian State Police personnel have cited their "policies" as the basis for justifying the practice of investigating their own officer involved shootings. These so called "policies" were the reasons given by both Lieutenant Sokolofski and Captain D'Ambrosio and relayed to District Attorney Morganelli on May 20, 2017. Captain D'Ambrosio specifically referred to these "policies" in his testimony before the grand jury and indicated that he had in fact talked to a major of the Pennsylvania State Police who reaffirmed these policies on the day of the Ardo shooting. However, when the grand jury heard from the Pennsylvania State Police's designated spokesperson, Major Douglas Burig, he seemed to suggest otherwise.

Major Douglas Burig testified before the grand jury on August 24, 2017 and stated he was authorized to speak on behalf of the Pennsylvania State Police agency. Major Burig astonishly stated that there is no policy that prohibits an independent agency from investigating a trooper involved shooting. Major Burig testified, for example, that the PSP policy allows for municipal police departments to take over as primary investigators in certain scenarios in a trooper involved shooting. He acknowledged that PSP policies recognize that in situations where the state police are <u>not the primary law enforcement agency,</u> if a state trooper kills

someone, that the municipal police department can make the decision to be the lead investigator and PSP has to accept their decision.

Major Burig acknowledged that the state police at Troop M had refused to allow the district attorney's office to lead the investigation in the matter involving Anthony Ardo which had occurred in a jurisdiction in which PSP is the primary law enforcement agency.  But Major Burig seemed to disagree with the decision made by Troop M.  Major Burig said it was the District Attorney's decision whether to be the lead on a case and that PSP policy does not prohibit the district attorney from being the lead on a case like the Ardo matter.  Major Burig stated that if he was on call the day of the Ardo incident, he would have agreed with District Attorney Morganelli and would have allowed the district attorney's office to take the lead in the case.  He stated that is PSP's policy.  Major Burig agreed that there was some type of confusion in the incident that occurred on May 20, 2017.

**"Question by Mr. Morganelli:  You cleared up a couple things today….The one point you cleared up is that in a jurisdiction where we have a municipal police department, like say, Bethlehem, which is our largest police department in Northampton County, if a state trooper … was called to Bethlehem for some reason and ended up killing somebody, that your policies only offer to assume primary (jurisdiction).**

But if they decline that and they say, no, we are retaining jurisdiction on our own, City of Bethlehem Police, and then you offer assistance, they could decline both. And with that, the PSP policy would recognize that the City of Bethlehem Police Department would be investigating the PSP shooter. I think you have said that, and that's what your policy said.

Do you agree on that?

**Answer by Major Douglas Burig**: That's what our policy states, sir.

**Question by Mr. Morganelli**: And now when we go into areas where we don't have a municipal police department, which is now, you know, where we are in this particular case, where PSP is the primary police jurisdiction - - agency, what you're telling us is that if the District Attorney as the chief law enforcement officer says we want to - - we want to be the independent agency, we are coming in with our guys or Chester County, for example, where you have Tom Hogan down there who has his own homicide squad, you are going to defer to the D.A.'s of those counties because that's what your policy allows. Is that correct?

**Answer by Major Douglas Burig**:    Yes. (pp. 75, 76)

The testimony by Major Burig was completely inconsistent and contrary to that of Lieutenant Sokolofski and Captain D'Ambrosio. Captain D'Ambrosio testified that he did not know why Lieutenant Sokolofski asked the district attorney how he wanted to handle the shooting. Captain D'Ambrosio explained that it is "clear cut" that if there is a shooting involving a trooper in a municipality that the

PSP covers, then PSP handles the investigation.  Captain D'Ambrosio stated that this has been the policy "forever."  (N.T. p. 15 of testimony)

Captain D'Ambrosio further stated that with respect to this matter his first call was to his superior, Major Dante Orlandi.  Major Orlandi is the commander in charge of the whole southeast part of the state.  Captain D'Ambrosio stated that Major Orlandi knew that the district attorney wanted to be the lead in the investigation into the shooting of Mr. Ardo.  Captain D'Ambrosio testified that the written policy of the PSP is for them to handle their own investigations.

