IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO ARDO, <u>et al.</u>, | : | CIVIL ACTION |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICER EDDIE PAGAN, <u>et al.</u>, | : | |
| | : | |
| Defendants. | : | No. 18-5217 |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2021, upon consideration of Commonwealth Defendants' Motion for Summary Judgment, and any response thereto, it is hereby ORDERED and DECREED that said motion is GRANTED. All claims against Commonwealth Defendants are hereby DISMISSED and JUDGMENT is entered in favor of defendants Pennsylvania State Police, Eddie Pagan, and Jay Splain on all claims.

BY THE COURT:

_____
Smith, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO ARDO, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICER EDDIE PAGAN, et al., | : | |
| | : | |
| Defendants. | : | No. 18-5217 |

**COMMONWEALTH DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants Pennsylvania State Police, Trooper Eddie Pagan, and Trooper Jay Splain

(collectively, "Commonwealth Defendants"), by and through counsel, for the reasons set forth in

the attached Memorandum of Law, hereby move for summary judgment pursuant to Federal

Rule of Civil Procedure 56.

Dated: July 15, 2021

Respectfully submitted,

JOSH SHAPIRO
Attorney General

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
The Phoenix Building
1600 Arch St., 3rd Floor
Philadelphia, PA 19103
Telephone:  (215) 560-2141
Fax:  (717) 772-4526
kle@attorneygeneral.gov

BY: /s/ Kathy A. Le
KATHY A. LE (Pa. No. 315677)
Deputy Attorney General

KAREN M. ROMANO
Chief Deputy Attorney General
Civil Litigation Section

## **<u>CERTIFICATE OF SERVICE</u>**

I, Kathy Le, hereby certify that a true and correct copy of the foregoing Motion for Summary Judgment to be filed electronically on July 15, 2021 and is available for viewing and downloading from the Court's Electronic Case Filing System ("ECF"). The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service.

/s/ Kathy A. Le
Kathy A. Le

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO ARDO, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICER EDDIE PAGAN, et al., | : | |
| | : | |
| Defendants. | : | No. 18-5217 |

**MEMORANDUM OF LAW IN SUPPORT OF COMMONWEALTH
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Pennsylvania State Police, Trooper Eddie Pagan, and Trooper Jay Splain

(collectively, "Commonwealth Defendants"), respectfully submit this Memorandum of Law in

Support of their Motion for Summary Judgment.

**I.      INTRODUCTION**

This lawsuit relates to the death of Anthony Ardo, who was killed in a police shooting

involving Troopers Pagan and Splain on May 20, 2017. Plaintiffs are the parents and

administrator of the estate of Anthony Ardo. Plaintiffs initiated this lawsuit on December 4,

2018, naming only Troopers Pagan and Splain and bringing a wrongful death and survival action

claim (Count I) and excessive force/assault and battery claim under 42 U.S.C. § 1983 and

common law (Count II). (ECF No. 1.) On October 10, 2019, on the eve of the close of discovery,

Plaintiffs filed a Motion for Leave to File a First Amended Complaint. (ECF No. 20.) On

January 17, 2020, after the Court granted leave, Plaintiffs filed the Second Amended Complaint,

adding a claim against the Pennsylvania State Police ("PSP") for violation of the Americans with

Disabilities Act (Count III). (ECF No. 33.)

With discovery now completed, it is clear that the material facts in this case are largely undisputed and Commonwealth Defendants are entitled to summary judgment on all claims. *First*, Tprs. Pagan and Splain are entitled to judgment in their favor on the excessive force claims brought pursuant to Section 1983 (Count II) because the material undisputed facts establish that the Troopers used reasonable force in response to the immediate threat of Ardo lighting an explosive strapped to his neck, in close proximity to the Troopers and Monaghan's residence. *Second*, Tprs. Pagan and Splain are entitled to qualified immunity on the excessive force claim (Count II) because they did not violate clearly established law. *Third*, Tprs. Pagan and Splain are entitled to judgment in their favor on all claims based on state law—including the wrongful death and survival claims (Count I) and assault and battery claims (Count II)—because, as a matter of law, Tprs. Pagan and Splain are protected by sovereign immunity. *Fourth*, PSP is entitled to judgment in its favor on the ADA claim (Count III) because, as a matter of law, this claim is barred by the statute of limitations. *Fifth*, PSP is entitled to judgment in its favor on the ADA claim because the material undisputed facts establish that PSP did not discriminate against Ardo by reason of a disability, and PSP did not exhibit deliberate indifference.

For the foregoing reasons, Commonwealth Defendants are entitled to summary judgment on all claims.