This contradictory testimony confused the grand jury, particularly due to the fact that Major Burig was selected by the PSP leadership to be the spokesman for them and to articulate the policy.  Because of that, the grand jury decided to subpoena Commissioner Tyree Blocker.

Commissioner Tyree Blocker testified before the grand jury on September 28, 2017.  Mr. Blocker is presently the highest ranking member of the Pennsylvania State Police.   Commissioner Tyree Blocker joined the Pennsylvania State Police in 1975 as a trooper.  The majority of his career involved criminal investigations including drug law enforcement and organized crime.  His 30 year career progressed up the ranks form trooper through major.  He left the PSP in 2005 but at the request of Governor Tom Wolf in 2015, he came back to serve as the State Police Commissioner.

Commissioner Blocker testified that the incident on May 20, 2017 occurred in an area that would be known as a "primary jurisdiction" of the Pennsylvanian State Police. This means that it was an area in which there is no municipal police department and that PSP provides the primary police services. Commissioner Blocker stated he was aware that Lieutenant Joseph Sokolofski left a voice message for District Attorney Morganelli wanting to know whether Mr. Morganelli wanted PSP to investigate the matter or if he wanted his office to investigate the matter. Commissioner Blocker stated he believes that Lieutenant Sokolofski may not have understood the policy of PSP.

Commissioner Blocker acknowledged that the PSP policy states that in a "non-primary jurisdiction," the PSP policy recognizes that if a PSP officer shot and killed someone, the incident would not be investigated by their own agency and that it would be the DA's office, **if that's how they elected to do so.**

However, Commissioner Blocker testified that if the officer involved shooting occurred in an area where Pennsylvania State Police is primary, then the PSP is going to conduct that investigation. He stated that Major Burig was wrong when he said he would agree with the District Attorney and allow the district attorney's office to interview the officers involved, collect the evidence and more or less handle the investigation. Commissioner Blocker stated that Major Burig was incorrect when he stated he would allow the district attorney's office to be the

independent agency when the incident occurred in an area where there is no municipal police department. He stated that in the areas where PSP has primary jurisdiction for police services, they will conduct the criminal investigations in consultation with the District Attorney.

- **Inconsistent and Contradictory Positions Regarding Potential Conflicts of Interest**

District Attorney Hogan of Chester County testified that an independent investigation by a non-involved agency is necessary in an officer involved shooting due to the fact that a police department is like any other work place and may have unknown social and/or personal relationships that could compromise an investigation. With respect to this issue we also heard inconsistent and contrary positions articulated by PSP personnel as to how potential conflicts of interest are handled in this type of an investigation. Commissioner Blocker stated the following are precautions PSP takes in order to prevent a conflict of interest in the investigation of an officer involved shooting:

1.  Each member of the team needs to self-examine themselves as to whether they have any insight regarding any aspect of the investigation or anyone that was involved.

2.  Corporals, sergeants, lieutenants and captains scrutinize the members of the officer involved shooting team to ensure that troopers are not potentially compromised with respect to an investigation.

He acknowledged, however, that there are no set screening mechanisms to assure self-reporting.

Major Burig testified that they do ask the members of the investigating team if they have personal or social relationship with respect to the involved troopers. Major Burig also stated that if one of the forensic service unit members did have a personal or social relationship with an involved trooper, PSP could bring people in from other parts of the state.  Major Burig stated that PSP has a lot of resources and the ability to move people not only within the same troop but also to other parts of the region or other parts of the state.