## II.      FACTUAL BACKGROUND

In accordance with this Court's procedures, the factual background of this case is set forth in Commonwealth Defendants' Statement of Undisputed Material Facts, which is being filed herewith.

### III.    LEGAL STANDARD

The summary judgment standard is well established. A party is entitled to summary judgment if it can show "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A movant that will not bear the burden of proof on an issue at trial satisfies its initial responsibility on summary judgment by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In that situation, a movant is entitled to summary judgment if the nonmoving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case." *Id.* at 322. This factual showing must be based on evidence in the factual record and not on conjecture or speculation. *Wharton v. Danberg*, 854 F.3d 234, 244-45 (3d Cir. 2017); *see also* Fed. R. Civ. P. 56(c) (evidence must be admissible to be considered at summary judgment). But in deciding whether the movant is entitled to judgment as a matter of law, the Court must view all admissible evidence in the record in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

A non-moving party may not "rest upon mere allegations, general denials or ... vague statements... ." *Trap Rock Industries, Inc. v. Local 825, Intern. Union of Operating Engineers, AFL-CIO*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3rd Cir.), *cert. denied*, 502 U.S. 940 (1991)). Conclusory statements are not facts and cannot create issues of fact. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 889 (1990). Furthermore, the party opposing summary judgment "must do more than simply show that there

is some metaphysical doubt to the material facts." *Matsushita Indus. Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The mere existence of an alternate version is not grounds for denial of summary judgment. *Saucier v. Katz*, 533 U.S. 194, 212 n.3 (2001), *overruled on other grounds* by *Pearson v. Callahan*, 129 S.Ct. 808 (2009) ("[d]isputed versions of the facts alone are not enough to warrant denial of summary judgment") (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). If the non-moving party's evidence "is merely colorable, …or is not significantly probative, ... summary judgment may be granted." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

## IV.   ARGUMENT

### A.   The Court Should Enter Judgment in Favor of Tprs. Pagan and Splain on the Excessive Force Claims

#### 1.   The Court Should Enter Judgment in Favor of Pagan and Splain on the Excessive Force Claim Because The Force They Used Was Reasonable

The Fourth Amendment provides, "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated." To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. County of Inyo,* 489 U.S. 593, 599 (1989)).

Plaintiffs in this matter have brought their claim for excessive force under the Fourth, Eighth, and Fourteenth Amendment. But, excessive force claims arising out of an arrest, investigatory stop, or other "seizure" of a free citizen—as is the case here—are properly analyzed only under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-395 109 S.Ct. 1865 (1989). The Eighth Amendment standard only applies after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. *Id.* at 395

n.10. Additionally, with respect to the Fourteenth Amendment, the Supreme Court has specifically held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and it 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395.

Under the Fourth Amendment, determining whether the force used to effect a particular seizure is "reasonable" requires balancing of the individual's Forth Amendment interests against the relevant government interests. *County of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1546 (2017) (quoting *Graham*, 490 U.S. at 395). "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694 (1985)); *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003). The reasonableness of the use of force is evaluated under an "objective" inquiry that pays "careful attention to the facts and circumstances of each particular case." *Mendez*, 137 S.Ct. at 1546. Factors to consider in making a determination of reasonableness include:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight, *see Graham, 490 U.S. at 396*, as well as the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time, *see Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds.

*Smith*, 318 F.3d at 515.

The question of reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Mendez*, 137 S.Ct. at 1546 (quoting Graham, 490 U.S. at 396). Moreover, "[t]he calculus of reasonableness must embody

allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. When assessing the reasonableness of an officer's use of deadly force, courts have considered, among other factors, "whether the suspect poses an immediate threat to the safety of the officers or others, … the duration of the officer's action, … [and] the possibility that the suspect may be armed." *Grant v. Winik*, 948 F.Supp.2d 480 (E.D. Pa. 2013) (citing *Couden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006).

In *Neuburger v. Thompson*, the Court held that an officer's use of deadly force was reasonable and granted summary judgment on the excessive force claim. 305 F.Supp.2d 521, 528 (3d Cir 2004). In *Neuburger*, the police were dispatched to the scene after concerned witnesses had observed the decedent acting distraught and firing a live round into the Lake. *Id.* When four officers arrived, the decedent was at the end of a 30-fott jetty in a public access area, still had a firearm, and she was still highly emotional and crying unintelligibly. *Id*. The officers approached the decedent who put the firearm to her head and told the officers "to get away from her and not make her do this." *Id*. at 525. As the officers continued approaching, the decedent began to point her firearm towards one of the officers, at which point, another officer fired multiple shots, striking her in the head and neck, and causing her death. *Id.* The Court held that the decedent's apparent instability and simultaneous possession of a loaded weapon were factors supporting the use of deadly force. *Id.* at 530.