However, Lieutenant Sokolofski and Captain D'Ambrosio testified that they don't ask questions about relationships because they believe in the integrity of their own people and that they would come forward on their own.  Further, Captain D'Ambrosio did not agree with Major Burig with respect to moving people in from another troop and testified that it would take time to bring people in from other troops and it would be cumbersome.  Captain D'Ambrosio stated that he did not agree that a different troop should be called in to such an investigation.  Captain D'Ambrosio indicated that although he understood the concern the public may have that the investigators may have relationships with the troopers who are being investigated, which could affect their objectivity, Captain D'Ambrosio stated that

he had confidence that his people would do the right thing and have the integrity to do the job the right way.

Lieutenant Sokolofski testified that he had appointed Trooper Michael Everk as the lead investigator in the Ardo investigation even though he did not know Trooper Everk's relationship with the two troopers involved in the Ardo incident. Lieutenant Sokolofski acknowledged that Trooper Jay Splain and Trooper Eddie Pagan were patrol unit members at the Belfast, Troop M barracks which primarily handles Lehigh and Northampton Counties. Lieutenant Sokolofski stated he did not know if Trooper Splain and/or Trooper Pagan had any social relationships with the troopers involved in the investigation of their incident. Lieutenant Sokolofski also stated that it would be a "nightmare" to deploy a different troop that is further away in order to assure that there are no personal relationships between any of the troopers. He enumerated a number of reasons why it would not be practical to deploy a different troop including but not limited to the following:

- No knowledge as to their availability
- The amount of time it is going to take for them to assemble to come hours away into another troop
- Unfamiliar with the workings of another county
- No idea of county rules
- It took two days to get a search warrant to hold the scene
- Logistical nightmare

Although Lieutenant Sokolofski indicated that it was not an "impossibility" to deploy another troop, he did not believe that it made sense to call in

investigators from two hours away who still worked from the same agency and he did not think that that was necessary in the Ardo matter.[4]

- **Inconsistent and Contradictory Positions regarding the Assignment of Troopers from Other Barracks**

As noted above, the testimony of Pennsylvania State Police supervisors including but not limited to the testimony of Captain D'Ambrosio suggested that it would be inefficient and impractical to bring state troopers or investigative teams in from other barracks outside Troop M to investigate a matter such as an officer involved shooting.  Likewise as noted above, Lieutenant Sokolofski stated it would be a "nightmare" to deploy members of a different troop that is farther away.

However, Commissioner Blocker acknowledged that there is a 72 hour period of time for the officer who is involved in an officer-involved shooting to be interviewed.  He stated that this would be enough time to bring in investigators from a troop someplace close but that he believed that Troop M has the requisite investigative talent within the troop to investigate major cases.[5]

- **Allowing the Involved Officers to Review the Video Recordings Prior to Being Interviewed**

---

[4] The grand jury notes that despite Lieutenant Sokolofski's testimony, Trooper Spandoloski, the Pennsylvania State Police bomb expert, was deployed from Hershey in order to conduct the search and investigation of the explosives in and about the Ardo vehicle.

[5] The grand jury also notes that a spokesperson for PSP, Ryan Tarkowski, was quoted in a Morning Call article dated November 1, 2017 that PSP procedures involves the assignment of investigators from barracks other than that of the involved troopers.  (**Exhibit 11**)

State Police investigators who conducted the investigation and questioning of Troopers Jay Splain and Eddie Pagan permitted the troopers to review the motor vehicle video recordings (MVR) depicting the events as they unfolded **prior to** interviewing them.  Mr. Davis specifically addressed the issue as to how video evidence should be used and introduced into the investigation of an officer involved shooting.  Mr. Davis noted that it is legitimate to question the practice of allowing police officers to view videos <u>prior</u> to them giving their official statements.  He noted that it has been a source of much consternation throughout the criminal justice community about <u>if and when</u> the police officers should view any or all video footage.  He also noted that many law enforcement unions have gotten mandatory review included in their collective bargaining agreements.  Mr. Davis testified that the best practices are as follows:

    (1)    The officers should **not** be allowed to view any or all videos **prior** to being interviewed.  The first phase of the interview with the officer involved shooting team is unaided by video, without allowing the officer to view the tapes.  In this phase, the officer provides his recollection:  what he feared; what he saw, heard or was focused in on, to the best of his recollections, understanding that human memory does not work like digital recording.  This unaided interview is imperative to understand the officer's perspective and his mindset and perceptions.  The cognitive interview style is a superior method to conduct the officer involved shooting interview.