In *Grant*, two officers arrived at the decedent's home for a well-being check. action, … [and] the possibility that the suspect may be armed." 948 F.Supp.2d at 487-88. The decedent had grabbed a large shard of glass. *Id*. The officers ordered the decedent to drop the piece of glass but

he failed to comply and continued towards the officer. *Id*. One of the officers shot the decedent as he advanced, while he was approximately eleven feet away. *Id*. The Court held that the use of force under these circumstances was reasonable. *Id*. at 506-507.

In *Lopez v. Lynch*, three officers responded to home for a domestic violence incidence. C.A. No. 12-03167, 2014 WL 4259132, at *1 (D.N.J. Aug. 2014). During a brief standoff, the decedent raised what appeared to be a sawed-off shotgun and pointed it at the doorway where two of the officers stood. *Id.* at *2. The third officer saw this, and believing that the other two officers' lives were in danger, he shot the decedent in the torso. *Id*. The officer did not observe a reaction by the decedent after being struck with the first shot, and he was still holding the shotgun, so the officer fired a second shot. *Id*. The Court held that, under these circumstances, the officer's use of deadly force was reasonable. *Id*. at *5.

In *Summers v. Ramsey*, the plaintiff, using his bare fist, punched the windshield of an officer's car while the officer sat in the driver's side. C.A. No. 13-6644, 2016 WL 7188616, at *4 (E.D. Pa. Dec. 2016). Plaintiff punched the windshield two times causing damage to the windshield and exploding glass dust on the officer. *Id*. As Plaintiff did not listen to any of the officer's requests to stop punching the patrol car. *Id*. As Plaintiff readied his swing a third time, and the officer, fearing for his life and safety, fired two shots towards plaintiff. *Id*. The Court ruled that the officer's use of deadly force, under these circumstances, was reasonable. *Id*. at *14.

In the instant case, Tprs. Pagan's and Splain's use of deadly force was objectively reasonable under the totality of the circumstances. Tpr. Pagan and Splain had heard Ardo threaten several times that morning that he would have some type of explosive device around his neck and "blow is head off." Ardo ignored repeated instructions from Tprs. Pagan and Splain to show his hands. While Ardo sat in his car, he had strapped near his neck an apparent explosive

device with a fuse. Tpr. Pagan approached Ardo's car and was standing within 3-4 feet from Ardo when Ardo turned towards Pagan with a maniacal smile, he ignited a lighter and moved it towards the fuse of the device strapped near neck. Tpr. Splain, who was standing towards the rear of Ardo's car, asked Pagan if Ardo had anything, and in response he saw Pagan's go wide as Pagan yelled out "yes!", just as Tpr. Splain saw a light spark in Ardo's hand. Although Tpr. Splain could not see the explosive device, based on Ardo's prior threats, Tpr Pagan's response, and the light spark, Tpr. Splain believed that Ardo was about to light an explosive. Tprs. Splain and Ardo immediately fired their weapons into the car to stop Ardo from igniting the explosive. Tpr. Pagan fired two shots. Tpr. Splain fired six shots and stopped when he saw Ardo lean towards the passenger side out of his view. Within 3-4 seconds, Ardo quickly sat back up and Tpr. Splain then fired three more shots into the car and stopped when he saw Ardo slump down. Tpr. Splain fired the additional shots because he believed there was still an imminent threat that Ardo would light the explosive. This is because Ardo had sat back up quickly, and at no point had raised his hands or stated that he was giving up.

As in the other deadly force cases wherein the Court held that the force used was reasonable, Tprs. Pagan and Splain were faced with an immediate threat of harm to themselves and potentially Monaghan. Ardo had a device with a fuse attached near his neck, the exact place that Ardo had threatened earlier to place an explosive. Ardo ignited a lighter and made a movement to light the fuse, as Tpr. Pagan was within 3-4 feet of him and Tpr. Splain was just a few feet towards the rear of the car. Under the totality of these circumstances, no jury could find that the Troopers use of force was unreasonable.

Therefore, judgment should be entered in favor of Tprs. Pagan and Splain on the
excessive force claim (Count II).