    (2)    The second phase, conducted right after the first, is to allow the involved officers to watch the tape from beginning to end without interruption.  Often times the officer, due to "inattentional blindness" perceptional distortions, such as

tunnel vision, or simply that the officer was not looking where the camera was facing and what the video captured, will not have seen or have no recollection for multiple actions or activities captured on tape.

(3)    The third phase allows the involved officers to explain or comment on what was captured on video and questions of investigators answered in a non-accusatory manner. In this way we learn what the officers saw, thought he saw, his perceptions, and what he was focused in on and his explanation as to why he/she did what they did. It is vital that these perceptions, fears, focus, thoughts, mindset and decision making processes are recorded as they provide the officers version of events independent of the videos.

The grand jury notes that these recommendations set forth in Mr. Davis's report of August 25, 2017 was also supported by District Attorney Thomas Hogan, District Attorney of Chester County.[6]

Pennsylvania State Police officials, however, defended the practice that permitted Troopers Splain and Pagan to view the dash cam video of the incident before they gave their statements. Captain D'Ambrosio stated that it was past practice to allow police officers to view motor vehicle recordings (MVR's) in a shooting. When he specifically asked if he thought it was good practice to show

---

[6] Mr. Hogan testified that although the policy of the PDAA does not include guidelines concerning when it is appropriate to show a video to a police officer who killed someone, his recommendation is to interview the officers first without showing them the video of the event. If there are differences between what the officers relate and what is depicted on the video, the investigator then has to make a judgment call. Mr. Hogan stated that if you think the subject is lying, then you should not show them the video. If you think the witness may have made an honest mistake, then Mr. Hogan suggests to show the video and ask them to clarify their statement. Mr. Hogan advised not to show the video first thing because then the witness will base their statement on the video.

the subject of an investigation a video of the events before interviewing them, he

stated he did not see any issues with them looking at it. (Notes of Testimony p. 33)

- **PSP's Motor Vehicle Recording Devices Failure to Capture Events**

  During the course of our investigation into the Ardo matter, it was

determined that the motor vehicle recording devices on the police cars utilized by

Troopers Splain and Pagan did not capture all of the events that occurred at that

time. Specifically, the cameras failed to capture the initial moments of the contact

between the troopers and Mr. Ardo including but not limited to the verbal

commands given by troopers to Mr. Ardo prior to engaging in the use of deadly

force. The grand jury received Exhibit 6 which was a letter dated July 21, 2017

from WatchGuard which is a manufacturer of law enforcement video recording

systems headquartered in Allen, Texas. Their products include the in car cameras

connected to the in car motor vehicle recorders or MVRs which are utilized by

Pennsylvania State Police. The letter explained that their technical personnel had

reviewed the MVR footage and log surrounding the vehicles utilized by Troopers

Splain and Pagan. They determined that both units were in proper working order

and that the video footage had not been altered, manipulated or edited in any way.

In essence, they assured us that the footage that we saw was the complete video

recording captured by this system on May 20, 2017 from the two police units at the

scene of the Ardo incident. They indicated that the camera is in a constant recording state while the car is in operation and that there are triggering events that will create and tag portions of video for later viewing either in car, from a server or both. Triggering events include but are not limited to activating the emergency lights on the vehicle or a user manually initiating a recording event. A review of the relevant logs for both units confirmed that both units ignition had been turned off and both units began the thirty minute shut down procedures. At approximately 9:44 a.m., both MVR units stopped recording as programed. This began the period of time that both troopers were inside Mrs. Monahan's residence waiting for Mr. Ardo to arrive. At approximately 10:10 a.m., the ignition in both units was turned on and both cameras began recording thirty seconds later after the normal system booting protocols. It was this period of time (the thirty seconds) that explained why there was no MVR footage of the incident until approximately 10:10 a.m. when troopers began to fire shots into Mr. Ardo's vehicle. Thus, the crucial period of time just prior to the shooting when troopers gave verbal warnings and commands were not captured.