>2.     The Court Should Find that Pagan and Splain Are Entitled to Qualified
>        Immunity Because They Did not Violate Clearly Established Law

"The doctrine of qualified immunity protects government officials 'from liability for civil
damages insofar as their conduct does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223,
(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Because qualified immunity
is 'an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is
erroneously permitted to go to trial.'"  *Pearson*, at 815 (quoting *Mitchell v. Forsyth*, 472 U.S.
511, 526 (1985)).  "[The Supreme Court] ha[s] repeatedly stressed the importance of resolving
immunity questions at the earliest possible stage in litigation."  *Scott v. Harris*, 550 U.S. 372,
376 n.2 (2007) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Qualified immunity applies unless both of the following are answered in the affirmative:
(1) whether the facts alleged by the plaintiff establish a violation of a constitutional right, and (2)
whether the constitutional right at issue was clearly established at the time of the alleged
violation. *Pearson*, at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (holding that
courts may address either prong first)).

"For a constitutional right to be clearly established, its contours 'must be sufficiently
clear that a reasonable official would understand that what he is doing violates that right.'"" *Hope*

*v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[T]he right allegedly violated must be established, 'not as a broad general proposition,' but in a

'particularized' sense so that the 'contours' of the right are clear to a reasonable official."

*Reichle v. Howards*, -- U.S. --, 132 S.Ct. 2088, 2094 (2012) (quoting *Brosseau v. Haugen*, 543

U.S. 194, 198 (2004) (per curiam); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As the

Third Circuit recently explained, "[i]n determining whether a properly tailored definition of the

right at issue is clearly established, the Court must consider whether 'existing precedent [has]

placed the statutory or constitutional question beyond debate.'" *Michtavi v. Scism*, 808 F.3d 203,

207 (3d Cir. 2015) (quoting *Mullenix v. Luna*, ⎯⎯ U.S. ⎯⎯, 136 S.Ct. 305, 308 (2015) (per

curiam) (reversing district court's denial of qualified immunity because it did not use appropriate

level of specificity).

   The constitutional question in this case is governed by the principles enunciated in

*Tennessee v. Garner*, 471 U.S. 1 (1985), *Graham v. Connor*, 490 U.S. 386 (1989) and *Brosseau*

*v. Haugen*, 543 U.S. 194, 197-98 (2004). These cases establish that claims of excessive force are

to be judged under the Fourth Amendment's "objective reasonableness" standard. *Graham,* 490

U.S. at 388. Specifically with regard to deadly force, the Supreme Court explained in Garner that

"[w]here the officer has probable cause to believe that the suspect poses a threat of serious

physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

escape by using deadly force." *Garner,* 471 U.S. at 11. Because the focus is on whether the

officer had fair notice that his or her conduct was unlawful, reasonableness is judged against the

backdrop of the law at the time of the conduct. *Brosseau*, 543 U.S. at 198. If the law at that time

did not clearly establish that the officer's conduct would violate the Constitution, the officer

should not be subject to liability or, indeed, even the burdens of litigation. *Id.*

"In the last five years, [the Supreme] Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (per curiam) (quoting *Pearson*, 555 U.S. at 231) (internal citations omitted).  The Supreme Court has been especially clear that police officers making decisions in the field—often split-second decisions in highly uncertain circumstances—are entitled to qualified immunity absent a clear violation of well-established law based on the facts known to the officer in the moment. *See, e.g., White v Pauly*, 137 S.Ct. 548, 552 (2017) (officer who used deadly force was entitled to qualified immunity even where he failed to shout a warning of police presence); *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam) (officer who used deadly force against fleeing suspect was entitled to qualified immunity, even where non-lethal alternatives may have been available); *Kisela v. Hughes,* 138 S.Ct. 1148 (2018) (qualified immunity applied where a police officer used deadly force to protect another officer from what he perceived to be a threat).

The Third Circuit has similarly found qualified immunity to apply in deadly force situations where, after consideration of the totality of circumstances, police officers feared for their own safety or the safety of those around them. *Desabetino v. Biagini*, 2021 WL 494359, *3 (3d Cir. Feb 10, 2021) (officers were entitled to qualified immunity for firing at a fleeing suspect when his "behavior threatened the safety of the officers, as well as the public at large."); *Martin for Estate of Webb v. City of Newark*, 762 Fed.Appx. 78, 83 (3d Cir. 2018) (officer who used deadly force was entitled to qualified immunity when faced with an erratic and noncompliant driver who disregarded his explicit warning not to start the car, and who was found to be a threat

to the officer) (citing *Scott v. Harris*, 550 U.S. 372, 382 n.9, (2007) (noting that a suspect's "flight itself" may "pose[ ] the threat of serious physical harm ... to others" (second alteration in original) (quotation marks omitted)); *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (officers entitled to qualified immunity where reports of an armed carjacking gave police reason to believe Plaintiff was armed even though they did not see a weapon).