We inquired as to whether or not Pennsylvania State Police Troopers wear body cameras and we were advised that they do not. It appeared to the grand jury that if body cameras had been utilized by both troopers on May 20, 2017, there would have been more video footage of the relevant events just prior to the

shooting of Mr. Ardo which would have been helpful to the grand jury in determining the use of force issue.[7]

### Recalcitrant Position with Respect to Re-evaluation of Policies

Commissioner Blocker testified that in his opinion, PSP's major case policy is up to current standards. To change the policy and allow the district attorney of a county to lead the investigation in a trooper-involved shooting, Commissioner Blocker would have to forward that request to PSP's Bureau of Research and Development for additional research and then they would get back to him to make a decision. When asked if he could make the change to the policy without referring it to others, Commissioner Blocker testified he had the authority to do that but that he wouldn't.

Commissioner Blocker stated that if the governor asked a commissioner to change the policy about investigating their own troopers, he could try to persuade him otherwise. If the commissioner is unsuccessful, the commissioner would have the choice of resigning or implementing the governor's directive.

- ### PSP's View of Themselves as a Superior Law Enforcement Agency

---

[7] The grand jury notes that this recommendation was a recommendation given by The Eighth investigating grand jury in Dauphin County, Pennsylvania in October, 2014. (See Exhibit 12 – Dauphin County Investigating Grand Jury Report No. 08-2013-11 )

Throughout our investigation, it became clear that the Pennsylvania State Police leadership have a somewhat arrogant view of superiority relative to other law enforcement agencies. This view has contributed to the recalcitrant position taken by PSP leadership relative to considering any change in their policies to allow for an independent investigation of their officer involved shootings. For example, Lieutenant Sokolofski stated: **"...we have the resources, knowledge and experience to conduct an investigation better than anyone else."** (N.T. p. 22) When Major Burig was asked why he would consider it to be good public policy or practice for a police department to investigate their own guys in a shooting, Burig stated as follows: **"To be honest, not all police departments possess the same capabilities. ...we have a long history of investigating our own and investigating those thoroughly. ...we believe that we can enforce the laws against our own people. We do it every day."**

## SPECIFIC FINDINGS

1.     The subject of police officer involved shootings of civilians and how they are investigated by law enforcement is an issue of high national interest and tremendous public importance. Police officer involved shootings across the United States have caused protest and violent confrontations. There is a distrust of law enforcement when it comes to the investigation of officer involved shootings.

2.     There is a public interest in assuring that investigations of police officer involved shootings of civilians are not subject to conflicts of interest or bias.  They need to be transparent.

3.     In November of 2016, the Pennsylvania District Attorneys Association adopted a "best practices" protocol for police officer involved shootings that recommends an independent agency lead the investigation in officer involved shootings.

4.     In March of 2017, the Association of Prosecuting Attorneys, a national organization of prosecuting attorneys, also recommended that an independent agency lead the investigation in officer involved shootings.

5.     The elected county district attorney of each of the counties of the Commonwealth of Pennsylvania is considered to be the chief law enforcement officer of that county.

6.     On May 20, 2017, in Northampton County, two Pennsylvania State Police officers shot and killed a civilian.  On that same day, the Pennsylvania State Police refused to yield the investigation to the Northampton County District Attorney and cited "policies" that require PSP to investigate their own officer involved shootings.