"At the summary judgment stage…once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether the force used by an officer was reasonable under the Fourth Amendment "is a pure question of law." *Scott*, 550 U.S. at 381 n.8. While analyzing an excessive-force claim under the Fourth Amendment, even though reasonableness traditionally is a question of fact for the jury, *see, e.g., White v. Pierce County,* 797 F.2d 812, 816 (9th Cir.1986); Akhil R. Amar, *The Bill of Rights as a Constitution,* 100 Yale L.J. 1131, 1179 (1991), defendants can still win on summary judgment if the district court concludes that the officer's use of force was objectively reasonable under the circumstances.  *Abraham v. Raso*, 183 F.3d 279, 290 (1999) (citing *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)).

In the case at bar, Commonwealth Defendants contend, as discussed in detail above, that Tprs. Pagan's and Splain's use of deadly force was objectively reasonable and thus did not violate the Fourth Amendment. But even if the Court found that the Trooper's use of force was not objectively reasonable, Tprs. Pagan and Splain are entitled to qualified immunity because their actions did not violate clearly established law. As the survey of relevant case law above shows, the law in May 2017 set forth that an officer was entitled to use deadly force where he was faced with an immediate threat of harm to himself or his fellow officers. Those cases included instances where the immediate harm came in the form of a firearm, a cutting

instrument, physical force, and a vehicle. In this case, the immediately harm came from an explosive device, which is at least as dangerous as, and arguably more dangerous than, the any of the prior circumstances.

Therefore, Tprs. Pagan and Splain are entitled to qualified immunity on the excessive force claim.

**B.      The Court Should Dismiss All State Law Claims Against Pagan and Splain**

1.      The Court Should Dismiss The State Law Claims Because Sovereign Immunity Bars Those Claims Against Tprs. Pagan and Splain

Plaintiff brings a wrongful death and survival claims (Count I) and assault and battery claim (Count II) under state law against Tprs. Pagan and Splain.

Article I, § 11 of the Pennsylvania Constitution specifies, in relevant part, "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." As the Pennsylvania Supreme Court has explained, "the Framers intended that the legislature have complete control over suits brought against the Commonwealth." *Smith v. City of Philadelphia*, 516 A.2d 306, 309 (Pa. 1986), *app. dism'd*, 479 U.S. 1074 (1987).

The legislature, in turn, has explicitly affirmed the sovereign immunity of the Commonwealth, except in those instances where immunity is specifically waived by the General Assembly. The pertinent enactment states:

> Pursuant to Section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity…

1 Pa. C.S. § 2310. This is "the legislature's proclamation that sovereign immunity is the constitutional rule." *E-Z Parks v. Philadelphia Parking Authority*, 532 A.2d 1272, 1276 (Pa. Cmwlth. 1987), *app. denied*, 546 A.2d 60 (Pa. 1988).

The Sovereign Immunity Act in title 42 waives the immunity of the Commonwealth and its employees in nine narrow categories of negligence cases: vehicle liability; medical-professional liability; care, custody, or control of personal property; Commonwealth real estate, highways, and sidewalks; potholes and other dangerous conditions; care custody, or control of animals; liquor store sales; National Guard activities; and toxoids and vaccines. 42 Pa. C.S. §8522(b). It is well established that these exceptions must be strictly construed. *Moser v. Heistand*, 681 A.2d 1322, 1326 (Pa. 1996).

The shield of sovereign immunity applies, first of all, to the Commonwealth and its agencies. *See* 42 Pa.C.S. §§ 8501, 8521-22; *see also* 1 Pa.C.S. § 2310. Commonwealth officials and employees acting within the scope of their duties enjoy the same immunity as the Commonwealth itself. *Moore v. Commonwealth*, 538 A.2d 111, 115 (Pa. Cmwlth. 1988). To determine whether the government employee was acting within the scope of his employment when he partook in the challenged conduct, a court must consult the relevant state law of *respondeat superior. See Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000).

Pennsylvania has adopted the Restatement's formulation of that standard, which considers conduct to be within the scope of employment if "(a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master...." *Id.* (quoting RESTATEMENT (SECOND) AGENCY § 228). *See also Natt v. Labar*,117 Pa. Cmwlth. 207, 543 A.2d 223, 225 (1988). "Acts of employees may be considered within the scope of their duties even if they acted

disobediently, abused authority, or behaved tortiously or criminally." *Drexel v. Horn*, No. 96-3918, 1997 WL 356484, at *7 (E.D. Pa. June 20, 1997). "An act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Restatement (Second) of Agency at § 230; *see also Brumfield*, 232 F.3d at 381 (noting that although the employer required the defendants to respond truthfully in the investigation of the plaintiff, even answering questions falsely was within the scope of employment).