7.      Although we concluded that the use of deadly force utilized by Troopers Splain and Pagan was justified, we had serious questions and concerns regarding the investigation by the State Police, its policies and practices as follows:

(a)   There seems to exist a great deal of confusion within PSP as to exactly what their Officer Involved Shooting Policy actually states and/or requires. For example:

- Lieutenant Sokolofski of Troop M on the day of the Ardo incident contacted the district attorney to inquire of him how the district attorney wanted to handle the investigation.  Lieutenant Sokolofski specifically asked if the district attorney wanted to handle the investigation or whether they should handle it.

- Lieutenant Sokolofski agreed with the district attorney's desire to lead the investigation and acquiesced.

- Subsequently, Lieutenant Sokolofski was overruled by his superior, Captain Richard D'Ambrosio of Troop M who stated that the PSP policy does not allow for the district attorney to lead an officer involved shooting involving a PSP trooper.  Captain D'Ambrosio testified before the grand jury that he had conferred with his superior Major Dante Orlandi.

- Thereafter, with two different positions by two different personnel of PSP, we requested the PSP to designate an official spokesperson to testify before the grand jury.  We allowed PSP to pick the person they wanted to state the official policy of the PSP.  Major Douglas Burig was designated and appeared before the grand jury.  However, his testimony was contrary to that of Captain D'Ambrosio and, in fact, he testified that he was in agreement with District Attorney Morganelli in that Troop M should have relinquished the Ardo investigation to the Northampton County District Attorney's Office.

- As a result of the confusion, the grand jury thereafter subpoenaed the commissioner of the PSP, Colonel Tyree Blocker. Commissioner Blocker testified that Lieutenant Sokolofski did not understand the policy. (p. 21) He further testified that Major Burig was also wrong when he testified that he would agree with the district attorney and allow the DA's Office to interview officers involved in the shooting, collect evidence and more or less lead and handle the investigation. (p. 34) Commissioner Blocker specifically stated that Major Burig was incorrect when he stated he would allow the DA's Office to be the independent agency to investigate a trooper involved shooting in a jurisdiction in which the Pennsylvania State Police provided primary police coverage. (p. 36)

    (b)    There seems to exist a great deal of contradiction within PSP as to how potential conflicts of interest should be handled between the officer involved shooting investigative team and the involved officers. For example:

- Commissioner Blocker testified that the Pennsylvania State Police takes precautions in order to prevent a conflict of interest in the investigation of an officer involved shooting. Specifically, he indicated that each member of the team needs to self-examine themselves and that corporals, sergeants, lieutenants and captains scrutinize the members of the officer involved shooting team to insure that troopers are not potentially conflicted with respect to an investigation.

- Additionally, Major Burig testified that they do ask members of the investigating team if they have personal or social relationships with the suspect troopers. Major Burig also stated that PSP has lots of resources and could bring in people from other parts of the state *i.e.* from other troops.

- However, both Lieutenant Sokolofski and Captain D'Ambrosio testified that they do not ask questions about relationships because they believe in the integrity of their own people and that they would come forward on their own. Further, Captain D'Ambrosio did not agree with Major Burig with respect to moving people in from another troop and testified that it

would take time to bring people in from other troops and it would be cumbersome.

(c)   There seems to exist a great deal of contradiction within PSP as to the ability to assign investigators from other barracks to conduct an officer involved investigation in another part of the state.  For example:

- Captain D'Ambrosio suggested that it would be inefficient and impractical to bring troopers or investigative teams in from other barracks outside Troop M to investigate a matter such as an officer involved shooting.

- Lieutenant Sokolofski also stated that it would be a "nightmare" to deploy members of a different troop that is farther away with respect to an officer involved shooting.

- However Commissioner Blocker acknowledged that there is a 72 hour period of time for an officer who is involved in a shooting to be interviewed.  He stated that this would be enough time to bring in investigators from a troop some place other than the troop where the shooting occurred.

- Additionally, a spokesperson for the State Police, Ryan Tarkowski, was quoted in a Morning Call article dated November 1, 2017 (Exhibit 11) that PSP procedures involve the assignment of investigators from barracks other than that of the involved troopers.