Here, Tprs. Pagan and Splain are employees of the Pennsylvania State Police, Commonwealth agency. The Troopers actions relative to Ardo were conducted within the scope of their employment. Tprs. Pagan and Splain were on shift when they dispatched to Monaghan's house. They did so in response to Monaghan's request that State Police provide assistance in apprehending Ardo. The Troopers were in constant communication by radio with PSP barracks via PCO Behler to coordinate with other troopers and provide updates of their actions. Thus, Tprs. Pagan and Splain are entitled to sovereign immunity for their actions.

The next question is any of Plaintiffs' state law claims fall within the exceptions to sovereign immunity enumerated in 42 Pa. C.S. § 8522(b). Plaintiffs purport to bring three state law claims—wrongful death, survival, and assault and battery. An assault and battery is a common law tort claim. It is clearly not among one of the nine exceptions to the sovereign immunity enumerated in Section 8522(b).

The Pennsylvania Wrongful Death and Survival Act, 42 Pa. C.S.A. §§ 8301, 8302, was enacted to in order to:

> allow the survival of viable causes of action for bodily injury to a deceased, beyond the life of the victim. The Wrongful Death and Survival Act did not create a new theory of liability but merely allowed a tort claim of the decedent to be prosecuted. As a result, a plaintiff must state all the elements of a valid tort in order to maintain a claim under those statute and such theory is subject to defenses.

*Becker v. Carbon Cnty.*, 177 F.Supp.3d 841, 847 (M.D. Pa. 2016) (quoting *Ferencz v. Medlock*,

905 F.Supp.2d 656, 674 (W.D. Pa. 2012)).

A wrongful death action under § 8301 is:

> One which is created for the benefit of and is held by statutorily specified survivors and is intended to compensate them for the pecuniary loss suffered because of the decedent's death. Put another way, the action remedies the loss sustained by the survivors who are deprived of the decedent's earnings, companionship, etc.

*Becker*, 177 F.Supp.3d at 847-48 (quoting *Miller v. Phila. Geriatric Ctr.*, 463 F.3d 266, 271 (3d

Cir. 2006)).

By contrast, a survival action under § 8302:

> Is brought by the administrator of the decedent's estate in order to recover the loss to the estate of the decedent resulting from the tort [and] [t]he measure of damages awarded . . . include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of earning power-less personal maintenance expenses, from the time of death through his estimated working life span.

*Becker*, 177 F.Supp.3d at 847 (quoting *Kiser v. Schulte*, 648 A.2d 1, 4 (Pa. 1994)).

Neither a wrongful death or survival claim is among one of the nine exceptions to the

sovereign immunity enumerated in Section 8522(b). *See Diorio v. Harry*, C.A. No. 1:16-CV-

01678, 2017 WL 3167408, at *5 (M.D. Pa. June 2017).

Therefore, Tprs. Pagan and Splain are entitled to sovereign immunity against Plaintiff's

state law wrongful death and survival claims (Count I), and assault and battery (Count II), and

these claims should be dismissed.

2.    The Court Should Dismiss the Wrongful Death Claim Because State Law Bars Collection of Wrongful Death Damages by Non-Spouses Against Commonwealth Defendants Plaintiffs

Claims for wrongful death damages are generally "fall into the loss of consortium

category." *Department of Public Welfare v. Schultz*, 579 Pa. 164, 855 A.2d 753, 755 (2004)

(mother sought damages for the loss of her son's "comfort, society, love, affection,

companionship, support, and friendship"). In the *Schultz* case, the Pennsylvania Supreme Court

held that the decedent's mother was barred from recovering such loss of consortium damages:

> Damages for loss of consortium are available only to spouses, and do not include
> a parent's loss of society and companionship of her child. Because a parent cannot
> bring an action for loss of consortium resulting from the death of her child,
> [mother] is barred under the Sovereign Immunity Act from bringing an action
> against the Commonwealth for non-pecuniary losses.

*Schultz*, 855 A.2d at 755. *See also Ewing v. Potkul*, 171 A.3d 10, 17 (Pa. Cmwlth 2017)

("*Schultz* held, without equivocation, that loss of consortium damages cannot be recovered by a

parent or child of the decedent."); *Schorr v. Borough of Lemoyne*, 265 F.Supp.2d 488, 496 (W.D

Pa. 2003) ("There is no parental right of action for loss of companionship and support provided

for explicitly under Pennsylvania's wrongful death statute.")