(d)   Despite our finding that Trooper Splain and Pagan's use of deadly force was justified, we find that the involved troopers were given special treatment by the investigating team comprised of members of their own troop not generally afforded to others who are the subject of a criminal investigation.  For example:

- Troopers Pagan and Splain were not subjected to an interview until 30 days after the shooting.

- When Trooper Splain and Pagan were interviewed, the troopers were allowed to view the video of the event as recorded by their motor vehicle recorders prior to being interviewed which practice is contrary to the recommended practice and a courtesy not afforded to others who are the subject of a criminal investigation.

(e)     Despite our finding that Trooper Splain and Pagan's use of deadly force was justified, and that the investigation was generally well conducted, we did find deficiencies in particular the following:

- The motor vehicle recording devices were inoperational at the exact time that the troopers engaged Mr. Ardo resulting in the grand jury's inability to view and hear the commands given by the troopers just prior to the shooting.  Fortunately, there were independent witnesses who were able to independently corroborate and verify the troopers testimony of having given said commands prior to the use of deadly force.

8.     Despite the assurances of PSP leadership, there is no formal structure in place to assure that there are no personal or other relationships between the members of the investigating team and the involved officers to assure a transparent and unbiased investigation.  Self-reporting alone cannot be relied upon.

9.     At the present time, not all of PSP personnel precisely know what their policies mean and, therefore, they cannot be uniformly applied throughout Pennsylvania in every matter.

10.    PSP leadership have a somewhat arrogant opinion of their own superiority over any other law enforcement agency which has contributed to their

recalcitrant position of not relinquishing an investigation involving one of their own officers to another law enforcement agency.

11.    The Pennsylvania State Police as an agency of the Commonwealth is not above the law.  They are not immune from public scrutiny.

12.    The Commissioner of the Pennsylvania State Police is appointed by and reports to the Governor of the Commonwealth of Pennsylvania.

13.    The Governor has the authority to order the Commissioner of the State Police to implement policies that will assure that the investigation of an officer involved shooting is transparent, free from potential bias or conflicts of interest and done by an independent agency.

## GRAND JURY RECOMMENDATIONS

1.    It is recommended that the commissioner of the Pennsylvania State Police strongly consider adopting the Pennsylvania District Attorney's Best Practices protocol with respect to officer involved shootings, or, in the alternative, adopt a practice and protocol that will involve an independent agency as the lead investigating agency in such matters.

2.    It is recommended that the Pennsylvania State Police leadership clarify its written policies and practices with respect to officer involved shootings and assure that all commanders throughout the Commonwealth of Pennsylvania

have a full and complete understanding of same in order to assure uniformity in application.

3.     It is recommended that the Pennsylvania State Police strongly consider the use of body cameras for all state troopers, particularly in light of the deficiencies associated with the present motor vehicle recording devices.  We note that PSP ignored a similar recommendation made by a grand jury in Dauphin County in 2014.

4.     It is recommended that a copy of this report be forwarded to Governor Tom Wolf, Governor of the Commonwealth of Pennsylvania for whatever action, if any he deems appropriate.

5.     It is recommended that a copy of this report be forwarded to the majority and minority leaders of the Pennsylvania Senate and the Pennsylvania House of Representatives for whatever action, if any they deem appropriate.

6.     It is recommended that a copy of this report be forwarded to the Attorney General of the Commonwealth of Pennsylvania for whatever action, if any he deems appropriate.

## **CONCLUSION**

This Report represents a summary of the pertinent evidence presented to the Northampton County Investigating Grand Jury of 2016 relating to the facts and circumstances surrounding the death of Anthony Ardo.  Although this Report does not recite all of the testimony placed before the Grand Jury, this Report does contain sufficient cause upon which to conclude that a Report detailing our findings and recommendations was necessary and in the public interest.