Under Pennsylvania law it is clear that a parent cannot recover wrongful death damages

based on loss of consortium against a Commonwealth defendant. The Plaintiffs here are Ardo's

parents. Ardo did not have a spouse, therefore no wrongful death damages would be available in

this case.

### C.   The Court Should Dismiss the ADA Claim Against PSP

#### 1.   The Court Should Dismiss The ADA Claim Against PSP Because the Claim Is Barred By the Statute of Limitations

Plaintiffs brings a claim against PSP for violation of the ADA (Count II). Although

Plaintiffs do not explicitly state on which provision of the ADA they base their claim, it is clear

that they rely on Title II, which protects qualified individuals with disabilities from

discrimination on the basis of disability in services, programs, and activities provided by State

and local government entities, and the Third Circuit Court of Appeals has ruled generally applies

when police officers make an arrest. *See Haberle v. Troxell*, 885 F.3d 170, 179-80 (3d Cir. 2018).

The Third Circuit Court of Appeals has also held that "the statute of limitations applicable to claims under Title II of the ADA . . . is the state of limitations for personal injury actions in the state in which the trial court sits." *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008). In Pennsylvania, the statute of limitations on personal injury actions is two years. 42 Pa.C.S.A. § 5524. "A federal cause of action accrues when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Id*. at 209.

In the instant case, Plaintiffs allege that PSP discriminated against Ardo via the actions of Tprs. Pagan and Splain on May 20, 2017 because PSP failed to adopt policies, procedures, and practices concerning mentally disabled individuals. SAC ¶ 56-57. The alleged discrimination, the injury, occurred on May 20, 2017. Plaintiffs did not attempt to file the ADA claim until October 21, 2019. (*See* ECF No. 25.) This was more than two years beyond the date of injury, thus the claim is barred by the statute of limitations.

Therefore, the ADA claim against PSP (Count II) should be dismissed because it is barred by the statute of limitations.

1.   The Court Should Enter Judgment in Favor of PSP on the ADA Claim
     Because PSP Was not Deliberately Indifferent

To successfully state a claim under Title II of the ADA, a person "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity (4) by reason of his disability." *Haberle v. Troxell* ("Haberle I") 885 F.3d 170, 178 (2018) (quoting *Bowers v. Nat'l Collegiate Athletic As*s'n, 475 F.3d 524,

553 n.32 (3d Cir. 2007)). The Third Circuit Court of appeals has held that, as a general matter, Title II of the ADA can apply to police conduct during an arrest. *Id.* at 180.

Even though the ADA generally applies in the arrest context, claims for compensatory damages under the ADA are not available absent proof of "intentional discrimination". *Haberle I* (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). To prove intentional discrimination, an ADA claimant must prove at least deliberate indifference. *Durrell*, 729 F.3d at 263. To plead deliberate indifference, a claimant must allege "(1) knowledge that a federally protected right is substantially likely to be violated … and (2) failure to act despite that knowledge." *Id.* at 265. To show that a defendant has "knowledge that a federally protected right is substantially likely to be violated", a plaintiff can: (1) show that existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like the plaintiffs; or (2) show that the risk of cognizable harm is so great and so obvious that the risk and the failure to respond will alone support finding deliberate indifference. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 181 (3d Cir. 2001) (internal citations omitted).

There is little established case law on what factually circumstances establish deliberate indifference in the context of this type of Title II claim. In *Haberle v. Borough of Nazareth*, the Third Circuit Court of Appeals gave some examples of facts that might show deliberate indifference. 936 F.3d 138, 142 ("*Haberle II*"). The Court found that the following allegations amounted to a plausaible claim that the police were deliberately indifferent:

    (i)     Officers "routinely" encountered "mentally challenged individuals," specifically including two named individuals

    (ii)    In encounters with mentally challenged individuals, the officers are "verbally abusive" and "harassing" and they performed arrests without accommodating the individuals' disabilities

> (iii)     Police department did not adopt a proposed policy for interacting with mentally
>           challenged individuals, which identified the risks of continuing with the existing
>           policies

*Haberle II*, 936 F.3d at 141-142.

In the instant case, the record does not provide any evidence to support deliberate
indifference. There is no evidence that PSP troopers used verbally abusive language towards
individuals with mental health issues. There is no evidence that the existing policies caused a
failure to adequately respond to a pattern of past occurrences of injuries like the plaintiffs. In fact
the record shows quite the opposite—that PSP has thousands of encounters with individuals with
mental health issues every year and they rarely end in a fatality as Ardo's encounter.

PSP produced the following data relating to its interactions with individuals with mental
health issues:

- In 2014, PSP responded to 3909 incidents coded as "Mental Health Calls",
  comprising incidents involving mental health commitments under Section 302 of
  the Mental Health Act and other incidents involving a mental health issue that do
  not necessarily involve a crime. Out of 3909 incidents involving individuals with
  mental health issues, there were two fatal officer-involved shootings involving an
  individual with a mental health issue.

- In 2015, PSP responded to 3728 incidents coded as "Mental Health Calls". Out of
  3728 incidents involving individuals with mental health issues, there were three
  fatal officer-involved shootings involving an individual with a mental health
  issue.

- In 2016, PSP responded to 3862 incidents coded as "Mental Health Calls". Out of
  3862 incidents involving individuals with mental health issues, there was one fatal
  officer-involved shootings involving an individual with a mental health issue.

- In 2017, PSP responded to 2312 incidents coded as "Mental Health Calls". Out of
  2312 incidents involving individuals with mental health issues, there were two
  fatal officer-involved shootings involving an individual with a mental health
  issue.

These data show that well less than 1% of interactions PSP has with individuals with
mental health issues ends in a fatal officer-involved shooting like Ardo's. This data and the

circumstances of the May 20 incident make clear that the critical element leading to Ardo's fatal encounter was Ardo's attempt to light an explosive device, not his alleged disability.

Second, the record shows that PSP's practices do not fail to address the challenges of interacting with individuals with mental health issues. PSP provides hours of training to cadets and provides annual training existing service members that includes training on emotional control, decision-making, and interactions with individuals experiencing mental health concerns. PSP. PSP provides the following training to cadets:

    a. 8 hours on Law Enforcement Active Diffusion Strategies (L.E.A.D.S) taught by PSP instructors

    b. 4 hours on Identifying Signs and Symptoms of Mental Illness, taught by personnel from the Pennsylvania Psychiatric Institute (Penn State University)

    c. 2 hours of classroom instruction on Autism Awareness, taught by personnel from the Autism Services, Education, Resources, and Training Collaborative

    d. 2 hours on PA Mental Health Laws, taught by PSP Academy Criminal Law Unit Instructors

    e. 16+ hours of Practical Application / Scenario-Based Training, which in part involves the utilization of de-escalation strategies and/or a role player suffering from a mental health emergency.

PSP has also provided the following updated training to existing service members

    a. MIST 2010: Patrol Response to Suicide Bombers

    b. MIST 2012: Disability, Aggression, and the Assault Cycle

    c. MIST 2013: Missing Endangered Persons Advisory System

    d. MIST 2015: Response Enhancing Arousal Control Techniques (authored by PSP Psychologist)

    e. MIST 2016: Tactical Communication and Conflict Management

    f. MIST 2016: Understanding and Effectively Engaging Individuals with Traumatic Brain Injuries (authored by PSP Psychologist)

    g. MIST 2017: Tactical Communication Review

    h.  MIST 2017: Ti® Use of Force Simulation Training and Use of Force Reaction Training

        i.  3 hours of scenario-based training that involves the use of de-escalation strategies and/or a role player suffering from a mental health emergency.

    i.  MIST 2018: Practical De-escalation Strategies

    j.  MIST 2018: Use of Force Stress Response Training

        ii.  2 hours of scenario-based training that involves the use of de-escalation strategies and/or a role player suffering from a mental health emergency.

    k.  MIST 2019: Use of Force Response Training

        a.  2 hours of scenario-based training that involves the use of de-escalation strategies and/or a role player suffering from a mental health emergency.

Therefore, PSP is entitled to judgment in its favor on the ADA claim because there is no evidence that PSP was deliberate indifferent the substantial likelihood that the federal rights of individuals with mental health issues would be violated.

## V.    CONCLUSION

Wherefore, this Court should grant summary judgment in favor of Commonwealth Defendants on all claims against them.

Dated: July 15, 2021                 Respectfully submitted,

                                 JOSH SHAPIRO
                                 Attorney General

COMMONWEALTH OF PENNSYLVANIA    BY: /s/ Kathy A. Le
OFFICE OF ATTORNEY GENERAL        KATHY A. LE (Pa. No. 315677)
The Phoenix Building                  Deputy Attorney General
1600 Arch St., 3rd Floor
Philadelphia, PA 19103               KAREN M. ROMANO
Telephone:  (215) 560-2141          Chief Deputy Attorney General
Fax:  (717) 772-4526                Civil Litigation Section
kle@attorneygeneral.gov