# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| ANGELA ARDO and JEAN | : CIVIL ACTION |
| MONAGHAN, individually | : |
| and as personal | : |
| representative/ | : |
| administrator of the | : |
| Estate of her son, | : |
| ANTHONY ARDO, | : |
| | : |
| Plaintiffs, | : |
| VS. | : |
| | : |
| OFFICER EDDIE PAGAN, in | : |
| his individual capacity | : |
| as a Pennsylvania State | : |
| Police Trooper, and | : |
| OFFICER JAY SPLAIN, in | : |
| his individual capacity | : |
| as a Pennsylvania State | : |
| Police Trooper, | : |
| | : |
| Defendants. | : NO. 5:18-cv-05217-EGS |

- - -

Oral deposition of OFFICER EDDIE PAGAN

Thursday, August 22, 2019

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

**OFFICER EDDIE PAGAN**

1

2

3              Oral deposition of OFFICER EDDIE PAGAN,

4     taken at Office of the Attorney General, 1600 Arch

5     Street, Suite 300, Philadelphia, Pennsylvania, on

6     Thursday, August 22, 2019, beginning at

7     approximately 11:14 a.m., before Elizabeth Kelly,

8     Professional Reporter and Notary Public in and of

9     the Commonwealth of Pennsylvania.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**OFFICER EDDIE PAGAN**

1    APPEARANCES:

2

3    WEISBERG LAW, P.C.
     BY:  L. ANTHONY DIJIACOMO, ESQUIRE
4    7 South Morton Avenue
     Morton, Pennsylvania 19070
5    (610) 690-0801
     adijiacomo@weisberglawoffices.com
6    Counsel for Plaintiffs

7

8    OFFICE OF THE ATTORNEY GENERAL
     BY:  KATHY A. LE, ESQUIRE
9    1600 Arch Street
     Suite 300
10   Philadelphia, Pennsylvania 19103
     (215) 560-2141
11   kle@attorneygeneral.gov
     Counsel for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

**OFFICER EDDIE PAGAN**

```
 1                    I N D E X

 2                      - - -

 3   WITNESS:                            PAGE

 4   OFFICER EDDIE PAGAN

 5   EXAMINATION

 6   By Mr. DiJiacomo                    5, 64

 7   By Ms. Le                           59

 8

 9

10                     EXHIBITS

11

12
     EXHIBIT NO.        DESCRIPTION       MARKED
13

14   Exhibit A         Transcript of the      8
                       Interview of Eddie Pagan
15

16   Exhibit B         Transcript of the     10
                       Interview of Jay Splain
17

18   Exhibit C         Investigation Report  43

19

20

21

22

23

24
```

OFFICER EDDIE PAGAN

```
 1              THE REPORTER:  Usual stipulations?
 2              MS. LE:  Yes.  I want to reserve the right
 3         to read and sign.
 4              MR. DIJIACOMO:  Of course.
 5                          - - -
 6                   (By agreement of counsel, the
 7              sealing, certification and filing are
 8              waived; and all objections, except as to
 9              the form of the question, are reserved
10              until the time of trial.)
11                          - - -
12                   OFFICER EDDIE PAGAN, having been
13                   first duly sworn to tell the
14                   truth, was examined and
15                   testified as follows:
16                          - - -
17                   EXAMINATION
18                          - - -
19    BY MR. DIJIACOMO:
20         Q    Good morning, sir.
21         A    Good morning.
22         Q    Again, for the record, my name is Anthony
23    DiJiacomo.  I represent the estate of Anthony Ardo
24    and his parents in a lawsuit against you and Trooper
```

**OFFICER EDDIE PAGAN**

1   Splain.  I just want to go over a few ground rules

2   just so we go okay throughout the process today.

3        A    Uh-huh.

4        Q    As you respond to questions, make sure

5   that they're verbal responses.  I noticed in the

6   prior interview, you tend to nod your head slightly,

7   which is perfectly reasonable in everyday

8   conversation, but for the transcript, we do need

9   verbal responses so your responses are clear.

10       A    All right.

11       Q    Okay.  You understand that you're under

12  oath and it has the same weight or meaning as if you

13  were in a courtroom before a judge and jury?

14       A    I do.

15       Q    Okay.  Any reason why you wouldn't be able

16  to testify truthfully today?

17       A    And reason why I would?

18       Q    Would not be able to testify truthfully

19  today?

20       A    No.

21       Q    Okay.  You're not under the influence of

22  any medication, alcohol, drugs?

23       A    No.

24       Q    Okay.  If there's a question I ask that

OFFICER EDDIE PAGAN

1    you don't understand, most likely because I'm not

2    making sense, tell me.

3                     Okay?

4         A    Okay.

5         Q    If you respond to a question, we're going

6    to assume that you understood it.

7                     Fair enough?

8         A    Fair enough.

9         Q    All right.  Throughout the questioning,

10   which I don't expect to be long, if you need to take

11   a break at any time for any reason, just tell me.  I

12   may ask you to answer a pending question first, but

13   again, this isn't a marathon by any means.  With

14   that said, I don't expect us to be here long, maybe

15   an hour, maybe two.

16        A    Okay.

17        Q    Any questions for me before we get

18   started?

19        A    No.

20        Q    Okay.  Let's see.  You gave a statement

21   that was videotaped and transcribed.  I'll tell you

22   the date was June 16th, 2017; correct?

23        A    I don't recall the specific date, but that

24   sounds about right.

OFFICER EDDIE PAGAN

```
1        Q    Okay.  And I'm going to show you a
2   document --
3             MS. LE:  For the record, I believe it was
4        June 20th, 2017.
5             THE WITNESS:  Yeah, it was June 20th.
6   BY MR. DIJIACOMO:
7        Q    Okay.
8        A    The incident occurred on May 20th.  Can I
9   see that?
10       Q    Yes.
11            MS. LE:  Jay Spain's was June 16th.
12            MR. DIJIACOMO:  Ah, understood.  All
13       right, thank you.
14            THE WITNESS:  Don't recall the date.
15                          -  -  -
16            (Exhibit A was marked for
17   identification.)
18                          -  -  -
19   BY MR. DIJIACOMO:
20       Q    So let me mark -- I'm going to mark that
21   as an exhibit after the fact as Exhibit A.
22            Have you ever seen a copy of your
23   transcript before?
24       A    No.  Well, yesterday.
```

**OFFICER EDDIE PAGAN**

1      Q    Okay.  Did you review it yesterday?

2      A    Yes.

3      Q    Excellent.  The statement that you gave on

4  June 20th, 2017, was it accurate?

5      A    Yes.

6      Q    Okay.  Was there any intent to mislead in

7  any accurate statements that you gave?

8      A    No.

9      Q    Okay.  But that statement was not under

10  oath; correct?

11     A    I don't recall.  They read me my Miranda

12  rights.

13     Q    Okay, fair enough.

14     A    I don't remember if I had a -- if it was

15  under oath, don't remember.

16     Q    Okay, understood, though.

17          But even though it wasn't under oath,

18  here -- sitting here today under oath, you do state

19  that the statement, the facts that you gave in that

20  June 20th, 2017 statement were true and accurate to

21  the best of your understanding?

22     A    Correct, they were.

23     Q    Okay.  And since giving that statement,

24  have you learned anything that you had stated that

**OFFICER EDDIE PAGAN**

1   day that was incorrect?

2              MS. LE:  Objection to form.

3              THE WITNESS:  No.

4   BY MR. DIJIACOMO:

5       Q    Okay, okay.  We can push that to the side

6   then, and let's go off the record for a second.

7                   (Discussion was held off the record.)

8                        -  -  -

9                   (Exhibit B was marked for

10  identification.)

11                       -  -  -

12  BY MR. DIJIACOMO:

13      Q    I'm going to show you a statement from

14  Trooper Splain, if I'm pronouncing it correctly?

15      A    Correct.

16      Q    Dated June 16th, 2017.

17                   Have you ever reviewed his statement?

18      A    No.

19      Q    Okay.  Put that to the side then.  Fair

20  enough.  All right, I have a few questions about the

21  circumstances of the statement that you gave on

22  June 20th, 2017.  Throughout the statement, as

23  anyone would, it gave the speaker who gave each

24  statement.

OFFICER EDDIE PAGAN

1               Make sense?

2       A    Yes.

3       Q    Okay.  Everk, E-V-E-R-K, is one of the

4  individuals on the transcript?

5       A    Everk, yes.

6       Q    Who is he?

7       A    He's a -- he's a criminal investigator

8  with the crimes unit for Troop M Bethlehem and also

9  the major case team.

10      Q    Help me here, does that Troop M, does that

11 sit at your barrack?

12      A    No.

13      Q    Okay.

14      A    Well, Troop M is the whole -- is the whole

15 troop that has a total of six different substations

16 -- well, five substations and Bethlehem is the

17 headquarter, which is the sixth station.  So five

18 plus six, six stations in Troop M.

19      Q    Okay.  Which troop are you in as of 2017?

20      A    The troop is M.  I was in Troop M for my

21 whole career.

22      Q    Okay.

23      A    Different barracks.

24      Q    But you sat at the Bethlehem barracks?

**OFFICER EDDIE PAGAN**

```
1      A     During the incident, I was in the Belfast
2  barracks.
3      Q     Belfast?
4      A     Belfast and Bethlehem is the headquarters.
5  Trooper Everk is in Bethlehem headquarters.
6      Q     Okay.  And he was the criminal homicide
7  investigator?
8      A     Correct.
9      Q     Who is Mr. Judge?
10     A     Trooper Judge is another criminal
11 investigator, also the major case team as well in
12 Troop M in Bethlehem headquarters.
13     Q     Okay.  And then did you have an attorney
14 at that time?
15     A     Yes, I did.
16     Q     What was his name?
17     A     Trooper -- Attorney Mark Minotti.
18     Q     Okay.  And was that an attorney that you
19 retained?
20     A     Yes.
21     Q     Okay.  Did, for the lack of a better term,
22 did the union provide any representation?
23     A     Initially, they did.  And then it was
24 their suggestion for me to hire my own personal
```

OFFICER EDDIE PAGAN

1    attorney at their expense.

2        Q    At their expense?

3        A    Correct.

4        Q    Understood, okay.

5             Who is the -- did you have any

6    conversations with the initial attorney?

7        A    With the initial attorney?

8             MS. LE:  Objection to the form.

9    BY MR. DIJIACOMO:

10       Q    Who was the first attorney that -- who was

11   the attorney the union --

12       A    I forgot the name.

13       Q    Okay.

14       A    I forgot the name.

15       Q    Okay.  Did you have any conversations with

16   that attorney?

17       A    Yes.

18       Q    Okay, all right.

19            Was anyone else present for the

20   transcribed interview?

21       A    For the transcribed interview, besides the

22   people listed in the actual -- in the transcript, I

23   do not recall, but I believe, no.

24       Q    Okay, all right.  In advance to the

OFFICER EDDIE PAGAN

1    June 20th, 2017 interview, did you have any

2    discussion with Trooper Splain concerning the

3    incident?

4          A     Yes.

5          Q     Okay.  On more than one occasion?

6          A     I believe so, yes.

7          Q     Okay.  Let me back up for a second.

8                Between the date of the incident --

9    when I say "incident," we're talking about the May

10   20th --

11         A     Correct.

12         Q     -- shooting.

13               Fair enough?

14         A     Fair.

15         Q     Okay.  Between the date of the incident

16   and in your interview, were you on leave?

17         A     On leave?  No, I was on administrative

18   duty.

19         Q     Okay.  Meaning you were assigned to a

20   desk?

21         A     Meaning I was assigned to do clerical work

22   at the station.

23         Q     Okay.  Were troopers from your station

24   assisting in the investigation?

**OFFICER EDDIE PAGAN**

```
 1              MS. LE:  Objection to form.
 2              THE WITNESS:  I guess I have to answer
 3         that?
 4              MS. LE:  If you understand the question.
 5              THE WITNESS:  I don't know.  I wouldn't
 6         know.
 7     BY MR. DIJIACOMO:
 8         Q    Okay.  Did you have any conversations with
 9     any -- anyone other than your attorneys or Trooper
10     Splain concerning the incident or the results of any
11     investigation into the incident prior to your
12     interview?
13         A    I was told not to speak to anyone, and I
14     don't believe I ever spoke to anyone about it
15     besides my attorney, you know, and Trooper Splain.
16         Q    Okay, all right.
17              Do you know how many occasions you
18     spoke with Trooper Splain about the incident prior
19     to the interview?
20         A    No, prior to --
21         Q    Prior to the June 20th, 2017 interview?
22         A    Don't recall.
23         Q    Okay.  Can you estimate at all?
24         A    No.
```

**OFFICER EDDIE PAGAN**

1    Q    Would it -- okay.

2              Can you state whether it was more

3    than five times?

4    A    I really can't.

5    Q    Okay.  Can you state the purpose for

6    discussing the incident with Trooper Splain?

7    A    Learning from experience, the technical

8    mistakes or technical soundness that we exhibited in

9    that incident, but.

10   Q    And that was in advance to the June 20th,

11   2017 interview?

12   A    It was -- if you mean in advance to

13   preparation to the interview, no.  It was just us

14   talking.

15   Q    I meant prior to?

16   A    Prior to, okay.  Yeah.

17   Q    Okay.

18   A    It was probably immediately afterwards,

19   next day or so, couple days or so.

20   Q    Okay.  Did anyone advise you not to speak

21   with Trooper Splain in advance to the recorded

22   interview?

23   A    Don't recall, so no.

24   Q    Okay.  Did you or, to your knowledge,

**OFFICER EDDIE PAGAN**

1    Trooper Splain determine that there were any
2    tactical errors that either you or Trooper Splain
3    exhibited on the day of the incident?
4         A    No.
5         Q    Okay, all right.  Were you provided any
6    type of evidence of the incident in advance to the
7    June 20th, 2017 interview?
8              MS. LE:  Objection to the form.  Just so
9         you know, if I -- just if I say "objection to
10        form," it's for the record.
11             THE WITNESS:  Okay.
12             MS. LE:  You can still answer the
13        question --
14             THE WITNESS:  Okay.
15             MS. LE:  -- if you understand it.
16             THE WITNESS:  The only thing was I was
17        able to review the little bit of MVR that was
18        actually available from the incident.
19    BY MR. DIJIACOMO:
20        Q    Do you recall -- do you recall how long
21    after the incident you were provided access to the
22    MVR?
23        A    I believe it was prior to my interview,
24    like, a week prior or so.  I really didn't want to

**OFFICER EDDIE PAGAN**

1    watch the MVR to begin with.

2         Q    Who provided to you the MVR radios?

3         A    Radios?  The MVR recordings?

4         Q    Yes.  Let's make sure we're talking about

5    the same thing.

6         A    Yes.

7         Q    Okay.  When I refer to "MVR," what do you

8    take that as?

9         A    As the actual visual footage.

10        Q    Ah, from the vehicles?

11        A    From the vehicles, correct.

12        Q    Okay.  And you were able to see the

13   footage from both vehicles in advance to the

14   interview?

15        A    Correct.

16        Q    Okay.  Were you also provided transcripts

17   or audio of the calls?

18        A    No.

19        Q    Okay, all right.  Understood.

20             Who provided you access to the

21   footage, the MVR footage?

22        A    I believe it was the -- it's always all

23   foggy in my mind.  I believe at the request of my

24   attorney, it was the crimes -- crimes supervisor.

**OFFICER EDDIE PAGAN**

1      Q      And --
2      A      I might -- I might not be right, but I
3    don't fully remember that point in time, but if I
4    had to take an educated guess, I believe it was the
5    crimes supervisor.
6      Q      Okay.  But your understanding is that your
7    attorney provided you the videos?  He --
8      A      My attorney suggested we see the video
9    prior to giving our statement.
10     Q      Okay.  Who physically gave you access to
11   the videos?
12     A      I don't know.
13     Q      Not --
14     A      I don't remember.
15     Q      Okay, all right.
16     A      I don't recall.
17     Q      All right.  So you don't know who
18   authorized you seeing the videos?
19     A      The authorization had to come from the
20   crimes supervisor.
21     Q      Okay.
22     A      And I believe it was him that gave it to
23   us.  I believe he gave it to Trooper Splain first,
24   and once Trooper Splain was able to review, it was

**OFFICER EDDIE PAGAN**

1    passed down to me for me to review on my own time.

2         Q    Okay.  Do you know who the name of the

3    supervisor was?

4         A    Corporal Blare Talijan.

5         Q    Do you know how to spell that?

6         A    Which one?

7         Q    The last name.

8         A    T-A-L-I-J-A-N.

9         Q    Okay.  And just to confirm, Everk and

10   Judge reported to that corporal?

11        A    No.  They don't report to that corporal.

12   No, he's -- that corporal is in charge of -- he's

13   the evidence custodian in Belfast.

14        Q    Okay, okay.

15        A    So anything that had to deal with evidence

16   or stuff like that, has to go through him through

17   that station.  That's pretty much -- everything runs

18   through him.

19        Q    Even though the investigation was being

20   run through --

21        A    Yes, because he's the one that has to

22   actually authorize and get out for whatever, and I

23   don't know where they keep the stuff at.  I'm just a

24   lowly trooper.  I don't have --

**OFFICER EDDIE PAGAN**

1          Q     Okay, understood.

2                      So the incident took place on May

3     20th, 2017; correct?

4          A     Correct.

5          Q     And your interview took place on June

6     20th, 2017?

7          A     Correct.

8          Q     Do you have an understanding as to -- I

9     don't want to characterize it as the delay, but why

10    it was -- the interview was taken 30 days later?

11         A     Yes.

12         Q     What was that?

13                     What's your understanding?

14         A     There was a dispute as to who was going to

15    be taking over the investigation between the

16    Pennsylvania State Police, major case team, or the

17    district attorney's office, at which point we didn't

18    know who was handling the investigation, and per my

19    attorney, we waited to -- on clarification and

20    proceeded forward.  I want it to be stated that from

21    the moment that it occurred, my attorney and I made

22    known that we were ready to give a statement at any

23    time they were ready.

24         Q     How so?

**OFFICER EDDIE PAGAN**

1               How was it made known?

2        A    My attorneys informed -- informed district

3    attorney's office and the Pennsylvania State Police.

4        Q    Okay.  Have you seen any writing or letter

5    between your attorney and the DA stating so?

6        A    No.

7        Q    Okay.  So you couldn't tell me whether it

8    was in writing or orally?

9        A    I wouldn't be able to tell you that.

10       Q    Okay.  And that communication, did that

11   come from the union-provided attorney or

12   Mr. Minotti?

13       A    Both.

14       Q    Okay, all right.  Understood.

15               Did you ever provide any independent

16   statement, other than the June 20th, 2017, to the

17   district attorney?

18            MS. LE:  Objection to form.

19            THE WITNESS:  Only the grand jury.

20   BY MR. DIJIACOMO:

21       Q    Okay.  And it's fair to assume that your

22   grand jury testimony was consistent with the

23   June 20th, 2017 statement?

24       A    Yes.

**OFFICER EDDIE PAGAN**

1          Q     Okay.  Do you know whether your attorney

2     was contacted for -- strike that.  Let me revise.

3                     Do you know when you or your attorney

4     were first contacted requesting an interview?

5               MS. LE:  I'm going to make a general

6          statement here.  You're doing fine, but

7          don't -- in your answers, don't reveal any of

8          your communications with --

9               THE WITNESS:  With my attorney --

10              MS. LE:  -- your attorney.

11              THE WITNESS:  Yes, I understand that.

12              MS. LE:  Okay.

13              THE WITNESS:  Can you repeat the question

14         again?

15    BY MR. DIJIACOMO:

16         Q     Do you know when either the district

17    attorney or the homicide investigation officers,

18    troopers, first contacted you or your attorney

19    requesting a transcribed interview?

20         A     I don't remember.

21         Q     Okay, fair enough.

22         A     I let my attorney handle and tell me where

23    to show up and where to speak.  And I show up, and I

24    speak.

OFFICER EDDIE PAGAN

1      Q     Okay, all right.  New topic.  I want to

2   understand what triggers the MVR to start recording

3   videotapes.

4                When you turn on your vehicle, do you

5   have an understanding as when the MVR begins to

6   record?

7      A     Let me preface this by saying I'm no MVR

8   specialist whatsoever, but, you know, due to this

9   whole incident, I've gained a little bit of

10  knowledge of how the MVR works.  So what would be

11  your question again?

12     Q     Based on your knowledge, which is a

13  general rule for any of these questions, do you have

14  an understanding as to when the MVR begins to record

15  after turning on a vehicle?

16     A     Yes.

17     Q     When?

18     A     Approximately a minute after you turn on

19  the vehicle.

20     Q     And your --

21     A     That's my understanding.

22     Q     Okay.  Have you been told at all that it

23  starts 30 seconds as opposed to 60 seconds after?

24     A     Like I said, I'm not really a -- I believe

OFFICER EDDIE PAGAN

1    I was told a minute.

2         Q    Okay, understood.

3              If you turn on your flashing lights,

4    does that immediately trigger the recording?

5         A    If the car has been on prior, yes.

6         Q    Okay.  If you turn on the vehicle, will

7    the vehicle -- will the MVR begin to automatically

8    record after 60 seconds?

9         A    That is my rudimentary understanding.

10        Q    Okay.  If the car has been on for over a

11   minute, does turning on the flashing lights affect

12   the MVR, to your understanding?

13        A    It should.

14        Q    How?

15        A    It should work.

16        Q    It should record?

17        A    It should record, yes.

18        Q    Okay.  Does it change by turning on the

19   flashing lights, does it charge the storage of the

20   recording?

21             MS. LE:  Objection to form.

22             THE WITNESS:  I don't have any knowledge

23        of how the storage works.

24

**OFFICER EDDIE PAGAN**

| | |
|---|---|
| 1 | BY MR. DIJIACOMO: |
| 2 | Q    Okay.  Is there a button on your steering |
| 3 | wheel that affects the MVR recording? |
| 4 | MS. LE:  Objection to form. |
| 5 | THE WITNESS:  It's a button in the |
| 6 | steering wheel that turns on the lights, which, |
| 7 | in essence, turns on the MVR as well. |
| 8 | BY MR. DIJIACOMO: |
| 9 | Q    Okay.  Is there a button on your uniform |
| 10 | that starts the MVR recording? |
| 11 | A    Yes, it's on the mic portion that's placed |
| 12 | on the lapel. |
| 13 | Q    Okay.  If the car is on but has not been |
| 14 | recording for -- I'm sorry, let me rephrase that. |
| 15 | If the car is on, but has not been on |
| 16 | for a minute yet, to your understanding, does the |
| 17 | lapel trigger an immediate recording? |
| 18 | MS. LE:  Object to form. |
| 19 | THE WITNESS:  After this investigation, I |
| 20 | found out a little bit that it does not. |
| 21 | BY MR. DIJIACOMO: |
| 22 | Q    Okay.  There's a delay still? |
| 23 | A    I believe so, yes. |
| 24 | Q    Okay. |

**OFFICER EDDIE PAGAN**

1        A    Like I said, I'm no expert in the MVR

2    system.  I'm sure you could refer to the detailed

3    letter by WatchGuard that was provided to the state.

4        Q    Understood, okay.

5             Prior to the incident, did you have

6    any training -- is there any policy directive as to

7    using flashing lights during incidents?

8             MS. LE:  Object to the form.

9             THE WITNESS:  Can you repeat the question

10       again?

11   BY MR. DIJIACOMO:

12       Q    To your knowledge, is there -- let me put

13   it like this, during the actual incident, you walked

14   to the back of your -- of the back of the property

15   where your vehicles were parked, got in the vehicle

16   and approached Mr. Ardo's vehicle --

17       A    Correct.

18       Q    -- correct?  Okay.

19             To your knowledge, did you violate

20   policy by not turning on the flashing lights once

21   you started the vehicle?

22       A    No.

23       Q    Okay.  To your knowledge, is there any

24   directive or policy requiring you to turn on the

OFFICER EDDIE PAGAN

1   lights as you're approaching a vehicle to stop it?

2      A    I'm misunderstanding the question.

3               Can you just repeat it again?

4      Q    Absolutely.  To your knowledge, is there

5   any policy or directive instructing a trooper to

6   turn on their flashing lights as they approach a

7   vehicle to stop it?

8      A    For a traffic stop, I believe so.

9      Q    Okay.  How about for a stop where you're

10   having to stop a vehicle where it's -- from getting

11   away?

12      A    I don't -- I don't understand the context

13   of the question.  Can you be a little more clear?

14      Q    When you got in the vehicle and drove

15   towards Anthony Ardo's vehicle, was there any point

16   in time where you turned on the flashing lights?

17      A    I believe I didn't.

18      Q    Okay.  And before you got out of the

19   vehicle, did you turn on the flashing lights?

20      A    No.

21      Q    To your knowledge, is there any policy

22   directive directing you to do otherwise?

23      A    For that specific circumstance, no.

24      Q    Okay, all right.  You would agree with me

**OFFICER EDDIE PAGAN**

1    that the video recorded by the MVR from your vehicle

2    of the incident does not capture -- well, let me

3    rephrase that -- begins after the first shot is

4    fired?

5         A    That I would agree with you -- that I

6    would agree with you what?

7         Q    That the video from your vehicle --

8         A    Uh-huh.

9         Q    -- from the MVR, the footage begins after

10   the first shot is fired?

11        A    Yes.

12        Q    Okay, all right.  Are you aware of any

13   recording of the interaction between you and Officer

14   Splain with Anthony Ardo prior to the MVR footage

15   beginning?

16        A    Am I aware of any recording of interaction

17   with Mr. Ardo prior to the MVR recording?

18        Q    Yes.

19        A    No.

20        Q    Okay, all right.  All right, let's go to

21   the date of the incident, talk through that.

22                  All right?

23        A    Okay.

24        Q    I have your -- the statements you made

OFFICER EDDIE PAGAN

1    before so I'm not going to walk you through the

2    entire incident, I just have certain questions I

3    want to understand?

4         A    Okay.

5         Q    Hopefully, it will make this a little bit

6    less painful.

7                   Prior to Anthony Ardo arriving at the

8    residence, you heard certain statements, certain

9    phone calls between Anthony Ardo and his mother;

10   correct?

11        A    Correct.

12        Q    Okay.  What I'm unclear on is, did Anthony

13   ever make any threats involving a firearm?

14        A    Yes.

15        Q    He did?

16        A    Yes.

17        Q    Okay.  My understanding is that you

18   overheard three phone calls, correct, between Ms.

19   Monaghan and Anthony Ardo?

20        A    Correct.

21        Q    Okay.  Do you recall in which or which

22   phone calls involved Anthony making a threat of a

23   gun, using a gun?

24        A    It was the first phone call.

OFFICER EDDIE PAGAN

1      Q    Okay.  Do you recall the actual words
2  Anthony used?
3      A    Yes.  He said, I'll get a gun and blow my
4  head off.
5      Q    Okay.  So in addition to saying "I'll blow
6  my head off," he also said, "I will get a gun"?
7      A    Yes.
8      Q    Okay, understood.
9            Did Anthony make any reference to a
10 firearm in the second or third phone call?
11     A    I'm just trying to -- there's three phone
12 calls, I'm trying to remember them.  In regards to a
13 firearm, it was only the first phone call.
14     Q    Okay, all right.  At some point during
15 those three phone calls, Anthony threatened to at
16 least blow himself up; correct?
17     A    At least, yes.
18     Q    Okay.
19     A    Him and others.
20     Q    That's where I'm going.
21            Do you recall Anthony making a threat
22 to blow up anyone else?
23     A    Yes.
24     Q    Who?

**OFFICER EDDIE PAGAN**

1      A     His exact word was everyone -- everyone --

2      and everyone involved, everyone else.

3      Q     And that was on the condition if officers

4      were present?

5      A     Correct.

6      Q     Okay.  And your recollection is that

7      Anthony specifically stated whoever was involved or

8      whoever was there, something along those lines?

9      A     Correct.

10     Q     Okay, all right.

11            To your knowledge, after hearing

12     Anthony make a threat concerning possessing and

13     using a bomb, did, to your knowledge, you or

14     officer -- or Trooper Splain request backup?

15     A     No.

16     Q     Why not?

17     A     We were the only ones in the area.

18     Q     And what do you mean by "area"?

19     A     We, the state police covers over 350

20     square miles in our barracks by ourselves.  At any

21     given moment in time, we only have, like, three

22     troopers working.

23     Q     All right.  When you say "350 square

24     miles," are you referring to Belfast?

OFFICER EDDIE PAGAN

1    A    Yes.

2    Q    Okay.

3    A    Roughly.  The mileage is not --

4    Q    Understood, understood.

5              To your knowledge, how many troopers

6    were on-duty during that shift from Belfast?

7    A    I don't remember exactly.  I believe it

8    was four.

9    Q    Okay.  I'll tell you that was my

10   understanding as well.

11   A    Okay.

12   Q    What was the distance between, the best

13   you can estimate in time or miles, between the

14   residence and the Belfast barrack?

15   A    The what?

16   Q    The residence, the property?

17   A    Roughly 20 minutes.

18   Q    Okay.  To your knowledge, was -- where

19   were the other two officers, other than you and

20   officer -- or Trooper Splain?

21              To your knowledge, were the two other

22   officers at the barracks, let's say, between the

23   timeframe of 9:00 a.m. and 10:00 a.m. on May 20th?

24   A    I don't know their actual locations at

**OFFICER EDDIE PAGAN**

1    that time.

2         Q    Okay.  To the residence, where is the

3    closest local police station?

4              MS. LE:  Object to the form.

5              THE WITNESS:  Probably Washington

6         Township.  It'd probably be around the same

7         distance.

8    BY MR. DIJIACOMO:

9         Q    Okay.  But despite the bomb threat, you

10   didn't feel a need to contact either one for backup?

11        A    No.

12        Q    Is that mainly just because of the

13   distance, or were there other factors?

14        A    There were other factors.

15        Q    What were the other factors?

16        A    We -- we already had two troopers on

17   scene, and bringing any more of the cops into the --

18   into the house would just congest the area, making

19   us more visible from far, making it less likely for

20   Ardo -- Mr. Ardo to actually show up at the

21   residence or take off.  The proverbial "too many

22   chefs in the kitchen" scenario.

23        Q    You had training during, forgive me, for

24   lack of a better term, "basic training," at the

**OFFICER EDDIE PAGAN**

1    academy?

2              You had basic training on bombs

3    there; correct?

4         A    Correct.

5         Q    Okay.  But you agree it was pretty basic?

6         A    Yes.

7         Q    Okay.  If you had called backup, where

8    would the closest bomb specialist have been out of?

9         A    The state police Hides Unit (ph), which is

10   the unit that deals with bombs.  I believe they have

11   one person that covers the whole eastern side of

12   Pennsylvania.

13        Q    Okay.

14        A    And he could be anywhere any given time.

15        Q    All right.  To your knowledge, is that

16   person assigned to any particular barrack?

17        A    No, he's assigned to the BSOL (ph).

18        Q    What's that?

19        A    Bureau of Special -- I should know this.

20   I'm blanking out right now.  It's called BSOL.  It's

21   the special unit for -- it's the bureau for special

22   units like the SWAT -- like our SWAT team, the Hides

23   team, the canine team, any specialized unit.

24   They're the ones that oversee that bureau.

**OFFICER EDDIE PAGAN**

1     Q     But those units aren't located in any

2     specific spot?

3     A     No.

4     Q     Okay.  The last question in this area:

5     Did you consider calling an EMT before Anthony

6     arrived?

7     A     Did we consider calling any what?

8     Q     EMT?

9     A     EMT?

10    Q     Paramedic.

11    A     No.

12    Q     Any reason why not?

13    A     The EMT -- the EMT would not be able to do

14    anything we were not able to do as far as detaining

15    him.  It would also put them at risk, so.  Plus, he

16    was not home.  So what, we were going to call extra

17    people to come to the scene when we don't know where

18    he's at?

19    Q     Okay.  Do you ever put an EMT or paramedic

20    on standby?

21    A     Yes.  When we know where the person's at.

22    Q     Okay, all right.

23          Okay, during the three phone call

24    conversations that you overheard, what do you

**OFFICER EDDIE PAGAN**

1  recall -- how do you recall Anthony describing the

2  bomb?

3       A    He just said -- just described it as a

4  bomb with nails.

5       Q    Did he say where it was on him?

6       A    I'm going to strap up a bomb to my neck

7  with -- with nails, along those lines.

8       Q    And to your recollection, Anthony Ardo

9  specifically said nails?

10      A    Yes.

11      Q    Okay, all right.

12           Did you take the bomb threat

13  seriously?

14           MS. LE:  Objection to form.

15           THE WITNESS:  I've heard people make

16      threats all the time.  I considered it was

17      fake, but you never know.

18  BY MR. DIJIACOMO:

19      Q    Okay, all right.  All right, I want you to

20  walk through what occurred, but beginning at the

21  point where you reached your vehicle after you saw

22  Anthony arrive at the residence.

23      A    So you want me to start from where?

24      Q    When you reached your vehicle.

OFFICER EDDIE PAGAN

1      A     So from the moment I left the house to go
2  back in my vehicle?
3      Q     Yes, sir.
4      A     You want to me to start from that point?
5      Q     Yeah.
6      A     So I run to the back of the house, get
7  inside my vehicle.  I turn my vehicle on.  I try to
8  navigate through a very hilly, rough terrain, being
9  careful.  It was a very tight space.  I didn't want
10  to crash my car before making it to the road.  I'm
11  cutting the wheel, trying to make all these turns to
12  get around the house, very bad terrain, at which
13  point I come out and I see Trooper Splain, his
14  lights activated behind Mr. Ardo's vehicle, at which
15  point I come into the main road.
16             And I see Mr. Ardo's vehicle move
17  towards me and kind of like about to take off.  At
18  which point, I'm thinking he's going to run me over.
19  Let me readjust the vehicle in a position where he
20  can't hit me.  I come to park.  I immediately jump
21  out of the car, draw my gun because his vehicle's
22  still not in park and still moving and mobile, which
23  poses a threat.
24             I activate -- I attempt to activate

**OFFICER EDDIE PAGAN**

1   my lights using my lapel mic with my left hand, at

2   which point I came out of the car, started giving

3   Mr. Ardo instructions and commands to let me see his

4   hands.  At which point, I also see Trooper Splain

5   behind his car -- behind Mr. Ardo's car with his gun

6   drawn giving him also commands to come out, let me

7   see your hands.

8            I proceeded to do a tactical L to get

9   out of the line of Trooper Splain's gun and get a

10  better view of Mr. Ardo, because at which point --

11  at that point, I wasn't fully able to see inside --

12  inside his vehicle through his windshield.  All I

13  saw was a silhouette of a man shaking.

14           Due to my experience with pulling

15  people out of cars and giving them commands, at that

16  time I believe that Mr. Ardo was doing one of these,

17  but I couldn't confirm.  Some people exaggerate and

18  put the hands all the way up to show their hands,

19  when told to show their hands.  Some people shrink

20  up with their hands by their shoulder side and

21  stiffen up as a sign of submission.

22           As I go towards the driver's side for

23  Mr. Ardo, I'm still unable to see inside his car

24  through his windshield, due to the gray overcast,

**OFFICER EDDIE PAGAN**

1    being under a tree, and the condensation inside his

2    vehicle.  At which point, I keep giving Mr. Ardo

3    commands, to let me see your hands, let me see your

4    hands.

5              Mr. Ardo refuses to show me his hands

6    or look in my direction.  At which point, I kept

7    going in closer, inching closer and closer with my

8    gun drawn at a lower ready, not pointed at him to

9    make sure that he actually has his hands up to then

10   take it to the next level of extract him out of the

11   vehicle.

12             As I got closer to Mr. Ardo, I was

13   approximately the distance from yourself and myself,

14   which, for the record, I'm going to estimate is

15   approximately three to four feet, Mr. Ardo turned

16   around, smiles at me with a maniacal look, lights up

17   a lighter, at which point it illuminates the cabin

18   from the inside, and he has the lighter in his right

19   hand and the fuse in his left hand attached to a

20   device in his neck, at which time I couldn't tell

21   what it was.

22             And he tries to light the fuse.  I

23   know what a fuse is.  A fuse is used to ignite

24   stuff.  Based on his prior comments about having a

**OFFICER EDDIE PAGAN**

1    bomb around his neck and blowing it up with nails, I

2    determined it was some kind of device that put my

3    life, and his life, and Jay Splain's life in danger,

4    as well as the property around.

5                   At that time, Trooper Splain was

6    simultaneously asking me if I see anything inside

7    the vehicle.  At which time, I yelled to him, yes.

8    And I proceeded to shoot two rounds towards Mr. Ardo

9    through the door and proceeded to retreat from my

10   location to possibly outrun the blast.

11        Q    All right.

12        A    You want me to keep on going?

13        Q    No, no, no.

14        A    Okay.

15        Q    I got questions.

16        A    Okay.

17        Q    Just give me a second.

18                  When you get out of the vehicle, you

19   said that you attempted to activate the MVR from

20   your uniform?

21        A    Lapel.

22        Q    Lapel.  But you used the word "attempted"?

23        A    When I used the word "attempted," it's in

24   hindsight.  I know it didn't work.

OFFICER EDDIE PAGAN

1        Q     Okay, all right.  Understood.

2              Did you know it at the time?

3        A     No.

4        Q     Okay, all right.

5        A     I've used my mic lapel dozens and

6   countless times during investigations, and it's

7   worked every single time.

8        Q     What does it look like?

9        A     It's a little, square -- it's a little,

10  square device.  It's actually the microphone that's

11  connected to the video recording system for that

12  specific car.

13       Q     Okay.  One button?

14       A     Yes, one button.

15       Q     That's it?

16       A     Yup.  It's one button at the top.  It's

17  very big.  It's meant to be able to reach in when

18  you need it because --

19       Q     You need it?

20       A     Yup, you need it.

21       Q     Understood, all right.  Good, all right.

22  Giving you two things.  First, can we mark this

23  document as Exhibit C?

24                         -  -  -

OFFICER EDDIE PAGAN

```
 1                    (Exhibit C was marked for
 2      identification.)
 3                        -   -   -
 4      BY MR. DIJIACOMO:
 5           Q    All right.  Do you agree that this is the
 6      investigative report on behalf of forensic services
 7      concerning this incident?  Take a minute.
 8           A    Let me review it first to make sure.
 9           Q    Absolutely.
10           A    Without reading the actual report, I agree
11      this is actually a forensic unit report that seems
12      to be for the case I was involved in on May 20th.
13           Q    Have you ever seen this report before?
14           A    This particular report?
15           Q    Yes.
16           A    No.
17           Q    Okay, all right.  The reason I'm showing
18      it to you, turn to what looks like page eight or
19      what's marked at the bottom as DEF-97?
20           A    That's the page number?
21           Q    Yes.
22           A    You mentioned something else.  I thought
23      you said something else.
24           Q    Yes.  Right below that, there's another
```

**OFFICER EDDIE PAGAN**

1      number?

2           A     Oh, I don't know what that number is.

3           Q     I'll just say for the record.  It's what's

4      called a Bates number, and it just identifies

5      documents that are exchanged between attorneys.

6           A     Got it.

7           Q     All right.

8           A     It's actually part of our actual

9      investigation and reports.

10          Q     Correct, yes.  Absolutely.  Looking at

11     this document -- let me just get some context first.

12     The box that's marked Buick, would it have been

13     Anthony Ardo's vehicle?

14          A     Correct.

15          Q     And the box marked M-6-8 would have been

16     the vehicle you were driving?

17          A     Correct.

18          Q     And the box marked M6-14, would have been

19     the vehicle that Trooper Splain was driving?

20          A     Correct.

21          Q     Okay.  Can you just draw -- I just want to

22     understand and you can draw right on top of that.

23          A     Okay.

24          Q     I just want to understand your movement

**OFFICER EDDIE PAGAN**

1    and the L approach.  So what I want you to do is,

2    just draw a line of your movements out of the

3    vehicle as you approached, as you maneuvered and

4    then backed up?

5         A    Well, want to show -- state for the

6    record, that the actual positon of this vehicle was

7    an outcome after the accident.  The incident did not

8    occur when the vehicles were in this position.

9         Q    So if I understand you correctly --

10        A    Mr. Ardo's vehicle actually moved

11   before -- after we extracted him from the vehicle.

12   His vehicle was never put in park; it was still in

13   drive the whole time.

14        Q    Understood.

15        A    Which explains to me the whole his vehicle

16   was moving towards me and made me fear that he was

17   going to run me over.

18        Q    All right.  I don't want you to use that

19   map.

20        A    All right, okay.

21        Q    Explain in more detail then.  So you got

22   out of your vehicle on the left-hand side, facing

23   Mr. Ardo's vehicle; correct?

24        A    I get out from my car.

OFFICER EDDIE PAGAN

1      Q      On the driver's side?

2      A      Yeah, the driver's side.

3      Q      Facing head-on to the vehicle?

4      A      Correct.

5      Q      To Mr. Ardo's vehicle?

6      A      Correct.

7      Q      You realized that you were in crossfire?

8      A      Correct.

9      Q      Okay.  When you realized that, are you in

10   a 12 o'clock position with the vehicle directly in

11   front of you, with the head of the vehicle directly

12   in front of you?

13      A      Mr. Ardo's vehicle was directly in front

14   of me, yes.

15      Q      Okay.  And then you move to your right?

16      A      Correct.  I move forward to the front of

17   my vehicle, cut across to the right, and move up,

18   which explains the imaginary L.

19      Q      Okay, understood.

20               After Officer Splain pulled Anthony

21   Ardo out of the vehicle, was the bomb still attached

22   to him?

23      A      Yes.

24      Q      How was it attached?

**OFFICER EDDIE PAGAN**

1       A     It was attached to his neck.

2       Q     With duct tape?

3       A     I don't recall.

4       Q     Okay.  Can you describe the bomb in more

5    detail to me?

6       A     It seemed like what is more commonly

7    referred to as a mortar round.  It was round, and it

8    was attached to his neck.

9       Q     Round as in a ball?

10      A     Say it again.

11      Q     Round as in a ball or round as in like a

12   cylinder?

13      A     Round as in a ball.

14      Q     Okay.  It had a fuse?

15      A     Yes.

16      Q     Was the bomb underneath his shirt?

17      A     I don't remember exactly.

18      Q     Okay.

19      A     It was in that vicinity.

20      Q     I've read somewhere that the fuse was

21   inserted through his shirt?

22      A     It might have been.  Like I said, I don't

23   remember.

24      Q     Okay, understood.  All right.

**OFFICER EDDIE PAGAN**

1      A     I believe he had a sweatshirt if I'm not
2   mistaken.

3      Q     Okay.

4      A     Did he?  I'm not sure.

5      Q     I'm not sure either.  We'll put that
6   aside.

7      A     I'm not sure anymore.

8      Q     As you were approaching the vehicle, did
9   you ever -- you said you saw movements?

10     A     What -- you need to be more specific in
11  whatever regards you're talking.

12     Q     As you approached the vehicle, were you
13  able to see into the vehicle -- strike that.  At any
14  point prior to the shooting, did you see Mr. Ardo
15  put his hands up?

16     A     No.

17     Q     Okay.  So when you were saying you weren't
18  sure if his hands were all the way up or by his
19  sides, you were just trying to see generally whether
20  they were even up?

21     A     To clarify, when I came out the vehicle,
22  he was doing -- he was doing what seemed like a
23  shimmy, meaning he was moving his shoulders side to
24  side.  At that point, I was under the assumption

OFFICER EDDIE PAGAN

1   that he was either trying to put his hands up

2   tensely or above, but being that I wasn't able to

3   see into the vehicle due to the weather, I was -- I

4   was trying to get further clarification of what his

5   actual movements were.

6        Q    Okay.  So you were able to see his

7   silhouette?

8        A    Yes.  The whole hands up is my assumption

9   at the time.

10       Q    Okay.  But to be clear, you never saw his

11   hands.

12       A    Never saw his hands up.

13       Q    Did you see his hands anywhere?

14       A    I saw his hands on the lighter.

15       Q    Okay.

16       A    And on the fuse.

17       Q    Okay.  And that's the first time you saw

18   --

19       A    That's the first time I saw his hands.

20       Q    All right.  So prior to the lighter being

21   ignited, illuminating the inside of the cab, the

22   only extent that you could see of Mr. Ardo is his

23   silhouette?

24       A    At that time when I was next to him, all I

OFFICER EDDIE PAGAN

1  could see is the side of his head looking straight

2  ahead, avoiding any eye contact with me.

3      Q    Okay.  When did Anthony Ardo smile at you?

4      A    When I got -- when I got close to him,

5  what I described earlier about three to four feet.

6      Q    And that smile was prior to the igniting

7  of the lighter?

8      A    It was concurrent.  It was simultaneously.

9      Q    Okay.  And to be clear, he looked at you,

10  made eye contact and smiled?

11      A    Yes.

12      Q    Okay.

13      A    A maniacal smile, not the smile that -- a

14  friendly smile, just to be -- clarify.  Not that

15  smile that you just had right now.

16      Q    Why do you say -- why do you describe it

17  that way?

18      A    Because your smile looks friendly.  His

19  smile did not look friendly.

20      Q    Okay.

21      A    More like a Jack Nicholson in the Shining

22  kind of smile.  Does that put it in perspective?

23      Q    It does.

24      A    Does the reference help?

OFFICER EDDIE PAGAN

```
 1         Q    I'll have to go back and watch that.  It's
 2    been a while.
 3         A    Okay.
 4         Q    All right.
 5              MS. LE:  Anthony, this may be a good time
 6         to take a quick break.
 7                   (Discussion was held off the record.)
 8    BY MR. DIJIACOMO:
 9         Q    All right.  One more set of questions for
10    you, basically involving deescalation techniques.
11                   During your training, have you been
12    trained on deescalation techniques generally?
13         A    Generally, yes.
14         Q    Okay.  Did those trainings involve
15    deescalation techniques dealing with a suicidal
16    individual?
17         A    I believe so, yes.
18         Q    Okay.  What techniques were you taught?
19         A    It's just -- it's just -- it's not so
20    straight-forward.  It's just take in the whole
21    circumstances, and then you just -- just
22    different -- different techniques based on the
23    person -- the person, the problems, his behavior at
24    the time, his motivations.  It's just -- I can't
```

**OFFICER EDDIE PAGAN**

1    give you a clear cut.  It's just based on my brief

2    training and in my experience throughout the years

3    of dealing -- it's just every circumstance is

4    different.

5        Q    Are there any general principles that you

6    were taught to keep in mind?

7        A    General principles in what sense?

8        Q    Deescalation techniques, things to keep in

9    mind, approaches, any type of general approaches?

10       A    I can't -- I can't think of --

11       Q    All right, understood.

12              In this incident, no deescalation

13   techniques were performed; correct?

14           MS. LE:  Objection to the form.  You can

15       answer.

16           THE WITNESS:  It was -- the situation did

17       not dictate to go to that point.

18   BY MR. DIJIACOMO:

19       Q    And thus none happened?

20       A    Yes.

21       Q    Okay.  Not suggesting that they should

22   have, just --

23       A    Okay.

24       Q    -- making baseline.

**OFFICER EDDIE PAGAN**

1        A      Uh-huh.

2        Q      All right.  You somewhat already answered

3   this next question, but give a full answer all the

4   same.

5                In retrospect, looking back at the

6   incident, were there any opportunities not taken

7   that could have been taken to deescalate the

8   situation?

9        A      No.

10       Q      Okay.  Looking back on the situation,

11  prior to Anthony's arrival at the house, could you

12  have taken any other approach to locate and

13  deescalate his intentions?

14       A      No.

15       Q      Okay.  After Anthony's arrival, could you

16  have taken any different approach to deescalate the

17  situation but control it, other than the one you

18  took?

19       A      What do you mean "but control it"?

20       Q      Well, for example, one approach would have

21  been not to stop Anthony whatsoever, but that would

22  have ran the risk of Anthony going elsewhere?

23       A      It would have created a lot more risk than

24  just going elsewhere.

OFFICER EDDIE PAGAN

1      Q    Okay.  So that's what I mean by
2  controlling the situation.
3            Were there any other techniques, any
4  other approaches you could have taken that would not
5  have allowed Anthony to leave the property, but
6  would not have caused you to approach Anthony
7  directly and put yourself at risk?
8      A    There was no other -- there was no other
9  options at that time or in hindsight that would have
10 -- that would have gone any other way.
11     Q    Okay.
12     A    Just to clarify, we attempted to give
13 Anthony the option to leave the vehicle and come
14 inside the house, making it a different, complete
15 circumstance.
16     Q    Meaning while you were still in the house,
17 you had the opportunity to wait, expect Anthony to
18 approach the house, and he choose to remain in his
19 vehicle at that time?
20     A    Meaning we were trying to separate Anthony
21 from his vehicle to further reduce the risk of
22 anything happening on a mobile vehicle.
23     Q    Understood.  And your intention prior to
24 Anthony's arrival was for him -- tell me your

OFFICER EDDIE PAGAN

```
 1    intention.
 2                    What was the intention?
 3         A     My intention was for him to not see us.
 4         Q     Right.
 5         A     Come into the house not knowing we're
 6    there and detain him.
 7         Q     Okay.  Did you and Officer Splain have any
 8    discussion about whether to 302 him prior to his
 9    arrival?
10         A     Yes.  When we were at the house, yes.
11         Q     Was it your intention to perform a 302?
12         A     My intention was to arrest him for the PFA
13    violation.
14         Q     Okay.
15         A     And at that point, he will get the help
16    needed.
17         Q     Understood.  Through the process?
18         A     Exactly.
19         Q     Understood, all right.  I just want to
20    confirm, when you and/or Officer Splain got out of
21    the vehicle, the commends that were given consisted
22    of put your hands up, show me your hands, get out of
23    the vehicle, and/or get on the ground?
24                    MS. LE:  Objection to form.
```

OFFICER EDDIE PAGAN

1               THE WITNESS:  My commands were, let me see

2        your hands.

3    BY MR. DIJIACOMO:

4        Q    And that's it from you?

5        A    Yes.

6        Q    Okay.  You had never ordered him to get

7    out of the vehicle?

8        A    No.

9        Q    Okay.

10        A    I have a process where -- where I go

11    before I get to that point.

12        Q    Step one is --

13        A    Let me see your hands.

14        Q    And once you see a suspect's hands, then

15    you move on to the next step?

16        A    Correct.

17        Q    And thus, because you never saw his hands

18    up, you never moved on to the next step?

19        A    The next step would be deescalation, let

20    me see your hands.

21        Q    Okay.

22        A    All right.  Carefully, slowly, open the

23    window, open the car using your right hand, reaching

24    across to the door handle from the outside.  It

OFFICER EDDIE PAGAN

1   crosses the person over, so that way it doesn't

2   allow him to, like, reach for the door, reach for

3   something else.

4             So it kind of binds up the person and

5   gives them -- puts them in a situation where I can

6   better see his movements as far as getting him out

7   of the vehicle safely.  Let me see your hands, what

8   I just described.  Open hand using your right hand

9   reaching across, open the door because now he has to

10   put himself in a formation where he's facing me,

11   open the door, slowly step out of the vehicle, turn

12   your back against me, walk towards the sound of my

13   voice, get on your left knee, get on your right knee

14   with your hands behind your back, and then the next

15   process will be me to approach and detain the person

16   using handcuffs.  That's the deescalation process.

17   One of them.

18       Q    All right.  I think that's my last

19   question.  There's an allegation in the complaint

20   that either you or Officer Splain made a statement

21   prior to leaving the house after -- presumably after

22   Anthony arrived to the extent of --

23       A    After the whole incident?

24       Q    No, no, no.  Let me start over.  Let me be

OFFICER EDDIE PAGAN

1    more broad.  There's an allegation that there was a

2    statement made by either you or Officer Splain more

3    or less of, I hope we make it home to our families

4    tonight.

5              Do you recall such a statement?

6        A    I make that statement every time either

7    myself or someone else is in a position where they

8    might be seriously hurt.  You would have to clarify

9    who made that statement or where.  Because I don't

10   -- I don't think I've said it.  I believe Trooper

11   Splain said it, but that's just normal.  We make it

12   home at the end of the day.  It's just -- it means

13   nothing other than just be safe.

14       Q    Yeah.

15       A    Be safe on everything you do, whether it's

16   a traffic stop, whether it's removing a deer carcass

17   in the middle of an interstate where vehicles

18   traveling at a minimum speed of 75, make it home at

19   the end of the day.  Don't get hit by a car.  Think

20   things through.  Be thorough.  Be safe.  That's all

21   it means.

22       Q    Understood.

23       A    It's a general statement -- it's a general

24   statement that encompasses a wide range of meanings.

**OFFICER EDDIE PAGAN**

1          MR. DIJIACOMO:  Understood, all right.

2     All right, I don't have any further questions.

3     Thank you for your time today.

4                    -   -   -

5                  EXAMINATION

6                    -   -   -

7   BY MS. LE:

8     Q    I just have a couple questions.

9              Sir, did you have something you

10  wanted to say?

11    A    No, I'll let you.

12    Q    All right, okay.  Officer Pagan, you

13  testified earlier that you -- regarding your

14  discussions with Trooper Splain prior to providing

15  the statement that you made on June 20th, 2017.

16  You -- I believe your testimony was that you had

17  discussed with him -- let me actually -- let me back

18  up.

19              Regarding your discussions with

20  Trooper Splain, you said, I believe you testified

21  that you had talked to the Trooper on the day of the

22  event and maybe the few days following the event; is

23  that accurate?

24    A    Yes.

OFFICER EDDIE PAGAN

1        Q     Okay.  What was the nature of your

2   discussions with Trooper Splain?

3        A     Like I explained earlier, we spoke a

4   little bit about the tactical and the safety

5   standards of our -- our actions during the scene,

6   how we did everything possible to keep ourselves

7   safe and minimize the situation, and thinking in

8   hindsight, I forgot to mention Trooper Splain had

9   been involved in a prior shooting in his career, and

10  most of the conversations revolved around him giving

11  me advice as to how to handle the stress, how not to

12  bring -- family life, how it's going to affect me in

13  the future, and how to go about myself and conduct

14  myself professionally throughout the whole ordeal in

15  that incident.  So that's mostly what the

16  conversations went -- or consisted of.

17       Q     Did you discuss with Trooper Splain during

18  any of these conversations the events of the

19  incident that occurred on May 20th, 2017, and by

20  that, I mean, did you and he discuss anything along

21  the lines of what do you remember happening, what do

22  I remember happening, do you remember him saying

23  this, do you remember me saying that?

24                    Did you -- was your discussion with

**OFFICER EDDIE PAGAN**

1  Trooper Splain anything along those lines?

2      A    No.  It was no questioning.  There was no

3  doubting of our actions that day.  So we didn't

4  speak in regards to, well, what did you hear?  Did I

5  do the right thing?  Or do you do the right -- do

6  you think I messed up?  There was no doubt in our

7  minds.  We weren't questioning our actions

8  whatsoever.  It was more of him -- his advice, and

9  furthermore, there was a lot of uncertainties with

10  the district attorney's office and we were just more

11  or less wondering how that's going to affect us, how

12  long we're going to be on administration duty, how

13  long it's going to take for them to get us back on

14  the road, which is what we ultimately love doing.

15  We love our jobs.  You know, we try to do it to the

16  best of our abilities, but that was pretty much it.

17      Q    You also testified earlier regarding the

18  use of the MVR.  At the time, you testified that you

19  have gained some knowledge about the MVR process

20  after -- following this event.

21            At the time of the incident, did you

22  believe that activating the MVR by use of the button

23  on your microphone on your lapel as you described

24  would activate the MVR in the same fashion as you

OFFICER EDDIE PAGAN

1   turning on your overhead lights or using the button

2   on your steering wheel?

3        A    Absolutely.

4        Q    And you had activated your MVR in this

5   manner with the button on your microphone, I believe

6   you testified many times before?

7        A    Correct.

8        Q    Okay.  You -- testified earlier that

9   having reviewed the MVR recording from your car for

10  this incident after the fact, that you do -- you are

11  aware that the MVR recording from your car starts

12  after the first shot was fired in this case; right?

13       A    Yes.

14       Q    Okay.  Since after the incident, have you

15  come to gain any understanding as to why the

16  recording started after the first shot was fired?

17       A    Yes.

18       Q    Okay.  And what did you learn after the

19  fact, just based on your understanding,

20  understanding you're not an MVR expert?

21       A    Okay.  Yeah, like she plainly stated, I'm

22  not an MVR expect.  What I've come to learn is, when

23  you shut down your vehicle, your MVR automatically

24  starts a seconds countdown which equates to 30

**OFFICER EDDIE PAGAN**

1    minutes.  When we parked the car behind the

2    residence, we shut off our cars obviously for our

3    safety because we carry ammo and rifles and weapons

4    in our car.  So the last thing we wanted to do was

5    for not only Mr. Ardo or anyone else to have access

6    to our vehicles and able to take our cars for a

7    joyride, or, you know, worse take one of our

8    weapons.  So we shut off the cars.  When we shut off

9    the cars and went inside the house, the 30 minutes

10   elapsed.  Once the 30 minutes elapsed in the

11   countdown of the MVR, the MVR is completely shut

12   down.  It's not recording after the fact or

13   anything.

14              When you turn it back on using the

15   key in the ignition manner, at that time, the MVR

16   has to reboot and there's a period of time where the

17   MVR has to reboot where nothing's being recorded no

18   matter what buttons or lights you press.  You have

19   to wait for that rebooting process to complete its

20   course.  And that's my understanding of how the MVR

21   works and that's my understanding as to why the

22   recording of the videos were after the first shots.

23        Q    And that understanding that you just

24   described now, is something that you came to learn

**OFFICER EDDIE PAGAN**

1   after this incident?

2        A    Correct.

3        Q    You did not understand that at the time?

4        A    No.

5        Q    And that rebooting process that you

6   describe, is that what you were referring to earlier

7   when you said it gets 60 seconds?

8        A    Correct, the rebooting process.

9             MS. LE:   I don't have any further

10       questions.

11                      -   -   -

12                    EXAMINATION

13                      -   -   -

14   BY MR. DIJIACOMO:

15       Q    Did the conversations you had with Trooper

16   Splain affect your testimony at all on June 20th,

17   2017?

18       A    No.

19            MR. DIJIACOMO:   Okay.  Nothing further.

20            (Deposition ended at 12:31 p.m.)

21

22

23

24

**OFFICER EDDIE PAGAN**

```
 1              C E R T I F I C A T E

 2

 3   COMMONWEALTH OF PENNSYLVANIA  :

 4                                 :     SS

 5   COUNTY OF PHILADELPHIA         :

 6

 7

 8                      I, ELIZABETH KELLY,

 9   Professional Reporter - Notary Public, within and

10   for the Commonwealth of Pennsylvania, do hereby

11   certify that the proceedings, evidence, and

12   objections noted are contained fully and accurately

13   in the notes taken by me of the preceding

14   deposition, and that this copy is a correct

15   transcript of the same.

16

17

18

19                      _____

20                      ELIZABETH KELLY

21                      Professional Reporter

22                      Notary Public

23

24
```

**OFFICER EDDIE PAGAN**

1                    INSTRUCTIONS TO THE WITNESS

2                         Read your deposition over carefully.

3       It is your right to read your deposition and make

4       changes in form or substance.  You should assign a

5       reason in the appropriate column on the errata

6       sheet for any change made.

7                         After making any changes in form or

8       substance which have been noted on the following

9       errata sheet along with the reason for any change,

10      sign your name on the errata sheet and date it.

11                        Then sign your deposition at the

12      end of your testimony in the space provided.  You

13      are signing it subject to the changes you have

14      made in the errata sheet, which will be attached

15      to the deposition before filing.  You must sign it

16      in front of a witness.  Have the witness sign in

17      the space provided.  The witness need not be a

18      notary public.  Any competent adult may witness

19      your signature.

20                        Return the original errata sheet to

21      your counsel promptly.  Court rules require filing

22      within thirty days after you receive the

23      deposition.

24

**OFFICER EDDIE PAGAN**

```
 1                        ERRATA SHEET

 2      Attach to Deposition of: Officer Eddie Pagan
        Taken on:    August 22, 2019
 3      In the matter of:  Estate of Anthony Ardo v. Pagan, et al.

 4      PAGE         LINE NO.        CHANGE         REASON

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____
```

**OFFICER EDDIE PAGAN**

```
 1                         SIGNATURE PAGE

 2

 3                             - - -

 4

 5              I hereby acknowledge that I have

 6     read the aforegoing transcript, dated August 22,

 7     2019, and the same is a true and correct

 8     transcription of the answers given by me to the

 9     questions propounded, except for the changes, if

10     any, noted on the Errata Sheet.

11

12                             - - -

13

14

15

16

17     SIGNATURE:        _____
                         OFFICER EDDIE PAGAN
18

19     DATE:             _____

20

21     WITNESSED BY:     _____

22

23

24
```

**OFFICER EDDIE PAGAN**

**A**

a.m 2:7 33:23,23
abilities 61:16
able 6:15,18 17:17
 18:12 19:24 22:9
 36:13,14 39:11
 42:17 48:13 49:2
 49:6 63:6
Absolutely 28:4
 43:9 44:10 62:3
academy 35:1
access 17:21 18:20
 19:10 63:5
accident 45:7
accurate 9:4,7,20
 59:23
accurately 65:12
acknowledge 68:5
ACTION 1:3
actions 60:5 61:3,7
activate 38:24,24
 41:19 61:24
activated 38:14
 62:4
activating 61:22
actual 13:22 18:9
 27:13 31:1 33:24
 43:10 44:8 45:6
 49:5
addition 31:5
adijiacomo@wei...
 3:5
administration
 61:12
administrative
 14:17
administrator 1:5
adult 66:18
advance 13:24
 16:10,12,21 17:6
 18:13
advice 60:11 61:8
advise 16:20
affect 25:11 60:12
 61:11 64:16
aforegoing 68:6
agree 28:24 29:5,6
 35:5 43:5,10
agreement 5:6
Ah 8:12 18:10
ahead 50:2
al 67:3
alcohol 6:22
allegation 57:19
 58:1
allow 57:2

allowed 54:5
ammo 63:3
and/or 55:20,23
ANGELA 1:3
answer 7:12 15:2
 17:12 52:15 53:3
answered 53:2
answers 23:7 68:8
Anthony 1:6 3:3
 5:22,23 28:15
 29:14 30:7,9,12
 30:19,22 31:2,9
 31:15,21 32:7,12
 36:5 37:1,8,22
 44:13 46:20 50:3
 51:5 53:21,22
 54:5,6,13,17,20
 57:22 67:3
Anthony's 53:11,15
 54:24
anymore 48:7
APPEARANCES
 3:1
approach 28:6 45:1
 53:12,16,20 54:6
 54:18 57:15
approached 27:16
 45:3 48:12
approaches 52:9,9
 54:4
approaching 28:1
 48:8
appropriate 66:5
approximately 2:7
 24:18 40:13,15
Arch 2:4 3:9
Ardo 1:3,6 5:23
 29:14,17 30:7,9
 30:19 34:20,20
 37:8 39:3,10,16
 39:23 40:2,5,12
 40:15 41:8 46:21
 48:14 49:22 50:3
 63:5 67:3
Ardo's 27:16 28:15
 38:14,16 39:5
 44:13 45:10,23
 46:5,13
area 32:17,18 34:18
 36:4
arrest 55:12
arrival 53:11,15
 54:24 55:9
arrive 37:22
arrived 36:6 57:22
arriving 30:7

aside 48:6
asking 41:6
assign 66:4
assigned 14:19,21
 35:16,17
assisting 14:24
assume 7:6 22:21
assumption 48:24
 49:8
Attach 67:2
attached 40:19
 46:21,24 47:1,8
 66:14
attempt 38:24
attempted 41:19,22
 41:23 54:12
attorney 2:4 3:8
 12:13,17,18 13:1
 13:6,7,10,11,16
 15:15 18:24 19:7
 19:8 21:19,21
 22:5,11,17 23:1,3
 23:9,10,17,18,22
attorney's 21:17
 22:3 61:10
attorneys 15:9 22:2
 44:5
audio 18:17
August 1:16 2:6
 67:2 68:6
authorization 19:19
authorize 20:22
authorized 19:18
automatically 25:7
 62:23
available 17:18
Avenue 3:4
avoiding 50:2
aware 29:12,16
 62:11

**B**

B 4:16 10:9
back 14:7 27:14,14
 38:2,6 51:1 53:5
 53:10 57:12,14
 59:17 61:13 63:14
backed 45:4
backup 32:14 34:10
 35:7
bad 38:12
ball 47:9,11,13
barrack 11:1
 33:14 35:16
barracks 11:23,24
 12:2 32:20 33:22

based 24:12 40:24
 51:22 52:1 62:19
baseline 52:24
basic 34:24 35:2,5
basically 51:10
Bates 44:4
beginning 2:6
 29:15 37:20
begins 24:5,14 29:3
 29:9
behalf 43:6
behavior 51:23
Belfast 12:1,3,4
 20:13 32:24 33:6
 33:14
believe 8:3 13:23
 14:6 15:14 17:23
 18:22,23 19:4,22
 19:23 24:24 26:23
 28:8,17 33:7
 35:10 39:16 48:1
 51:17 58:10 59:16
 59:20 61:22 62:5
best 9:21 33:12
 61:16
Bethlehem 11:8,16
 11:24 12:4,5,12
 better 12:21 34:24
 39:10 57:6
big 42:17
binds 57:4
bit 17:17 24:9 26:20
 30:5 60:4
blanking 35:20
Blare 20:4
blast 41:10
blow 31:3,5,16,22
blowing 41:1
bomb 32:13 34:9
 35:8 37:2,4,6,12
 41:1 46:21 47:4
 47:16
bombs 35:2,10
bottom 43:19
box 44:12,15,18
break 7:11 51:6
brief 52:1
bring 60:12
bringing 34:17
broad 58:1
BSOL 35:17,20
Buick 44:12
bureau 35:19,21,24
button 26:2,5,9
 42:13,14,16 61:22
 62:1,5

buttons 63:18

**C**

C 4:18 42:23 43:1
 65:1,1
cab 49:21
cabin 40:17
call 30:24 31:10,13
 36:16,23
called 35:7,20 44:4
calling 36:5,7
calls 18:17 30:9,18
 30:22 31:12,15
canine 35:23
capacity 1:9,11
capture 29:2
car 25:5,10 26:13
 26:15 38:10,21
 39:2,5,5,23 42:12
 45:24 56:23 58:19
 62:9,11 63:1,4
carcass 58:16
career 11:21 60:9
careful 38:9
carefully 56:22 66:2
carry 63:3
cars 39:15 63:2,6,8
 63:9
case 11:9 12:11
 21:16 43:12 62:12
caused 54:6
certain 30:2,8,8
certification 5:7
Certified 1:21
certify 65:11
change 25:18 66:6
 66:9 67:4
changes 66:4,7,13
 68:9
characterize 21:9
charge 20:12 25:19
chefs 34:22
choose 54:18
circumstance
 28:23 52:3 54:15
circumstances
 10:21 51:21
CIVIL 1:3
clarification 21:19
 49:4
clarify 48:21 50:14
 54:12 58:8
clear 6:9 28:13
 49:10 50:9 52:1
clerical 14:21
close 50:4

**OFFICER EDDIE PAGAN**

closer 40:7,7,7,12
closest 34:3 35:8
column 66:5
come 19:19 22:11
36:17 38:13,15,20
39:6 54:13 55:5
62:15,22
commands 39:3,6
39:15 40:3 56:1
commends 55:21
comments 40:24
commonly 47:6
Commonwealth
2:9 65:3,10
communication
22:10
communications
23:8
competent 66:18
complaint 57:19
complete 54:14
63:19
completely 63:11
concerning 14:2
15:10 32:12 43:7
concurrent 50:8
condensation 40:1
condition 32:3
conduct 60:13
confirm 20:9 39:17
55:20
congest 34:18
connected 42:11
consider 36:5,7
considered 37:16
consisted 55:21
60:16
consistent 22:22
contact 34:10 50:2
50:10
contacted 23:2,4
23:18
contained 65:12
context 28:12 44:11
control 53:17,19
controlling 54:2
conversation 6:8
conversations 13:6
13:15 15:8 36:24
60:10,16,18 64:15
cops 34:17
copy 8:22 65:14
corporal 20:4,10,11
20:12
correct 7:22 9:10
9:22 10:15 12:8

13:3 14:11 18:11
18:15 21:3,4,7
27:17,18 30:10,11
30:18,20 31:16
32:5,9 35:3,4
44:10,14,17,20
45:23 46:4,6,8,16
52:13 56:16 62:7
64:2,8 65:14 68:7
correctly 10:14
45:9
counsel 3:6,11 5:6
66:21
countdown 62:24
63:11
countless 42:6
COUNTY 65:5
couple 16:19 59:8
course 5:4 63:20
Court 1:1,21,21
66:21
courtroom 6:13
covers 32:19 35:11
crash 38:10
created 53:23
crimes 11:8 18:24
18:24 19:5,20
criminal 11:7 12:6
12:10
crosses 57:1
crossfire 46:7
custodian 20:13
cut 46:17 52:1
cutting 38:11
cylinder 47:12

———
**D**
D 4:1
DA 22:5
danger 41:3
date 7:22,23 8:14
14:8,15 29:21
66:10 68:19
dated 10:16 68:6
day 10:1 16:19 17:3
58:12,19 59:21
61:3
days 16:19 21:10
59:22 66:22
deal 20:15
dealing 51:15 52:3
deals 35:10
deer 58:16
deescalate 53:7,13
53:16
deescalation 51:10

51:12,15 52:8,12
56:19 57:16
DEF-97 43:19
Defendants 1:13
3:11
delay 21:9 26:22
deposition 1:15 2:3
64:20 65:14 66:2
66:3,11,15,23
67:2
describe 47:4 50:16
64:6
described 37:3
50:5 57:8 61:23
63:24
describing 37:1
DESCRIPTION 4:12
desk 14:20
despite 34:9
detail 45:21 47:5
detailed 27:2
detain 55:6 57:15
detaining 36:14
determine 17:1
determined 41:2
device 40:20 41:2
42:10
dictate 52:17
different 11:15,23
51:22,22 52:4
53:16 54:14
DiJiacomo 3:3 4:6
5:4,19,23 8:6,12
8:19 10:4,12 13:9
15:7 17:19 22:20
23:15 26:1,8,21
27:11 34:8 37:18
43:4 51:8 52:18
56:3 59:1 64:14
64:19
directing 28:22
direction 40:6
directive 27:6,24
28:5,22
directly 46:10,11,13
54:7
discuss 60:17,20
discussed 59:17
discussing 16:6
discussion 10:7
14:2 51:7 55:8
60:24
discussions 59:14
59:19 60:2
dispute 21:14
distance 33:12 34:7

34:13 40:13
district 1:1,1 21:17
22:2,17 23:16
61:10
document 8:2
42:23 44:11
documents 44:5
doing 23:6 39:16
48:22,22 61:14
door 41:9 56:24
57:2,9,11
doubt 61:6
doubting 61:3
dozens 42:5
draw 38:21 44:21
44:22 45:2
drawn 39:6 40:8
drive 45:13
driver's 39:22 46:1
46:2
driving 44:16,19
drove 28:14
drugs 6:22
duct 47:2
due 24:8 39:14,24
49:3
duly 5:13
duty 14:18 61:12

———
**E**
E 4:1 65:1,1
E-V-E-R-K 11:3
earlier 50:5 59:13
60:3 61:17 62:8
64:6
eastern 1:1 35:11
Eddie 1:8,15 2:3 4:4
4:14 5:12 67:2
68:17
educated 19:4
eight 43:18
either 17:2 23:16
34:10 48:5 49:1
57:20 58:2,6
elapsed 63:10,10
Elizabeth 2:7 65:8
65:20
EMT 36:5,8,9,13,13
36:19
encompasses
58:24
ended 64:20
entire 30:2
equates 62:24
errata 66:5,9,10,14
66:20 67:1 68:10

errors 17:2
ESQUIRE 3:3,8
essence 26:7
estate 1:5 5:23 67:3
estimate 15:23
33:13 40:14
et 67:3
event 59:22,22
61:20
events 60:18
Everk 11:3,5 12:5
20:9
everyday 6:7
evidence 17:6
20:13,15 65:11
exact 32:1
exactly 33:7 47:17
55:18
exaggerate 39:17
EXAMINATION 4:5
5:17 59:5 64:12
examined 5:14
example 53:20
Excellent 9:3
exchanged 44:5
exhibit 4:12,14,16
4:18 8:16,21,21
10:9 42:23 43:1
exhibited 16:8 17:3
EXHIBITS 4:10
expect 7:10,14
54:17 62:22
expense 13:1,2
experience 16:7
39:14 52:2
expert 27:1 62:20
Explain 45:21
explained 60:3
explains 45:15
46:18
extent 49:22 57:22
extra 36:16
extract 40:10
extracted 45:11
eye 50:2,10

———
**F**
F 65:1
facing 45:22 46:3
57:10
fact 8:21 62:10,19
63:12
factors 34:13,14,15
facts 9:19
fair 7:7,8 9:13 10:19
14:13,14 22:21

23:21
**fake** 37:17
**families** 58:3
**family** 60:12
**far** 34:19 36:14 57:6
**fashion** 61:24
**fear** 45:16
**feel** 34:10
**feet** 40:15 50:5
**filing** 5:7 66:15,21
**fine** 23:6
**firearm** 30:13 31:10
  31:13
**fired** 29:4,10 62:12
  62:16
**first** 5:13 7:12 13:10
  19:23 23:4,18
  29:3,10 30:24
  31:13 42:22 43:8
  44:11 49:17,19
  62:12,16 63:22
**five** 11:16,17 16:3
**flashing** 25:3,11,19
  27:7,20 28:6,16
  28:19
**Fleming** 1:23
**foggy** 18:23
**following** 59:22
  61:20 66:8
**follows** 5:15
**footage** 18:9,13,21
  18:21 29:9,14
**forensic** 43:6,11
**forgive** 34:23
**forgot** 13:12,14
  60:8
**form** 5:9 10:2 13:8
  15:1 17:8,10
  22:18 25:21 26:4
  26:18 27:8 34:4
  37:14 52:14 55:24
  66:4,7
**formation** 57:10
**forward** 21:20
  46:16
**found** 26:20
**four** 33:8 40:15
  50:5
**friendly** 50:14,18
  50:19
**front** 46:11,12,13
  46:16 66:16
**full** 53:3
**fully** 19:3 39:11
  65:12
**further** 49:4 54:21

59:2 64:9,19
**furthermore** 61:9
**fuse** 40:19,22,23,23
  47:14,20 49:16
**future** 60:13

**G**
**gain** 62:15
**gained** 24:9 61:19
**general** 2:4 3:8 23:5
  24:13 52:5,7,9
  58:23,23
**generally** 48:19
  51:12,13
**getting** 28:10 57:6
**give** 21:22 41:17
  52:1 53:3 54:12
**given** 32:21 35:14
  55:21 68:8
**gives** 57:5
**giving** 9:23 19:9
  39:2,6,15 40:2
  42:22 60:10
**go** 6:1,2 10:6 20:16
  29:20 38:1 39:22
  51:1 52:17 56:10
  60:13
**going** 7:5 8:1,20
  10:13 21:14 23:5
  30:1 31:20 36:16
  37:6 38:18 40:7
  40:14 41:12 45:17
  53:22,24 60:12
  61:11,12,13
**good** 5:20,21 42:21
  51:5
**grand** 22:19,22
**gray** 39:24
**ground** 6:1 55:23
**guess** 15:2 19:4
**gun** 30:23,23 31:3,6
  38:21 39:5,9 40:8

**H**
**Hammonton** 1:23
**hand** 39:1 40:19,19
  56:23 57:8,8
**handcuffs** 57:16
**handle** 23:22 56:24
  60:11
**handling** 21:18
**hands** 39:4,7,18,18
  39:19,20 40:3,4,5
  40:9 48:15,18
  49:1,8,11,12,13
  49:14,19 55:22,22

56:2,13,14,17,20
  57:7,14
**happened** 52:19
**happening** 54:22
  60:21,22
**head** 6:6 31:4,6
  46:11 50:1
**head-on** 46:3
**headquarter** 11:17
**headquarters** 12:4
  12:5,12
**hear** 61:4
**heard** 30:8 37:15
**hearing** 32:11
**held** 10:7 51:7
**help** 11:10 50:24
  55:15
**Hides** 35:9,22
**hilly** 38:8
**hindsight** 41:24
  54:9 60:8
**hire** 12:24
**hit** 38:20 58:19
**home** 36:16 58:3,12
  58:18
**homicide** 12:6
  23:17
**hope** 58:3
**Hopefully** 30:5
**hour** 7:15
**house** 34:18 38:1,6
  38:12 53:11 54:14
  54:16,18 55:5,10
  57:21 63:9
**hurt** 58:8

**I**
**identification** 8:17
  10:10 43:2
**identifies** 44:4
**ignite** 40:23
**ignited** 49:21
**igniting** 50:6
**ignition** 63:15
**illuminates** 40:17
**illuminating** 49:21
**imaginary** 46:18
**immediate** 26:17
**immediately** 16:18
  25:4 38:20
**inching** 40:7
**incident** 8:8 12:1
  14:3,8,9,15 15:10
  15:11,18 16:6,9
  17:3,6,18,21 21:2
  24:9 27:5,13 29:2

29:21 30:2 43:7
  45:7 52:12 53:6
  57:23 60:15,19
  61:21 62:10,14
  64:1
**incidents** 27:7
**incorrect** 10:1
**independent** 22:15
**individual** 1:9,11
  51:16
**individually** 1:3
**individuals** 11:4
**influence** 6:21
**informed** 22:2,2
**initial** 13:6,7
**Initially** 12:23
**inserted** 47:21
**inside** 38:7 39:11
  39:12,23 40:1,18
  41:6 49:21 54:14
  63:9
**instructing** 28:5
**instructions** 39:3
  66:1
**intent** 9:6
**intention** 54:23
  55:1,2,3,11,12
**intentions** 53:13
**interaction** 29:13
  29:16
**interstate** 58:17
**interview** 4:14,16
  6:6 13:20,21 14:1
  14:16 15:12,19,21
  16:11,13,22 17:7
  17:23 18:14 21:5
  21:10 23:4,19
**investigation** 4:18
  14:24 15:11 20:19
  21:15,18 23:17
  26:19 44:9
**investigations** 42:6
**investigative** 43:6
**investigator** 11:7
  12:7,11
**involve** 51:14
**involved** 30:22 32:2
  32:7 43:12 60:9
**involving** 30:13
  51:10
**It'd** 34:6

**J**
**Jack** 50:21
**Jay** 1:10 4:16 8:11
  41:3

**JEAN** 1:3
**Jersey** 1:23
**jobs** 61:15
**joyride** 63:7
**judge** 6:13 12:9,10
  20:10
**jump** 38:20
**June** 7:22 8:4,5,11
  9:4,20 10:16,22
  14:1 15:21 16:10
  17:7 21:5 22:16
  22:23 59:15 64:16
**jury** 6:13 22:19,22

**K**
**KATHY** 3:8
**keep** 20:23 40:2
  41:12 52:6,8 60:6
**Kelly** 2:7 65:8,20
**kept** 40:6
**key** 63:15
**kind** 38:17 41:2
  50:22 57:4
**kitchen** 34:22
**kle@attorneygen...**
  3:11
**knee** 57:13,13
**know** 15:5,6,15,17
  17:9 19:12,17
  20:2,5,23 21:18
  23:1,3,16 24:8
  33:24 35:19 36:17
  36:21 37:17 40:23
  41:24 42:2 44:2
  61:15 63:7
**knowing** 55:5
**knowledge** 16:24
  24:10,12 25:22
  27:12,19,23 28:4
  28:21 32:11,13
  33:5,18,21 35:15
  61:19
**known** 21:22 22:1

**L**
**L** 3:3 39:8 45:1
  46:18
**lack** 12:21 34:24
**lapel** 26:12,17 39:1
  41:21,22 42:5
  61:23
**LAW** 3:3
**lawsuit** 5:24
**Le** 3:8 4:7 5:2 8:3
  8:11 10:2 13:8
  15:1,4 17:8,12,15

OFFICER EDDIE PAGAN

22:18 23:5,10,12
25:21 26:4,18
27:8 34:4 37:14
51:5 52:14 55:24
59:7 64:9
**learn** 62:18,22
63:24
**learned** 9:24
**Learning** 16:7
**leave** 14:16,17 54:5
54:13
**leaving** 57:21
**left** 38:1 39:1 40:19
57:13
**left-hand** 45:22
**let's** 7:20 10:6 18:4
29:20 33:22
**letter** 22:4 27:3
**level** 40:10
**life** 41:3,3,3 60:12
**light** 40:22
**lighter** 40:17,18
49:14,20 50:7
**lights** 25:3,11,19
26:6 27:7,20 28:1
28:6,16,19 38:14
39:1 40:16 62:1
63:18
**line** 39:9 45:2 67:4
**lines** 32:8 37:7
60:21 61:1
**listed** 13:22
**little** 17:17 24:9
26:20 28:13 30:5
42:9,9 60:4
**local** 34:3
**locate** 53:12
**located** 36:1
**location** 41:10
**locations** 33:24
**long** 7:10,14 17:20
61:12,13
**look** 40:6,16 42:8
50:19
**looked** 50:9
**looking** 44:10 50:1
53:5,10
**looks** 43:18 50:18
**lot** 53:23 61:9
**love** 61:14,15
**lower** 40:8
**lowly** 20:24

**M**

**M** 11:8,10,14,18,20
11:20 12:12

**M-6-8** 44:15
**M6-14** 44:18
**main** 38:15
**major** 11:9 12:11
21:16
**making** 7:2 30:22
31:21 34:18,19
38:10 52:24 54:14
66:7
**man** 39:13
**maneuvered** 45:3
**maniacal** 40:16
50:13
**manner** 62:5 63:15
**map** 45:19
**marathon** 7:13
**mark** 8:20,20 12:17
42:22
**marked** 4:12 8:16
10:9 43:1,19
44:12,15,18
**matter** 63:18 67:3
**mean** 16:12 32:18
53:19 54:1 60:20
**meaning** 6:12 14:19
14:21 48:23 54:16
54:20
**meanings** 58:24
**means** 7:13 58:12
58:21
**meant** 16:15 42:17
**medication** 6:22
**mention** 60:8
**mentioned** 43:22
**messed** 61:6
**mic** 26:11 39:1 42:5
**microphone** 42:10
61:23 62:5
**middle** 58:17
**mileage** 33:3
**miles** 32:20,24
33:13
**mind** 18:23 52:6,9
**minds** 61:7
**minimize** 60:7
**minimum** 58:18
**Minotti** 12:17 22:12
**minute** 24:18 25:1
25:11 26:16 43:7
**minutes** 33:17 63:1
63:9,10
**Miranda** 9:11
**mislead** 9:6
**mistaken** 48:2
**mistakes** 16:8
**misunderstanding**

28:2
**mobile** 38:22 54:22
**moment** 21:21
32:21 38:1
**Monaghan** 1:3
30:19
**morning** 5:20,21
**mortar** 47:7
**Morton** 3:4,4
**mother** 30:9
**motivations** 51:24
**move** 38:16 46:15
46:16,17 56:15
**moved** 45:10 56:18
**movement** 44:24
**movements** 45:2
48:9 49:5 57:6
**moving** 38:22 45:16
48:23
**MVR** 17:17,22 18:1
18:2,3,7,21 24:2,5
24:7,10,14 25:7
25:12 26:3,7,10
27:1 29:1,9,14,17
41:19 61:18,19,22
61:24 62:4,9,11
62:20,22,23 63:11
63:11,15,17,20

**N**

**N** 4:1
**nails** 37:4,7,9 41:1
**name** 5:22 12:16
13:12,14 20:2,7
66:10
**nature** 60:1
**navigate** 38:8
**neck** 37:6 40:20
41:1 47:1,8
**need** 6:8 7:10 34:10
42:18,19,20 48:10
66:17
**needed** 55:16
**never** 37:17 45:12
49:10,12 56:6,17
56:18
**New** 1:23 24:1
**Nicholson** 50:21
**nod** 6:6
**normal** 58:11
**notary** 2:8 65:9,22
66:18
**noted** 65:12 66:8
68:10
**notes** 65:13
**nothing's** 63:17

**noticed** 6:5
**number** 43:20 44:1
44:2,4

**O**

**o'clock** 46:10
**oath** 6:12 9:10,15
9:17,18
**Object** 26:18 27:8
34:4
**objection** 10:2 13:8
15:1 17:8,9 22:18
25:21 26:4 37:14
52:14 55:24
**objections** 5:8
65:12
**obviously** 63:2
**occasion** 14:5
**occasions** 15:17
**occur** 45:8
**occurred** 8:8 21:21
37:20 60:19
**office** 2:4 3:8 21:17
22:3 61:10
**officer** 1:8,10,15
2:3 4:4 5:12 29:13
32:14 33:20 46:20
55:7,20 57:20
58:2 59:12 67:2
68:17
**officers** 23:17 32:3
33:19,22
**Oh** 44:2
**okay** 6:2,11,15,21
6:24 7:3,4,16,20
8:1,7 9:1,6,9,13
9:16,23 10:5,5,19
11:3,13,19,22
12:6,13,18,21
13:4,13,15,18,24
14:5,7,15,19,23
15:8,16,23 16:1,5
16:16,17,20,24
17:5,11,14 18:7
18:12,16,19 19:6
19:10,15,21 20:2
20:9,14,14 21:1
22:4,7,10,14,21
23:1,12,21 24:1
24:22 25:2,6,10
25:18 26:2,9,13
26:22,24 27:4,18
27:23 28:9,18,24
29:12,20,23 30:4
30:12,17,21 31:1
31:5,8,14,18 32:6

32:10 33:2,9,11
33:18 34:2,9 35:5
35:7,13 36:4,19
36:22,23 37:11,19
41:14,16 42:1,4
42:13 43:17 44:21
44:23 45:20 46:9
46:15,19 47:4,14
47:18,24 48:3,17
49:6,10,15,17
50:3,9,12,20 51:3
51:14,18 52:21,23
53:10,15 54:1,11
55:7,14 56:6,9,21
59:12 60:1 62:8
62:14,18,21 64:19
**on-duty** 33:6
**once** 19:24 27:20
56:14 63:10
**ones** 32:17 35:24
**open** 56:22,23 57:8
57:9,11
**opportunities** 53:6
**opportunity** 54:17
**opposed** 24:23
**option** 54:13
**options** 54:9
**Oral** 1:15 2:3
**orally** 22:8
**ordeal** 60:14
**ordered** 56:6
**original** 66:20
**outcome** 45:7
**outrun** 41:10
**outside** 56:24
**overcast** 39:24
**overhead** 62:1
**overheard** 30:18
36:24
**oversee** 35:24

**P**

**P.C** 3:3
**p.m** 64:20
**Pagan** 1:8,15 2:3
4:4,14 5:12 59:12
67:2,3 68:17
**page** 4:3 43:18,20
67:4 68:1
**painful** 30:6
**paramedic** 36:10
36:19
**parents** 5:24
**park** 38:20,22 45:12
**parked** 27:15 63:1
**part** 44:8

**OFFICER EDDIE PAGAN**

particular 35:16
   43:14
passed 20:1
pending 7:12
Pennsylvania 1:1,9
   1:11,22 2:5,9 3:4
   3:10 21:16 22:3
   35:12 65:3,10
people 13:22 36:17
   37:15 39:15,17,19
perfectly 6:7
perform 55:11
performed 52:13
period 63:16
person 35:11,16
   51:23,23 57:1,4
   57:15
person's 36:21
personal 1:4 12:24
perspective 50:22
PFA 55:12
ph 35:9,17
Philadelphia 1:22
   2:5 3:10 65:5
phone 30:9,18,22
   30:24 31:10,11,13
   31:15 36:23
physically 19:10
Pike 1:23
place 21:2,5
placed 26:11
plainly 62:21
Plaintiffs 1:7 3:6
plus 11:18 36:15
point 19:3 21:17
   28:15 31:14 37:21
   38:4,13,15,18
   39:2,4,10,11 40:2
   40:6,17 48:14,24
   52:17 55:15 56:11
pointed 40:8
police 1:10,12
   21:16 22:3 32:19
   34:3 35:9
policy 27:6,20,24
   28:5,21
portion 26:11
poses 38:23
position 38:19 45:8
   46:10 58:7
positon 45:6
possessing 32:12
possible 60:6
possibly 41:10
preceding 65:13
preface 24:7

preparation 16:13
present 13:19 32:4
press 63:18
presumably 57:21
pretty 20:17 35:5
   61:16
principles 52:5,7
prior 6:6 15:11,18
   15:20,21 16:15,16
   17:23,24 19:9
   25:5 27:5 29:14
   29:17 30:7 40:24
   48:14 49:20 50:6
   53:11 54:23 55:8
   57:21 59:14 60:9
probably 16:18
   34:5,6
problems 51:23
proceeded 21:20
   39:8 41:8,9
proceedings 65:17
process 6:2 55:17
   56:10 57:15,16
   61:19 63:19 64:5
   64:8
Professional 2:8
   65:9,21
professionally
   60:14
promptly 66:21
pronouncing 10:14
property 27:14
   33:16 41:4 54:5
propounded 68:9
proverbial 34:21
provide 12:22
   22:15
provided 17:5,21
   18:2,16,20 19:7
   27:3 66:12,17
providing 59:14
public 2:8 65:9,22
   66:18
pulled 46:20
pulling 39:14
purpose 16:5
push 10:5
put 10:19 27:12
   36:15,19 39:18
   41:2 45:12 48:5
   48:15 49:1 50:22
   54:7 55:22 57:10
puts 57:5

**Q**

question 5:9 6:24

7:5,12 15:4 17:13
   23:13 24:11 27:9
   28:2,13 36:4 53:3
   57:19
questioning 7:9
   61:2,7
questions 6:4 7:17
   10:20 24:13 30:2
   41:15 51:9 59:2,8
   64:10 68:9
quick 51:6

**R**

R 65:1
radios 18:2,3
ran 53:22
range 58:24
reach 42:17 57:2,2
reached 37:21,24
reaching 56:23
   57:9
read 5:3 9:11 47:20
   66:2,3 68:6
reading 43:10
readjust 38:19
ready 21:22,23 40:8
realized 46:7,9
really 16:4 17:24
   24:24
reason 6:15,17 7:11
   36:12 43:17 66:5
   66:9 67:4
reasonable 6:7
reboot 63:16,17
rebooting 63:19
   64:5,8
recall 7:23 8:14
   9:11 13:23 15:22
   16:23 17:20,20
   19:16 30:21 31:1
   31:21 37:1,1 47:3
   58:5
receive 66:22
recollection 32:6
   37:8
record 5:22 8:3
   10:6,7 17:10 24:6
   24:14 25:8,16,17
   40:14 44:3 45:6
   51:7
recorded 16:21
   29:1 63:17
recording 24:2 25:4
   25:20 26:3,10,14
   26:17 29:13,16,17
   42:11 62:9,11,16

63:12,22
recordings 18:3
reduce 54:21
refer 18:7 27:2
reference 31:9
   50:24
referred 47:7
referring 32:24
   64:6
refuses 40:5
regarding 59:13,19
   61:17
regards 31:12
   48:11 61:4
remain 54:18
remember 9:14,15
   19:3,14 23:20
   31:12 33:7 47:17
   47:23 60:21,22,22
   60:23
removing 58:16
repeat 23:13 27:9
   28:3
rephrase 26:14
   29:3
report 4:18 20:11
   43:6,10,11,13,14
reported 20:10
Reporter 2:8 5:1
   65:9,21
Reporters 1:21
REPORTING 1:21
reports 44:9
represent 5:23
representation
   12:22
representative/ 1:4
request 18:23
   32:14
requesting 23:4,19
require 66:21
requiring 27:24
reserve 5:2
reserved 5:9
residence 30:8
   33:14,16 34:2,21
   37:22 63:2
respond 6:4 7:5
responses 6:5,9,9
results 15:10
retained 12:19
retreat 41:9
retrospect 53:5
Return 66:20
reveal 23:7
review 9:1 17:17

19:24 20:1 43:8
reviewed 10:17
   62:9
revise 23:2
revolved 60:10
rifles 63:3
right 5:2 6:10 7:9
   7:24 8:13 10:20
   13:18,24 15:16
   17:5 18:19 19:2
   19:15,17 22:14
   24:1 28:24 29:12
   29:20,20,22 31:14
   32:10,23 35:15,20
   36:22 37:11,19,19
   40:18 41:11 42:1
   42:4,21,21 43:5
   43:17,24 44:7,22
   45:18,20 46:15,17
   47:24 49:20 50:15
   51:4,9 52:11 53:2
   55:4,19 56:22,23
   57:8,13,18 59:1,2
   59:12 61:5,5
   62:12 66:3
rights 9:12
risk 36:15 53:22,23
   54:7,21
road 38:10,15 61:14
rough 38:8
Roughly 33:3,17
round 47:7,7,9,11
   47:11,13
rounds 41:8
rudimentary 25:9
rule 24:13
rules 6:1 66:21
run 20:20 38:6,18
   45:17
runs 20:17

**S**

safe 58:13,15,20
   60:7
safely 57:7
safety 60:4 63:3
sat 11:24
saw 37:21 39:13
   48:9 49:10,12,14
   49:17,19 56:17
saying 24:7 31:5
   48:17 60:22,23
scenario 34:22
scene 34:17 36:17
   60:5
sealing 5:7

Page 73

OFFICER EDDIE PAGAN

second 10:6 14:7
  31:10 41:17
seconds 24:23,23
  25:8 62:24 64:7
see 7:20 8:9 18:12
  19:8 38:13,16
  39:3,4,7,11,23
  40:3,3 41:6 48:13
  48:14,19 49:3,6
  49:13,22 50:1
  55:3 56:1,13,14
  56:20 57:6,7
seeing 19:18
seen 8:22 22:4
  43:13
sense 7:2 11:1 52:7
separate 54:20
seriously 37:13
  58:8
services 43:6
set 51:9
shaking 39:13
sheet 66:6,9,10,14
  66:20 67:1 68:10
shift 33:6
shimmy 48:23
Shining 50:21
shirt 47:16,21
shoot 41:8
shooting 14:12
  48:14 60:9
shot 29:3,10 62:12
  62:16
shots 63:22
shoulder 39:20
shoulders 48:23
show 8:1 10:13
  23:23,23 34:20
  39:18,19 40:5
  45:5 55:22
showing 43:17
shrink 39:19
shut 62:23 63:2,8,8
  63:11
side 10:5,19 35:11
  39:20,22 45:22
  46:1,2 48:23,24
  50:1
sides 48:19
sign 5:3 39:21
  66:10,11,15,16
signature 66:19
  68:1,17
signing 66:13
silhouette 39:13
  49:7,23

simultaneously
  41:6 50:8
single 42:7
sir 5:20 38:3 59:9
sit 11:11
sitting 9:18
situation 52:16
  53:8,10,17 54:2
  57:5 60:7
six 11:15,18,18
sixth 11:17
slightly 6:6
slowly 56:22 57:11
smile 50:3,6,13,13
  50:14,15,18,19,22
smiled 50:10
smiles 40:16
somewhat 53:2
son 1:5
sorry 26:14
sound 57:12
soundness 16:8
sounds 7:24
South 3:4
space 38:9 66:12
  66:17
Spain's 8:11
speak 15:13 16:20
  23:23,24 61:4
speaker 10:23
special 35:19,21,21
specialist 24:8 35:8
specialized 35:23
specific 7:23 28:23
  36:2 42:12 48:10
specifically 32:7
  37:9
speed 58:18
spell 20:5
Splain 1:10 4:16 6:1
  10:14 14:2 15:10
  15:15,18 16:6,21
  17:1,2 19:23,24
  29:14 32:14 33:20
  38:13 39:4 41:5
  44:19 46:20 55:7
  55:20 57:20 58:2
  58:11 59:14,20
  60:2,8,17 61:1
  64:16
Splain's 39:9 41:3
spoke 15:14,18
  60:3
spot 36:2
square 32:20,23
  42:9,10

SS 65:4
standards 60:5
standby 36:20
start 24:2 37:23
  38:4 57:24
started 7:18 27:21
  39:2 62:16
starts 24:23 26:10
  62:11,24
state 1:9,11 9:18
  16:2,5 21:16 22:3
  27:3 32:19 35:9
  45:5
stated 9:24 21:20
  32:7 62:21
statement 7:20 9:3
  9:9,19,20,23
  10:13,17,21,22,24
  19:9 21:22 22:16
  22:23 23:6 57:20
  58:2,5,6,9,23,24
  59:15
statements 9:7
  29:24 30:8
STATES 1:1
stating 22:5
station 11:17 14:22
  14:23 20:17 34:3
stations 11:18
steering 26:2,6
  62:2
step 56:12,15,18,19
  57:11
stiffen 39:21
stipulations 5:1
stop 28:1,7,8,9,10
  53:21 58:16
storage 25:19,23
straight 50:1
straight-forward
  51:20
strap 37:6
Street 1:22 2:5 3:9
stress 60:11
strike 23:2 48:13
stuff 20:16,23 40:24
subject 66:13
submission 39:21
substance 66:4,8
substations 11:15
  11:16
suggested 19:8
suggesting 52:21
suggestion 12:24
suicidal 51:15
Suite 1:22 2:5 3:9

SUMMIT 1:21
supervisor 18:24
  19:5,20 20:3
sure 6:4 18:4 27:2
  40:9 43:8 48:4,5,7
  48:18
suspect's 56:14
SWAT 35:22,22
sweatshirt 48:1
sworn 5:13
system 27:2 42:11

——————

**T**

T 65:1,1
T-A-L-I-J-A-N 20:8
tactical 17:2 39:8
  60:4
take 7:10 18:8 19:4
  34:21 37:12 38:17
  40:10 43:7 51:6
  51:20 61:13 63:6
  63:7
taken 2:4 21:10
  53:6,7,12,16 54:4
  65:13 67:2
Talijan 20:4
talk 29:21
talked 59:21
talking 14:9 16:14
  18:4 48:11
tape 47:2
taught 51:18 52:6
team 11:9 12:11
  21:16 35:22,23,23
technical 16:7,8
techniques 51:10
  51:12,15,18,22
  52:8,13 54:3
tell 5:13 7:2,11,21
  22:7,9 23:22 33:9
  40:20 54:24
tend 6:6
tensely 49:2
term 12:21 34:24
terrain 38:8,12
testified 5:15 59:13
  59:20 61:17,18
  62:6,8
testify 6:16,18
testimony 22:22
  59:16 64:16 66:12
thank 8:13 59:3
thing 17:16 18:5
  61:5 63:4
things 42:22 52:8
  58:20

think 52:10 57:18
  58:10,19 61:6
thinking 38:18 60:7
third 31:10
thirty 66:22
thorough 58:20
thought 43:22
threat 30:22 31:21
  32:12 34:9 37:12
  38:23
threatened 31:15
threats 30:13 37:16
three 30:18 31:11
  31:15 32:21 36:23
  40:15 50:5
Thursday 1:16 2:6
tight 38:9
time 5:10 7:11
  12:14 19:3 20:1
  21:23 28:16 32:21
  33:13 34:1 35:14
  37:16 39:16 40:20
  41:5,7 42:2,7
  45:13 49:9,17,19
  49:24 51:5,24
  54:9,19 58:6 59:3
  61:18,21 63:15,16
  64:3
timeframe 33:23
times 16:3 42:6
  62:6
today 6:2,16,19
  9:18 59:3
told 15:13 24:22
  25:1 39:19
tonight 58:4
top 42:16 44:22
topic 24:1
total 11:15
Township 34:6
traffic 28:8 58:16
trained 51:12
training 27:6 34:23
  34:24 35:2 51:11
  52:2
trainings 51:14
transcribed 7:21
  13:20,21 23:19
transcript 4:14,16
  6:8 8:23 11:4
  13:22 65:15 68:6
transcription 68:8
transcripts 18:16
traveling 58:18
tree 40:1
trial 5:10

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**OFFICER EDDIE PAGAN**

**tries** 40:22
**trigger** 25:4 26:17
**triggers** 24:2
**troop** 11:8,10,14,15
  11:18,19,20,20
  12:12
**trooper** 1:10,12
  5:24 10:14 12:5
  12:10,17 14:2
  15:9,15,18 16:6
  16:21 17:1,2
  19:23,24 20:24
  28:5 32:14 33:20
  38:13 39:4,9 41:5
  44:19 58:10 59:14
  59:20,21 60:2,8
  60:17 61:1 64:15
**troopers** 14:23
  23:18 32:22 33:5
  34:16
**true** 9:20 68:7
**truth** 5:14
**truthfully** 6:16,18
**try** 38:7 61:15
**trying** 31:11,12
  38:11 48:19 49:1
  49:4 54:20
**turn** 24:4,18 25:3,6
  27:24 28:6,19
  38:7 43:18 57:11
  63:14
**turned** 28:16 40:15
**turning** 24:15 25:11
  25:18 27:20 62:1
**turns** 26:6,7 38:11
**two** 7:15 33:19,21
  34:16 41:8 42:22
**type** 17:6 52:9

**U**

**Uh-huh** 6:3 29:8
  53:1
**ultimately** 61:14
**unable** 39:23
**uncertainties** 61:9
**unclear** 30:12
**underneath** 47:16
**understand** 6:11
  7:1 15:4 17:15
  23:11 24:2 28:12
  30:3 44:22,24
  45:9 64:3
**understanding**
  9:21 19:6 21:8,13
  24:5,14,21 25:9
  25:12 26:16 30:17

33:10 62:15,19,20
  63:20,21,23
**understood** 7:6
  8:12 9:16 13:4
  18:19 21:1 22:14
  25:2 27:4 31:8
  33:4,4 42:1,21
  45:14 46:19 47:24
  52:11 54:23 55:17
  55:19 58:22 59:1
**uniform** 26:9 41:20
**union** 12:22 13:11
**union-provided**
  22:11
**unit** 11:8 35:9,10,21
  35:23 43:11
**UNITED** 1:1
**units** 35:22 36:1
**use** 45:18 61:18,22
**Usual** 5:1

**V**

**v** 67:3
**vehicle** 24:4,15,19
  25:6,7 27:15,16
  27:21 28:1,7,10
  28:14,15,19 29:1
  29:7 37:21,24
  38:2,7,7,14,16,19
  39:12 40:2,11
  41:7,18 44:13,16
  44:19 45:3,6,10
  45:11,12,15,22,23
  46:3,5,10,11,13
  46:17,21 48:8,12
  48:13,21 49:3
  54:13,19,21,22
  55:21,23 56:7
  57:7,11 62:23
**vehicle's** 38:21
**vehicles** 18:10,11
  18:13 27:15 45:8
  58:17 63:6
**verbal** 6:5,9
**vicinity** 47:19
**video** 19:8 29:1,7
  42:11
**Videographers**
  1:21
**videos** 19:7,11,18
  63:22
**videotaped** 7:21
**videotapes** 24:3
**view** 39:10
**violate** 27:19
**violation** 55:13

**visible** 34:19
**visual** 18:9
**voice** 57:13
**VS** 1:7

**W**

**wait** 54:17 63:19
**waited** 21:19
**waived** 5:8
**walk** 30:1 37:20
  57:12
**walked** 27:13
**Walnut** 1:22
**want** 5:2 6:1 17:24
  21:9,20 24:1 30:3
  37:19,23 38:4,9
  41:12 44:21,24
  45:1,5,18 55:19
**wanted** 59:10 63:4
**Washington** 34:5
**wasn't** 9:17 39:11
  49:2
**watch** 18:1 51:1
**WatchGuard** 27:3
**way** 39:18 48:18
  50:17 54:10 57:1
**We'll** 48:5
**we're** 7:5 14:9 18:4
  55:5 61:12
**weapons** 63:3,8
**weather** 49:3
**week** 17:24
**weight** 6:12
**WEISBERG** 3:3
**went** 60:16 63:9
**weren't** 48:17 61:7
**whatsoever** 24:8
  53:21 61:8
**wheel** 26:3,6 38:11
  62:2
**wide** 58:24
**window** 56:23
**windshield** 39:12
  39:24
**witness** 4:3 8:5,14
  10:3 15:2,5 17:11
  17:14,16 22:19
  23:9,11,13 25:22
  26:5,19 27:9 34:5
  37:15 52:16 56:1
  66:1,16,16,17,18
**WITNESSED** 68:21
**wondering** 61:11
**word** 32:1 41:22,23
**words** 31:1
**work** 14:21 25:15

41:24
**worked** 42:7
**working** 32:22
**works** 24:10 25:23
  63:21
**worse** 63:7
**wouldn't** 6:15 15:5
  22:9
**writing** 22:4,8
**www.summitrep...**
  1:24

**X**

**X** 4:1

**Y**

**Yeah** 8:5 16:16 38:5
  46:2 58:14 62:21
**years** 52:2
**yelled** 41:7
**yesterday** 8:24 9:1
**Yup** 42:16,20

**Z**

**0**

**08037** 1:23

**1**

**10** 4:16
**10:00** 33:23
**11:14** 2:7
**12** 46:10
**12:31** 64:20
**1500** 1:22
**1600** 2:4 3:9
**1610** 1:22
**16th** 7:22 8:11
  10:16
**19070** 3:4
**19102** 1:22
**19103** 3:10

**2**

**20** 33:17
**2017** 7:22 8:4 9:4
  9:20 10:16,22
  11:19 14:1 15:21
  16:11 17:7 21:3,6
  22:16,23 59:15
  60:19 64:17
**2019** 1:16 2:6 67:2
  68:7
**20th** 8:4,5,8 9:4,20
  10:22 14:1,10
  15:21 16:10 17:7

21:3,6 22:16,23
  33:23 43:12 59:15
  60:19 64:16
**215** 1:23 3:10
**22** 1:16 2:6 67:2
  68:6

**3**

**30** 21:10 24:23
  62:24 63:9,10
**300** 2:5 3:9
**302** 55:8,11
**350** 32:19,23

**4**

**424** 1:23
**43** 4:18
**447-8648** 1:23

**5**

**5** 4:6
**5:18-cv-05217-EGS**
  1:13
**560-2141** 3:10
**567-3315** 1:23
**59** 4:7

**6**

**60** 24:23 25:8 64:7
**609** 1:23
**610** 3:5
**64** 4:6
**690-0801** 3:5

**7**

**7** 3:4
**75** 58:18

**8**

**8** 4:14
**800** 1:23

**9**

**9:00** 33:23
**985-2400** 1:23

Page 75

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

ANGELO ARDO                       :   CIVIL ACTION
        and                       :
JEAN MONAGHAN,                    :
individually and as              :
personal representative/         :
administrator of the             :
estate of her son, ANTHONY:
ARDO,                            :
                                  :
            Plaintiffs,           :
                                  :
        vs.                       :
                                  :
OFFICER EDDIE PAGAN in his:
individual capacity as a         :
Pennsylvania State Police        :
Trooper                          :
        and                       :
OFFICER JAY SPLAIN in his        :
individual capacity as a         :
Pennsylvania State Police        :
Trooper,                         :
                                  :
            Defendants.           :   NO. 5:18-cv-05217-EGS


- - -

ORAL DEPOSITION OF OFFICER JAY SPLAIN
FRIDAY, AUGUST 23, 2019

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

**OFFICER JAY SPLAIN**

1                              - - -

2

3            Oral deposition of OFFICER JAY SPLAIN,

4    taken at the Pennsylvania Office of Attorney General,

5    1600 Arch Street, Suite 300, Philadelphia,

6    Pennsylvania, on Friday, August 23, 2019, commencing

7    at 10:10 a.m., before Andrea M. Brinton, Certified

8    Court Reporter and Notary Public.

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**OFFICER JAY SPLAIN**

```
 1    APPEARANCES:

 2    WEISBERG LAW, P.C.
      BY:  L. ANTHONY DiJIACOMO, ESQUIRE
 3    7 South Morton Avenue
      Morton, Pennsylvania 19070
 4    (610) 690-0801
      adijiacomo@weisberglawoffices.com
 5    Counsel for Plaintiffs

 6    PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL
      BY:  KATHY A. LE, ESQUIRE
 7    1600 Arch Street
      Suite 300
 8    Philadelphia, Pennsylvania 19103
      (215) 560-2402
 9    kle@attorneygeneral.gov
      Counsel for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**OFFICER JAY SPLAIN**

1                          I N D E X

2       WITNESS                                          PAGE

3       OFFICER JAY SPLAIN

4       EXAMINATION

5            By Mr. DiJiacomo                              5

6
                              - - -
7

8                        E X H I B I T S

9                                             PAGE FIRST
        EXHIBIT NO.     DESCRIPTION           REFERENCED
10
        Exhibit A       Pennsylvania State Police        8
11                      Rights Warning and Waiver and
                        Trooper Jay Splain Interview
12
        Exhibit B       Homicide Investigation Action    33
13                      Report

14

15                            - - -

16

17

18

19

20

21

22

23

24

**OFFICER JAY SPLAIN**

1              (By agreement of counsel, the sealing,

2      certification and filing are waived; and all

3      objections, except as to the form of the question,

4      are reserved until the time of trial.)

5                              - - -

6              OFFICER JAY SPLAIN, after having been first

7      duly sworn, was examined and testified as follows:

8                              - - -

9                         EXAMINATION

10                             - - -

11     BY MR. DiJIACOMO:

12         Q.    Good morning, sir.

13         A.    Good morning.

14         Q.    Again, for the record, my name's Anthony

15     DiJiacomo.  I represent the Estate of Anthony Ardo

16     and his parents, of course, in the lawsuit against

17     you and Officer Pagan.

18                   Thank you for being here this morning.

19     I just want to go over a few, I guess, procedural

20     ground rules, if you would, to make sure things go

21     smoothly today.

22         A.    Okay.

23         Q.    As I ask you questions, in the same way you

24     did in your testimony before, just be sure you make

**OFFICER JAY SPLAIN**

1    your responses verbal.  It's very natural to nod the

2    head or to give guttural responses at times, but just

3    for the record's sake, so we can make sure it's an

4    affirmative versus negative response, make sure

5    they're verbal; fair enough?

6         A.   Got it.

7         Q.   All right.  I do not expect us to be here

8    long; likely, less than an hour, in fact.

9                   With that said, if there's any point

10   in time where you need to take a break to use the

11   bathroom or talk to your attorney, just let me

12   know --

13        A.   Okay.

14        Q.   -- okay?

15                  I may ask you to answer a pending

16   question first, but we'll play it by ear.

17                  Do you understand that you're under

18   oath and it has the same weight or meaning as if you

19   were before a judge and a jury?

20        A.   I do.

21        Q.   Okay.  And you're doing a fantastic job of

22   letting me get the full question out, and I'll try to

23   do the same for you as we go.  If there's any point I

24   interrupt you and you need to respond further, just

**OFFICER JAY SPLAIN**

1    tell me; okay?

2        A.    Okay.

3        Q.    The most important thing today is not to

4    guess.  If there's something you don't recall, just

5    tell me, because I appreciate it's been some time.

6                    And then I guess the last thing I

7    should tell you is if there's a question I ask you,

8    and likely it will happen, that just doesn't make

9    sense or you don't understand it, just tell me and

10   I'll try and give you a better question; okay?

11       A.    Got it.  Yes.

12       Q.    We will assume, though, that if you answer

13   a question, that you understood it; fair enough?

14       A.    Fair.

15       Q.    Okay.  I understand that you gave a

16   deposition -- well, you gave a statement that was

17   transcribed and videotaped --

18       A.    Yes.

19       Q.    -- concerning the underlying incident on

20   June 16th, 2017.

21       A.    Yes.

22       Q.    And just to confirm the date, I'm going to

23   show you a document.

24                    MR. DiJIACOMO:  Let's mark it

**OFFICER JAY SPLAIN**

1      as Exhibit A.

2                  (Exhibit A marked for

3   identification.)

4   BY MR. DiJIACOMO:

5      Q.   The transcript that I'm referencing, that's

6   marked as Exhibit A, do you recall giving this

7   statement?

8      A.   I do.

9      Q.   Okay.  And I'll say it's extremely

10  detailed, and I appreciate that.  It will make today

11  much quicker.

12                  Is the statement that you provided on

13  June 16th, 2017 accurate and truthful?

14     A.   Yes.

15     Q.   Okay.  Were any statements therein given

16  accurate, but with any intent to mislead?

17     A.   No.

18     Q.   Okay.  The statement that you gave on June

19  16th, 2017 was approximately 27 days or so after the

20  incident; correct?

21     A.   Correct.

22     Q.   And when I say incident, we both understand

23  I'm referring to the May 20th, 2017 police

24  shooting --

**OFFICER JAY SPLAIN**

1      A.   Correct.

2      Q.   -- involving Anthony Ardo?

3      A.   Yes.

4      Q.   Okay.  First, do you have an understanding

5  as to why there was such a length of time between the

6  incident and your transcript -- and your statement?

7      A.   Well, that was the first time that I had

8  been asked to provide a statement, and as far as -- I

9  can only guess why it took that long --

10      Q.   Don't guess.

11      A.   -- so I'm not going to guess.

12      Q.   That's perfect.

13              But the first time the homicide

14  investigative officers reached out to you to schedule

15  a statement was for that date?

16      A.   Correct.

17      Q.   Understood.

18              Okay.  Between the time of the

19  incident and your statement, did you have any

20  discussions with Trooper Pagan concerning the events

21  of the underlying incident?

22      A.   Yes, only in generalities, though.

23      Q.   How so?

24      A.   Well, we discussed, you know -- I just

**OFFICER JAY SPLAIN**

1  wanted to -- I would reassure him that, you know,

2  hey, we did everything by procedure, by policy, you

3  know, you don't have anything to worry about; and I

4  wanted to reassure him, you know, that he did a good

5  job at the scene, you know, the way he handled

6  himself.

7              I explained to him how the process

8  works, and -- but my main goal was to not get too

9  much into the details of the incident itself, because

10  I wanted to preserve the integrity of the

11  investigation.

12      Q.   Okay.  For context, you were involved in a

13  police shooting prior to this incident; correct?

14      A.   Correct.

15      Q.   And to your understanding, Trooper Pagan

16  was not ever prior involved in a police shooting.

17      A.   That's correct.

18      Q.   Okay.  So to the extent that you were

19  giving advice or discussing the incident, it's your

20  testimony that it concerned general guidance

21  concerning the process and how to deal with it.

22      A.   Yes.

23      Q.   Okay.  Was there any discussion about

24  comparing recollections of the incident?

**OFFICER JAY SPLAIN**

1      A.   I know just initially the only thing I

2  really remember was the day that it happened, the day

3  of the incident, he -- initially he didn't remember

4  if he fired or not, and I told him, I'm like, no, I'm

5  pretty sure you fired.

6            But other than that difference in

7  recollection, I don't recall anything else

8  discussion-wise we had about specifics of differences

9  of recollections.

10           That was the -- that was the main

11  thing, is just he's like -- he's like, I -- I fired?

12  You know, did I shoot?  And I was, like, yeah.  But

13  other than that, we didn't -- that was about as

14  specific as it got.

15      Q.   Okay.  Did you have any discussion

16  concerning or confirming whether the other had seen

17  Anthony Ardo ignite the lighter?

18      A.   Not -- no, not that I recall.

19      Q.   Okay.  All right.  In advance to providing

20  your statement on June 16th, did you review any type

21  of evidence?

22      A.   Yes.

23      Q.   All right.  What was that?

24      A.   The MVR recording.

**OFFICER JAY SPLAIN**

1      Q.   And just to make sure we're on the same

2   page, the MVR recording is the video footage from the

3   vehicles?

4      A.   Yes.

5      Q.   Okay.  Who provided you, to your

6   understanding, authorization to view the video?

7      A.   I want to say it was probably the criminal

8   unit supervisor at the station, which would have been

9   Corporal Blair Talijan, but he might have -- and I'm

10   guessing here.  I'm assuming he would have had to

11   have -- had to get the station commander, which would

12   have been Sergeant O'Malley, he probably would have

13   gotten his permission just to make sure that he -- it

14   was all right with him.

15            But, again, I don't know who actually,

16   if you want to say, signed off on it or approved it,

17   I just know that I asked if I would be able to review

18   it before providing my statement.

19      Q.   Okay.  For context, O'Malley is the --

20   forgive me for terms, but he's in charge of the

21   Belfast barracks?

22      A.   Yes, he -- he was -- let's see.  By the

23   time -- the date of the incident, he was not.  The

24   current station commander, which would have been

**OFFICER JAY SPLAIN**

1     Sergeant Joseph Sparich, he was on his way out, he
2     was transferring -- promoting out, and then -- but we
3     did know at that time that Sergeant O'Malley was
4     going to be the one moving in to -- taking over
5     Sergeant Sparich's position as station commander.
6                  And then I think -- I'm pretty sure by
7     then -- by the time that I did give my statement in
8     June, Sergeant O'Malley was there as the station
9     commander.  So, yeah, it should have been Sergeant
10    O'Malley.
11         Q.   Understood.
12                  Do I understand correctly that you
13    requested -- you personally requested to view the MVR
14    footage?
15         A.   Yes.
16                  MS. LE:   Objection to form.
17                  If I object to form, you can
18         ignore me and answer the question if you
19         understand.
20    BY MR. DiJIACOMO:
21         Q.   For the record, I just wanted to make sure
22    you had context.
23                  What was the purpose of you viewing
24    the MVR footage in advance of this statement?

**OFFICER JAY SPLAIN**

1       A.   My purpose I wanted to see the footage in

2    advance to give my statement was because there had

3    been -- you know, it was about a month time that had

4    elapsed and -- since the incident, and I just wanted

5    to make sure that before I gave my official statement

6    in a homicide investigation, that my memory was

7    serving me correctly and matched up with the MVR.

8               And, you know, that's -- I didn't want

9    there to be any surprises or lapse in memory on my

10   part that would make me look like I was giving a

11   false statement, you know, falsely remembering things

12   or anything like that.

13       Q.   In your June 17th, 2017 statement, you made

14   a note that after viewing the MVR footage, you had

15   realized you had shot six shots, as opposed to your

16   memory serving you as four or five.

17       A.   Yes.

18       Q.   Besides that -- besides that, were there

19   any other -- did the MVR footage help you recall any

20   other facts that you wouldn't have otherwise?

21       A.   No.  Reviewing the MVR footage then just

22   reaffirmed that my memory of the event was solid and

23   it did match up.

24               But there's no surprises after

**OFFICER JAY SPLAIN**

1    reviewing the MVR footage that made me go, oh, wow, I

2    forgot about that.  There's nothing like that.

3        Q.   All right.  Understood.

4             All right.  I just want to go through

5    pieces of the incident just for clarification,

6    because I need it.  Again, I appreciate the statement

7    you gave before.

8             Did you -- did you personally hear

9    Anthony, during the various phone calls between

10   Anthony and his mother, make any statement concerning

11   a gun?

12       A.   Yes.

13       Q.   Okay.  Which -- during which phone call --

14   let me back up.

15             How many phone calls did you hear?

16       A.   I believe it was three.

17       Q.   Okay.

18       A.   Yeah.

19       Q.   So you were present for all three phone

20   calls?

21       A.   Yes.

22       Q.   Okay.  Understood.

23             To your recollection, did Anthony

24   mention a gun in more than one phone call?

**OFFICER JAY SPLAIN**

1      A.   The mention of the gun was just during the

2   first phone call between him and his mother right

3   after I had arrived at the residence.

4      Q.   And what's your recollection of the

5   statement he made at the time?

6      A.   He had said that -- he had said something

7   to the effect that he could get a gun by tomorrow and

8   he would just blow his head off.

9      Q.   Did Anthony give a time frame, do you

10  remember?

11           MS. LE:   Objection to form.

12           THE WITNESS:   Yeah, I'm pretty

13      certain that I remember him saying "by

14      tomorrow."

15  BY MR. DiJIACOMO:

16     Q.   Okay.   Okay.   Understood.

17           During those three phone calls, what

18  do you recall Anthony saying about a bomb?

19     A.   He had said that he would have a -- a bomb

20  strapped around his neck loaded with nails, and that

21  if -- if his mom was tricking him or if this was some

22  sort of ruse to get him to come to the house, he

23  would blow himself up and make her watch, and if

24  there was any police presence, he would blow himself

**OFFICER JAY SPLAIN**

1  up.

2     Q.   Did you overhear Anthony make any threat to

3  blowing up others, in addition to himself, if it was

4  a ruse?

5     A.   No, he never specifically mentioned anyone

6  else.

7     Q.   Okay.  All right.  So over the phone calls,

8  the threats that you heard concerning a gun and a

9  bomb were all threats of self harm?

10    A.   I'd like to argue that when he mentioned

11  the nail bomb, that at that point, you know, that's

12  what set off the biggest red flag in my mind, was

13  that, you know, a nail bomb is not a weapon that's

14  intended to hurt just one person.  In this case, it

15  would have been just Anthony.

16           That's something that's designed

17  purposefully to create mass casualty, based on, you

18  know, the nails being shrapnel, just flying

19  360 degrees and don't care who or what they hit,

20  so --

21    Q.   Understood.  Okay.  So -- understood.

22           Okay.  My understanding is that after

23  the third phone call in which Anthony explicitly made

24  the threat of a bomb including the nails, you had

**OFFICER JAY SPLAIN**

 1   radioed back to the station stating the same.

 2       A.   Yes.

 3       Q.   My understanding, though, is at that point,

 4   there wasn't any request for assistance; is that

 5   accurate?

 6       A.   That's correct.

 7       Q.   Okay.  Why not?

 8       A.   There was only four of us working at that

 9   point.  Two of us were -- myself and Trooper Pagan

10   were already tied up with this incident, we had no

11   one else that was anywhere close, there were still

12   other police calls -- calls for police service

13   currently happening at that time, and I felt like

14   Trooper Pagan and I had the situation under control

15   at that point.

16            I mean, if I would have thought at

17   that point that we needed more assistance, I would

18   have certainly asked for it.

19       Q.   Did you think that the threat of the bomb

20   was, for lack of a better term, serious?

21            No, let me rephrase that.  I don't

22   like that word.  Legitimate.

23       A.   At the point where I heard Anthony saying

24   it, I remember thinking to myself, I'm hoping that

**OFFICER JAY SPLAIN**

1   he's just blowing smoke and just trying to terrorize

2   his mom, but then once the conversation with his

3   mother ended, then I immediately asked her if she had

4   any knowledge of him ever playing with explosives or

5   setting off pipe bombs or building bombs or anything

6   like that, and the look of concern that was on her

7   face after I asked her that and her hesitation before

8   answering the question, in which she did finally say,

9   well, he does play with fireworks a lot, that's

10  when -- it was at that point that I was like, this --

11  I'm going to have to take this as a legitimate bomb

12  threat until proven otherwise.

13       Q.   But you didn't call for any type of bomb

14  squad, EMT or other type of backup.

15       A.   No, because we had no idea where the bomb

16  or Anthony was at at that point, so calling somebody

17  there at that point is -- they're going to -- they're

18  going to ask, okay, well, where's it at?  And I'm

19  going to say, I don't know yet.  And they're going to

20  say, okay, once you have a location, then call us

21  back.

22       Q.   Is there value, in your opinion, to calling

23  and putting them on standby?  And I realize I'm

24  asking 20/20 questions, all right, backward-looking,

**OFFICER JAY SPLAIN**

1    I appreciate that.

2         A.   No, because it's not really going to change

3    the facts and circumstances that we had right there

4    at that moment in time.

5              You know, it's something that, you

6    know, if they're needed, you call them as soon as you

7    definitely know that they're needed, and at that

8    point, we didn't have a definite need for them, so --

9         Q.   Okay.  In the course of your career, have

10   you ever had to deal with a bomb, an actual bomb

11   threat, other than with Anthony Ardo?

12        A.   Let me think.  I think there was a bomb

13   threat at one of the schools, yeah.  Yeah, but that

14   was the only -- that's the only thing that comes to

15   recollection right now as far as a bomb threat.

16        Q.   Were you involved in responding to that?

17        A.   Yes.

18        Q.   Again, forgive me for lack of good terms,

19   but were you one of the officers in charge of

20   responding to that?

21        A.   No.

22              MS. LE:  Object to form.

23   BY MR. DiJIACOMO:

24        Q.   Okay.  A supporting officer, then?

**OFFICER JAY SPLAIN**

1      A.   Yes.

2      Q.   Okay.  In the situation we're discussing,

3  was any type of bomb specialist called in?

4      A.   You're referring to the school bomb threat?

5      Q.   The school bomb, yes.

6      A.   I -- I don't recall.  I know I don't

7  remember ever seeing any of the bomb -- our bomb

8  technicians at that call, but, you know, I don't know

9  if they were called and placed on standby or

10  anything.  I don't know.  I don't have that

11  information, sorry.

12      Q.   Understood.  Final follow-up question about

13  that.  In the school bomb threat situation -- nix it.

14  Never mind.

15           I'm jumping around.  There was a point

16  in time after Anthony was shot in which you opened

17  the door and pulled Anthony out.

18           Do you have a memory, from those

19  observations during that time period, of how the bomb

20  was attached to Anthony?

21      A.   Yes.

22      Q.   How so?

23      A.   He had a -- there's a hole in the -- just

24  underneath the collar of the shirt he was wearing.

**OFFICER JAY SPLAIN**

1    It was like a waffle knit, like a thermal, like a

2    long john --

3         Q.   Okay.

4         A.   -- type material shirt, long-sleeved, and,

5    you know, there was a hole just underneath the

6    collar, right in the front center.

7              And the fuse was passed through the

8    hole and then, like, tied in the -- I don't know if

9    it was a knot or just, like, a once -- like, a

10   crossover on itself and pulled so that it was -- it

11   was affixed to his shirt collar.

12        Q.   If I understand you correctly, the bomb was

13   underneath the shirt, then?

14        A.   No, it was --

15             MS. LE:  Object to form.

16             THE WITNESS:  It was exposed on

17        the outside of his shirt.

18   BY MR. DiJIACOMO:

19        Q.   So the fuse, if I understand correctly,

20   went from the bomb, through the shirt and then back

21   out?

22        A.   Yes.

23        Q.   Okay.  Okay.  I'm not going to ask you to

24   walk through the shooting, I'm just going to be a

**OFFICER JAY SPLAIN**

1    little more pointed to get to the point.

2             There's a point in time where you

3    shoot the initial six shots; correct?

4         A.   Correct.

5         Q.   And it was in response to -- well, instead

6    of me putting words in your mouth, what was it in

7    response to?

8             Why did you shoot the first six shots?

9         A.   Because Anthony attempted to light the --

10   the bomb.

11        Q.   And you were able to see the lighter;

12   correct?

13        A.   Yes.

14        Q.   And --

15        A.   Well, no, let me --

16        Q.   Go ahead, please.

17        A.   I didn't see the lighter, I saw the

18   flame --

19        Q.   Okay.

20        A.   -- emitting from his clenched fist.

21        Q.   Okay.  Were you able to see the flame or

22   illumination?

23        A.   I saw the flame.

24        Q.   Okay.  Were you able to see the fuse?

**OFFICER JAY SPLAIN**

1       A.   No, not from where I was standing.

2       Q.   Okay.  But based on the prior threat,

3   Officer Pagan's eyes responding and the response of

4   yes to your question of is there something there, or

5   something along those lines, you had a fear that the

6   flame was lighting a fuse.

7       A.   Yes.

8       Q.   Okay.  And, thus, you took the six shots.

9       A.   Yes.

10      Q.   All right.  And I have understanding of why

11  six, so we won't go there.

12           What I want to understand is the

13  thought process from after the first six shots to

14  including why the following three shots were taken.

15  So walk me through that part.

16      A.   At that point, after the first six shots,

17  Anthony had -- had disappeared from my line of sight.

18  I had no idea at that point whether any of my first

19  six shots had struck him or incapacitated him, and so

20  I was beginning to approach the car to get closer to

21  try and get a visual on Anthony, and it was at that

22  point that he immediately, what I perceived to be

23  aggressively, sat straight back up like there was

24  nothing wrong with him.

**OFFICER JAY SPLAIN**

1           He didn't have his hands up in the

2    air, he didn't -- there was no statements from him,

3    about all right, all right, I give up, and so at that

4    point, he was still just as much of a threat, because

5    I still could not see his hands, and that's why I was

6    still in very much fear of my life and being blown up

7    that I took the follow-up three shots.

8           Q.   When -- let me just go through that.

9           When Anthony Ardo fell out of sight,

10   am I correct in understanding that he was sitting up

11   and then went to his right, towards the passenger's

12   seat?

13          A.   Yes.

14          Q.   And then came back up?

15          A.   Yes.

16          Q.   Okay.  When Anthony came back up, did you

17   see his hands?

18          A.   No.

19          Q.   Okay.  At any point in time did you see a

20   gun, Anthony possess a gun?

21          A.   No.

22          Q.   At any point in time did you see Anthony

23   possess anything that made you think he had a gun?

24          A.   No.

**OFFICER JAY SPLAIN**

1      Q.   Okay.  Between the six shots and the three

2   shots, did you see any flame or illumination inside

3   the vehicle?

4      A.   No.

5      Q.   Okay.  Between the six shots and the three

6   shots, did you give any verbal commands?

7      A.   I don't recall.  I don't even know if I had

8   time to, it happened so quick.  I don't remember if I

9   gave him any commands in that brief period or not.

10      Q.   I'll represent to you that from watching

11   the footage, I did not see or hear any commands in

12   between those three -- between the six and the three.

13             To the extent you're willing to accept

14   that, why didn't you give any commands after you saw

15   Anthony go down and come back up?

16      A.   At that point I was still so concerned that

17   I couldn't see him and I didn't know what he was --

18   what he was doing inside the vehicle, that I just --

19   I -- I guess I didn't think about trying to give him

20   commands.

21             I was just trying, as quickly as

22   possible, get eyes on him to try to determine what

23   the level of threat still was at that point.

24             And, also, my mind was pretty

OFFICER JAY SPLAIN

1   preoccupied at that point with thinking, holy crap,

2   you know, I'm -- I was just waiting for the boom and

3   the flash and, you know, for it to all be over, and I

4   was -- that was -- that's what was going through my

5   mind, for the most part, at that point.  So I might

6   not have thought to give him more commands, other

7   than the -- you know, after the initial ones I had

8   given him.

9             I think I was also, looking back at it

10  now, probably thinking that, you know, he knows now

11  that, you know, we're not -- we're not kidding around

12  here.  You know, he should be thinking, holy shit,

13  the police just shot at me multiple times.

14            You know, any reasonable person at

15  that point is going to either stay down and say -- at

16  least just take cover or at least say, you know, all

17  right, I give up, I give up, don't shoot, you know,

18  something to that effect.  You know, with there being

19  none of that, I just -- he was still a threat.

20       Q.   Prior to the final three shots -- let me

21  just confirm.

22            Well, your position, we can see it on

23  the video, but we can't see exactly your perspective.

24       A.   Uh-huh.

**OFFICER JAY SPLAIN**

1      Q.   The instant prior -- or, I guess, really,
2   at any point between the six shots and the three
3   shots, were you able to see Anthony Ardo's face?
4      A.   No.
5      Q.   Okay.  We know you weren't able to see his
6   hands; right?
7      A.   Correct.
8      Q.   Okay.  Were you looking, essentially, over
9   Anthony's left shoulder?
10      A.   At exactly which point in time are we
11   talking about?
12      Q.   The instant -- yeah, thank you.
13           The instant before the three shots,
14   what angle, I guess, essentially, did you have of
15   Anthony?
16      A.   I believe at that point I had initially
17   started to side-step to my right.  I was going to
18   make an approach to the passenger's side of the car
19   then, but then I think I only took, like, one, maybe
20   two steps, and then it hit me, hey, if I end up
21   putting myself on the passenger's side of the car,
22   I'm going to be putting myself in a crossfire
23   situation with Trooper Pagan's current position.
24           So then I reversed myself and decided

**OFFICER JAY SPLAIN**

1    to just approach on the driver's side.  It was -- you

2    know, I only had enough time to take those, like, one

3    or two steps and then come back, and that's when he

4    popped right back up and I fired the three shots.

5         Q.   Okay.  All right.

6         A.   So, sorry, maybe I didn't quite answer your

7    question about looking over his left shoulder.

8              That was your question; correct?

9         Q.   More or less, yes.

10        A.   You know, I mean, I would say I was on an

11   angle, you know, between -- it would have been

12   between, like, directly behind him and just slightly

13   offset to his -- what would have been his left side,

14   so --

15        Q.   Okay.  All right.  I appreciate the fear of

16   the bomb through this incident, but did you also --

17   did you have any fear of him having a gun on him?

18        A.   Yes, that was in the back of my mind as

19   well.

20        Q.   Okay.  All right.  I believe in your

21   statement you had said while you were waiting in the

22   house for Anthony to arrive, you were running through

23   various scenarios.

24        A.   Yes.

**OFFICER JAY SPLAIN**

1      Q.   Okay.  And at that point in time, your

2   intent was for Anthony to come into the house, and

3   then approach and stop him inside the house.

4      A.   Yes.

5      Q.   Okay.  While you were waiting and running

6   through the scenarios, did you run through scenarios

7   to the extent Anthony didn't exit his vehicle?

8      A.   I want to say I don't specifically recall

9   that scenario, but knowing how I think and Officer

10   Pagan thinks, I'm -- I can say with pretty good

11   certainty that I'm sure that was one of the

12   possibilities we discussed.

13      Q.   When you had parked your vehicles, I think

14   there was an acknowledgment or a discussion about

15   parking them end-to-end in case you had to pull out

16   quickly.

17      A.   Yes, back-to-back.

18      Q.   Back-to-back, yes.

19            And that was for the purpose if

20   Anthony decided to, more or less, make a run for it.

21            MS. LE:  Object to form.

22            THE WITNESS:  That was for

23      if -- for any reason if we needed to get

24      out of there as quickly as possible, that

**OFFICER JAY SPLAIN**

```
 1          was the most tactically sound way to park
 2          the vehicles.
 3     BY MR. DiJIACOMO:
 4          Q.   Okay.  What I'm leading up to, more or
 5     less, is did you have considerations of alternative
 6     approaches to controlling Anthony, other than
 7     bringing your vehicles and stopping his vehicle, to
 8     the extent Anthony didn't leave his vehicle?
 9               MS. LE:   Objection to form.
10     BY MR. DiJIACOMO:
11          Q.   I can restate that if it's confusing.
12          A.   Yeah, if you don't mind, please.
13          Q.   While running through the scenarios or in
14     preparation of Anthony's arrival, to the extent you
15     considered the possibility that Anthony would not
16     exit his vehicle, did you consider any alternative
17     approaches to what you did?
18          A.   Not that I recall.
19          Q.   Okay.  Did you have concern in waiting for
20     Anthony to arrive, that if he didn't get out of his
21     vehicle and you had to stop him, you would be putting
22     yourself within a range of the bomb?
23          A.   Yes, that's a -- that was a concern.
24          Q.   Did you consider any alternatives to avoid
```

**OFFICER JAY SPLAIN**

1    that concern?

2        A.   No, I didn't -- at the time, I didn't

3    really see any other way around it, and my greater

4    concern at that point, too, was that if he did have a

5    bomb and went mobile, you know, there was a -- the

6    town of Bangor is very close by, and my concern is

7    keeping the situation as contained as possible to

8    that rural area around the residence, where there

9    would be less likelihood of innocent casualties -- or

10   civilian casualties.

11            So, yeah, no, my main focus was

12   keeping him in that location.

13       Q.   Okay.  Based on your experience, your

14   training, were there any alternative -- any type of

15   de-escalation techniques that you could have used,

16   but didn't, in trying to calm down Anthony before you

17   approached?

18       A.   There are de-escalation techniques, but in

19   my opinion, based on how rapidly the situation was

20   evolving and Anthony's choices, we didn't have an

21   opportunity to try and have a discussion with him.

22            That was initially where I thought it

23   was going when we had him at gunpoint, were giving

24   him simple commands, he's not obeying them.  I'm

OFFICER JAY SPLAIN

```
1    like, okay.  I'm thinking, all right, we're going to
2    have a barricade subject in the vehicle and it's
3    going to be, like, a standoff, but before I could
4    even finish processing those thoughts is when the
5    lighter came into play, and that was the
6    game-changer, so --
7        Q.   Okay.  All right.  Let's see here.  I just
8    want to show you one document and then we'll wrap it
9    up.
10                  MR. DiJIACOMO:  Can we mark
11        this as Exhibit B.
12                  (Exhibit B marked for
13    identification.)
14   BY MR. DiJIACOMO:
15        Q.   And, sir, first, I'll represent to you that
16   this was a document that was exchanged during the
17   course of discovery.  For the record, it's marked as
18   Defendant 77, and I think it speaks for itself, but I
19   will tell you it was part of the homicide
20   investigation report.
21                  Have you ever seen this document
22   before?
23        A.   No.
24        Q.   Okay.  Would you just read through it for a
```

**OFFICER JAY SPLAIN**

```
 1   moment.
 2        A.   Sure.
 3        Q.   Tell me when you're done.
 4        A.   Okay.
 5        Q.   I understand you didn't see this document
 6   before.  Were you generally aware of the findings
 7   therein?
 8        A.   Yes.
 9        Q.   Okay.  Do you have any reason to dispute
10   those findings?
11        A.   No.
12        Q.   Okay.  Based on your observations of
13   Anthony's movements, did you form an opinion or do
14   you have an opinion as to the three shots that hit
15   Anthony, whether they were within the first six shots
16   that were shot or the final three shots?
17                MS. LE:  Objection to form.
18                THE WITNESS:  So just to make
19        sure I understand your question, you're
20        asking if, based on my knowledge at that
21        time of the incident, in the moment --
22   BY MR. DiJIACOMO:
23        Q.   No.
24        A.   Okay.
```

**OFFICER JAY SPLAIN**

```
 1          Q.    Sitting here today --

 2          A.    Okay.

 3          Q.    -- considering what you know here today --

 4          A.    Yes.

 5          Q.    -- knowing Anthony went down and came back

 6    up, your observations of how Anthony reacted after

 7    the final three shots, your observations of pulling

 8    Anthony out, is it fair to say that the final three

 9    shots were the three shots that penetrated Anthony

10    Ardo?

11                MS. LE:  Objection to form.

12                THE WITNESS:  Yeah, I don't --

13          I don't feel that I can answer that based

14          on -- I have -- I have -- I have no

15          idea -- no way of knowing which one of my

16          rounds, at which point, struck him.

17                All I know is that rounds that

18          I fired did strike him, whether it was

19          during the first six or the second three.

20                I do know that during the last

21          three rounds that I fired, I remember

22          do -- I do remember seeing him kind of

23          slump down then and remain motionless at

24          that point.  So at that point I could
```

**OFFICER JAY SPLAIN**

1          only -- I assumed that at least one of

2          those three rounds had struck him.

3     BY MR. DiJIACOMO:

4          Q.   But whether or not one of the first six

5     struck him, you couldn't tell?

6          A.   Yes, that I have no idea.

7                    MR. DiJIACOMO:  Understood.

8                    All right.  All right.  I do

9          not have any further questions at this

10         point.

11                   MS. LE:  I have no questions.

12                   MR. DiJIACOMO:  All right.

13         Thank you, sir.  I appreciate you coming

14         in today.

15                   (Deposition concluded at

16    10:52 a.m.)

17

18

19

20

21

22

23

24

**OFFICER JAY SPLAIN**

1                           CERTIFICATION

2                               - - -

3           I hereby certify that the testimony and the

4    proceedings in the aforegoing matter are contained

5    fully and accurately in the stenographic notes taken

6    by me, and that the copy is a true and correct

7    transcript of the same.

8

9

10

11

12

13                    _____

14                    Andrea M. Brinton, Certified
                      Court Reporter and Notary Public

15

16

17

18

19           The foregoing certification does not apply

20    to any reproduction of the same by any means, unless

21    under the direct control and/or supervision of the

22    certifying reporter.

23

24

**OFFICER JAY SPLAIN**

1    INSTRUCTIONS TO WITNESS FOR READING & SIGNING

2         Read your deposition over carefully.  It is

3    your right to read your deposition and make changes

4    in form or substance.  You should assign a reason in

5    the appropriate column on the errata sheet for any

6    change made.

7         After making any changes in form or substance

8    which have been noted on the following errata sheet

9    along with the reason for any change, sign your name

10   on the errata sheet and date it.

11        Then sign your deposition at the end of your

12   testimony in the space provided.  You are signing it

13   subject to the changes you have made in the errata

14   sheet, which will be attached to the deposition

15   before filing.  You must sign it in front of a

16   witness.  Have the witness sign in the space

17   provided.  The witness need not be a notary public.

18   Any competent adult may witness your signature.

19        Return the original errata sheet to your

20   counsel promptly.  Court rules require filing within

21   30 days after you receive the deposition.  Counsel is

22   asked to send a copy of the errata sheet to Summit

23   Court Reporting for our records.

24

**OFFICER JAY SPLAIN**

1                              ERRATA SHEET

2        Attach to Deposition of:  OFFICER JAY SPLAIN

3        Taken on:  August 23, 2019

4        In the Matter of:  Angelo Ardo, et al. vs. Officer
                            Eddie Pagan, et al.
5

6        PAGE    LINE NO.      CHANGE            REASON

7        ------------------------------------------------------

8        ------------------------------------------------------

9        ------------------------------------------------------

10       ------------------------------------------------------

11       ------------------------------------------------------

12       ------------------------------------------------------

13       ------------------------------------------------------

14       ------------------------------------------------------

15       ------------------------------------------------------

16       ------------------------------------------------------

17       ------------------------------------------------------

18       ------------------------------------------------------

19       ------------------------------------------------------

20       ------------------------------------------------------

21       ------------------------------------------------------

22       ------------------------------------------------------

23       ------------------------------------------------------

24       ------------------------------------------------------

**OFFICER JAY SPLAIN**

1                      SIGNATURE PAGE

2

3                          - - -

4

5          I hereby acknowledge that I have

6   read the aforegoing transcript, dated August 23,

7   2019, and the same is a true and correct

8   transcription of the answers given by me to the

9   questions propounded, except for the changes, if any,

10  noted on the errata sheet.

11

12                         - - -

13

14

15

16  SIGNATURE: ------------------------------
                  OFFICER JAY SPLAIN
17

18  DATE: -------------------

19

20  WITNESSED BY: ------------------------

21

22

23

24

**OFFICER JAY SPLAIN**

**A**

**a.m** 2:7 36:16
**able** 12:17 23:11,21 23:24 28:3,5
**accept** 26:13
**accurate** 8:13,16 18:5
**accurately** 37:5
**acknowledge** 40:5
**acknowledgment** 30:14
**Action** 1:3 4:12
**actual** 20:10
**addition** 17:3
**adijiacomo@wei...** 3:4
**administrator** 1:5
**adult** 38:18
**advance** 11:19 13:24 14:2
**advice** 10:19
**affirmative** 6:4
**affixed** 22:11
**aforegoing** 37:4 40:6
**aggressively** 24:23
**agreement** 5:1
**ahead** 23:16
**air** 25:2
**al** 39:4,4
**alternative** 31:5,16 32:14
**alternatives** 31:24
**and/or** 37:21
**Andrea** 2:7 37:13
**Angelo** 1:3 39:4
**angle** 28:14 29:11
**answer** 6:15 7:12 13:18 29:6 35:13
**answering** 19:8
**answers** 40:8
**Anthony** 1:6 3:2 5:14,15 9:2 11:17 15:9,10,23 16:9 16:18 17:2,15,23 18:23 19:16 20:11 21:16,17,20 23:9 24:17,21 25:9,16 25:20,22 26:15 28:3,15 29:22 30:2,7,20 31:6,8 31:15,20 32:16 34:15 35:5,6,8,9
**Anthony's** 28:9 31:14 32:20 34:13
**APPEARANCES**

3:1
**apply** 37:19
**appreciate** 7:5 8:10 15:6 20:1 29:15 36:13
**approach** 24:20 28:18 29:1 30:3
**approached** 32:17
**approaches** 31:6 31:17
**appropriate** 38:5
**approved** 12:16
**approximately** 8:19
**Arch** 2:5 3:7
**Ardo** 1:3,6 5:15 9:2 11:17 20:11 25:9 35:10 39:4
**Ardo's** 28:3
**area** 32:8
**argue** 17:10
**arrival** 31:14
**arrive** 29:22 31:20
**arrived** 16:3
**asked** 9:8 12:17 18:18 19:3,7 38:22
**asking** 19:24 34:20
**assign** 38:4
**assistance** 18:4,17
**assume** 7:12
**assumed** 36:1
**assuming** 12:10
**Attach** 39:2
**attached** 21:20 38:14
**attempted** 23:9
**attorney** 2:4 3:6 6:11
**August** 1:17 2:6 39:3 40:6
**authorization** 12:6
**Avenue** 3:3
**avoid** 31:24
**aware** 34:6

**B**

**B** 4:8,12 33:11,12
**back** 15:14 18:1 19:21 22:20 24:23 25:14,16 26:15 27:9 29:3,4,18 35:5
**back-to-back** 30:17 30:18
**backup** 19:14
**backward-looking**

19:24
**Bangor** 32:6
**barracks** 12:21
**barricade** 33:2
**based** 17:17 24:2 32:13,19 34:12,20 35:13
**bathroom** 6:11
**beginning** 24:20
**Belfast** 12:21
**believe** 15:16 28:16 29:20
**better** 7:10 18:20
**biggest** 17:12
**Blair** 12:9
**blow** 16:8,23,24
**blowing** 17:3 19:1
**blown** 25:6
**bomb** 16:18,19 17:9 17:11,13,24 18:19 19:11,13,15 20:10 20:10,12,15 21:3 21:4,5,7,7,13,19 22:12,20 23:10 29:16 31:22 32:5
**bombs** 19:5,5
**boom** 27:2
**break** 6:10
**brief** 26:9
**bringing** 31:7
**Brinton** 2:7 37:13
**building** 19:5

**C**

**call** 15:13,24 16:2 17:23 19:13,20 20:6 21:8
**called** 21:3,9
**calling** 19:16,22
**calls** 15:9,15,20 16:17 17:7 18:12 18:12
**calm** 32:16
**capacity** 1:10,12
**car** 24:20 28:18,21
**care** 17:19
**career** 20:9
**carefully** 38:2
**case** 17:14 30:15
**casualties** 32:9,10
**casualty** 17:17
**center** 22:6
**certain** 16:13
**certainly** 18:18
**certainty** 30:11
**certification** 5:2

19:24
**Certified** 1:21 2:7 37:13
**certify** 37:3
**certifying** 37:22
**change** 20:2 38:6,9 39:6
**changes** 38:3,7,13 40:9
**charge** 12:20 20:19
**choices** 32:20
**circumstances** 20:3
**CIVIL** 1:3
**civilian** 32:10
**clarification** 15:5
**clenched** 23:20
**close** 18:11 32:6
**closer** 24:20
**collar** 21:24 22:6,11
**column** 38:5
**come** 16:22 26:15 29:3 30:2
**comes** 20:14
**coming** 36:13
**commander** 12:11 12:24 13:5,9
**commands** 26:6,9 26:11,14,20 27:6 32:24
**commencing** 2:6
**comparing** 10:24
**competent** 38:18
**concern** 19:6 31:19 31:23 32:1,4,6
**concerned** 10:20 26:16
**concerning** 7:19 9:20 10:21 11:16 15:10 17:8
**concluded** 36:15
**confirm** 7:22 27:21
**confirming** 11:16
**confusing** 31:11
**consider** 31:16,24
**considerations** 31:5
**considered** 31:15
**considering** 35:3
**contained** 32:7 37:4
**context** 10:12 12:19 13:22
**control** 18:14 37:21
**controlling** 31:6
**conversation** 19:2

37:1,19
**copy** 37:6 38:22
**Corporal** 12:9
**correct** 8:20,21 9:1 9:16 10:13,14,17 18:6 23:3,4,12 25:10 28:7 29:8 37:6 40:7
**correctly** 13:12 14:7 22:12,19
**counsel** 3:5,9 5:1 38:20,21
**course** 5:16 20:9 33:17
**Court** 1:1,21,21 2:8 37:14 38:20,23
**cover** 27:16
**crap** 27:1
**create** 17:17
**criminal** 12:7
**crossfire** 28:22
**crossover** 22:10
**current** 12:24 28:23
**currently** 18:13

**D**

**D** 4:1
**date** 7:22 9:15 12:23 38:10 40:18
**dated** 40:6
**day** 11:2,2
**days** 8:19 38:21
**de-escalation** 32:15,18
**deal** 10:21 20:10
**decided** 28:24 30:20
**Defendant** 33:18
**Defendants** 1:14 3:9
**definite** 20:8
**definitely** 20:7
**degrees** 17:19
**deposition** 1:16 2:3 7:16 36:15 38:2,3 38:11,14,21 39:2
**DESCRIPTION** 4:9
**designed** 17:16
**detailed** 17:16
**details** 10:9
**determine** 26:22
**difference** 11:6
**differences** 11:8
**DiJIACOMO** 3:2 4:5 5:11,15 7:24 8:4 13:20 16:15 20:23 22:18 31:3,10

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

OFFICER JAY SPLAIN

33:10,14 34:22
36:3,7,12
**direct** 37:21
**directly** 29:12
**disappeared** 24:17
**discovery** 33:17
**discussed** 9:24
30:12
**discussing** 10:19
21:2
**discussion** 10:23
11:15 30:14 32:21
**discussion-wise**
11:8
**discussions** 9:20
**dispute** 34:9
**DISTRICT** 1:1,1
**document** 7:23
33:8,16,21 34:5
**doing** 6:21 26:18
**door** 21:17
**driver's** 29:1
**duly** 5:7

**E**
**E** 4:1,8
**ear** 6:16
**EASTERN** 1:1
**Eddie** 1:9 39:4
**effect** 16:7 27:18
**either** 27:15
**elapsed** 14:4
**emitting** 23:20
**EMT** 19:14
**end-to-end** 30:15
**ended** 19:3
**errata** 38:5,8,10,13
38:19,22 39:1
40:10
**ESQUIRE** 3:2,6
**essentially** 28:8,14
**estate** 1:6 5:15
**et** 39:4,4
**event** 14:22
**events** 9:20
**evidence** 11:21
**evolving** 32:20
**exactly** 27:23 28:10
**EXAMINATION** 4:4
5:9
**examined** 5:7
**exchanged** 33:16
**Exhibit** 4:9,10,12
8:1,2,6 33:11,12
**exit** 30:7 31:16
**expect** 6:7

**experience** 32:13
**explained** 10:7
**explicitly** 17:23
**explosives** 19:4
**exposed** 22:16
**extent** 10:18 26:13
30:7 31:8,14
**extremely** 8:9
**eyes** 24:3 26:22

**F**
**face** 19:7 28:3
**fact** 6:8
**facts** 14:20 20:3
**fair** 6:5 7:13,14 35:8
**false** 14:11
**falsely** 14:11
**fantastic** 6:21
**far** 9:8 20:15
**fear** 24:5 25:6 29:15
29:17
**feel** 35:13
**fell** 25:9
**felt** 18:13
**filing** 5:2 38:15,20
**final** 21:12 27:20
34:16 35:7,8
**finally** 19:8
**findings** 34:6,10
**finish** 33:4
**fired** 11:4,5,11 29:4
35:18,21
**fireworks** 19:9
**first** 4:9 5:6 6:16 9:4
9:7,13 16:2 23:8
24:13,16,18 33:15
34:15 35:19 36:4
**fist** 23:20
**five** 14:16
**flag** 17:12
**flame** 23:18,21,23
24:6 26:2
**flash** 27:3
**Fleming** 1:23
**flying** 17:18
**focus** 32:11
**follow-up** 21:12
25:7
**following** 24:14
38:8
**follows** 5:7
**footage** 12:2 13:14
13:24 14:1,14,19
14:21 15:1 26:11
**foregoing** 37:19
**forgive** 12:20 20:18

**forgot** 15:2
**form** 5:3 13:16,17
16:11 20:22 22:15
30:21 31:9 34:13
34:17 35:11 38:4
38:7
**four** 14:16 18:8
**frame** 16:9
**Friday** 1:17 2:6
**front** 22:6 38:15
**full** 6:22
**fully** 37:5
**further** 6:24 36:9
**fuse** 22:7,19 23:24
24:6

**G**
**game-changer** 33:6
**general** 2:4 3:6
10:20
**generalities** 9:22
**generally** 34:6
**give** 6:2 7:10 13:7
14:2 16:9 25:3
26:6,14,19 27:6
27:17,17
**given** 8:15 27:8
40:8
**giving** 8:6 10:19
14:10 32:23
**go** 5:19,20 6:23
15:1,4 23:16
24:11 25:8 26:15
**goal** 10:8
**going** 7:22 9:11
13:4 19:11,17,18
19:19,19 20:2
22:23,24 27:4,15
28:17,22 32:23
33:1,3
**good** 5:12,13 10:4
20:18 30:10
**gotten** 12:13
**greater** 32:3
**ground** 5:20
**guess** 5:19 7:4,6
9:9,10,11 26:19
28:1,14
**guessing** 12:10
**guidance** 10:20
**gun** 15:11,24 16:1,7
17:8 25:20,20,23
29:17
**gunpoint** 32:23
**guttural** 6:2

**H**
**H** 4:8
**Hammonton** 1:23
**handled** 10:5
**hands** 25:1,5,17
28:6
**happen** 7:8
**happened** 11:2
26:8
**happening** 18:13
**harm** 17:9
**head** 6:2 16:8
**hear** 15:8,15 26:11
**heard** 17:8 18:23
**help** 14:19
**hesitation** 19:7
**hey** 10:2 28:20
**hit** 17:19 28:20
34:14
**hole** 21:23 22:5,8
**holy** 27:1,12
**homicide** 4:12 9:13
14:6 33:19
**hoping** 18:24
**hour** 6:8
**house** 16:22 29:22
30:2,3
**hurt** 17:14

**I**
**idea** 19:15 24:18
35:15 36:6
**identification** 8:3
33:13
**ignite** 11:17
**ignore** 13:18
**illumination** 23:22
26:2
**immediately** 19:3
24:22
**important** 7:3
**incapacitated**
24:19
**incident** 7:19 8:20
8:22 9:6,19,21
10:9,13,19,24
11:3 12:23 14:4
15:5 18:10 29:16
34:21
**including** 17:24
24:14
**individual** 1:10,12
**individually** 1:4
**information** 21:11
**initial** 23:3 27:7
**initially** 11:1,3

28:16 32:22
**innocent** 32:9
**inside** 26:2,18 30:3
**instant** 28:1,12,13
**INSTRUCTIONS**
38:1
**integrity** 10:10
**intended** 17:14
**intent** 8:16 30:2
**interrupt** 6:24
**Interview** 4:11
**investigation** 4:12
10:11 14:6 33:20
**investigative** 9:14
**involved** 10:12,16
20:16
**involving** 9:2

**J**
**Jay** 1:12,16 2:3 4:3
4:11 5:6 39:2
40:16
**JEAN** 1:4
**Jersey** 1:23
**job** 6:21 10:5
**john** 22:2
**Joseph** 13:1
**judge** 6:19
**jumping** 21:15
**June** 7:20 8:13,18
11:20 13:8 14:13
**jury** 6:19

**K**
**KATHY** 3:6
**keeping** 32:7,12
**kidding** 27:11
**kind** 35:22
**kle@attorneygen...**
3:9
**knit** 22:1
**knot** 22:9
**know** 6:12 9:24
10:1,3,4,5 11:1,12
12:15,17 13:3
14:3,8,11 17:11
17:13,18 19:19
20:5,6,7 21:6,8,8
21:10 22:5,8 26:7
26:17 27:2,3,7,10
27:11,12,14,16,17
27:18 28:5 29:2
29:10,11 32:5
35:3,17,20
**knowing** 30:9 35:5
35:15

**knowledge** 19:4
34:20
**knows** 27:10

--------

**L**

**L** 3:2
**lack** 18:20 20:18
**lapse** 14:9
**LAW** 3:2
**lawsuit** 5:16
**LE** 3:6 13:16 16:11
20:22 22:15 30:21
31:9 34:17 35:11
36:11
**leading** 31:4
**leave** 31:8
**left** 28:9 29:7,13
**legitimate** 18:22
19:11
**length** 9:5
**let's** 7:24 12:22
33:7
**letting** 6:22
**level** 26:23
**life** 25:6
**light** 23:9
**lighter** 11:17 23:11
23:17 33:5
**lighting** 24:6
**likelihood** 32:9
**line** 24:17 39:6
**lines** 24:5
**little** 23:1
**loaded** 16:20
**location** 19:20
32:12
**long** 6:8 9:9 22:2
**long-sleeved** 22:4
**look** 14:10 19:6
**looking** 27:9 28:8
29:7
**lot** 19:9

--------

**M**

**M** 2:7 37:13
**main** 10:8 11:10
32:11
**making** 38:7
**mark** 7:24 33:10
**marked** 8:2,6 33:12
33:17
**mass** 17:17
**match** 14:23
**matched** 14:7
**material** 22:4
**matter** 37:4 39:4

**mean** 18:16 29:10
**meaning** 6:18
**means** 37:20
**memory** 14:6,9,16
14:22 21:18
**mention** 15:24 16:1
**mentioned** 17:5,10
**mind** 17:12 21:14
26:24 27:5 29:18
31:12
**mislead** 8:16
**mobile** 32:5
**mom** 16:21 19:2
**moment** 20:4 34:1
34:21
**MONAGHAN** 1:4
**month** 14:3
**morning** 5:12,13,18
**Morton** 3:3,3
**mother** 15:10 16:2
19:3
**motionless** 35:23
**mouth** 23:6
**movements** 34:13
**moving** 13:4
**multiple** 27:13
**MVR** 11:24 12:2
13:13,24 14:7,14
14:19,21 15:1

--------

**N**

**N** 4:1
**nail** 17:11,13
**nails** 16:20 17:18
17:24
**name** 38:9
**name's** 5:14
**natural** 6:1
**neck** 16:20
**need** 6:10,24 15:6
20:8 38:17
**needed** 18:17 20:6
20:7 30:23
**negative** 6:4
**never** 17:5 21:14
**New** 1:23
**nix** 21:13
**nod** 6:1
**notary** 2:8 37:14
38:17
**note** 14:14
**noted** 38:8 40:10
**notes** 37:5

--------

**O**

**O'Malley** 12:12,19

13:3,8,10
**oath** 6:18
**obeying** 32:24
**object** 13:17 20:22
22:15 30:21
**Objection** 13:16
16:11 31:9 34:17
35:11
**objections** 5:3
**observations** 21:19
34:12 35:6,7
**Office** 2:4 3:6
**officer** 1:9,12,16
2:3 4:3 5:6,17
20:24 24:3 30:9
39:2,4 40:16
**officers** 9:14 20:19
**official** 14:5
**offset** 29:13
**oh** 15:1
**okay** 5:22 6:13,14
6:21 7:1,2,10,15
8:9,15,18 9:4,18
10:12,18,23 11:15
11:19 12:5,19
15:13,17,22 16:16
16:16 17:7,21,22
18:7 19:18,20
20:9,24 21:2 22:3
22:23,23 23:19,21
23:24 24:2,8
25:16,19 26:1,5
28:5,8 29:5,15,20
30:1,5 31:4,19
32:13 33:1,7,24
34:4,9,12,24 35:2
**once** 19:2,20 22:9
**ones** 27:7
**opened** 21:16
**opinion** 19:22
32:19 34:13,14
**opportunity** 32:21
**opposed** 14:15
**Oral** 1:16 2:3
**original** 38:19
**outside** 22:17
**overhear** 17:2

--------

**P**

**P.C** 3:2
**Pagan** 1:9 5:17 9:20
10:15 18:9,14
30:10 39:4
**Pagan's** 24:3 28:23
**page** 4:2,9 12:2
39:6 40:1

**parents** 5:16
**park** 31:1
**parked** 30:13
**parking** 30:15
**part** 14:10 24:15
27:5 33:19
**passed** 22:7
**passenger's** 25:11
28:18,21
**pending** 6:15
**penetrated** 35:9
**Pennsylvania** 1:1
1:10,13,22 2:4,6
3:3,6,8 4:10
**perceived** 24:22
**perfect** 9:12
**period** 21:19 26:9
**permission** 12:13
**person** 17:14 27:14
**personal** 1:5
**personally** 13:13
15:8
**perspective** 27:23
**Philadelphia** 1:22
2:5 3:8
**phone** 15:9,13,15
15:19,24 16:2,17
17:7,23
**pieces** 15:5
**Pike** 1:23
**pipe** 19:5
**placed** 21:9
**Plaintiffs** 1:7 3:5
**play** 6:16 19:9 33:5
**playing** 19:4
**please** 23:16 31:12
**point** 6:9,23 17:11
18:3,9,15,17,23
19:10,16,17 20:8
21:15 23:1,2
24:16,18,22 25:4
25:19,22 26:16,23
27:1,5,15 28:2,10
28:16 30:1 32:4
35:16,24,24 36:10
**pointed** 23:1
**police** 1:10,13 4:10
8:23 10:13,16
16:24 18:12,12
27:13
**policy** 10:2
**popped** 29:4
**position** 13:5 27:22
28:23
**possess** 25:20,23
**possibilities** 30:12

**possibility** 31:15
**possible** 26:22
30:24 32:7
**preoccupied** 27:1
**preparation** 31:14
**presence** 16:24
**present** 15:19
**preserve** 10:10
**pretty** 11:5 13:6
16:12 26:24 30:10
**prior** 10:13,16 24:2
27:20 28:1
**probably** 12:7,12
27:10
**procedural** 5:19
**procedure** 10:2
**proceedings** 37:4
**process** 10:7,21
24:13
**processing** 33:4
**promoting** 3:4
**promptly** 38:20
**propounded** 40:9
**proven** 19:12
**provide** 9:8
**provided** 8:12 12:5
38:12,17
**providing** 11:19
12:18
**public** 2:8 37:14
38:17
**pull** 30:15
**pulled** 21:17 22:10
**pulling** 35:7
**purpose** 13:23 14:1
30:19
**purposefully** 17:17
**putting** 19:23 23:6
28:21,22 31:21

--------

**Q**

**question** 5:3 6:16
6:22 7:7,10,13
13:18 19:8 21:12
24:4 29:7,8 34:19
**questions** 5:23
19:24 36:9,11
40:9
**quick** 26:8
**quicker** 8:11
**quickly** 26:21 30:16
30:24
**quite** 29:6

--------

**R**

**radioed** 18:1

range 31:22
rapidly 32:19
reached 9:14
reacted 35:6
read 33:24 38:2,3
40:6
READING 38:1
reaffirmed 14:22
realize 19:23
realized 14:15
really 11:2 20:2
28:1 32:3
reason 30:23 34:9
38:4,9 39:6
reasonable 27:14
reassure 10:1,4
recall 7:4 8:6 11:7
11:18 14:19 16:18
21:6 26:7 30:8
31:18
receive 38:21
recollection 11:7
15:23 16:4 20:15
recollections 10:24
11:9
record 5:14 13:21
33:17
record's 6:3
recording 11:24
12:2
records 38:23
red 17:12
REFERENCED 4:9
referencing 8:5
referring 8:23 21:4
remain 35:23
remember 11:2,3
16:10,13 18:24
21:7 26:8 35:21
35:22
remembering
14:11
rephrase 18:21
report 4:13 33:20
reporter 2:8 37:14
37:22
Reporters 1:21
Reporting 1:21
38:23
represent 5:15
26:10 33:15
representative/ 1:5
reproduction 37:20
request 18:4
requested 13:13,13
require 38:20

reserved 5:4
residence 16:3 32:8
respond 6:24
responding 20:16
20:20 24:3
response 6:4 23:5
23:7 24:3
responses 6:1,2
restate 31:11
Return 38:19
reversed 28:24
review 11:20 12:17
reviewing 14:21
15:1
right 6:7 11:19,23
12:14 15:3,4 16:2
17:7 19:24 20:3
20:15 22:6 24:10
25:3,3,11 27:17
28:6,17 29:4,5,15
29:20 33:1,7 36:8
36:8,12 38:3
Rights 4:11
rounds 35:16,17,21
36:2
rules 5:20 38:20
run 30:6,20
running 29:22 30:5
31:13
rural 32:8
ruse 16:22 17:4

**S**

S 4:8
sake 6:3
sat 24:23
saw 23:17,23 26:14
saying 16:13,18
18:23
scenario 30:9
scenarios 29:23
30:6,6 31:13
scene 10:5
schedule 9:14
school 21:4,5,13
schools 20:13
sealing 5:1
seat 25:12
second 35:19
see 12:22 14:1
23:11,17,21,24
25:5,17,19,22
26:2,11,17 27:22
27:23 28:3,5 32:3
33:7 34:5
seeing 21:7 35:22

seen 11:16 33:21
self 17:9
send 38:22
sense 7:9
Sergeant 12:12
13:1,3,5,8,9
serious 18:20
service 18:12
serving 14:7,16
set 17:12
setting 19:5
sheet 38:5,8,10,14
38:19,22 39:1
40:10
shirt 21:24 22:4,11
22:13,17,20
shit 27:12
shoot 11:12 23:3,8
27:17
shooting 8:24
10:13,16 22:24
shot 14:15 21:16
27:13 34:16
shots 14:15 23:3,8
24:8,13,14,16,19
25:7 26:1,2,5,6
27:20 28:2,3,13
29:4 34:14,15,16
35:7,9,9
shoulder 28:9 29:7
show 7:23 33:8
shrapnel 17:18
side 28:18,21 29:1
29:13
side-step 28:17
sight 24:17 25:9
sign 38:9,11,15,16
signature 38:18
40:1,16
signed 12:16
signing 38:1,12
simple 32:24
sir 5:12 33:15 36:13
sitting 25:10 35:1
situation 18:14
21:2,13 28:23
32:7,19
six 14:15 23:3,8
24:8,11,13,16,19
26:1,5,12 28:2
34:15 35:19 36:4
slightly 29:12
slump 35:23
smoke 19:1
smoothly 5:21
solid 14:22

somebody 19:16
son 1:6
soon 20:6
sorry 21:11 29:6
sort 16:22
sound 31:1
South 3:3
space 38:12,16
Sparich 13:1
Sparich's 13:5
speaks 33:18
specialist 21:3
specific 11:14
specifically 17:5
30:8
specifics 11:8
Splain 1:12,16 2:3
4:3,11 5:6 39:2
40:16
squad 19:14
standby 19:23 21:9
standing 24:1
standoff 33:3
started 28:17
State 1:10,13 4:10
statement 7:16 8:7
8:12,18 9:6,8,15
9:19 11:20 12:18
13:7,24 14:2,5,11
14:13 15:6,10
16:5 29:21
statements 8:15
25:2
STATES 1:1
stating 18:1
station 12:8,11,24
13:5,8 18:1
stay 27:15
stenographic 37:5
steps 28:20 29:3
stop 30:3 31:21
stopping 31:7
straight 24:23
strapped 16:20
Street 1:22 2:5 3:7
strike 35:18
struck 24:19 35:16
36:2,5
subject 33:2 38:13
substance 38:4,7
Suite 1:22 2:5 3:7
Summit 1:21 38:22
supervision 37:21
supervisor 12:8
supporting 20:24
sure 5:20,24 6:3,4

11:5 12:1,13 13:6
13:21 14:5 30:11
34:2,19
surprises 14:9,24
sworn 5:7

**T**

T 4:8
tactically 31:1
take 6:10 19:11
27:16 29:2
taken 2:4 24:14
37:5 39:3
Talijan 12:9
talk 6:11
talking 28:11
technicians 21:8
techniques 32:15
32:18
tell 7:1,5,7,9 33:19
34:3 36:5
term 18:20
terms 12:20 20:18
terrorize 19:1
testified 5:7
testimony 5:24
10:20 37:3 38:12
thank 5:18 28:12
36:13
thermal 22:1
thing 7:3,6 11:1,11
20:14
things 5:20 14:11
think 13:6 18:19
20:12,12 25:23
26:19 27:9 28:19
30:9,13 33:18
thinking 18:24 27:1
27:10,12 33:1
thinks 30:10
third 17:23
thought 18:16
24:13 27:6 32:22
thoughts 33:4
threat 17:2,24
18:19 19:12 20:11
20:13,15 21:4,13
24:2 25:4 26:23
27:19
threats 17:8,9
three 15:16,19
16:17 24:14 25:7
26:1,5,12,12
27:20 28:2,13
29:4 34:14,16
35:7,8,9,19,21

**OFFICER JAY SPLAIN**

36:2
**tied** 18:10 22:8
**time** 5:4 6:10 7:5
   9:5,7,13,18 12:23
   13:3,7 14:3 16:5,9
   18:13 20:4 21:16
   21:19 23:2 25:19
   25:22 26:8 28:10
   29:2 30:1 32:2
   34:21
**times** 6:2 27:13
**today** 5:21 7:3 8:10
   35:1,3 36:14
**told** 11:4
**tomorrow** 16:7,14
**town** 32:6
**training** 32:14
**transcribed** 7:17
**transcript** 8:5 9:6
   37:7 40:6
**transcription** 40:8
**transferring** 13:2
**trial** 5:4
**tricking** 16:21
**Trooper** 1:11,13
   4:11 9:20 10:15
   18:9,14 28:23
**true** 37:6 40:7
**truthful** 8:13
**try** 6:22 7:10 24:21
   26:22 32:21
**trying** 19:1 26:19
   26:21 32:16
**two** 18:9 28:20 29:3
**type** 11:20 19:13,14
   21:3 22:4 32:14

**U**

**Uh-huh** 27:24
**underlying** 7:19
   9:21
**underneath** 21:24
   22:5,13
**understand** 6:17
   7:9,15 8:22 13:12
   13:19 22:12,19
   24:12 34:5,19
**understanding** 9:4
   10:15 12:6 17:22
   18:3 24:10 25:10
**understood** 7:13
   9:17 13:11 15:3
   15:22 16:16 17:21
   17:21 21:12 36:7
**unit** 12:8
**UNITED** 1:1

**use** 6:10

**V**

**value** 19:22
**various** 15:9 29:23
**vehicle** 26:3,18
   30:7 31:7,8,16,21
   33:2
**vehicles** 12:3 30:13
   31:2,7
**verbal** 6:1,5 26:6
**versus** 6:4
**video** 12:2,6 27:23
**Videographers**
   1:21
**videotaped** 7:17
**view** 12:6 13:13
**viewing** 13:23
   14:14
**visual** 24:21
**vs** 1:8 39:4

**W**

**waffle** 22:1
**waiting** 27:2 29:21
   30:5 31:19
**waived** 5:2
**Waiver** 4:11
**walk** 22:24 24:15
**Walnut** 1:22
**want** 5:19 12:7,16
   14:8 15:4 24:12
   30:8 33:8
**wanted** 10:1,4,10
   13:21 14:1,4
**Warning** 4:11
**wasn't** 18:4
**watch** 16:23
**watching** 26:10
**way** 5:23 10:5 13:1
   31:1 32:3 35:15
**we'll** 6:16 33:8
**we're** 12:1 21:2
   27:11,11 33:1
**weapon** 17:13
**wearing** 21:24
**weight** 6:18
**WEISBERG** 3:2
**went** 22:20 25:11
   32:5 35:5
**weren't** 28:5
**willing** 26:13
**witness** 4:2 16:12
   22:16 30:22 34:18
   35:12 38:1,16,16
   38:17,18

**WITNESSED** 40:20
**word** 18:22
**words** 23:6
**working** 18:8
**works** 10:8
**worry** 10:3
**wouldn't** 14:20
**wow** 15:1
**wrap** 33:8
**wrong** 24:24
**www.summitrep...**
   1:24

**X**

**X** 4:1,8

**Y**

**yeah** 11:12 13:9
   15:18 16:12 20:13
   20:13 28:12 31:12
   32:11 35:12

**Z**

**0**

**08037** 1:23

**1**

**10:10** 2:7
**10:52** 36:16
**1500** 1:22
**1600** 2:5 3:7
**1610** 1:22
**16th** 7:20 8:13,19
   11:20
**17th** 14:13
**19070** 3:3
**19102** 1:22
**19103** 3:8

**2**

**20/20** 19:24
**2017** 7:20 8:13,19
   8:23 14:13
**2019** 1:17 2:6 39:3
   40:7
**20th** 8:23
**215** 1:23 3:8
**23** 1:17 2:6 39:3
   40:6
**27** 8:19

**3**

**30** 38:21
**300** 2:5 3:7
**33** 4:12

**360** 17:19

**4**

**424** 1:23
**447-8648** 1:23

**5**

**5** 4:5
**5:18-cv-05217-EGS**
   1:14
**560-2402** 3:8
**567-3315** 1:23

**6**

**609** 1:23
**610** 3:4
**690-0801** 3:4

**7**

**7** 3:3
**77** 33:18

**8**

**8** 4:10
**800** 1:23

**9**

**985-2400** 1:23

Page 45

EXHIBIT 3

Jean Monaghan
September 17, 2019

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

ANGELO ARDO, et al.                :
                                   :   CIVIL ACTION
            Plaintiff              :
                                   :   NO. 18-5217
            -VS-                   :
                                   :
OFFICER EDDIE PAGAN, et al.        :
                                   :
            Defendant              :
_____

* * * * *

TUESDAY, SEPTEMBER 17, 2019

* * * * *

Oral deposition of JEAN MONAGHAN, was taken
at the Office of Attorney General, 1600 Arch Street,
Philadelphia, Pennsylvania, before Renee Schumann, a
Notary Public of the State of New Jersey and Notary
Public of the Commonwealth of Pennsylvania, on the
above date, commencing at 10:50 a.m.

STREHLOW & ASSOCIATES
COURT REPORTERS - VIDEOGRAPHERS
54 FRIENDS LANE, SUITE 116
NEWTOWN, PENNSYLVANIA 18940
WWW.STREHLOWCOURTREPORTING.COM

(215) 504-4622 FAX (215) 504-7155

Jean Monaghan
September 17, 2019

Page 2

A P P E A R A N C E S :


        LAW OFFICES OF HOPKINS & SCHAFKOPF

        BY: GARY SCHAFKOPF, ESQUIRE

            11 Bala Avenue

            Bala Cynwyd, Pennsylvania 19004

            (610) 664-5200

            Gary@schaflaw.com

            Representing the Plaintiff



        OFFICE OF ATTORNEY GENERAL

        BY: KATHY A. LE, DEPUTY ATTORNEY GENERAL

            1600 Arch Street, Suite 300

            Philadelphia, Pennsylvania 1913

            (215) 560-2141

            Kle@attorneygeneral.gov

            Representing the Defendants

Jean Monaghan
September 17, 2019

Page 3

1                    I N D E X

2

3   WITNESS                              PAGE

4   JEAN MONAGHAN,

5        (Witness Sworn.)

6

7        DIRECT EXAMINATION BY MS. LE        4

8

9

10

11

                    E X H I B I T S
12

13   NUMBER              DESCRIPTION              PAGE

14   Exhibit-1           Interview                15

15

16

          (Exhibit attached to the transcript.)
17

18

19   REQUESTS FOR PRODUCTION:

20   BY MS. LE:   Page 67 Line 21
                       68      16
21                     69      07

22

23

24

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Jean Monaghan
September 17, 2019

Page 4

```
 1                        * * * * *
 2               (It is agreed by and between counsel
 3          that reading, signing, sealing, filing, and
 4          certification are hereby waived and all
 5          objections, except as to the form of the
 6          questions, are reserved until the time of
 7          trial.)
 8                        * * * * *
 9               JEAN MONAGHAN, having been duly sworn
10          according to law, was examined and testified
11          as follows:
12                        * * * * *
13                    DIRECT EXAMINATION
14                        * * * * *
15     BY MS. LE:
16          Q.    Ms. Monaghan, I'll introduce myself for
17     the record, even though we met outside.  My name is
18     Kathy Le, I am with the Commonwealth Office of
19     Attorney General.  I'm representing the defendants in
20     this case, Troopers Splain and Pagan.  This is a
21     lawsuit that you have brought on behalf of the Estate
22     of your son, Anthony Ardo; is that right?
23          A.    Uh-huh, yes.
24          Q.    Ms. Monaghan, have you ever been
```

Jean Monaghan
September 17, 2019

1    subject to a deposition before?

2         A.    Never.

3         Q.    Okay.  So I'll give you a few ground

4    rules and instructions as to how a deposition goes.

5    So I will be today asking you a series of questions

6    and I ask that you allow me to fully complete my

7    question before you start your answer.  It's very

8    natural in a conversation to anticipate what the rest

9    of my sentence is and start answering, but for the

10   sake of the record the court reporter who is here

11   taking down everything we say, I ask that you allow

12   me to fully complete my question before you start

13   your answer and I will do the same for you.

14              Do you understand?

15        A.    Yes.

16        Q.    I also ask you again for the sake of

17   the record to answer all of my questions audibly

18   versus a nod of the head.  If your answer is yes, so

19   you actually say yes versus uh-huh or some other type

20   of guttural reaction.

21              Do you understand that?

22        A.    Yes.

23        Q.    I don't anticipate that we are going to

24   be here very long today, but if at any time you need

Jean Monaghan
September 17, 2019

Page 6

1    a break, I'll be happy to give you one.  I only ask

2    that you complete whatever my last question was

3    before we take a break.

4                    Do you understand?

5          A.     Yes.

6          Q.     If at any time you don't understand one

7    of my questions because it's poorly worded or it's

8    confusing, feel free to ask me to rephrase it, and if

9    you answer my question I will assume that you

10   understood it.

11                   Do you understand that?

12         A.     Yes.

13         Q.     Okay.  So, Ms. Monaghan, you were of

14   course -- you contacted the State Police on May 20,

15   2017 in relation to your son, Mr. Ardo; is that

16   right?

17         A.     Yes.

18         Q.     And what was your purpose for

19   contacting the State Police on that date?

20         A.     He was in a bad way and I was just

21   trying to get him help.

22         Q.     And you spoke to an individual, I don't

23   know if you remember his name, PCO Bailer a couple of

24   times in the morning of May 20, 2017.  Do you recall

Jean Monaghan
September 17, 2019

Page 7

1    that?

2          A.     If that was the State Police barracks,

3    then yes, I did.

4          Q.     Okay.  We have recordings of the call

5    that you made with PCO Bailer, so I'm not going to

6    ask you to go over that.  Was your intention in

7    calling that day to try to have the State Police I

8    believe you said pick him up and get him some help?

9          A.     Yes.

10         Q.     And the State Police did send out two

11   state troopers to your house; is that right?

12         A.     Yes.

13         Q.     And that would be Trooper Splain and

14   Pagan?

15         A.     Yes.

16         Q.     Following the incident on that date,

17   you gave a statement to the State Police

18   investigator; is that right?

19         A.     Yes.

20         Q.     Was that an individual named Mr. Everk?

21         A.     Yes.  I believe he was with the State

22   Police in Bethlehem; is that correct?

23         Q.     Yes, that is my understanding.

24                There was also, to my knowledge,

Jean Monaghan
September 17, 2019

Page 8

1    another State Police individual during that interview

2    present.  Do you recall that, there were two State

3    Police individuals present for your interview?

4           A.     I don't remember that, I only remember

5    the one.

6           Q.     During of the course of this

7    litigation, defendant produced to your counsel a

8    large number of documents, part of which included the

9    transcript of your interview with Trooper Everk on

10   the day of the incident, May 20, 2017.

11              Did your counsel show that transcript

12   to you prior to your deposition today?

13          A.     No.

14          Q.     Okay.  Did you meet with -- and I don't

15   want to know the nature of your conversation, but did

16   you meet with your counsel to prepare for this

17   deposition today?

18          A.     Yes.

19          Q.     And, again, without revealing the

20   content of those conversations, did your counsel show

21   you any documents in order to prepare for the

22   deposition today?

23          A.     No.

24          Q.     Did you ask to see that -- the

Jean Monaghan
September 17, 2019

Page 9

1    transcript of your interview with the State Police

2    from May 20th?

3           A.      No.

4           Q.      Okay.  At any time prior to today, have

5    you seen a copy of the transcript from your interview

6    with the State Police on May 20th?

7           A.      I chose not to, no.

8           Q.      Okay.  Why did you choose not to see

9    that?

10          A.      I understood it to be very graphic and

11   it's very difficult to relive.

12          Q.      I understand.  Understanding that you

13   have not seen the transcript and I understand why,

14   between then, May 20, 2017 and now, are there things

15   that you believe you want to correct from the

16   statement that you gave the State Police on that

17   date?

18          A.      Not that I'm aware of.

19          Q.      Okay.  In addition to the statement

20   that you gave the State Police on May 20, 2017, did

21   you also provide testimony to a grand jury in

22   relation to the incident?

23          A.      Yes, I did.

24          Q.      Do you believe -- again, understanding

Jean Monaghan
September 17, 2019

Page 10

1    you never looked at the transcript of that

2    interview --

3              A.    Yes.

4              Q.    -- do you believe the testimony that

5    you gave to the grand jury is consistent with the

6    testimony that you gave in your interview with the

7    State Police?

8              A.    Yes.

9              Q.    Did you -- are you aware that at the

10   start of this lawsuit, to kickoff this lawsuit, a

11   document called a complaint was filed with the court

12   which lays out your allegations against the troopers

13   in this case?

14             A.    Yes.

15             Q.    Okay.  Did you -- that document was

16   filed by your lawyers, correct?

17             A.    I believe so.

18             Q.    Did you assist your lawyers in setting

19   out the allegations, the factual allegations in that

20   complaint?  Let's rephrase.

21                   Let me ask you this:  Did you have any

22   opportunity to review the allegations in that

23   complaint before it was filed?

24             A.    No.

Jean Monaghan
September 17, 2019

Page 11

1          Q.      To your knowledge, were the allegations

2   in that complaint based on information that you gave

3   them as to what happened?

4          A.      I would assume so.

5          Q.      I just want to ask you about one of the

6   specific allegations in that complaint.  In that

7   complaint, paragraph 26, it states that the troopers,

8   I'll quote, "hitting him," meaning your son, "six

9   times which plaintiff Monaghan witnessed."

10              Do you recall that you witnessed the

11   state troopers actually firing shots at your son?

12          A.      Oh, firing shots, yes, I was at the

13   window, yes.

14          Q.      According to your statement to the

15   State Police on May 20, 2017, you said that you

16   turned away from the window because you didn't want

17   to see -- you thought that your son was lighting up

18   whatever was around his neck and that you didn't want

19   to see that, and so therefore, you didn't actually

20   see the shots fired?

21          A.      I did see the shots fired.  I was in

22   the window the whole time.  I was on the phone with

23   my son.

24          Q.      Is it your statement today that at no

Jean Monaghan
September 17, 2019

Page 12

1   point did you turn away from the window?

2        A.      No.

3        Q.      Just to clarify, no, you didn't turn

4   away from the window?

5        A.      No, I did not.

6        Q.      Is there a reason why the statement you

7   gave the State Police on May 20th you said that you

8   did turn away from the window?

9        A.      I don't recall that.  I turned away

10  from the window after they shot him.  Then I went

11  back into the great room, but the only thing I saw

12  was they were screaming at him and then they just

13  started shooting.

14       Q.      Is it your testimony today that on May

15  20, 2017 you understood that at the time that you

16  gave the interview to the State Police that Trooper

17  Pagan and Splain had shot your son?

18       A.      I may -- it was so far beyond my

19  comprehension that they would do something like that.

20  Now, you know, I called them for help, I didn't call

21  them for them to kill him.

22       Q.      At some point in time, did you believe

23  that your son had lit an explosive device that was

24  around his neck?

Jean Monaghan
September 17, 2019

Page 13

1          A.      No.

2          Q.      At some point in time, did you believe

3    that he actually had some type of explosive device

4    around his neck?

5          A.      He did say that on the phone that he

6    had something that he would blow his head off.

7          Q.      When you refer to that he said that on

8    the phone, was that prior to his arrival at your

9    house or was that while he was on the phone with you

10   sitting out in the driveway?

11         A.      I think he mentioned that before he

12   arrived at the house and then when he parked in front

13   of the house, he did say that to me on the phone.

14         Q.      Okay.  So prior to his arrival at the

15   house, he said that he had an explosive device?

16         A.      He had a firecracker.

17         Q.      Is it your recollection today that he

18   said he had a firecracker or that he had some type of

19   explosive?

20         A.      He did not mention the explosive.  He

21   just said he would blow his head off.

22         Q.      So prior to his arrival at your house

23   he mentioned that he was going to blow his head off?

24         A.      To my knowledge.

Jean Monaghan
September 17, 2019

Page 14

1          Q.      That was on a phone call with you?

2          A.      That's correct.

3          Q.      Okay.  Please continue.

4          A.      But I believe the state troopers heard

5     that also.

6          Q.      Yes.  Okay.  Did you have -- was this a

7     phone call during which -- let me rephrase.

8                  Was this a phone call with your son in

9     which you had the phone on speakerphone?

10         A.      Yes.

11         Q.      And the two troopers were in your home

12    at the time?

13         A.      Yes.

14         Q.      And it's your impression that they

15    heard that statement as well, that he would blow his

16    head off?

17         A.      Yes.

18         Q.      Then I believe you just testified that

19    when your son arrived at your house and was sitting

20    in his car, he was on his phone with you again, and

21    he, again, mentioned that he would blow his head off,

22    something to that effect?

23         A.      Something to that effect, if he saw

24    police officers.

Jean Monaghan
September 17, 2019

Page 15

1          Q.     Do you recall if your impression on

2    that date was that he was actually getting ready to

3    light whatever explosive may have been around --

4          A.     Not to my knowledge.

5                          * * * * *

6                  (Whereupon, Exhibit-1 was marked for

7          identification.)

8                          * * * * *

9    BY MS. LE:

10         Q.     Ms. Monaghan, I'm handing you what has

11   been marked by the court reporter as Exhibit-1 for

12   your deposition.  This is a transcript of the

13   interview that you gave to the State Police on May

14   20, 2017, and understanding that it's painful for you

15   to have to relive this, I just need to clarify.

16         A.     Do you need me on a page on here?

17         Q.     Yes.  First of all, I'm sure your

18   counsel will tell you as well, any time you're handed

19   an exhibit, you should feel free to take as much time

20   as you need to review the entire exhibit if you so

21   wish.  I will direct you to certain portions.

22                  So if you could, just turn to page 16,

23   you'll see at the bottom in the middle of every page

24   there is a page number, if you turn to page 16 of the

Jean Monaghan
September 17, 2019

Page 16

1   transcript.  In the second portion where you provide

2   testimony you'll see on the left is the name of the

3   person speaking.  In the second section where you

4   provide testimony in the big paragraph, if you could

5   please read that?

6          A.     I'm sorry, say that again.

7          Q.     If you could read the paragraph at the

8   top that begins your testimony where you say yeah,

9   and then what happened was, that block of testimony,

10  if you could read that to yourself?

11         A.     (Witness complies.)

12                There's a little confusion here.

13         Q.     Okay.

14         A.     There were two police officers there.

15  They had two police cars that were behind the pool

16  that could not be seen from the roadway, and then

17  what happened was from that time Tony was still in

18  the car and the police officers came -- there were

19  two driveways.  There were two driveways coming out

20  to the front of the house which is like right here.

21                They boxed him in there and then they

22  got out of their car and the only thing they just

23  started shouting at him and then they started firing

24  at him.

Jean Monaghan
September 17, 2019

Page 17

1      Q.     So here where you say at the end of

2  your testimony and he said okay, mom, and he ignited

3  that thing and all I heard were the things exploding,

4  they were trying to get him out of the car.

5      A.     They did not try to get him out of the

6  car.

7      Q.     This is a statement that you gave on

8  May 20, 2017.  Is there a reason why you are changing

9  your statement between May -- the day that the

10  incident occurred and today?

11      A.     I'm not sure I'm changing my statement.

12  My eyes will never forget what I saw.  I was in shock

13  over this whole thing and I may have said the wrong

14  thing.

15      Q.     Here also you state that, and he said

16  okay, mom and he ignited that thing and all I heard

17  were the things exploding.  At the time that you gave

18  this statement, it appears that your impression was

19  that he ignited whatever it was?

20      A.     That was my impression.  I did not

21  think that the police officers that I called for

22  help -- I couldn't even process something like that

23  happening.

24      Q.     Okay.  So your impression on May 20,

Jean Monaghan
September 17, 2019

1    2017 when you gave this statement was that he

2    quote/unquote ignited that thing?

3         A.    Yes.

4         Q.    Okay.  Now, you also testified later

5    down the page that you stated all I heard the officer

6    screaming, show me your hands, show me your hands.

7    Do you recall -- sitting here today, do you recall

8    them saying show me your hands, show me your hands?

9         A.    Show me your hands, get out of the car.

10   Show me your hands, get out of the car.  They said

11   that three or four times.

12        Q.    Okay.  Now, again, one line down from

13   what I just read, you testified on May 20, 2017 I

14   couldn't see in the car, but I was by the window.  I

15   had to then, I just turned around and ran back

16   because I knew what he was doing.  So here this

17   testimony you gave on May 20, 2017 you said -- you

18   turned around and you ran back into the house?

19        A.    I was already in the house by the

20   window.

21        Q.    Right.

22        A.    Like I said, I could not process what

23   they were doing out there.  I took it to say that he

24   may have carried out what he was talking about, but

Jean Monaghan
September 17, 2019

Page 19

1    he was in such a depressed state and when the police

2    officers got there, they didn't try to help him.

3         Q.    Let me ask my question in a little bit

4    better way.  It appears from your testimony on May

5    20, 2017 that I just read that you turned away from

6    the window facing back inside the house versus out

7    the window as you originally stated.  Is that an

8    accurate testimony that you gave on May 20, 2017,

9    that you turned away from the window?

10        A.    I don't believe I did, you know, I just

11   don't believe I did.  I saw them shoot him.  Again,

12   may I speak again.  At that point, like I said, it

13   wasn't even in my thought process that they would

14   shoot him.  They made no attempt to get him out of

15   the car.  He didn't have a weapon.

16        Q.    Okay.  I'm sorry, I didn't mean to cut

17   you off.

18        A.    That's okay, I just wanted to clarify

19   that.

20        Q.    Of course.  At any point today, please

21   feel free to clarify anything you need to say.

22        A.    Uh-huh.

23        Q.    Did you have more or are you done at

24   this point?

Jean Monaghan
September 17, 2019

Page 20

1        A.     Yes.

2        Q.     All right.  So sitting here today, your

3   recollection is that you witnessed the troopers

4   firing their weapons?

5        A.     Yes.

6        Q.     Is it possible sitting here today that

7   you actually learned of the troopers firing their

8   weapons during your interview with the interviewer,

9   Mr. Everk?

10       A.     I don't believe so.

11       Q.     Why do you believe that that was not

12  the situation?

13       A.     Because I witnessed it.  You just don't

14  forget something like that.

15       Q.     If you would turn to page 17 in that

16  transcript there, about halfway down the page you

17  testified and the police -- the police couldn't be

18  any nicer, they did have their pistols drawn.  I

19  can't confirm the fact that they shot.  I don't know

20  that because I heard that going off in the car and I

21  just couldn't look at him like that.

22              So my question is seeing that testimony

23  that you gave on May 20, 2017, does that refresh your

24  memory that perhaps at the time you gave this

Jean Monaghan
September 17, 2019

Page 21

1   statement you were not aware that the State Police

2   had fired their weapons?

3          A.     Correct, but I couldn't believe that

4   they would do that only because of the circumstances.

5   They knew Tony at that time was suicidal and they

6   made no attempt to help him.

7          Q.     Again, just for the sake of the record

8   to clarify it, having read this testimony that you

9   gave on May 20th, you now recall that at the time you

10  gave this statement you were not aware that the State

11  Police had fired their weapons?

12         A.     Obviously not at that time.

13         Q.     You came to learn that they fired their

14  weapons?

15         A.     I think it was -- like I said, for them

16  to be there and that was not in my thought process

17  that they were going to shoot him.

18         Q.     Of course.  Here your testimony is that

19  the police couldn't have been any nicer on the date

20  of the incident when you gave this testimony.  Do you

21  recall if your impression on that date was that the

22  troopers were trying to assist your son?

23         A.     They were in my house for an hour.

24  Whether they were going to assist him, I don't know

Jean Monaghan
September 17, 2019

Page 22

1    what they were thinking, but the one trooper came in

2    the front door and he was fooling around with the

3    window curtain and he said I don't want to get shot

4    in the back, I have a family to go home to.  How

5    insensitive is that?

6                And not only that, in my opinion I

7    believe he had an anxiety level, and, you know, I

8    have my own thoughts about that.

9         Q.    At what point do you recall feeling

10   that one of the troopers had an anxiety level?

11        A.    Well, when he said that to me, he said

12   I have a family to go home to, I don't want to get

13   shot in the back and Tony didn't have a weapon.

14        Q.    At what point do you recall him making

15   that statement during the time that he was at your

16   house?

17        A.    As soon as he came in the door.

18        Q.    Do you recall which of the two troopers

19   made that statement?

20        A.    It was a tall dark haired guy, thin,

21   slight build.

22        Q.    Do you recall if the two troopers

23   arrived at the same time?

24        A.    No.

Jean Monaghan
September 17, 2019

Page 23

1        Q.      Was it the trooper who arrived first or
2   second that made the statement?
3        A.      Second.
4        Q.      I'll represent to you that the trooper
5   who arrived second was Trooper Splain just to make it
6   easier for reference.
7        A.      Okay.
8        Q.      Is it your impression sitting here
9   today that you weren't sure what the two troopers
10  were doing at your house that day?
11       A.      I was sure I called them, I called them
12  for help.
13       Q.      Did the two troopers give you any
14  impression that they were not there to help?
15       A.      I don't understand that.  What do you
16  mean that they were not there to help.  Did I get the
17  impression that they wanted to help him?
18       Q.      Let me rephrase my question.
19               So you called the State Police --
20       A.      Uh-huh.
21       Q.      -- to get assistance for your son?
22       A.      Uh-huh.  Yes.
23       Q.      And that assistance included you wanted
24  them to bring him in for a potentially an involuntary

Jean Monaghan
September 17, 2019

Page 24

1    commitment?

2         A.     Correct, yes.

3         Q.     And earlier in your call to the State

4    Police you had asked the State Police to try to track

5    him so that they could bring him in?

6         A.     Yes.

7         Q.     When Troopers Pagan and Splain arrived

8    at your home during the time that they were there,

9    did they give you the impression that they were

10   trying to do anything other than bring your son in

11   for an involuntary commitment as you asked?

12        A.     No, I wouldn't know what they were

13   thinking because they were in another front room.

14        Q.     Were they speaking with you throughout

15   the time that they were at your home?

16        A.     Not totally.

17        Q.     Were there portions of the time that

18   they were at your home where they were speaking with

19   you?

20        A.     I believe the one trooper, I can't

21   remember who it was, but I believe one of the

22   troopers had said that -- well, they were here, they

23   were in my house for at least an hour and, of course,

24   they said well, we can't stay here all day.

Jean Monaghan
September 17, 2019

Page 25

1          Q.     Is it your impression -- let me ask

2    you:  Sitting here today, what is your impression of

3    the two troopers' demeanor during the time that they

4    were in your home?

5          A.     I just don't feel that they tried to

6    help the situation.  I believe they could have called

7    for someone to talk to him or help him get out of the

8    car because he never did.  So I mean -- I can't make

9    an assumption of what kind of frame of mind they were

10   in only because I was very upset over the whole

11   thing.

12         Q.     Okay.

13         A.     I don't believe they tried to help.

14         Q.     Why do you believe that they didn't try

15   to help?

16         A.     They were in my house when I saw them

17   flying out of the front door and, of course, they

18   came around and trapped Tony in there and they didn't

19   try to get him out of the car and he never got out of

20   the car once he hit the farm.  So, you know, all they

21   did was they just started screaming at him.

22         Q.     Had they discussed with you prior to

23   your son's arrival that they were going to try to

24   wait for him to come into the house to apprehend him?

Jean Monaghan
September 17, 2019

Page 26

1        A.      That's correct, yes.

2        Q.      Do you recall if once your son arrived

3    at the house that they were waiting for him to get

4    out of the car but only left the house to stop him

5    when they saw him moving the car?

6        A.      He didn't move the car.

7        Q.      Were you standing at the window

8    watching his car during this time when he was there?

9        A.      Yes.

10       Q.      Prior to the police leaving the house?

11       A.      Yes.

12       Q.      Okay.  So your recollection is that

13   your son didn't move the car at any point while he

14   was sitting in the driveway?

15       A.      No.

16       Q.      Okay.  So do you have -- were you going

17   to say something?

18       A.      May I say something?

19       Q.      Of course.

20       A.      The car was running at the time and

21   then the two police officers, one was behind and one

22   was in the front and then of course once they shot

23   him, they drug him out of the car and laid him on the

24   roadway.  At that time because the car was still

Jean Monaghan
September 17, 2019

Page 27

1    running, it moved up to the tree which was -- it

2    moved maybe two feet and then it stopped on the

3    mulch.

4           Q.     Now at the time you gave your statement

5    on May 20, 2017 to Trooper Everk, you stated that you

6    couldn't -- you were looking out the window but you

7    couldn't see actually into your son's car; is that

8    correct?

9           A.     That's correct, yes.

10          Q.     But you could see where the troopers

11   were positioned in relation to your son's car,

12   correct?

13          A.     That's correct.

14          Q.     Sitting here today, you testified that

15   you felt -- you feel that the troopers were not

16   trying to help your son on that date --

17          A.     Yes.

18          Q.     -- is that right?

19          A.     That's correct.

20          Q.     Other than the fact that they did not,

21   as you described it, try to get him out of the car

22   when he arrived, is there anything else that they did

23   or said during the time that they were with you that

24   gives you that belief that they weren't trying to

Jean Monaghan
September 17, 2019

Page 28

1   help your son?

2          A.     Right.  I don't believe they were there

3   to help him.  Only through their own actions.

4          Q.     What I'm trying to get at is what did

5   they do and say -- excuse me -- that gave you the

6   impression that they weren't there to help him?

7          A.     I don't believe they said anything to

8   me because, like I said, both police officers were in

9   the front room and I was in the great room.  What

10  they talked about among themselves, I don't know.

11         Q.     Did, at some point, they try to ask you

12  to get your son to come to the house so they could

13  bring him in?

14         A.     Yes.

15         Q.     At that time when they asked you to do

16  that, did you think that was a good idea?

17         A.     Well, I knew he needed help and at that

18  time I thought it would work if they could get him

19  and take him for help.

20         Q.     So at the time when they asked you to

21  do that, did you have any impression that they were

22  trying to do anything other than get him to your

23  house to try to bring him in to get help?

24         A.     I didn't have that thought only

Jean Monaghan
September 17, 2019

Page 29

1    because, like I said -- it was so far beyond my

2    thought process, I asked them for help.

3            Q.      So at the time that they asked you to

4    try to get him to the house, your belief was that

5    they could get him to the house so they could help

6    him?

7            A.      Yes.

8            Q.      And it was only since you found out

9    later that they shot him that your impression has

10   changed?

11           A.      Yes.

12           Q.      Did you, on May 20, 2017, during the

13   time that the two troopers, Splain and Pagan, were in

14   your home, do you recall if you told the troopers

15   that your son did -- have experience with fireworks?

16           A.      I wouldn't, at that time, have any

17   reason to assume that, you know, the only thing I

18   heard was that he had something around his neck.

19           Q.      Let me rephrase my question.  Putting

20   aside the explosive around his neck statement, you're

21   aware that your son worked with and/or sold fireworks

22   with his cousin; is that right?

23           A.      I was aware of that.

24           Q.      And that he had some fireworks in his

Jean Monaghan
September 17, 2019

Page 30

1    room on that date of May 20, 2017?

2         A.    Yes.

3         Q.    Do you recall that you told Troopers

4    Splain and Pagan that your son did have some

5    fireworks and was experienced with fireworks, not

6    explosives but fireworks?

7         A.    I don't recall that.

8         Q.    You don't recall telling them that?

9         A.    Right.

10        Q.    Do you recall the two troopers asking

11   you whether or not -- scratch that.

12             You testified earlier that during the

13   one of the calls with your son while the two troopers

14   were in your home that he mentioned that he was going

15   to blow his head off?

16        A.    Yes.

17        Q.    And that the two troopers heard that,

18   you believe they heard that?

19        A.    I believe, I can't say yes or no to

20   that.

21        Q.    Do you recall that one or both of the

22   troopers asking you after that phone call whether

23   your son had any experience with explosive devices?

24        A.    There's a little bit of difference with

Jean Monaghan
September 17, 2019

Page 31

1    explosive devices as opposed to fireworks.

2          Q.      Yes.

3          A.      I said fireworks.

4          Q.      You recall one of them asking you about

5    fire explosive devices?

6          A.      Pardon me, I knew he had fireworks,

7    yes.

8          Q.      Okay.

9          A.      Whether they asked me that or not, I

10   don't recall that.

11         Q.      Do you recall telling Mr. Everk during

12   your interview that your son did have experience with

13   fireworks?

14         A.      I may have, I don't recall.

15         Q.      Do you recall that the fireworks were

16   -- some of the fireworks that your son had experience

17   with were what's known as M-80s or quarter sticks?

18         A.      I have no experience with that.  I'm a

19   baby boomer.  I used fireworks with the little

20   sparklers.  I mean, I have no knowledge of what they

21   did or what they could do.

22         Q.      Following the incident on May 20, 2017,

23   did you have any other contact with either Trooper

24   Pagan or Trooper Splain?

Jean Monaghan
September 17, 2019

Page 32

```
 1          A.      After that time period?

 2          Q.      Yes.

 3          A.      No.

 4          Q.      Do you have any knowledge or

 5   information that Trooper Pagan had any part in

 6   investigating the incident that happened on May 20th?

 7          A.      I don't know that.

 8          Q.      Okay.  So you would have no knowledge

 9   or information that Trooper Pagan had any part in

10   deciding who should investigate that situation?

11          A.      That's correct, I don't know.

12          Q.      And can the same be said you have no

13   knowledge or information that Trooper Splain had any

14   involvement in the investigation of the incident?

15          A.      No.

16          Q.      Is it your understanding and belief

17   that Trooper Pagan and Trooper Splain were at your

18   house on May 20, 2017 as a part of their duties as

19   Pennsylvania State Troopers?

20          A.      I believe that or else I wouldn't have

21   called them.

22          Q.      Okay.

23          A.      Whether they followed through as

24   professionals, I disagree with that, they did not.
```

Jean Monaghan
September 17, 2019

Page 33

1          Q.     I understand.  Why do you believe that
2    they did not follow through as professionals?
3          A.     They rushed on him, they ran out of the
4    house, they got in their cars and then they started
5    firing.  They had no conversation with him at all and
6    then they said he lit a lighter and they started
7    shooting.
8                 I just don't -- as a mother, I just
9    don't believe that they took the time that they
10   should have taken to try and talk him out of the car
11   or just try to talk to him in some way to get him to
12   realize what was going on.  They made no attempt to
13   do that.
14         Q.     What do you think they should have done
15   differently?
16         A.     I think they should have maybe tried to
17   get a suicide prevention counselor there.  They had
18   an hour to do that because they knew he was coming
19   back to the farm.  Don't they carry Tasers?  They
20   were not threatened in any way, he just didn't get
21   out of the car.
22         Q.     Understanding that you couldn't see
23   into the car and you don't have any knowledge, but
24   since you say that they were not threatened in any

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Jean Monaghan
September 17, 2019

Page 34

1    way, if it's true that as the troopers say that they

2    saw your son, you know, turn on a lighter and

3    believed him to be lighting some type of device that

4    they saw around his neck, just assuming that that's

5    -- understanding you don't know if that's true or

6    not, if that's what they saw from their vantage

7    point, do you believe that it would have been

8    reasonable for them to fear they were in danger if

9    they saw something around your son's neck after the

10   statement he made and lit a lighter?

11           A.    There is a whole roadway there, they

12   could have got in their vehicles and just split or

13   moved away from the car.

14           Q.    Do you recall that one of the troopers

15   was, you know, maybe just feet from the driver's side

16   of your son's car?

17           A.    They were both on the driver's side.

18           Q.    Your recollection is that both were on

19   the driver's side?

20           A.    One was in the back, one was in the

21   front.

22           Q.    Do you recall how close the trooper was

23   who was in the front was to the car?

24           A.    Just a couple of feet, they both were

Jean Monaghan
September 17, 2019

Page 35

1    just a couple of feet away from him.

2          Q.     So if Trooper Pagan stated that what

3    they saw was, as they were just a few feet from the

4    car, they saw something strapped around your son's

5    neck and he had a lighter that he clicked on and was

6    about to or let me say the lighter came on and it was

7    very close to whatever he had around his neck.

8               Do you believe at this point for the

9    troopers to be fearful that they were in danger?

10         A.     Not if there were exits for them to

11   take.  There were three people -- well, there were

12   plenty of people on the farm, but I saw nothing

13   around his neck.  The one girl in the barn passed him

14   to go get her horses and saw nothing around his neck

15   and the eyewitness, Bob Cruts, saw nothing around his

16   neck.

17         Q.     You previously stated that you could

18   not see into the car?

19         A.     That's correct.

20         Q.     Do you recall Mr. Cruts was as close to

21   your son's vehicle as to the two troopers?

22         A.     No.

23         Q.     Do you recall where he was when he

24   witnessed --

Jean Monaghan
September 17, 2019

Page 36

```
 1        A.      He was in his apartment.

 2        Q.      How far away from the car would you say

 3   that is?

 4        A.      Maybe about 20, 25 feet.

 5        Q.      Do you recall from his vantage point

 6   what direction he would have been looking at the car,

 7   for example, would he have been looking at the back

 8   of the car, the passenger side or directly into the

 9   front of the car?

10        A.      His apartment is elevated so at that

11   point he could only see the back of the car.

12        Q.      Okay.  So he didn't have a view of your

13   son directly?

14        A.      Correct.

15        Q.      Okay.  You said the other witness,

16   you're referring to Lori?

17        A.      Yes.

18        Q.      Also saw your son?

19        A.      Yes.

20        Q.      Okay.  Do you recall how close she was

21   to your son?

22        A.      The car was in front of a yard and the

23   driveway was right there.  I mean she had to be maybe

24   two feet away from him because she said good morning
```

Jean Monaghan
September 17, 2019

1    Tony, how are you doing and he answered.

2         Q.    Do you recall what angle she was

3    looking into the car?

4         A.    Coming from behind.

5         Q.    So she was behind the car?

6         A.    She approached the car from behind.

7         Q.    And then did she pass by the driver's

8    side of the car, to your knowledge?

9         A.    Yes.

10        Q.    And you said that she passed by within

11   two feet of the car?

12        A.    Yes.

13        Q.    Do you have any knowledge whether or

14   not she looked into the car when she spoke to your

15   son?

16        A.    I can't answer that, I don't know.

17        Q.    So when you said that she didn't see

18   anything around your son's neck, do you have any

19   knowledge that she actually looked at your son and

20   she didn't see or did she just tell you I don't

21   recall seeing anything?

22        A.    I don't think I even talked to her

23   about that.

24        Q.    How do you know she didn't see

Jean Monaghan
September 17, 2019

Page 38

1    anything?

2         A.    I guess I don't know.

3         Q.    Are you aware of any witness stating

4    that they actually were able to see your son at that

5    time while he was sitting in the car on that day and

6    that they did not see anything around his neck?

7         A.    I can't speak for somebody else.

8         Q.    I meant only that you have no knowledge

9    of that?

10        A.    No, I have no knowledge.

11        Q.    Okay.  You testified that the two

12   troopers should have called a suicide prevention,

13   some kind of person?

14        A.    Is that not protocol?

15        Q.    Did you request either of the troopers

16   to call in a suicide prevention specialist?

17        A.    I did not only because they knew he was

18   suicidal.  I thought it was part of protocol that

19   somebody would try to get to him before the troopers

20   got to him.

21        Q.    Did you attempt to call any mental

22   health professionals?

23        A.    We called the suicide hotline.

24        Q.    Did you ask them to send anybody to

Jean Monaghan
September 17, 2019

Page 39

1   assist?

2         A.     I did not only because I figured that

3   they would do that, they would automatically send

4   somebody.

5         Q.     But during the time, the hour or so

6   that you said the troopers were at your home, you

7   didn't specifically ask them to call in any kind of

8   mental health professionals?

9         A.     No, I did not.  I firmly believed that

10  they were going to try to help him.

11        Q.     That the two troopers that were there

12  were going to try to help him?

13        A.     Right.

14        Q.     Do you recall that -- now you testified

15  earlier today the troopers, you know, had time to

16  call somebody, they were at your house for an hour or

17  so before your son arrived; is that right?

18        A.     Yes.

19        Q.     Okay.  Do you recall it was not -- when

20  they first arrived at your home, the two troopers

21  this was not -- at that point you didn't know your

22  son was going to be arriving at the house; is that

23  right, do you recall that?

24        A.     When they got there, but they wanted me

Jean Monaghan
September 17, 2019

Page 40

1    to get him back to the house.

2                    MS. LE:  Off the record.

3                         *  *  *  *  *

4              (Whereupon, an off the record

5         discussion was held.)

6                         *  *  *  *  *

7    BY MS. LE:

8         Q.    Ms. Monaghan, so having read some parts

9    of your testimony from May 20, 2017 to Trooper Everk,

10   do you recall now that your impression on the day

11   that you gave this statement was that your son was

12   lighting whatever he may have had, explosives he may

13   have had at the time?

14        A.    At that time, yes.

15        Q.    Okay.  And --

16        A.    That was my first initial thought.

17        Q.    And then you came to learn later that

18   he was actually shot by the police?

19        A.    Yes.

20        Q.    And was --

21        A.    But I seen them shoot him.

22        Q.    So your testimony today is that you

23   believe you saw them shoot?

24        A.    I saw them shoot him.

Jean Monaghan
September 17, 2019

Page 41

1          Q.      When you testified on May 20, 2017, I

2     can't confirm the fact that they shot, do you have

3     any reason to understand why you would have said on

4     that day that you can't confirm that they shot?

5          A.      Because it was not in my thought

6     process that they were doing something like that at

7     this time.

8          Q.      So at the time that you gave this

9     statement to Trooper Everk and stated I can't confirm

10    the fact that they shot, when you stated that, had

11    you seen them -- did you know for a fact that they

12    had shot their weapons, the two Troopers Pagan and

13    Splain?

14         A.      Yes.  They did, like I said, I think

15    it's very difficult for someone to stand there and

16    watch your son or your daughter die like that.  Now,

17    granted they did -- he did say he had something

18    around his neck, but, again, it was not in my thought

19    process they would even do that, but my eyes will

20    never forget what I saw.

21         Q.      Do you recall that you turned your face

22    away from the window at some point from the incident?

23         A.      I don't recall that.

24         Q.      So I'll again direct your attention to

Jean Monaghan
September 17, 2019

Page 42

1    page 16 of Exhibit-1 that I showed you earlier.

2           A.     Okay.

3           Q.     At the bottom -- towards the bottom of

4    the page you testified that, I'm reading here from

5    the bottom, all I heard from the officer screaming

6    show me your hands, show me your hands and apparently

7    then he ignited whatever was around his neck.

8    Trooper Smith then asked did you see him do that?

9    You then testified I couldn't see in the car, but I

10   was by the window.  I had to -- then I just turned

11   around and ran back because I knew what he was doing.

12           So does this -- seeing this testimony

13   that you gave on the date of the incident, does this

14   refresh your memory that you did, at some point, turn

15   away from the window?

16          A.     I certainly could have done that, but

17   it wasn't until after the shooting happened.

18          Q.     Okay.

19          A.     Actually after the shooting, I did go

20   back into the great room to call my ex-husband and

21   then when I came back to the window, they had him out

22   on the ground.

23          Q.     If you'll look on that same page, page

24   16 in the middle of the page, Trooper Everk states --

Jean Monaghan
September 17, 2019

Page 43

1    sorry, at the top of the page you had testified and

2    he said okay, mom and he ignited that thing and I

3    heard were the things exploding, they were trying to

4    get him out of the car.

5              Trooper Everk then states he did have

6    something around his neck and you stated --

7    testified, yeah.  And then Trooper Everk testified

8    but he was also our guys, the two guys that were

9    there, one of them or if not both, at this point we

10   do not know, shot him also.  And then you testified

11   oh, my goodness.

12             Do you recall -- seeing this today does

13   this refresh your memory that that may have been the

14   point that you learned that the two troopers had shot

15   Mr. Ardo, your son?

16        A.    I don't know that.

17        Q.    On page 17 of the transcript trooper --

18   you testified at the top of the page and then one of

19   troopers came around from the back of the house

20   around the pool area there and he stopped them and

21   there was the other one was in the back of him and

22   then all I heard him say was okay, okay, mom and he

23   ignited that thing.

24             Trooper Everk stated you were on the

Jean Monaghan
September 17, 2019

Page 44

1    phone with him at this point?  And you testified yes.
2    Trooper Smith asked you heard it light?  And you
3    testified no, he said okay, mom and he hung up and a
4    split second later I heard it, I heard the explosion
5    in the car.  Trooper Smith stated okay.
6                And Trooper Everk states was there --
7    you then testified and the police couldn't be any
8    nicer.  They did have their pistols drawn.  I can't
9    confirm the fact that they shot.  I don't know that
10   because I heard that going off in the car and I just
11   couldn't look at him like that?
12               Does this refresh your memory at all
13   seeing this testimony whether or not you turned away
14   from the window when your son hung up the phone?
15        A.     I turned away after they shot him.
16        Q.     But based on your testimony on the day
17   that you spoke with the Trooper Everk and Trooper
18   Smith, you stated that you, as soon as your son hung
19   up the phone, you heard at the time you thought him
20   igniting explosives?
21        A.     Yes.
22        Q.     And then you turned -- and you
23   weren't -- you didn't actually see anything?
24        A.     I'm sorry, rephrase that.  What do you

Jean Monaghan
September 17, 2019

Page 45

1    mean I didn't see anything?

2          Q.     So based on your testimony, May 20th

3    which I just read to you, you testified on that day

4    that after your son hung up the phone you heard

5    explosives going off or what you thought at the time

6    were explosives going off.  So at that point you are

7    testifying today that you then turned away from the

8    window?

9          A.    I turned away after the police officers

10   had their weapons and they were shooting.  It was so

11   far beyond comprehension they would try to shoot him

12   like that because I asked for help.  I didn't ask for

13   them to kill him.

14         Q.    I understand.

15         A.     My eyes will not let me forget what I

16   saw.

17         Q.    I understand.  I'm just trying to

18   understand.  I'm not trying to give you a hard time.

19         A.    No.  No, I know that.

20         Q.    I know that this is very difficult.

21   What I'm trying to understand today is why at the

22   time that you gave the statement to Trooper Everk and

23   Smith on May 20th after the incident you did not

24   recall that the troopers had -- you did not recall

Jean Monaghan
September 17, 2019

Page 46

1    that you saw the troopers shooting, but sitting here
2    today you say that you are certain that you saw the
3    troopers shooting?
4         A.    Yes.
5         Q.    Is there -- can you explain why on the
6    date of the incident when you gave your statement you
7    did not recall the troopers shooting, but sitting
8    here today you said you remembered it?
9         A.    I remembered it that afternoon or that
10   evening because, you know, friends came and we wrote
11   everything down exactly how it happened.  I mean,
12   like I said, it was not part of my thinking that they
13   would even do that.  I went into shock I think.
14        Q.    So you believe that at the time you
15   gave the statement you did not recall it, but then
16   later when you were meeting --
17        A.    With my friends and we went over
18   everything -- I'm sorry.  We went over everything.
19   We wrote everything down on paper and the time and
20   exactly what happened and that's when I knew that's
21   what happened.
22        Q.    So it's at that point you have given
23   your statement that you then recollected that they
24   had shot their weapons?

Jean Monaghan
September 17, 2019

Page 47

1        A.      I gave my statement as to what I
2   thought was happening.
3        Q.      Okay.
4        A.      Because I didn't believe that they
5   would do that.  That's probably my point.  I never
6   even thought that they would do something like that.
7        Q.      Okay.  At the time when you gave your
8   statement to the troopers, according to their
9   records, it was at 1 o'clock in the afternoon.  You
10  were not aware that the trooper had shot, but then
11  later when you were going over the events of the day
12  with your friends and you were writing everything
13  down, at that point you had learned that they shot
14  and you recalled that yourself?
15       A.      No, I believe I knew that when they
16  were doing the shooting.
17       Q.      Is there some reason why you would not
18  have -- you would have stated to the contrary when
19  you were testifying to Troopers Everk and Smith?
20       A.      I don't know if it is to the contrary.
21  My words at that point had to be -- I was devastated
22  with the whole thing and that's maybe why I came
23  across that way.
24       Q.      Okay.  So when you testified that you

Jean Monaghan
September 17, 2019

Page 48

1    couldn't confirm the fact that they shot on May 20,

2    2017, at that point you actually were sure they shot,

3    you just stated that you couldn't confirm that they

4    shot?

5         A.    Not that I wanted to lie about it.  It

6    was like I said, it was so far beyond my

7    comprehension that they would do that.

8         Q.    Did you --

9         A.    I think your brain and your whole

10   demeanor saves you at some point from such trauma and

11   that's what I believed happened here.

12        Q.    Okay.  But then having learned from the

13   statement, State Police investigators said that your

14   son was indeed shot.  Is that then what caused you to

15   be sure that they (sic) were shot?

16        A.    I think I was sure when they were

17   shooting him.  They did come in and they did tell me

18   he was shot before I went to the State Police

19   barracks.

20        Q.    Okay.  So you believed that you learned

21   from the State Police that your son had been shot

22   prior to giving your statement to Troopers Everk and

23   Smith?

24        A.    I don't think that was the case.

Jean Monaghan
September 17, 2019

Page 49

1          Q.     Okay.  I misunderstood you then.  Do

2    you recall if at the time you gave your statement to

3    Troopers Everk and Smith whether you knew for sure

4    that your son had been -- let me rephrase.

5               Do you recall if at the time you gave

6    your statement to Troopers Everk and Smith that you

7    knew Trooper Pagan and Smith had shot at your son?

8          A.     I'm not sure of the time frame there.

9    I'm not sure if they talked with me at my house or if

10   they talked with me at the State Police barracks.

11         Q.     So you don't recall at this point

12   sitting here today whether you knew that the two

13   troopers had fired at your son when you gave your

14   statement to Troopers Everk and Smith?

15         A.     No, I did not.  After we went to the

16   State Police barracks I was in shock.  Like I said, I

17   don't -- it was far beyond my comprehension that I

18   had to witness that.

19         Q.     So it is your statement that you knew

20   at the point when you gave the statement but you

21   didn't recall because you were in shock?

22         A.     Yes, that would be my assessment

23   myself.

24         Q.     Okay.  But then you did recall that

Jean Monaghan
September 17, 2019

Page 50

1    after your interview with them later in the evening

2    when you were talking to your friends?

3            A.     It wasn't later in the evening --

4    right.  Well, I spent a couple of hours at the State

5    Police barracks, so it had to be -- I don't recall if

6    they came into the house before I went to the police

7    barracks, it could have been, I just don't recall.

8            Q.     Having seen some of your testimony from

9    May 20, 2017, do you recall if your impression during

10   your conversation with your son while he was sitting

11   in his car was that he was intending to --

12           A.     Commit suicide?

13           Q.     Yes.

14           A.     Yes.

15           Q.     And that was based on whatever he was

16   saying to you on the phone and his demeanor at the

17   time?

18           A.     Yes.

19           Q.     Okay.

20           A.     But the two police officers knew that

21   at that time.

22           Q.     They knew what, ma'am?

23           A.     They knew he was suicidal.

24           Q.     To be clear, based on your conversation

Jean Monaghan
September 17, 2019

Page 51

1   with your son while he was sitting in the car and you

2   were on the phone with him, you believe that he did

3   indeed have an explosive, that he had threatened and

4   he was about to light it up?

5          A.     I probably knew that, yes.

6          Q.     Okay.  If the -- let me rephrase.

7                 Do you believe that the two troopers on

8   May 20, 2017 should have allowed your son to drive

9   away in his car instead of engaging with him and

10  blocking him in?

11         A.     That's not what I wanted to happen on

12  that date.  I wanted them to take him and get him

13  help.

14         Q.     So in terms of thinking that they could

15  have done more on that date, you had said before that

16  they should have called in some kind of -- I don't

17  remember the phrase you used, crisis prevention,

18  suicide prevention or mental health professional,

19  something along those lines?

20         A.     Yes.

21         Q.     Other than calling someone along those

22  lines, is there anything else that you believe they

23  should have done that day that they didn't?

24         A.     I don't know what the protocol is for

Jean Monaghan
September 17, 2019

Page 52

1    the troopers.  I totally believe they acted too

2    quickly and it was excessive force as far as I'm

3    concerned.

4          Q.    When you say that they acted too

5    quickly, what part of their actions was too quick?

6          A.    They flew out of the front door.  They

7    came on up in the two police cars and they got out

8    and that's exactly when they started screaming at him

9    and it was over, he was dead.

10         Q.    Do you believe they should have stayed

11   in the house and waited for a longer period of time?

12         A.    Like I said, I don't know what protocol

13   is.  All I know is they went flying and then they

14   started shooting.

15         Q.    During your statement on May 20, 2017,

16   you stated that the troopers couldn't have been

17   nicer.  Do you recall at what point you changed your

18   impression of their demeanor?

19         A.    They came into my house and they asked

20   me questions and at that time they were very

21   respectful and very cordial until they got him back

22   at the house or I got him back at the house and then

23   the whole thing just went out the front door.

24         Q.    Okay.  So is it your impression that

Jean Monaghan
September 17, 2019

1    initially they were -- couldn't have been any nicer,

2    but then at the point where they flew out of the

3    house as you described, that's when things changed?

4           A.    I think some things changed after I

5    heard that comment, you know, he didn't want to get

6    shot in the back because he had a family to go home

7    to.  I mean that -- that kind of changed a little bit

8    as far as my thinking is concerned.

9           Q.    Do I recall your testimony accurately

10   that you said that that comment occurred soon after

11   Trooper Splain arrived?

12          A.    That's correct, yes.

13          Q.    So fairly early into your roughly one

14   hour with the two troopers?

15          A.    Correct.

16          Q.    So from that point when you said that

17   Trooper Splain made that comment about not wanting to

18   get shot in the back is your recollection that you

19   then no longer believe them to be, you know, acting

20   very nicely towards you?

21          A.    That's not -- no, they were.  I mean my

22   opinion changed a little then, but they weren't with

23   me the whole time.  They were in the front room

24   watching and waiting for him to come up the driveway.

Jean Monaghan
September 17, 2019

Page 54

1          Q.      When you say that your impression
2    changed after you heard that statement, in what way
3    did your impression change?
4          A.      I thought he was an arrogant young cop.
5    That's what I thought.  I mean how do you make a
6    statement like that?  You're on duty and you are
7    somewhere where you're supposed to be helping someone
8    else.
9          Q.      Did you, at that point, have any
10   concerns as to how he would handle the situation with
11   your son?
12         A.      Yes.
13         Q.      Did you express those concerns in any
14   way, either to those two troopers or to anybody?
15         A.      No.
16         Q.      What concerns did you develop at that
17   point about how Trooper Splain would handle the
18   situation given what you heard him say?
19         A.      I don't know if that was necessarily my
20   thought process.
21         Q.      So from sitting here today, you believe
22   that from the moment you heard Trooper Splain make
23   that statement you started to develop concerns about
24   how he would handle the situation?

Jean Monaghan
September 17, 2019

Page 55

1          A.      I think so.

2          Q.      When you gave your statement to Trooper

3    Everk and Trooper Smith, after everything happened

4    why didn't you express those concerns to Troopers

5    Everk or Smith?

6          A.      I did state the comment that he made.

7          Q.      Why did you testify that the police

8    couldn't have been any nicer if you had such

9    concerns?

10         A.      But when they came to the house, they

11   were.

12         Q.      Okay.

13         A.      As time went on it changed my mind.

14         Q.      The point at which you say the police

15   couldn't be any nicer is when you were testifying

16   about them getting ready to leave the house, it's on

17   page 17 of the transcript, and you say that the

18   police couldn't be any nicer.  They did have their

19   pistols drawn, et cetera, et cetera.

20              Does that refresh your memory that at

21   the time you gave this statement you did believe the

22   troopers to be Troopers Splain and Pagan, they

23   couldn't have been any nicer during the time that

24   they were with you?

Jean Monaghan
September 17, 2019

Page 56

1      A.     I think the part -- when I made that

2 statement, I was hoping they were going to help him.

3 That was the main objective for them being there.

4      Q.     So at the time -- would it be accurate

5 for me to say that at the time you gave the statement

6 to Troopers Everk and Smith, you still believed that

7 Troopers Pagan and Smith had tried to help your son?

8      A.     They did not try.

9      Q.     So at the time -- I understand that is

10 your belief now sitting here today.  What I'm trying

11 to ask is at the time that you gave this statement to

12 Troopers Everk and Smith, which is roughly 1:00 on

13 the day that it happened, having heard some of your

14 testimony from that day, do you believe that at the

15 time that you gave the statement to Smith and Everk

16 that you did still have an impression that Trooper

17 Splain and Pagan still tried to help your son on that

18 day?

19      A.     Not after the shooting.

20      Q.     Do you believe that at the time you

21 gave the statement to Trooper Smith and Trooper Everk

22 that you had already formed the belief that Troopers

23 Smith and Pagan were not there to help your son?

24      A.     I couldn't make an assessment like

Jean Monaghan
September 17, 2019

Page 57

1    that.  I didn't know what was going through their
2    head and actions speak louder than words.  I saw what
3    they did.  I saw where they went.  I saw what the
4    final situation was.  So as far as I was concerned
5    they were not there to help him.
6            Q.    Right.  What I'm trying to ask you is
7    your opinion as to what they were doing or not doing.
8    When you gave your statement to Smith and Everk, was
9    it your belief at that point when you were giving
10   this statement to Trooper Everk and Trooper Smith and
11   that Troopers Pagan and Splain had not been trying to
12   help your son?
13           A.    Do I believe that at 1:00 in the
14   afternoon?
15           Q.    At the time when you gave that
16   statement, not sitting here?
17           A.    That they weren't trying to help him?
18           Q.    Let me rephrase.  At the point when you
19   gave your statement to Troopers Everk and Smith --
20           A.    That was my house at 1:00.
21           Q.    -- was it your impression at that point
22   that the troopers were to help your son or not help
23   him?
24           A.    Not help him.

Jean Monaghan
September 17, 2019

Page 58

1          Q.      So when you gave your statement, you
2   had already formed the belief that the troopers were
3   not trying to help your son?
4          A.      That is correct.
5          Q.      So when you testified to Smith and
6   Everk and that the two troopers couldn't be any nicer
7   and that they were trying to get him out of the car,
8   I guess my question to you is why did you say that if
9   you had already formed the belief that they were not
10  trying to help your son?
11         A.      I may have misspoke.  I still may have
12  been under all the stress that I was under that day.
13  What I saw I will never forget.  The reason why we
14  called them was to help him, not shoot him, not 11
15  times.  I mean --
16         Q.      Understanding that you were certainly
17  probably in shock as you said when you know you gave
18  this statement, what I'm trying to understand is if
19  you had already formed concerns as you testified
20  earlier about at the very least, Trooper Splain since
21  he made that statement about not wanting to be shot
22  in the back which is early in the one hour that he
23  was with you?
24         A.      That's correct.

Jean Monaghan
September 17, 2019

Page 59

1        Q.     If you already had that concern for

2   essentially most of the time that Trooper Splain was

3   with you, then why did you say during your testimony

4   to Trooper Smith and Trooper Everk after the shooting

5   that you thought the troopers couldn't have been any

6   nicer?

7              You, at that point, already had

8   concerns about Trooper Splain for quite sometime.  So

9   I'm trying to understand why you would characterize

10  them as couldn't have been any nicer?

11       A.     At that time at 1:00 in the afternoon,

12  those two police officers were gone.  After the

13  shooting they got them out of there pronto and then

14  sent in a police officer that was really nice and

15  very considerate and maybe that's how I made that

16  statement.  He sat in the house with me for quite a

17  while.  He was in the kitchen and I was in the great

18  room and he was a genuine person and that's probably

19  where that statement came from.

20       Q.     So you believe your statement -- I'm

21  sorry to have to read the same thing over and over,

22  I'm just trying to clarify.

23       A.     That's fine.

24       Q.     So your testimony is on page 17 and the

Jean Monaghan
September 17, 2019

Page 60

1    police, the police couldn't be any nicer.  They did

2    have their pistols drawn.  I don't -- I can't confirm

3    the fact that they shot because I heard that going

4    off in the car and I couldn't look at him like that.

5              So you believe that statement that you

6    made where you said the police couldn't have been any

7    nicer was referring to Trooper Everk to whom you were

8    making the statement, you were saying to him -- you

9    were talking to Trooper Everk at the time and Smith

10   and you say quote, "and the police couldn't have been

11   any nicer," in the past tense.  You believe that that

12   statement was referring to Trooper Everk who you were

13   speaking to at that very moment?

14        A.    Yes.  Yes, because he was at that table

15   and he was a very considerate police officer.  I

16   think he was a detective from the barracks and he was

17   in plainclothes, so...

18        Q.    Why would you, in the middle of

19   speaking about Trooper Pagan and Splain and what

20   happened, what unfolded that day, would you then

21   suddenly say to Trooper Everk you couldn't have been

22   any nicer, I mean this is in the middle of a long

23   statement, a question and answer period of what

24   happened with your son.  I don't understand why --

Jean Monaghan
September 17, 2019

Page 61

1          A.     I don't believe I directed that to

2     Splain and Pagan.  I believe the police officers that

3     were there afterwards were very considerate of my

4     feelings.  Very considerate of the whole situation,

5     that is my assessment of that statement.

6          Q.     Would you, if you were going to

7     compliment Trooper Everk and possibly Trooper Smith,

8     why wouldn't you have just referred to them in the

9     first person versus says the police couldn't be any

10    nicer and then go on to speak up about the Troopers

11    Pagan and Splain.  You said the police couldn't be

12    any nicer.  They did have pistols drawn.  I can't

13    confirm that they shot, so the rest of the statement

14    is clearly about Pagan and Splain.

15              So why would you think the first

16    sentence was about Troopers Everk and Smith?

17         A.     I can't answer that, I don't know.

18         Q.     Okay.  So you don't recall sitting here

19    today that the police could have been any nicer?

20         A.     No, I may have made it as far as

21    Trooper Everk was concerned, because he was.

22         Q.     You don't recall making the statement,

23    you believe sitting here today that you -- if you

24    made it, you would have referred to Trooper Everk

Jean Monaghan
September 17, 2019

1    because he was -- you recall him being very nice?

2          A.     To my recollection, that's where I was

3    coming from, yes.

4          Q.     Do you actually recollect the statement

5    and you recollect that that's what you were saying?

6          A.     I can't recollect that, no.

7          Q.     So you are supposing that that's what

8    you meant because your impression, sitting here

9    today, is that Pagan and Splain were not nice when

10   they were with you, but Trooper Everk was very nice

11   when he was interviewing you?

12         A.     I didn't say that they were not nice to

13   me.  They were very aloof.  They had their own

14   conversations among themselves in the front room.

15   Detective Everk was at least cordial.

16         Q.     So what I'm trying to get at is the

17   reason sitting here today that you're saying you

18   believe this statement, the police couldn't be any

19   nicer, that you were directing that at the person you

20   were speaking with, Trooper Everk, is that -- sitting

21   here today you do not have an impression of Troopers

22   Pagan and Splain as being -- couldn't be any nicer,

23   but you do have an impression of Trooper Everk as

24   being very nice?

Jean Monaghan
September 17, 2019

Page 63

1        A.      That's correct, yes.

2        Q.      But you don't specifically recall this

3   statement that you made on May 20th?

4        A.      I do not.

5        Q.      Okay.  And understanding that this is

6   what you believe you meant at the time sitting here

7   today, can you understand how reading this paragraph

8   now it would sound like you were referring to Splain

9   and Pagan?

10       A.      That's somebody else's opinion.

11  Everybody has one.

12       Q.      So does it seem reasonable to you that

13  somebody could read this paragraph, this statement,

14  the police couldn't be any nicer as referring to

15  Pagan and Splain since you were talking about them

16  very directly in the next few sentences?

17       A.      Yeah, I could see where someone would.

18       Q.      I believe you testified earlier that

19  you said that you recall telling Troopers Everk and

20  Smith when you gave them this statement on May 20th,

21  you believe that you told them at that time what you

22  say Trooper Splain -- let me rephrase the whole

23  question.

24               You testified earlier that you told

Jean Monaghan
September 17, 2019

Page 64

1    Troopers Everk and Smith when you gave the statement

2    on May 20th that Trooper Splain had said to you while

3    he was in your house that something along the lines

4    of I don't want to get shot in the back because I

5    have a family?

6         A.    Yes.

7         Q.    You recall telling Troopers Everk and

8    Smith that?

9         A.    Yes.

10        Q.    I hate to make you go through the

11   transcript, but since I don't recall seeing it

12   anywhere in the transcript, could you look through

13   the transcript and point it out to me?

14        A.    You're asking me to point out what?

15        Q.    Your testimony to Smith and Everk that

16   you told them that Trooper Splain had said something

17   along the lines of --

18        A.    Yes, I did say that because I was

19   really annoyed about it.  I don't know if it's in

20   here.  Like I said, I didn't read it.  I'm trying to

21   get a grip on what happened and rehashing everything

22   is very difficult.  I didn't want to read this, I

23   knew what happened.

24        Q.    Is it possible that you did not tell

Jean Monaghan
September 17, 2019

Page 65

1    them that on the day that you gave this --

2          A.     I firmly believe I did because that

3    stuck at me because I thought it was very insensitive

4    and he had a lot of anxiety about his job.

5          Q.     Did he say anything else to you that

6    caused you to believe him to have a lot of anxiety

7    about his job other than what you already described?

8          A.     No.

9          Q.     Okay.  Do you believe it's possible

10   that you told Troopers Everk and/or Smith at some

11   point outside of this May 20, 2017 interview about

12   the statement?

13         A.     No.

14         Q.     So you very specifically recall that

15   you said it during this interview?

16         A.     Absolutely.

17         Q.     Did you speak or have you spoken to any

18   of the neighbors or anybody who may have witnessed

19   what happened on that day?

20         A.     I did not.  I didn't feel I had to.

21   The eyewitness that is coming this afternoon saw

22   exactly what I saw, and I had never, ever had a

23   spoken word with him about it.

24         Q.     How do you know the witness that is

Jean Monaghan
September 17, 2019

Page 66

1    coming later today?

2         A.    After the fact he wrote it on paper.  I

3    sent that to the attorney, a copy of that testimony

4    and the grand jury at that time had that also.

5         Q.    Were you present for I believe the

6    person you're referring to is Mr. Cruts?

7         A.    Yes.

8         Q.    Were you present for Mr. Cruts'

9    testimony to the grand jury?

10        A.    No.

11        Q.    Did you read the transcript of

12   Mr. Cruts' testimony to the grand jury?

13        A.    He had written down what he saw and I'm

14   not sure where it went or if the police got it

15   because they did question him.

16        Q.    Did you see whatever it was that

17   Mr. Cruts had written down?

18        A.    Yes.

19        Q.    Did he provide this to you?

20        A.    Yes.

21        Q.    And you said you gave that to your

22   attorneys?

23        A.    Yes.

24        Q.    Do you know what --

Jean Monaghan
September 17, 2019

Page 67

1          A.     At that point it must have gone to

2     Mr. Morganella because he went in and offered to do

3     and did a separate investigation.

4          Q.     Not --

5          A.     Excuse me.  At that point I did not

6     have an attorney, Mr. Morganella was the rep.  There

7     was an attorney that I spoke with in Easton and I

8     just don't remember his name.

9          Q.     Is it your recollection that you

10    provided a note that Mr. Cruts gave you to

11    Mr. Morganella?

12         A.     Yes.

13         Q.     Is Mr. Morganella the DA investigator?

14         A.     That is correct.

15         Q.     Did you make a copy of those notes

16    before giving them to Mr. Morganella?

17         A.     Yes.

18         Q.     Did you still have a copy of those

19    notes?

20         A.     Yes.

21                (REQUEST)

22         Q.     I'll ask that you provide them to your

23    counsel to be produced in this case.

24         A.     Yes.

Jean Monaghan
September 17, 2019

Page 68

```
 1          Q.     So your only knowledge as to what Cruts
 2    saw or didn't see on that day is what he wrote on his
 3    notes that he provided to you?
 4          A.     That's correct, yes.
 5          Q.     You said that you also took notes in
 6    the late afternoon or evening following what happened
 7    on May 20th?
 8          A.     Yes.
 9          Q.     Okay.  Do you still have a copy of
10    those notes?
11          A.     Yes.
12          Q.     Have you provided those to your
13    attorney?
14          A.     I believe I provided that to
15    Mr. Morganella.
16                 (REQUEST)
17          Q.     I ask that you provide that to your
18    attorney so they can be produced in this case.
19                 Are you aware of any other notes taken
20    by you or anybody else that relates to what happened
21    on May 20th?
22          A.     Just what Lori saw, what Bob Cruts saw;
23    and, of course, what I saw.
24          Q.     Do you know if Lori took any notes
```

Jean Monaghan
September 17, 2019

Page 69

1    about what happened?

2         A.    I believe I have a copy of her

3    statement also.

4         Q.    Is that a statement that she wrote out

5    and gave to you?

6         A.    Yes.

7               (REQUEST)

8         Q.    Okay.  I would also ask that you

9    provide a copy of that.

10        A.    Yes, I believe that did go to

11   Mr. Morganella also.

12        Q.    Since I don't work with Mr. Morganella,

13   I don't have any other line to him.

14        A.    I understand.

15        Q.    I'm not trying to make busy work for

16   you, but these are things that you have in your

17   possession?

18        A.    Yes.

19        Q.    Is that a statement that you asked Lori

20   to provide to you as to what she saw or how did the

21   statement come about?

22        A.    I believe the -- I believe it could

23   have been the attorney or Mr. Morganella that wanted

24   some statements from the people that were directly on

Jean Monaghan
September 17, 2019

Page 70

1    the farm at that time.

2         Q.     When you refer to the attorney at that

3    time, would that have been an attorney that you

4    hired?

5         A.     No.  No.

6         Q.     Who are you referring to by the

7    attorney at the time?

8         A.     My daughter has, I believe, she would

9    remember the attorney in Easton.

10              MR. SCHAFKOPF:  It was Philip

11         something.  I don't know his last name or it

12         could have been something Philip.

13   BY MS. LE:

14        Q.     Was it an attorney with the DA or was

15   it attorney representing you and your family is what

16   I'm trying to get at?

17        A.     We were there just to get the

18   statements.  They never hired an attorney.

19   Ms. Morganella stepped in and then it all went from

20   there to the grand jury.

21        Q.     So accurate for me to say that

22   Mr. Morganella had requested you to get a statement

23   from Lori as to what she saw.  Is that what happened,

24   and then she gave the statement to you?

Jean Monaghan
September 17, 2019

Page 71

1         A.      I'm not sure where that came from.

2         Q.      Okay, but Lori provided a copy to you

3    of her statement?

4         A.      That is correct, yes.

5         Q.      And you then provided that to

6    Mr. Morganella?

7         A.      Yes.

8         Q.      Do you know how long after the incident

9    Lori -- do you recall how long after the incident

10   Lori gave that statement to you?

11        A.      I don't recall that.

12        Q.      Do you recall if it was a matter of

13   days or if it was more than a month later?

14        A.      Oh, it wasn't a month later.  It was

15   probably just a matter of days.

16        Q.      Other than Lori's statement that she

17   provided to you and Mr. Cruts' notes that he gave to

18   you, are you aware of any other notes or written

19   statements by witnesses to this incident?

20        A.      Not to my knowledge.

21        Q.      At the time in May -- in or around May

22   2017, I know that your son was doing some work for

23   you on your farm; is that right?

24        A.      Yes.

Jean Monaghan
September 17, 2019

Page 72

```
 1        Q.      Okay.  Other than the work that he was

 2   doing for you on your farm, do you know if he had any

 3   other employment?

 4        A.      Not that recent, no.

 5        Q.      Do you know recall when he was last

 6   employed?

 7        A.      When I originally -- I lived on the

 8   farm for 45 years and Tony was always part of that

 9   farm maintenance and I thought I had the farm sold in

10   2008 or 2009 and the gentleman that thought he was

11   buying it reneged, so I had to take it back in lieu

12   of foreclosure.

13               Now, in that time period from '09 to

14   2016, Tony had worked for Lifetime Doors and then he

15   came back to me when I bought a house in Martin Creek

16   and then he -- both of us wanted to go back to the

17   farm and live and that's when we went back.

18        Q.      So you said that Tony worked for

19   Lifetime Doors between '09 and '16?

20        A.      Sometime in between them.

21        Q.      Not during that whole period?

22        A.      No.

23        Q.      What kind of work was he doing for

24   Lifetime Doors?
```

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Jean Monaghan
September 17, 2019

Page 73

1          A.      Making doors.

2          Q.      Do you know if he was working

3    full-time?

4          A.      Yes.  At that point, yes.

5          Q.      Do you know if your son was receiving

6    any type of Social Security payments or anything

7    along those lines?

8          A.      No.

9          Q.      So in or around May of 2017, to your

10   knowledge, the only employment he had was working

11   with you on the farm?

12         A.      Primarily, yes.

13                MS. LE:  I don't have any further

14         questions, Ms. Monaghan, thank you for coming

15         in today.

16                          * * * * *

17                (This concludes the deposition of Jean

18         Monaghan at 11:39 a.m.)

19                          * * * * *

20

21

22

23

24

Jean Monaghan
September 17, 2019

Page 74

1                C E R T I F I C A T I O N

2

3

4          I hereby certify that the proceedings and

5    evidence noted are contained fully and accurately in

6    the stenographic notes taken by me upon the foregoing

7    matter dated _____2019, and that this is a

8    correct transcript of the same.

9

10

11

12

            RENEE SCHUMANN
13          CERTIFIED COURT REPORTER
            LICENSE NUMBER: 30XT00005200
14

15

16          (The foregoing certification of this

17   transcript does not apply to any reproduction of the

18   same by any means, unless under the direct control

19   and/or supervision of the certifying reporter.)

20

21

22

23

24

Jean Monaghan
September 17, 2019

**A**

a.m 1:19
73:18
able 38:4
Absolutely
65:16
accurate 19:8
56:4 70:21
accurately
53:9 74:5
acted 52:1,4
acting 53:19
ACTION 1:5
actions 28:3
52:5 57:2
addition 9:19
afternoon
46:9 47:9
57:14 59:11
65:21 68:6
agreed 4:2
al 1:4,7
allegations
10:12,19,19
10:22 11:1
11:6
allow 5:6,11
allowed 51:8
aloof 62:13
and/or 29:21
65:10 74:19
ANGELO
1:4
angle 37:2
annoyed
64:19
answer 5:7,13
5:17,18 6:9
37:16 60:23
61:17
answered
37:1
answering
5:9
Anthony 4:22
anticipate 5:8
5:23
anxiety 22:7
22:10 65:4
65:6
anybody
38:24 54:14
65:18 68:20

apartment
36:1,10
apparently
42:6
appears
17:18 19:4
apply 74:17
apprehend
25:24
approached
37:6
Arch 1:15
2:20
Ardo 1:4 4:22
6:15 43:15
area 43:20
arrival 13:8
13:14,22
25:23
arrived 13:12
14:19 22:23
23:1,5 24:7
26:2 27:22
39:17,20
53:11
arriving
39:22
arrogant 54:4
aside 29:20
asked 24:4,11
28:15,20
29:2,3 31:9
42:8 44:2
45:12 52:19
69:19
asking 5:5
30:10,22
31:4 64:14
assessment
49:22 56:24
61:5
assist 10:18
21:22,24
39:1
assistance
23:21,23
ASSOCIA...
1:20
assume 6:9
11:4 29:17
assuming
34:4
assumption

25:9
attached 3:16
attempt
19:14 21:6
33:12 38:21
attention
41:24
attorney 1:15
2:18,19
4:19 66:3
67:6,7
68:13,18
69:23 70:2
70:3,7,9,14
70:15,18
attorneys
66:22
audibly 5:17
automatical...
39:3
Avenue 2:11
aware 9:18
10:9 21:1
21:10 29:21
29:23 38:3
47:10 68:19
71:18

**B**

B 3:11
baby 31:19
back 12:11
18:15,18
19:6 22:4
22:13 33:19
34:20 36:7
36:11 40:1
42:11,20,21
43:19,21
52:21,22
53:6,18
58:22 64:4
72:11,15,16
72:17
bad 6:20
Bailer 6:23
7:5
Bala 2:11,12
barn 35:13
barracks 7:2
48:19 49:10
49:16 50:5
50:7 60:16
based 11:2

44:16 45:2
50:15,24
begins 16:8
behalf 4:21
belief 27:24
29:4 32:16
56:10,22
57:9 58:2,9
believe 7:8,21
9:15,24
10:4,17
12:22 13:2
14:4,18
19:10,11
20:10,11
21:3 22:7
24:20,21
25:6,13,14
28:2,7
30:18,19
32:20 33:1
33:9 34:7
35:8 40:23
46:14 47:4
47:15 51:2
51:7,22
52:1,10
53:19 54:21
55:21 56:14
56:20 57:13
59:20 60:5
60:1 61:1
61:2,23
62:18 63:6
63:18,21
65:2,6,9
66:5 68:14
69:2,10,22
69:22 70:8
believed 34:3
39:9 48:11
48:20 56:6
Bethlehem
7:22
better 19:4
beyond 12:18
29:1 45:11
48:6 49:17
big 16:4
bit 19:3 30:24
53:7
block 16:9
blocking

51:10
blow 13:6,21
13:23 14:15
14:21 30:15
Bob 35:15
68:22
boomer 31:19
bottom 15:23
42:3,3,5
bought 72:15
boxed 16:21
brain 48:9
break 6:1,3
bring 23:24
24:5,10
28:13,23
brought 4:21
build 22:21
busy 69:15
buying 72:11

**C**

C 2:5 74:1,1
call 7:4 12:20
14:1,7,8
24:3 30:22
38:16,21
39:7,16
42:20
called 10:11
12:20 17:21
23:11,11,19
25:6 32:21
38:12,23
51:16 58:14
calling 7:7
51:21
calls 30:13
car 14:20
16:18,22
17:4,6 18:9
18:10,14
19:15 20:20
25:8,19,20
26:4,5,6,8
26:13,20,23
26:24 27:7
27:11,21
33:10,21,23
34:13,16,23
35:4,18
36:2,6,8,9
36:11,22
37:3,5,6,8

51:10
37:11,14
38:5 42:9
43:4 44:5
44:10 50:11
51:1,9 58:7
60:4
carried 18:24
carry 33:19
cars 16:15
33:4 52:7
case 4:20
10:13 48:24
67:23 68:18
caused 48:14
65:6
certain 15:21
46:2
certainly
42:16 58:16
certification
4:4 74:16
CERTIFIED
74:13
certify 74:4
certifying
74:19
cetera 55:19
55:19
change 54:3
changed
29:10 52:17
53:3,4,7,22
54:2 55:13
changing
17:8,11
characterize
59:9
choose 9:8
chose 9:7
circumstan...
21:4
CIVIL 1:5
clarify 12:3
15:15 19:18
19:21 21:8
59:22
clear 50:24
clearly 61:14
clicked 35:5
close 34:22
35:7,20
36:20
come 25:24

28:12 48:17
53:24 69:21
coming 16:19
33:18 37:4
62:3 65:21
66:1 73:14
commencing
1:19
comment
53:5,10,17
55:6
Commit
50:12
commitment
24:1,11
Commonwe...
1:18 4:18
complaint
10:11,20,23
11:2,6,7
complete 5:6
5:12 6:2
complies
16:11
compliment
61:7
comprehen...
12:19 45:11
48:7 49:17
concern 59:1
concerned
52:3 53:8
57:4 61:21
concerns
54:10,13,16
54:23 55:4
55:9 58:19
59:8
concludes
73:17
confirm
20:19 41:2
41:4,9 44:9
48:1,3 60:2
61:13
confusing 6:8
confusion
16:12
considerate
59:15 60:15
61:3,4
consistent
10:5

contact 31:23
contacted
6:14
contacting
6:19
contained
74:5
content 8:20
continue 14:3
contrary
47:18,20
control 74:18
conversation
5:8 8:15
33:5 50:10
50:24
conversations
8:20 62:14
cop 54:4
copy 9:5 66:3
67:15,18
68:9 69:2,9
71:2
cordial 52:21
62:15
correct 7:22
9:15 10:16
14:2 21:3
24:2 26:1
27:8,9,12
27:13,19
32:11 35:19
36:14 53:12
53:15 58:4
58:24 63:1
67:14 68:4
71:4 74:8
counsel 4:2
8:7,11,16
8:20 15:18
67:23
counselor
33:17
couple 6:23
34:24 35:1
50:4
course 6:14
8:6 19:20
21:18 24:23
25:17 26:19
26:22 68:23
court 1:1,21
5:10 10:11

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Jean Monaghan
September 17, 2019

15:11 74:13
cousin 29:22
**Creek** 72:15
crisis 51:17
**Cruts** 35:15
  35:20 66:6
  66:17 67:10
  68:1,22
**Cruts'** 66:8
  66:12 71:17
curtain 22:3
cut 19:16
**Cynwyd** 2:12

_____ **D** _____
**D** 3:1
**DA** 67:13
  70:14
danger 34:8
  35:9
dark 22:20
date 1:19
  6:19 7:16
  9:17 15:2
  21:19,21
  27:16 30:1
  42:13 46:6
  51:12,15
dated 74:7
daughter
  41:16 70:8
day 7:7 8:10
  17:9 23:10
  24:24 38:5
  40:10 41:4
  44:16 45:3
  47:11 51:23
  56:13,14,18
  58:12 60:20
  65:1,19
  68:2
days 71:13,15
dead 52:9
deciding
  32:10
defendant 1:8
  8:7
defendants
  2:24 4:19
demeanor
  25:3 48:10
  50:16 52:18
deposition
  1:14 5:1,4

8:12,17,22
  15:12 73:17
depressed
  19:1
**DEPUTY**
  2:19
described
  27:21 53:3
  65:7
**DESCRIPT...**
  3:13
detective
  60:16 62:15
devastated
  47:21
develop 54:16
  54:23
device 12:23
  13:3,15
  34:3
devices 30:23
  31:1,5
die 41:16
difference
  30:24
differently
  33:15
difficult 9:11
  41:15 45:20
  64:22
direct 3:7
  4:13 15:21
  41:24 74:18
directed 61:1
directing
  62:19
direction 36:6
directly 36:8
  36:13 63:16
  69:24
disagree
  32:24
discussed
  25:22
discussion
  40:5
**DISTRICT**
  1:1,1
document
  10:11,15
documents
  8:8,21
doing 18:16

18:23 23:10
  37:1 41:6
  42:11 47:16
  57:7,7
  71:22 72:2
  72:23
door 22:2,17
  25:17 52:6
  52:23
doors 72:14
  72:19,24
  73:1
drawn 20:18
  44:8 55:19
  60:2 61:12
drive 51:8
driver's
  34:15,17,19
  37:7
driveway
  13:10 26:14
  36:23 53:24
driveways
  16:19,19
drug 26:23
duly 4:9
duties 32:18
duty 54:6

_____ **E** _____
**E** 2:5,5 3:1,11
  74:1
earlier 24:3
  30:12 39:15
  42:1 58:20
  63:18,24
early 51:13
  58:22
easier 23:6
**EASTERN**
  1:1
**Easton** 67:7
  70:9
**EDDIE** 1:7
effect 14:22
  14:23
either 31:23
  38:15 54:14
elevated
  36:10
else's 63:10
employed
  72:6
employment

72:3 73:10
engaging
  51:9
entire 15:20
**ESQUIRE**
  2:10
essentially
  59:2
**Estate** 4:21
et 1:4,7 55:19
  55:19
evening 46:10
  50:1,3 68:6
events 47:11
**Everk** 7:20
  8:9 20:9
  27:5 31:11
  40:9 41:9
  42:24 43:5
  43:7,24
  44:6,17
  45:22 47:19
  48:22 49:3
  49:6,14
  55:3,5 56:6
  56:12,15,21
  57:8,10,19
  58:6 59:4
  60:7,9,12
  60:21 61:7
  61:16,21,24
  62:10,15,20
  62:23 63:19
  64:1,7,15
  65:10
**Everybody**
  63:11
evidence 74:5
ex-husband
  42:20
exactly 46:11
  46:20 52:8
  65:22
**EXAMINA...**
  3:7 4:13
examined
  4:10
example 36:7
excessive 52:2
excuse 28:5
  67:5
exhibit 3:16
  15:19,20

**Exhibit-1**
  3:14 15:6
  15:11 42:1
exits 35:10
experience
  29:15 30:23
  31:12,16,18
experienced
  30:5
explain 46:5
exploding
  17:3,17
  43:3
explosion
  44:4
explosive
  12:23 13:3
  13:15,19,20
  15:3 29:20
  30:23 31:1
  31:5 51:3
explosives
  30:6 40:12
  44:20 45:5
  45:6
express 54:13
  55:4
eyes 17:12
  41:19 45:15
eyewitness
  35:15 65:21

_____ **F** _____
**F** 74:1
face 41:21
facing 19:6
fact 20:19
  27:20 41:2
  41:10,11
  44:9 48:1
  60:3 66:2
factual 10:19
fairly 53:13
family 22:4
  22:12 53:6
  64:5 70:15
far 12:18
  29:1 36:2
  45:11 48:6
  49:17 52:2
  53:8 57:4
  61:20
farm 25:20
  33:19 35:12

70:1 71:23
  72:2,8,9,9
  72:17 73:11
**FAX** 1:24
fear 34:8
fearful 35:9
feel 6:8 15:19
  19:21 25:5
  27:15 65:20
feeling 22:9
feelings 61:4
feet 27:2
  34:15,24
  35:1,3 36:4
  36:24 37:11
felt 27:15
figured 39:2
filed 10:11,16
  10:23
filing 4:3
final 57:4
fine 59:23
fire 31:5
firecracker
  13:16,18
fired 11:20,21
  21:2,11,13
  49:13
fireworks
  29:15,21,24
  30:5,5,6
  31:1,3,6,13
  31:15,16,19
firing 11:11
  11:12 16:23
  20:4,7 33:5
firmly 39:9
  65:2
first 15:17
  23:1 39:20
  40:16 61:9
  61:15
flew 52:6 53:2
flying 25:17
  52:13
follow 33:2
followed
  32:23
following
  7:16 31:22
  68:6
follows 4:11
fooling 22:2

force 52:2
foreclosure
  72:12
foregoing
  74:6,16
forget 17:12
  20:14 41:20
  45:15 58:13
form 4:5
formed 56:22
  58:2,9,19
found 29:8
four 18:11
frame 25:9
  49:8
free 6:8 15:19
  19:21
friends 1:21
  46:10,17
  47:12 50:2
front 13:12
  16:20 22:2
  24:13 25:17
  26:22 28:9
  34:21,23
  36:9,22
  52:6,23
  53:23 62:14
full-time 73:3
fully 5:6,12
  74:5
further 73:13

_____ **G** _____
**GARY** 2:10
Gary@scha...
  2:14
**General** 1:15
  2:18,19
  4:19
gentleman
  72:10
genuine
  59:18
getting 15:2
  55:16
girl 35:13
give 5:3 6:1
  23:13 24:9
  45:18
given 46:22
  54:18
gives 27:24
giving 48:22

57:9 67:16
go 7:6 22:4,12
  35:14 42:19
  53:6 61:10
  64:10 69:10
  72:16
goes 5:4
going 5:23
  7:5 13:23
  20:20 21:17
  21:24 25:23
  26:16 30:14
  33:12 39:10
  39:12,22
  44:10 45:5
  45:6 47:11
  56:2 57:1
  60:3 61:6
  good 28:16
  36:24
goodness
  43:11
grand 9:21
  10:5 66:4,9
  66:12 70:20
granted
  41:17
graphic 9:10
great 12:11
  28:9 42:20
  59:17
grip 64:21
ground 5:3
  42:22
guess 38:2
  58:8
guttural 5:20
guy 22:20
guys 43:8,8

_____ **H** _____
**H** 3:11
haired 22:20
halfway
  20:16
handed 15:18
handing
  15:10
handle 54:10
  54:17,24
hands 18:6,6
  18:8,8,9,10
  42:6,6
happen 51:11

**happened**
11:3 16:9
16:17 32:6
42:17 46:11
46:20,21
48:11 55:3
56:13 60:20
60:24 64:21
64:23 65:19
68:6,20
69:1 70:23
**happening**
17:23 47:2
**happy** 6:1
**hard** 45:18
**hate** 64:10
**head** 5:18
13:6,21,23
14:16,21
30:15 57:2
**health** 38:22
39:8 51:18
**heard** 14:4,15
17:3,16
18:5 20:20
29:18 30:17
30:18 42:5
43:3,22
44:2,4,4,10
44:19 45:4
53:5 54:2
54:18,22
56:13 60:3
**held** 40:5
**help** 6:21 7:8
12:20 17:22
19:2 21:6
23:12,14,16
23:17 25:6
25:7,13,15
27:16 28:1
28:3,6,17
28:19,23
29:2,5
39:10,12
45:12 51:13
56:2,7,17
56:23 57:5
57:12,17,22
57:22,24
58:3,10,14
**helping** 54:7
**hired** 70:4,18

**hit** 25:20
**hitting** 11:8
**home** 14:11
22:4,12
24:8,15,18
25:4 29:14
30:14 39:6
39:20 53:6
**hoping** 56:2
**HOPKINS**
2:9
**horses** 35:14
**hotline** 38:23
**hour** 21:23
24:23 33:18
39:5,16
53:14 58:22
**hours** 50:4
**house** 7:11
13:9,12,13
13:15,22
14:19 16:20
18:18,19
19:6 21:23
22:16 23:10
24:23 25:16
25:24 26:3
26:4,10
28:12,23
29:4,5
32:18 33:4
39:16,22
40:1 43:19
49:9 50:6
52:11,19,22
52:22 53:3
55:10,16
57:20 59:16
64:3 72:15
**hung** 44:3,14
44:18 45:4

**I**

**idea** 28:16
**identification**
15:7
**ignited** 17:2
17:16,19
18:2 42:7
43:2,23
**igniting** 44:20
**impression**
14:14 15:1
17:18,20,24

21:21 23:8
23:14,17
24:9 25:1,2
28:6,21
29:9 40:10
50:9 52:18
52:24 54:1
54:3 56:16
57:21 62:8
62:21,23
**incident** 7:16
8:10 9:22
17:10 21:20
31:22 32:6
32:14 41:22
42:13 45:23
46:6 71:8,9
71:19
**included** 8:8
23:23
**individual**
6:22 7:20
8:1
**individuals**
8:3
**information**
11:2 32:5,9
32:13
**initial** 40:16
**initially** 53:1
**insensitive**
22:5 65:3
**inside** 19:6
**instructions**
5:4
**intending**
50:11
**intention** 7:6
**interview**
3:14 8:1,3,9
9:1,5 10:2,6
12:16 15:13
20:8 31:12
50:1 65:11
65:15
**interviewer**
20:8
**interviewing**
62:11
**introduce**
4:16
**investigate**
32:10

**investigating**
32:6
**investigation**
32:14 67:3
**investigator**
7:18 67:13
**investigators**
48:13
**involuntary**
23:24 24:11
**involvement**
32:14

**J**

**Jean** 1:14 3:4
4:9 73:17
**Jersey** 1:17
**job** 65:4,7
**jury** 9:21
10:5 66:4,9
66:12 70:20

**K**

**Kathy** 2:19
4:18
**kickoff** 10:10
**kill** 12:21
45:13
**kind** 25:9
38:13 39:7
51:16 53:7
72:23
**kitchen** 59:17
**Kle@attor...**
2:23
**knew** 18:16
21:5 28:17
31:6 33:18
38:17 42:11
46:20 47:15
49:3,7,12
49:19 50:20
50:22,23
51:5 64:23
**know** 6:23
8:15 12:20
19:10 20:19
21:24 22:7
24:12 25:20
28:10 29:17
32:7,11
34:2,5,15
37:16,24
38:2 39:15

39:21 41:11
43:10,16
44:9 45:19
45:20 46:10
47:20 51:24
52:12,13
53:5,19
54:19 57:1
58:17 61:17
64:19 65:24
66:24 68:24
70:11 71:8
71:22 72:2
72:5 73:2,5
**knowledge**
7:24 11:1
13:24 15:4
31:20 32:4
32:8,13
33:23 37:8
37:13,19
38:8,10
68:1 71:20
73:10
**known** 31:17

**L**

**laid** 26:23
**LANE** 1:21
**large** 8:8
**late** 68:6
**law** 2:9 4:10
**lawsuit** 4:21
10:10,10
**lawyers** 10:16
10:18
**lays** 10:12
**Le** 2:19 3:7
3:20 4:15
4:18 15:9
40:2,7
70:13 73:13
**learn** 21:13
40:17
**learned** 20:7
43:14 47:13
48:12,20
**leave** 55:16
**leaving** 26:10
**left** 16:2 26:4
**Let's** 10:20
**level** 22:7,10
**LICENSE**
74:13

**lie** 48:5
**lieu** 72:11
**Lifetime**
72:14,19,24
**light** 15:3
44:2 51:4
**lighter** 33:6
34:2,10
35:5,6
**lighting** 11:17
34:3 40:12
**line** 3:20
18:12 69:13
**lines** 51:19,22
64:3,17
73:7
**lit** 12:23 33:6
34:10
**litigation** 8:7
**little** 16:12
19:3 30:24
31:19 53:7
53:22
**live** 72:17
**lived** 72:7
**long** 5:24
60:22 71:8
71:9
**longer** 52:11
53:19
**look** 20:21
42:23 44:11
60:4 64:12
**looked** 10:1
37:14,19
**looking** 27:6
36:6,7 37:3
**Lori** 36:16
68:22,24
69:19 70:23
71:2,9,10
**Lori's** 71:16
**lot** 65:4,6
**louder** 57:2

**M**

**M-80s** 31:17
**ma'am** 50:22
**main** 56:3
**maintenance**
72:9
**making** 22:14
60:8 61:22
73:1

**marked** 15:6
15:11
**Martin** 72:15
**matter** 71:12
71:15 74:7
**mean** 19:16
23:16 25:8
31:20 36:23
45:1 46:11
53:7,21
54:5 58:15
60:22
**meaning** 11:8
**means** 74:18
**meant** 38:8
62:8 63:6
**meet** 8:14,16
**meeting**
46:16
**memory**
20:24 42:14
43:13 44:12
55:20
**mental** 38:21
39:8 51:18
**mention**
13:20
**mentioned**
13:11,23
14:21 30:14
**met** 4:17
**middle** 15:23
42:24 60:18
60:22
**mind** 25:9
55:13
**misspoke**
58:11
**misunderst...**
49:1
**mom** 17:2,16
43:2,22
44:3
**moment**
54:22 60:13
**Monaghan**
1:14 3:4 4:9
4:16,24
6:13 11:9
15:10 40:8
73:14,18
**month** 71:13
71:14

**Morganella**
67:2,6,11
67:13,16
68:15 69:11
69:12,23
70:19,22
71:6
**morning** 6:24
36:24
**mother** 33:8
**move** 26:6,13
**moved** 27:1,2
34:13
**moving** 26:5
**mulch** 27:3

**N**

**N** 2:5 3:1 74:1
**name** 4:17
6:23 16:2
67:8 70:11
**named** 7:20
**natural** 5:8
**nature** 8:15
**necessarily**
54:19
**neck** 11:18
12:24 13:4
29:18,20
34:4,9 35:5
35:7,13,14
35:16 37:18
38:6 41:18
42:7 43:6
**need** 5:24
15:15,16,20
19:21
**needed** 28:17
**neighbors**
65:18
**never** 5:2
10:1 17:12
25:8,19
41:20 47:5
58:13 65:22
70:18
**New** 1:17
**NEWTOWN**
1:22
**nice** 59:14
62:1,9,10
62:12,24
**nicely** 53:20
**nicer** 20:18

Jean Monaghan
September 17, 2019

Page 4

21:19 44:8
52:17 53:1
55:8,15,18
55:23 58:6
59:6,10
60:1,7,11
60:22 61:10
61:12,19
62:19,22
63:14
**nod** 5:18
**Notary** 1:17
1:17
**note** 67:10
**noted** 74:5
**notes** 67:15
67:19 68:3
68:5,10,19
68:24 71:17
71:18 74:6
**number** 3:13
8:8 15:24
74:13

**O**

**O** 74:1
**o'clock** 47:9
**objections** 4:5
**objective**
56:3
**Obviously**
21:12
**occurred**
17:10 53:10
**offered** 67:2
**Office** 1:15
2:18 4:18
**officer** 1:7
18:5 42:5
59:14 60:15
**officers** 14:24
16:14,18
17:21 19:2
26:21 28:8
45:9 50:20
59:12 61:2
**OFFICES**
2:9
**oh** 11:12
43:11 71:14
**okay** 5:3 6:13
7:4 8:14 9:4
9:8,19
10:15 13:14

14:3,6
16:13 17:2
17:16,24
18:4,12
19:16,18
23:7 25:12
26:12,16
31:8 32:8
32:22 36:12
36:15,20
38:11 39:19
40:15 42:2
42:18 43:2
43:22,22
44:3,5 47:3
47:7,24
48:12,20
49:1,24
50:19 51:6
52:24 55:12
61:18 63:5
65:9 68:9
69:8 71:2
72:1
**once** 25:20
26:2,22
**opinion** 22:6
53:22 57:7
63:10
**opportunity**
10:22
**opposed** 31:1
**Oral** 1:14
**order** 8:21
**originally**
19:7 72:7
**outside** 4:17
65:11

**P**

**P** 2:5,5
**Pagan** 1:7
4:20 7:14
12:17 24:7
29:13 30:4
31:24 32:5
32:9,17
35:2 41:12
49:7 55:22
56:7,17,23
57:11 60:19
61:2,11,14
62:9,22
63:9,15

**page** 3:3,13
3:20 15:16
15:22,23,24
15:24 18:5
20:15,16
42:1,4,23
42:23,24
43:1,17,18
55:17 59:24
**painful** 15:14
**paper** 46:19
66:2
**paragraph**
11:7 16:4,7
63:7,13
**Pardon** 31:6
**parked** 13:12
**part** 8:8 32:5
32:9,18
38:18 46:12
52:5 56:1
72:8
**parts** 40:8
**pass** 37:7
**passed** 35:13
37:10
**passenger**
36:8
**payments**
73:6
**PCO** 6:23 7:5
**Pennsylvania**
1:1,16,18
1:22 2:12
2:21 32:19
**people** 35:11
35:12 69:24
**period** 32:1
52:11 60:23
72:13,21
**person** 16:3
38:13 59:18
61:9 62:19
66:6
**Philadelphia**
1:16 2:21
**Philip** 70:10
70:12
**phone** 11:22
13:5,8,9,13
14:1,7,8,9
14:20 30:22
44:1,14,19

45:4 50:16
51:2
**phrase** 51:17
**pick** 7:8
**pistols** 20:18
44:8 55:19
60:2 61:12
**plainclothes**
60:17
**plaintiff** 1:5
2:15 11:9
**please** 14:3
16:5 19:20
**plenty** 35:12
**point** 12:1,22
13:2 19:12
19:20,24
22:9,14
26:13 28:11
34:7 35:8
36:5,11
39:21 41:22
42:14 43:9
43:14 44:1
45:6 46:22
47:5,13,21
48:2,10
49:11,20
52:17 53:2
53:16 54:9
54:17 55:14
57:9,18,21
59:7 64:13
64:14 65:11
67:1,5 73:4
**police** 6:14,19
7:2,7,10,17
7:22 8:1,3
9:1,6,16,20
10:7 11:15
12:7,16
14:24 15:13
16:14,15,18
17:21 19:1
20:17,17
21:1,11,19
23:19 24:4
24:4 26:10
26:21 28:8
40:18 44:7
45:9 48:13
48:18,21
49:10,16

50:5,6,20
52:7 55:7
55:14,18
59:12,14
60:1,1,6,10
60:15 61:2
61:9,11,19
62:18 63:14
66:14
**pool** 16:15
43:20
**poorly** 6:7
**portion** 16:1
**portions**
15:21 24:17
**positioned**
27:11
**possession**
69:17
**possible** 20:6
64:24 65:9
**possibly** 61:7
**potentially**
23:24
**prepare** 8:16
8:21
**present** 8:2,3
66:5,8
**prevention**
33:17 38:12
38:16 51:17
51:18
**previously**
35:17
**Primarily**
73:12
**prior** 8:12 9:4
13:8,14,22
25:22 26:10
48:22
**probably**
47:5 51:5
58:17 59:18
71:15
**proceedings**
74:4
**process** 17:22
18:22 19:13
21:16 29:2
41:6,19
54:20
**produced** 8:7
67:23 68:18

**PRODUCT...**
3:19
**professional**
51:18
**professionals**
32:24 33:2
38:22 39:8
**pronto** 59:13
**protocol**
38:14,18
51:24 52:12
**provide** 9:21
16:1,4
66:19 67:22
68:17 69:9
69:20
**provided**
67:10 68:3
68:12,14
71:2,5,17
**Public** 1:17
1:18
**purpose** 6:18
**Putting** 29:19

**Q**

**quarter** 31:17
**question** 5:7
5:12 6:2,9
19:3 20:22
23:18 29:19
58:8 60:23
63:23 66:15
**questions** 4:6
5:5,17 6:7
52:20 73:14
**quick** 52:5
**quickly** 52:2
52:5
**quite** 59:8,16
**quote** 11:8
60:10
**quote/unqu...**
18:2

**R**

**R** 2:5 74:1
**ran** 18:15,18
33:3 42:11
**reaction** 5:20
**read** 16:5,7
16:10 18:13
19:5 21:8
40:8 45:3

59:21 63:13
64:20,22
66:11
**reading** 4:3
42:4 63:7
**ready** 15:2
55:16
**realize** 33:12
**really** 59:14
64:19
**reason** 12:6
17:8 29:17
41:3 47:17
58:13 62:17
**reasonable**
34:8 63:12
**recall** 6:24
8:2 11:10
12:9 15:1
18:7,7 21:9
21:21 22:9
22:14,18,22
26:2 29:14
30:3,7,8,10
30:21 31:4
31:10,11,14
31:15 34:14
34:22 35:20
35:23 36:5
36:20 37:2
37:21 39:14
39:19,23
40:10 41:21
41:23 43:12
45:24,24
46:7,15
49:2,5,11
49:21,24
50:5,7,9
52:17 53:9
61:18,22
62:1 63:2
63:19 64:7
64:11 65:14
71:9,11,12
72:5
**recalled**
47:14
**receiving**
73:5
**recollect** 62:4
62:5,6
**recollected**

46:23
**recollection**
13:17 20:3
26:12 34:18
53:18 62:2
67:9
**record** 4:17
5:10,17
21:7 40:2,4
**recordings**
7:4
**records** 47:9
70:2
**refer** 13:7
70:2
**reference**
23:6
**referred** 61:8
61:24
**referring**
36:16 60:7
60:12 63:8
63:14 66:6
70:6
**refresh** 20:23
42:14 43:13
44:12 55:20
**rehashing**
64:21
**relates** 68:20
**relation** 6:15
9:22 27:11
**relive** 9:11
15:15
**remember**
6:23 8:4,4
24:21 51:17
67:8 70:9
**remembered**
46:8,9
**Renee** 1:16
74:12
**reneged**
72:11
**rep** 67:6
**rephrase** 6:8
10:20 14:7
23:18 29:19
44:24 49:4
51:6 57:18
63:22
**reporter** 5:10
15:11 74:13
74:19

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

REPORTE... 1:21
represent 23:4
representing 2:15,24 4:19 70:15
reproduction 74:17
request 38:15 67:21 68:16 69:7
requested 70:22
REQUESTS 3:19
reserved 4:6
respectful 52:21
rest 5:8 61:13
revealing 8:19
review 10:22 15:20
right 4:22 6:16 7:11 7:18 16:20 18:21 20:2 27:18 28:2 29:22 30:9 36:23 39:13 39:17,23 50:4 57:6 71:23
roadway 16:16 26:24 34:11
room 12:11 24:13 28:9 28:9 30:1 42:20 53:23 59:18 62:14
roughly 53:13 56:12
rules 5:4
running 26:20 27:1
rushed 33:3

**S**
S 2:5 3:11
sake 5:10,16 21:7
sat 59:16
saves 48:10
saw 12:11 14:23 17:12 19:11 25:16 26:5 34:2,4 34:6,9 35:3 35:4,12,14 35:15 36:18 40:23,24 41:20 45:16 46:1,2 57:2 57:3,3 58:13 65:21 65:22 66:13 68:2,22,22 68:23 69:20 70:23
saying 18:8 50:16 60:8 62:5,17
says 61:9
SCHAFKO... 2:9,10 70:10
Schumann 1:16 74:12
scratch 30:11
screaming 12:12 18:6 25:21 42:5 52:8
sealing 4:3
second 16:1,3 23:2,3,5 44:4
section 16:3
Security 73:6
see 8:24 9:8 11:17,19,20 11:21 15:23 16:2 18:14 27:7,10 33:22 35:18 36:11 37:17 37:20,24 38:4,6 42:8 42:9 44:23 45:1 63:17 66:16 68:2
seeing 20:22 37:21 42:12 43:12 44:13 64:11
seen 9:5,13 16:16 40:21 41:11 50:8
send 7:10 38:24 39:3
sent 59:14 66:3
sentence 5:9 61:16
sentences 63:16
separate 67:3
SEPTEMB... 1:11
series 5:5
setting 10:18
shock 17:12 46:13 49:16 49:21 58:17
shoot 19:11 19:14 21:17 40:21,23,24 45:11 58:14
shooting 12:13 33:7 42:17,19 45:10 46:1 46:3,7 47:16 48:17 52:14 56:19 59:4,13
shot 12:10,17 20:19 22:3 22:13 26:22 29:9 40:18 41:2,4,10 41:12 43:10 43:14 44:9 44:15 46:24 47:10,13 48:1,2,4,14 48:15,18,21 49:7 53:6 53:18 58:21 60:3 61:13 64:4
shots 11:11 11:12,20,21
shouting 16:23
show 8:11,20 18:6,6,8,8,9 18:10 42:6
42:6
showed 42:1
sic 48:15
side 34:15,17 34:19 36:8 37:8
signing 4:3
sitting 13:10 14:19 18:7 20:2,6 23:8 25:2 26:14 27:14 38:5 46:1,7 49:12 50:10 51:1 54:21 56:10 57:16 61:18,23 62:8,17,20 63:6
situation 20:12 25:6 32:10 54:10 54:18,24 57:4 61:4
six 11:8
slight 22:21
Smith 42:8 44:2,5,18 45:23 47:19 48:23 49:3 49:6,7,14 55:3,5 56:6 56:7,12,15 56:21,23
sound 63:8
sparklers 31:20
speak 19:12 38:7 57:2 61:10 65:17
speakerpho... 14:9
speaking 16:3 24:14,18 60:13,19 62:20
specialist 38:16
specific 11:6
specifically 39:7 63:2 65:14
spent 50:4
26:2,13 27:16 28:1 28:12 29:15 29:21 30:4 30:13,23 31:12,16 34:2 36:13 36:18,21 37:15,19 38:4 39:17 39:22 40:11 41:16 43:15 44:14,18 45:4 48:14 48:21 49:4 49:7,13 50:10 51:1 51:8 54:11 56:7,17,23 57:12,22 58:3,10 60:24 71:22 73:5
son's 25:23 27:7,11 34:9,16 35:4,21 37:18
soon 22:17 44:18 53:10
sorry 16:6 19:16 43:1 44:24 46:18 59:21
sound 63:8
sparklers 31:20
speak 19:12 38:7 57:2 61:10 65:17
speakerpho... 14:9
speaking 16:3 24:14,18 60:13,19 62:20
Splain 4:20 7:13 12:17 23:5 24:7 29:13 30:4 31:24 32:13 32:17 41:13 53:11,17 54:17,22 55:22 56:17 57:11 58:20 59:2,8 60:19 61:2 61:11,14 62:9,22 63:8,15,22 64:2,16
split 34:12 44:4
spoke 6:22 37:14 44:17 67:7
spoken 65:17 65:23
stand 41:15
standing 26:7
start 5:7,9,12 10:10
started 12:13 16:23,23 25:21 33:4 33:6 52:8 52:14 54:23
state 1:17 6:14,19 7:2 7:7,10,11 7:17,21 8:1 8:2 9:1,6,16 9:20 10:7 11:11,15 12:7,16 14:4 15:13 17:15 19:1 21:1,10 23:19 24:3 24:4 32:19 48:13,18,21 49:10,16 50:4 55:6
stated 18:5 19:7 27:5 35:2,17 41:9,10 43:6,24
44:5,18 47:18 48:3 52:16
statement 7:17 9:16 9:19 11:14 11:24 12:6 14:15 17:7 17:9,11,18 18:1 21:1 21:10 22:15 22:19 23:2 27:4 29:20 34:10 40:11 41:9 45:22 46:6,15,23 47:1,8 48:13,22 49:2,6,14 49:19,20 52:15 54:2 54:6,23 55:2,21 56:2,5,11 56:15,21 57:8,10,16 57:19 58:1 58:18,21 59:16,19,20 60:5,8,12 60:23 61:5 61:13,22 62:4,18 63:3,13,20 64:1 65:12 69:3,4,19 69:21 70:22 70:24 71:3 71:10,16
statements 69:24 70:18 71:19
states 1:1 11:7 42:24 43:5 44:6
stating 38:3
stay 24:24
stayed 52:10
stenographic 74:6
stepped 70:19
sticks 31:17
stop 26:4
stopped 27:2 43:20
strapped 35:4
Street 1:15 2:20
STREHLOW 1:20
stress 58:12
stuck 65:3
subject 5:1
suddenly 60:21
suicidal 21:5 38:18 50:23
suicide 33:17 38:12,16,23 50:12 51:18
Suite 1:21 2:20
supervision 74:19
supposed 54:7
supposing 62:7
sure 15:17 17:11 23:9 23:11 48:2 48:15,16 49:3,8,9 66:14 71:1
sworn 3:5 4:9

**T**
T 3:11 74:1,1
table 60:14
take 6:3 15:19 28:19 35:11 51:12 72:11
taken 1:14 33:10 68:19 74:6
talk 25:7 33:10,11
talked 28:10 37:22 49:9 49:10
talking 18:24 50:2 60:9 63:15
tall 22:20
Tasers 33:19
tell 15:18

Jean Monaghan
September 17, 2019

37:20 48:17
64:24
**telling** 30:8
31:11 63:19
64:7
**tense** 60:11
**terms** 51:14
**testified** 4:10
14:18 18:4
18:13 20:17
27:14 30:12
38:11 39:14
41:1 42:4,9
43:1,7,7,10
43:18 44:1
44:3,7 45:3
47:24 58:5
58:19 63:18
63:24
**testify** 55:7
**testifying**
45:7 47:19
55:15
**testimony**
9:21 10:4,6
12:14 16:2
16:4,8,9
17:2 18:17
19:4,8
20:22 21:8
21:18,20
40:9,22
42:12 44:13
44:16 45:2
50:8 53:9
56:14 59:3
59:24 64:15
66:3,9,12
**thank** 73:14
**thin** 22:20
**thing** 12:11
16:22 17:3
17:13,14,16
18:2 25:11
29:17 43:2
43:23 47:22
52:23 59:21
**things** 9:14
17:3,17
43:3 53:3,4
69:16
**think** 13:11
17:21 21:15

28:16 33:14
33:16 37:22
41:14 46:13
48:9,16,24
53:4 55:1
56:1 60:16
61:15
**thinking** 22:1
24:13 46:12
51:14 53:8
**thought**
11:17 19:13
21:16 28:18
28:24 29:2
38:18 40:16
41:5,18
44:19 45:5
47:2,6 54:4
54:5,20
59:5 65:3
72:9,10
**thoughts** 22:8
**threatened**
33:20,24
53:1
**three** 18:11
35:11
**time** 4:6 5:24
6:6 9:4
11:22 12:15
12:22 13:2
14:12 15:18
15:19 16:17
17:17 20:24
21:5,9,12
22:15,23
24:8,15,17
25:3 26:8
26:20,24
27:4,23
28:15,18,20
29:3,13,16
32:1 33:9
38:5 39:5
39:15 40:13
40:14 41:7
41:8 44:19
45:5,18,22
46:14,19
47:7 49:2,5
49:8 50:17
50:21 52:11
52:20 53:23

55:13,21,23
56:4,5,9,11
56:15,20
57:15 59:2
59:11 60:9
63:6,21
66:4 70:1,3
70:7 71:21
72:13
**times** 6:24
11:9 18:11
58:15
**today** 5:5,24
8:12,17,22
9:4 11:24
12:14 13:17
17:10 18:7
19:20 20:2
20:6 23:9
25:2 27:14
39:15 40:22
43:12 45:7
45:21 46:2
46:8 49:12
54:21 56:10
61:19,23
62:9,17,21
63:7 66:1
73:15
**told** 29:14
30:3 63:21
63:24 64:16
65:10
**Tony** 16:17
21:5 22:13
25:18 37:1
72:8,14,18
**top** 16:8 43:1
43:18
**totally** 24:16
52:1
**track** 24:4
**transcript**
3:16 8:9,11
9:1,5,13
10:1 15:12
16:1 20:16
30:3,10,13
30:17,22
32:19 34:1
34:14 35:9
35:21 38:12
38:15,19
39:6,11,15

**trauma** 48:10
**tree** 27:1
**trial** 4:7
**tried** 25:5,13
33:16 56:7
56:17
**trooper** 7:13
8:9 12:16
22:1 23:1,4
23:5 24:20
27:5 31:23
31:24 32:5
32:9,13,17
32:17 34:22
35:2 40:9
41:9 42:8
42:24 43:5
43:7,17,24
44:2,5,6,17
44:17 45:22
47:10 49:7
53:11,17
54:17,22
55:2,3
56:16,21,21
57:10,10
58:20 59:2
59:4,4,8
60:7,9,12
60:19,21
61:7,7,21
61:24 62:10
62:20,23
63:22 64:2
64:16
**troopers** 4:20
7:11 10:12
11:7,11
14:4,11
20:3,7
21:22 22:10
22:18,22
23:9,13
24:7,22
27:10,15
29:13,14
30:3,10,13
30:17,22
32:19 34:1
34:14 35:9
35:21 38:12
38:15,19
39:6,11,15

39:20 41:12
43:14,19
45:24 46:1
46:3,7 47:8
47:19 48:22
49:3,6,13
49:14 51:7
52:1,16
53:14 54:14
55:4,22,22
56:6,7,12
56:22 57:11
57:19,22
58:2,6 59:5
61:10,16
62:21 63:19
64:1,7
65:10
**troopers'**
25:3
**true** 34:1,5
19:2 24:4
25:14,19,23
27:21 28:11
28:23 29:4
33:10,11
38:19 39:10
39:12 45:11
56:8
**trying** 6:21
17:4 21:22
24:10 27:16
27:24 28:4
28:22 43:3
45:17,18,21
56:10 57:6
57:11,17
58:3,7,10
58:18 59:9
59:22 62:16
64:20 69:15
70:16
**TUESDAY**
1:11
**turn** 12:1,3,8
15:22,24
20:15 34:2
42:14
**turned** 11:16
12:9 18:15
18:18 19:5
19:9 41:21

42:10 44:13
44:15,22
45:7,9
**two** 7:10 8:2
14:11 16:14
16:15,19,19
22:18,22
23:9,13
25:3 26:21
27:2 29:13
30:10,13,17
35:21 36:24
37:11 38:11
39:11,20
41:12 43:8
43:14 49:12
50:20 51:7
52:7 53:14
54:14 58:6
59:12
**type** 5:19
13:3,18
34:3 73:6

___ **U** ___
**uh-huh** 4:23
5:19 19:22
23:20,22
**understand**
5:14,21 6:4
6:6,11 9:12
9:13 23:15
33:1 41:3
45:14,17,18
45:21 56:9
58:18 59:9
60:24 63:7
69:14
**understand...**
7:23 9:12
9:24 15:14
32:16 33:22
34:5 58:16
63:5
**understood**
6:10 9:10
12:15
**unfolded**
60:20
**UNITED** 1:1
**upset** 25:10

___ **V** ___
**vantage** 34:6

36:5
**vehicle** 35:21
**vehicles**
34:12
**versus** 5:18
5:19 19:6
61:9
**VIDEOGR...**
1:21
**view** 36:12
**VS-** 1:6

___ **W** ___
**wait** 25:24
**waited** 52:11
**waiting** 26:3
53:24
**waived** 4:4
**want** 8:15
9:15 11:5
11:16,18
22:3,12
53:5 64:4
64:22
**wanted** 19:18
23:17,23
39:24 48:5
51:11,12
69:23 72:16
**wanting**
53:17 58:21
**wasn't** 19:13
42:17 50:3
71:14
**watch** 41:16
**watching**
26:8 53:24
**way** 6:20 19:4
33:11,20
34:1 47:23
54:2,14
**weapon** 19:15
22:13
**weapons** 20:4
20:8 21:2
21:11,14
41:12 45:10
46:24
**went** 12:10
46:13,17,18
48:18 49:15
50:6 52:13
52:23 55:13
57:3 66:14

67:2 70:19
72:17
**weren't** 23:9
27:24 28:6
44:23 53:22
57:17
**window** 11:13
11:16,22
12:1,4,8,10
18:14,20
19:6,7,9
22:3 26:7
27:6 41:22
42:10,15,21
44:14 45:8
wish 15:21
**witness** 3:3,5
16:11 36:15
38:3 49:18
65:24
**witnessed**
11:9,10
20:3,13
35:24 65:18
**witnesses**
71:19
**word** 65:23
**worded** 6:7
**words** 47:21
57:2
**work** 28:18
69:12,15
71:22 72:1
72:23
**worked** 29:21
72:14,18
**working** 73:2
73:10
**wouldn't**
24:12 29:16
32:20 61:8
**writing** 47:12
**written** 66:13
66:17 71:18
**wrong** 17:13
**wrote** 46:10
46:19 66:2
68:2 69:4
**WWW.ST...**
1:23

___ **X** ___
**X** 3:1,11

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

**Y**

**yard** 36:22
**yeah** 16:8
  43:7 63:17
**years** 72:8
**young** 54:4

**Z**

**0**

**07** 3:21
**09** 72:13,19

**1**

**1** 47:9
**1:00** 56:12
  57:13,20
  59:11
**10:50** 1:19
**11** 2:11 58:14
**11:39** 73:18
**116** 1:21
**15** 3:14
**16** 3:20 15:22
  15:24 42:1
  42:24 72:19
**1600** 1:15
  2:20
**17** 1:11 20:15
  43:17 55:17
  59:24
**18-5217** 1:6
**18940** 1:22
**19004** 2:12
**1913** 2:21

**2**

**20** 6:14,24
  8:10 9:14
  9:20 11:15
  12:15 15:14
  17:8,24
  18:13,17
  19:5,8
  20:23 27:5
  29:12 30:1
  31:22 32:18
  36:4 40:9
  41:1 48:1
  50:9 51:8
  52:15 65:11
**2008** 72:10
**2009** 72:10

**2016** 72:14
**2017** 6:15,24
  8:10 9:14
  9:20 11:15
  12:15 15:14
  17:8 18:1
  18:13,17
  19:5,8
  20:23 27:5
  29:12 30:1
  31:22 32:18
  40:9 41:1
  48:2 50:9
  51:8 52:15
  65:11 71:22
  73:9
**2019** 1:11
  74:7
**20th** 9:2,6
  12:7 21:9
  32:6 45:2
  45:23 63:3
  63:20 64:2
  68:7,21
**21** 3:20
**215** 1:24,24
  2:22
**25** 36:4
**26** 11:7

**3**

**300** 2:20
**30XT00005...**
  74:13

**4**

**4** 3:7
**45** 72:8

**5**

**504-4622**
  1:24
**504-7155**
  1:24
**54** 1:21
**560-2141**
  2:22

**6**

**610** 2:13
**664-5200**
  2:13
**67** 3:20
**68** 3:20

**69** 3:21

EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ANGELO ARDO, et al.,          :
                              :
              Plaintiffs,     :
                              :
                              :
          vs.                 :
                              :
OFFICER EDDIE PAGAN,          :
et al.,                       :
                              :
              Defendants.  :   NO. 15-05217


Remote video conference deposition of

SERGEANT TYLER BURGESS, taken on Wednesday, May 19,

2021, beginning at approximately 10:10 a.m., before

Charles P. Carmody, Federally Approved Registered

Professional Reporter and Notary Public.


- - -


SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

**SERGEANT TYLER BURGESS**

```
 1    APPEARANCES:

 2

 3        (PRESENT VIA VIDEO CONFERENCE)
          WEISBERG LAW, P.C.
 4        BY:  L. ANTHONY DIJIACOMO, III, ESQUIRE
                 7 South Morton Avenue
 5               Morton, Pennsylvania 19070
                 (610) 690-0880
 6               adijiacomo@weisberglawoffices.com
          Representing the Plaintiffs
 7

 8        (PRESENT VIA VIDEO CONFERENCE)
          OFFICE OF THE ATTORNEY GENERAL
 9        BY:   KATHY A. LE, ESQUIRE
                 1600 Arch Street, Third Floor
10               Philadelphia, Pennsylvania 19103
                 (215) 560-2141
11               kle@attorneygeneral.gov
          Representing the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24
```

**SERGEANT TYLER BURGESS**

```
1                          INDEX

2     WITNESS                                    PAGE

3     SERGEANT TYLER BURGESS

4          Examination by Mr. DiJiacomo             7

5

6                       ----------

7

8                        EXHIBITS

9     NUMBER        DESCRIPTION                  PAGE

10     (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**SERGEANT TYLER BURGESS**

1                DEPOSITION SUPPORT INDEX

2

3

4    DIRECTION TO WITNESS NOT TO ANSWER

5    Page      Line

6    -none-    -none-

7

     REQUEST FOR PRODUCTION OF DOCUMENTS

8

     Page      Line      Description

9

     -none-    -none-    -none-

10

11   STIPULATIONS

12   Page      Line

13   -none-    -none-

14

     QUESTIONS MARKED

15

     Page      Line

16

     -none-    -none-

17

18

19

20

21

22

23

24

**SERGEANT TYLER BURGESS**

```
 1                 ----------

 2                 PROCEEDINGS

 3                 ----------

 4

 5           Counsel, I have a brief statement I

 6      ask you to acknowledge before swearing in

 7      the witness.

 8           The attorneys participating in this

 9      proceeding acknowledge that I am not

10      physically present with the witness and that

11      I would be reporting this proceeding

12      remotely.

13           They further acknowledge that in

14      lieu of an oath administered in person, the

15      witness will verbally declare that his or

16      her testimony in this matter is under

17      penalty of perjury.

18           The parties and their counsel you

19      consent to this arrangement and waive any

20      observations at this time or 2349 future to

21      this manner of reporting and swearing in the

22      witness.

23           They also acknowledge and agree that

24      the official transcript is solely the one
```

**SERGEANT TYLER BURGESS**

1    transcribed by the the court reporter.

2         Counsel, please indicate your

3    agreement by stating your name and your

4    agreement on the the the record.

5              MR. DIJIACOMO:  This

6    plaintiff's counsel Anthony DiJiacomo,

7    agreed.

8              MS. LE:  This is Kathy Le

9    counsel for defendant, I agree.

10

11            It is hereby stipulated by and

12   between counsel that the reading, signing,

13   sealing, certification and filing are waived, and

14   that all objections, except as to the form of the

15   question, are reserved until the time of trial.

16

17              SERGEANT TYLER BURGESS,

18   having been first duly sworn, was examined

19   and testified as follows:

20

21              MS. LE:  Sir, could you speak

22   up because I wasn't actually able to hear

23   you just now.

24              THE WITNESS:  Can you hear me

**SERGEANT TYLER BURGESS**

1       now?

2                       MS. LE:  Yes.  It might have

3       just been my computer.

4

5                       MR. DIJIACOMO:  I had trouble

6       too.

7               Sergeant, can you hear me?

8                       THE WITNESS:  Yes.

9

10                      ----------

11                      EXAMINATION

12                      ----------

13      BY MR. DIJIACOMO:

14      Q.      My name is Anthony DiJiacomo and

15      represent Angelo Ardo and Jean Monaghan

16      individually and on behalf of her son, Angelo

17      Ardo, in a case against the officers as well as

18      the Pennsylvania State Police.

19              Again, so far you can hear me all right?

20      A.      Yes.

21      Q.      Okay.

22              If there's a point in time that you

23      cannot here hear me or understand me, let me know

24      and I'll try to address that, all right?

**SERGEANT TYLER BURGESS**

1    A.        Yes.

2    Q.        Likewise, over of the past year during

3    COVID we've been doing this a lot with Zoom.   And

4    at times I'll tell you that we may freeze.

5    You'll see the screen and we for lack of a better

6    word, freeze.

7              At that point I would just suggest you

8    stop answering, wait for the technical difficulty

9    to work out, and then I'll likely re-ask the

10   question or we'll go from there, okay?

11   A.        Okay.

12   Q.        As an officer you've testified in court,

13   likely, on numerous occasions, right?

14   A.        Yes.

15   Q.        Have you ever given a deposition in a

16   civil matter?

17   A.        Yes.

18   Q.        Okay.

19             Do you want me to go over some

20   instructions or are you familiar with the

21   process?

22   A.        I'm familiar but if you want to go over

23   them, that's fine.

24   Q.        I don't have any need to.

**SERGEANT TYLER BURGESS**

1              But you understand that even though

2    we're here in an informal setting, the oath that

3    you just took has at same weight or meaning as if

4    you were in a courtroom before a judge and jury?

5    A.       Yes.

6    Q.       Sir, my understanding is that you are

7    appearing today as a Rule 30B witness, what I

8    refer to as a corporate designee on behalf of the

9    Pennsylvania State Police; is that correct?

10   A.       Correct.

11   Q.       And I just want to understand who you

12   are very briefly before we get into that.  My

13   understanding is that between the period of 2014

14   approximately and approximately 2018 you were the

15   head of the policies and procedures unit of the

16   Bureau of Research and Development on behalf of

17   the Pennsylvania State Police; is that accurate?

18   A.       Yes, it is.

19   Q.       Okay.  All right.

20              Is there a better word than head or

21   director?

22   A.       Supervisor.  I was a corporal then, so I

23   was a supervisor of that unit, yes.

24   Q.       And just give me a general understanding

**SERGEANT TYLER BURGESS**

1    of what that unit did during that time frame?

2    A.      Sure.  Basically, developed new

3    policies, run procedures through revision,

4    rewrites, prepared any special orders that came

5    down from the front office or chief counsel's

6    office.  Distributed and put it in the manuals,

7    our field regulation manuals or AR's, our OM's.

8    Again, reviewed, revised and completed

9    regulations for those manuals to go out to the

10   department.

11   Q.      Okay.  Understood.

12           In preparation for today's deposition

13   did you receive a list of topics?

14   A.      Yes.

15   Q.      Okay.  All right.

16                   MR. DIJIACOMO:  Let's go off

17       the record for a second.

18                   ----------

19                   (Whereupon, a discussion was

20       held off the record.)

21                   ----------

22   BY MR. DIJIACOMO:

23   Q.      Back on the record.

24           Sergeant, do you know when the

**SERGEANT TYLER BURGESS**

1   Pennsylvania State Police first adopted a written

2   policy concerning the use of force for officers?

3   A.      I don't know the exact date but I can

4   try to find out.  It was prior to the year 2000.

5   You would have to archive that through the Bureau

6   of Research and Development to see when the exact

7   date that the first policy went into effect.  So

8   21-plus years now.

9   Q.      Understood.  Okay.

10          Let me focus in now and I will tell you

11  otherwise but for most of my questioning I'm

12  focusing on the time frame of January 1st, 2014

13  through May 20th of 2017, okay?

14  A.      Okay.

15  Q.      I'll try to reiterate that as I ask

16  questions.  But just as a --

17  A.      What was the date again, just so that I

18  can --

19  Q.      January 1st, 2014 through May 20th of

20  2017.

21  A.      Okay.

22  Q.      During that period of time did the

23  Pennsylvania State Police have a written policy

24  concerning the process to revise written policies

**SERGEANT TYLER BURGESS**

1   such as the use of force policy?

2   A.      Was it revised?

3   Q.      Let me say that again.

4           So during the period of 2014 through May

5   of 2017, did the Pennsylvania State Police have a

6   written policy for the process to revise, for

7   example, the use of force policy?

8   A.      There is a process to revise

9   overregulation.  The regulation revision started,

10  I believe, in 2016 of October to revise the use

11  of force policy.

12  Q.      Okay.  That's helpful.

13          Between January 1st of 2014 and -- did

14  you say October of 2016?

15  A.      Yes.

16  Q.      Were any revisions to the use of force

17  policy made?

18  A.      No.

19  Q.      Okay.

20          And between January of 2014 and that

21  October of 2016 date, was there any review of the

22  use of force policy towards revision?

23                  MS. LE:  Object to the form.

24      You can answer the question.

**SERGEANT TYLER BURGESS**

1                    THE WITNESS:  No, there was
2        not.
3    BY MR. DIJIACOMO:
4    Q.       I received a policy that was marked as
5    "AR1-2" and labeled "Directives, Regulations and
6    Correspondence."
7              Are you familiar with that policy?
8    A.       I am.  I haven't looked it over in a
9    while but I guess I am.
10   Q.       Is that the policy that would outline
11   the basic process for revisions to a written
12   policy such as the use of force policy?
13   A.       That's the way it's supposed to be done,
14   yes.  There's -- if I remember correctly, there's
15   a certain way revisions need to be done to a
16   regulation, there's a process that needs to be
17   used, and I think -- and I believe it states how
18   to make those changes within that certain
19   regulation.
20   Q.       Okay.
21             And is the use of force policy
22   considered a regulation?
23   A.       Yes.
24   Q.       Okay.  All right.

**SERGEANT TYLER BURGESS**

1          You said in October of 2016 the

2   Pennsylvania State Police began a process or a

3   review reviewing the use of force policy,

4   correct?

5   A.        Correct.

6   Q.        Would you describe how that process

7   proceeded?

8   A.        It comes through our RA account, through

9   the bureau records, e-mail or it's sent down from

10   -- it could be a deputy or the colonel to the

11   major requesting the change or looking into the

12   change of a regulation.  It gets sent down the

13   channel to the lieutenant and then to myself --

14   excuse me -- the lieutenant and then the sergeant

15   then as a corporal I would either assign it to a

16   trooper or I'd handle it myself and make the

17   revision.

18   Q.        In October of 2016 were particular

19   revisions directed to be made?

20   A.        Yes, in regards to that regulation, yes.

21   Q.        Okay.

22          To put it differently, was the bureau

23   directed to -- was your unit directed to perform

24   a general review of the entire policy?

**SERGEANT TYLER BURGESS**

1    A.        No.

2    Q.        Okay.

3              Do you recall the topics that the

4    revision concerned?

5    A.        I recall the taser had to be renamed

6    from ECD -- I think it was from ECD to CEW, what

7    it's currently now.  And some minor grammar, some

8    little changes, and, I think, a couple of

9    definitions were added in the beginning to the

10   regulation.

11   Q.        Were any revisions that were directed in

12   October of 2016 not adopted?

13   A.        Not that I recall, no.

14   Q.        Okay.

15             So is it fair to say I could essentially

16   review the two documents next to each other to

17   review and see what those revisions were directed

18   as of October of 2016?

19   A.        Yes.

20   Q.        When did that -- the revisions that were

21   directed to be made in October of 2016, when were

22   they implemented?

23   A.        Whatever -- I believe it was

24   August 23rd, 2017.  So that would be all those

**SERGEANT TYLER BURGESS**

 1    revisions would be when that was -- that

 2    effective date.

 3    Q.      Okay.

 4            Is there a given department or a unit

 5    that reviews essentially new guidance from the

 6    courts on a regular basis to ensure that the use

 7    of force policy remains constitutional?

 8    A.      Yes.

 9    Q.      What unit would that be?

10    A.      It would be the chief counsel's office

11    would have to review that and let our unit know,

12    hey, there's an issue with the policy or the way

13    it's worded.  It also needs to be signed off by

14    our CALEA accreditation.

15    Q.      What is that accreditation?

16    A.      That's for an ESP so we get our credit,

17    it's CALEA, C-A-L-E-A.

18                    ----------

19            (Whereupon, a discussion was

20        held off the record at this time.)

21                    ----------

22    BY MR. DIJIACOMO:

23    Q.      Does that stand for something?

24    A.      Yes.  I don't remember what it stands

**SERGEANT TYLER BURGESS**

1    for.  Commonwealth -- I don't remember.

2                    MS. LE:  It stands for the

3        Commission on Accreditation for Law

4        Enforcement Agencies.

5    BY MR. DIJIACOMO

6    Q.        Is that a nationwide accreditation

7    organization?

8    A.        Yes.

9    Q.        Are you aware of that organization --

10   let me rephrase that.

11             Was the use of force policy that was in

12   place, I think, from 2011 until 2017, was that

13   accredited by t his organization?

14   A.        I don't know.

15   Q.        Do you know whether the subsequent use

16   of force policy was accredited by this

17   organization?

18   A.        From 2017?

19   Q.        Yes.

20   A.        Yes, it was.

21   Q.        Okay.

22             Did that organization have various

23   levels of accreditation?

24   A.        No.

**SERGEANT TYLER BURGESS**

1              When I say "accreditation," it's a

2    civilian that looks up the CALEA, however they

3    look it up in their database and then they can

4    sign off of it.  We don't get in contact with

5    CALEA.  There's a civilian that works in the

6    Bureau of Research and Development, the site of

7    the CALEA department or unit, I should say.

8    Q.      But that organization provides, for

9    whatever purpose, approval of the policy?

10   A.      Yes.

11   Q.      And that organization approved the

12   policies that was put in place in 2017?

13   A.      Yes.  There was no conflicts.

14   Q.      Okay.

15              Are you aware of any instance between

16   2014 and -- let me rephrase that.

17              The policy that was prior to the policy

18   adoption in August of 2017, are you aware of any

19   instance in which chief counsel's office

20   suggested the use of force policy was not with

21   the then current law?

22   A.      No.

23   Q.      Okay.

24              Are you aware of any review by the

**SERGEANT TYLER BURGESS**

1    Pennsylvania State Police concerning the use of

2    force policy being compliant with the Americans

3    with Disabilities Act?

4    A.        No.

5    Q.        Are you aware of any action the

6    Pennsylvania State Police took between

7    January 1st of 2014 and May 20th, 2017, to ensure

8    the then current use of force policy met

9    constitutional requirements pertaining to

10   individuals displaying suicidal ideation?

11   A.        No.

12   Q.        Did the Pennsylvania State Police take

13   any actions between or prior to May 20th, 2017,

14   to ensure that the use of force policy then in

15   place did not discriminate against individuals

16   displaying suicidal ideation?

17   A.        I don't recall whether something was

18   sent out by e-mail.

19   Q.        And when you say "Whether something was

20   sent out by e-mail," what do you mean?  Who would

21   send it and what --

22   A.        It depends.  It could be a deputy of

23   operations, a deputy of admin would have said

24   something about it.  But I don't recall anything

**SERGEANT TYLER BURGESS**

1    ever being sent out between that time frame

2    regarding this regulation.

3    Q.       As of May of 2017 the then current use

4    of force policy allowed an officer to use less

5    than lethal force in preventing a suicide,

6    correct?

7    A.       Yes.

8    Q.       Okay.

9             Was there any policy in place that

10   concerned how that officer should approach or

11   interact with an individual threatening suicide?

12                  MS. LE:  Objection to the form.

13            I'm going to say that the policy

14       speaks for itself.  This witness wasn't

15       designated to speak to the specifics of the

16       policy.

17            You can answer but this is not -- I

18       wouldn't consider that this witness is

19       somebody who is an expert on what the policy

20       does or doesn't say.  The witness was

21       designated to discuss the revisions to the

22       policy and mechanics of that, et cetera.

23       I'm fine with the witness answering, but I'm

24       putting that caveat on the question.

**SERGEANT TYLER BURGESS**

```
 1              MR. DIJIACOMO:  Kathy, I'm just
 2      wondering, is this witness for topic number
 3      7 or did I misunderstand the e-mail?
 4              MS. LE:  Let me read that,
 5      number 7 again.  Maybe I'm misunderstanding
 6      your question.
 7          The use of force policy's
 8      interactions with any other policies -- I
 9      guess I'm not -- I don't understand -- I may
10      have misunderstood your question.  It
11      doesn't seem to fall under this category.
12      But I'm fine with you proceeding.
13          I'm just you know, I'm putting it
14      out there.
15          Why don't we proceed and then let's
16      see where it goes?
17              MR. DIJIACOMO:  Okay.  All
18      right.
19  BY MR. DIJIACOMO:
20  Q.      Sir, I'm trying to understand the realm
21  of policies that are in place essentially as of
22  May 20th, 2017.
23          And in reviewing the use of force
24  policy, it seems to me it pertains to the instant
```

**SERGEANT TYLER BURGESS**

1  which an officer needs to decide whether to use

2  lethal force.

3          Is that fair?

4  A.      It depends on the incident or the

5  totality of the circumstance.

6  Q.      Is there any, to your knowledge, is

7  there any policy that was in place on May 20th,

8  2017 that concerned an officer's interaction or

9  approach to an individual displaying suicidal

10  ideation or threatening suicide?

11  A.      No.

12  Q.      Okay.

13          Other than the revisions that were

14  directed in October of 2016, did the Bureau of

15  Research and Development receive any other

16  internally-proposed revisions to the use of force

17  policy?

18  A.      I don't recall.  Like I said, there was

19  a definition, a re-definition that was added,

20  maybe some grammar.  I don't recall all of the

21  revisions that were made.  I don't know if that

22  was really a whole rewrite, maybe just a quick

23  edit.  I don't recall.

24  Q.      With setting aside those edits or

SERGEANT TYLER BURGESS

1    revisions that were instructed to be made in
2    October of 2016, were there any other proposals
3    for revisions made by any other internal unit
4    between, let's say, January 1st, 2014 and May of
5    2017?
6    A.        I don't remember.  I think I reached out
7    to the Bureau of Training and Education, the
8    major there to implement -- to see if he had any
9    changes that he wanted to make within the
10   regulation.  I don't remember what his -- at the
11   time.  I think he's retired now.  I don't
12   remember what his situation was.  I think there's
13   an e-mail on it.
14   Q.        Do you recall the individual's name?
15   A.        I believe it was Major White.
16   Q.        But he's retired at this point?
17   A.        Yes.
18   Q.        So if an external party, a citizen, a
19   citizen group, a nonprofit group wanted to
20   propose a revision or change to the use of force
21   policy, would the Bureau of Research and
22   Development receive that proposal?
23   A.        Directly from them?
24   Q.        Well, I suppose, let's start with that.

**SERGEANT TYLER BURGESS**

1    A.        No.

2    Q.        Okay.

3              If an organization or a citizen, a

4    nonprofit group wanted to propose a revision, who

5    would they submit it to within the Pennsylvania

6    State Police?

7    A.        One of the deputies or the colonel.

8    Q.        Then that individual would decide how to

9    act and whether to direct you to do something?

10   A.        He or she would then talk with the major

11   of research and development, and then obviously,

12   concur whether they talk with the office of chief

13   counsel as well.

14   Q.        Did the Pennsylvania State Police

15   receive any external proposals for revisions to

16   the use of force policy as it pertains to

17   individuals with suicidal ideations prior to May

18   20th, 2017?

19   A.        Not that I'm aware of.

20                   MR. DIJIACOMO:  All right.

21            Give me just a few moments.

22                   ----------

23                   (Whereupon, a brief recess took

24        place at this time.)

**SERGEANT TYLER BURGESS**

```
 1                     ----------
 2     BY MR. DIJIACOMO:
 3     Q.        Did the Bureau of Research and
 4     Development perform any review or research
 5     concerning the use of force policy following an
 6     officer-involved shooting?
 7     A.        While I was there we have not.
 8     Q.        Okay.
 9                     MS. LE:  And let me suggest --
10          I think I made a mistake when I designated
11          the witness.
12              Let me suggest that any questions
13          you have specific to the officer-involved
14          shooting and potential revisions, you ask
15          the second witness who was in the Bureau of
16          Training and Education on the use of force
17          unit which would have been more involved in
18          the mechanics whereas the unit, the policy
19          unit drives the actual revision, but in
20          terms of the specifics of the policy and
21          review and things like that, the Bureau of
22          Training and Education is a co-owner of this
23          process.
24              Do you see what I'm saying?
```

**SERGEANT TYLER BURGESS**

1          MR. DIJIACOMO:  Yes.  Thank

2     you, Kathy.

3          MS. LE:  Yes.

4          MR. DIJIACOMO:  Sergeant, I am

5     done.

6          Thank you for your time this

7     morning.

8          THE WITNESS:  You're very

9     welcome.

10          MS. LE:  Thank you, Sergeant

11     Burgess.

12          THE WITNESS:  You're welcome.

13

14          ----------

15          (Whereupon, the deposition was

16     adjourned at 10:40 a.m.)

17          ----------

18

19

20

21

22

23

24

**SERGEANT TYLER BURGESS**

1                        CERTIFICATION

2

3

4            I HEREBY CERTIFY that the

5       proceedings and evidence are contained fully

6       and accurately in the stenographic notes

7       taken by me upon the foregoing matter on

8       Wednesday, May 19, 2021, and that this is a

9       correct transcript of same.

10

11

12

13

14
                        CHARLES P. CARMODY
15                      Federally Approved
                        Registered Professional
16                      Reporter and Notary Public

17

18

19

20

21                      (The foregoing certification
                        of this transcript does not
22                      apply to any reproduction of
                        the same by any means,
23                      unless under the direct
                        control and/or supervision
24                      of the certifying reporter.)

**SERGEANT TYLER BURGESS**

**A**

a.m 1:14 26:16
able 6:22
account 14:8
accreditation 16:14
 16:15 17:3,6,23
 18:1
accredited 17:13
 17:16
accurate 9:17
accurately 27:6
acknowledge 5:6,9
 5:13,23
act 19:3 24:9
action 19:5
actions 19:13
actual 25:19
added 15:9 22:19
address 7:24
adijiacomo@wei...
 2:6
adjourned 26:16
admin 19:23
administered 5:14
adopted 11:1 15:12
adoption 18:18
Agencies 17:4
agree 5:23 6:9
agreed 6:7
agreement 6:3,4
al 1:4,9
allowed 20:4
Americans 19:2
and/or 27:23
Angelo 1:4 7:15,16
answer 4:4 12:24
 20:17
answering 8:8
 20:23
Anthony 2:4 6:6
 7:14
APPEARANCES
 2:1
appearing 9:7
apply 27:22
approach 20:10
 22:9
approval 18:9
approved 1:15
 18:11 27:15
approximately 1:14
 9:14,14
AR's 10:7
AR1-2 13:5
Arch 2:9
archive 11:5

**Ardo** 1:4 7:15,17
arrangement 5:19
aside 22:24
assign 14:15
ATTORNEY 2:8
attorneys 5:8
August 15:24 18:18
Avenue 2:4
aware 17:9 18:15
 18:18,24 19:5
 24:19

**B**

Back 10:23
basic 13:11
Basically 10:2
basis 16:6
began 14:2
beginning 1:14
 15:9
behalf 7:16 9:8,16
believe 12:10 13:17
 15:23 23:15
better 8:5 9:20
brief 5:5 24:23
briefly 9:12
bureau 9:16 11:5
 14:9,22 18:6
 22:14 23:7,21
 25:3,15,21
Burgess 1:13 3:3
 6:17 26:11

**C**

C-A-L-E-A 16:17
CALEA 16:14,17
 18:2,5,7
Carmody 1:15
 27:14
case 7:17
category 21:11
caveat 20:24
certain 13:15,18
certification 6:13
 27:1,21
Certified 1:22
CERTIFY 27:4
certifying 27:24
cetera 20:22
CEW 15:6
change 14:11,12
 23:20
changes 13:18 15:8
 23:9
channel 14:13
Charles 1:15 27:14

**chief** 10:5 16:10
 18:19 24:12
circumstance 22:5
citizen 23:18,19
 24:3
civil 8:16
civilian 18:2,5
co-owner 2:4
colonel 14:10 24:7
comes 14:8
Commission 17:3
Commonwealth
 17:1
completed 10:8
compliant 19:2
computer 7:3
concerned 15:4
 20:10 22:8
concerning 11:2,24
 19:1 25:5
concur 24:12
conference 1:12
 2:3,8
conflicts 18:13
consent 5:19
consider 20:18
considered 13:22
constitutional 16:7
 19:9
contact 18:4
contained 27:5
control 27:23
corporal 9:22 14:15
corporate 9:8
correct 9:9,10 14:4
 14:5 20:6 27:9
correctly 11:7
Correspondence
 13:6
counsel 5:5,18 6:2
 6:6,9,12 24:13
counsel's 10:5
 16:10 18:19
couple 15:8
court 1:1,21,22 6:1
 8:12
courtroom 9:4
courts 16:6
COVID 8:3
credit 16:16
current 18:21 19:8
 20:3
currently 15:7

**D**

database 18:3

**date** 11:3,7,17
 12:21 16:2
decide 22:1 24:8
declare 5:15
defendant 6:9
Defendants 1:10
 2:11
definition 22:19
definitions 15:9
department 10:10
 16:4 18:7
depends 19:22 22:4
deposition 1:12 4:1
 8:15 10:12 26:15
deputies 24:7
deputy 14:10 19:22
 19:23
describe 14:6
Description 3:9 4:8
designated 20:15
 20:21 25:10
designee 9:8
developed 10:2
development 9:16
 11:6 18:6 22:15
 23:22 24:11 25:4
differently 14:22
difficulty 8:8
DiJiacomo 2:4 3:4
 6:5,6 7:5,13,14
 10:16,22 13:3
 16:22 17:5 21:1
 21:17,19 24:20
 25:2 26:1,4
direct 24:9 27:23
directed 14:19,23
 14:23 15:11,17,21
 22:14
DIRECTION 4:4
Directives 13:5
Directly 23:23
director 9:21
Disabilities 19:3
discriminate 19:15
discuss 20:21
discussion 10:19
 16:19
displaying 19:10,16
 22:9
Distributed 10:6
DISTRICT 1:1,2
documents 4:7
 15:16
doing 8:3
drives 25:19
duly 6:18

**E**

e-mail 14:9 19:18
 19:20 21:3 23:13
EASTERN 1:2
ECD 15:6,6
EDDIE 1:8
edit 22:23
edits 22:24
Education 23:7
 25:16,22
effect 11:7
effective 16:2
either 14:15
Enforcement 17:4
ensure 16:6 19:7,14
entire 14:24
ESP 16:16
ESQUIRE 2:4,9
essentially 15:15
 16:5 21:21
et 1:4,9 20:22
evidence 27:5
exact 11:3,6
Examination 3:4
 7:11
examined 6:18
example 12:7
excuse 14:14
EXHIBITS 3:8
expert 20:19
external 23:18
 24:15

**F**

fair 15:15 22:3
fall 21:11
familiar 8:20,22
 13:7
far 7:19
Federally 1:15
 27:15
field 10:7
filing 6:13
find 11:4
fine 8:23 20:23
 21:12
first 6:18 11:1,7
Fleming 1:23
Floor 2:9
focus 11:10
focusing 11:12
following 25:5
follows 6:19
force 11:2 12:1,7,11
 12:16,22 13:12,21
 14:3 16:7 17:11

SERGEANT TYLER BURGESS

17:16 18:20 19:2
19:8,14 20:4,5
21:7,23 22:2,16
23:20 24:16 25:5
25:16
foregoing 27:7,21
form 6:14 12:23
20:12
frame 10:1 11:12
20:1
freeze 8:4,6
front 10:5
fully 27:5
further 5:13
future 5:20

**G**

general 2:8 9:24
14:24
give 9:24 24:21
given 8:15 16:4
go 8:10,19,22 10:9
10:16
goes 21:16
going 20:13
grammar 15:7
22:20
group 23:19,19
24:4
guess 13:9 21:9
guidance 16:5

**H**

Hammonton 1:23
handle 14:16
head 9:15,20
hear 6:22,24 7:7,19
7:23
held 10:20 16:20
helpful 12:12
hey 16:12

**I**

ideation 19:10,16
22:10
ideations 24:17
III 2:4
implement 23:8
implemented 15:22
incident 22:4
INDEX 3:1 4:1
indicate 6:2
individual 20:11
22:9 24:8
individual's 23:14
individually 7:16

individuals 19:10
19:15 24:17
informal 9:2
instance 18:15,19
instant 21:24
instructed 23:1
instructions 8:20
interact 20:11
interaction 22:8
interactions 21:8
internal 23:3
internally-propos...
22:16
involved 25:17
issue 16:12

**J**

January 11:12,19
12:13,20 19:7
23:4
Jean 7:15
Jersey 1:23
judge 9:4
jury 9:4

**K**

Kathy 2:9 6:8 21:1
26:2
kle@attorneygen...
2:11
know 7:23 10:24
11:3 16:11 17:14
17:15 21:13 22:21
knowledge 22:6

**L**

L 2:4
labeled 13:5
lack 8:5
law 2:3 17:3 18:21
Le 2:9 6:8,8,21 7:2
12:23 17:2 20:12
21:4 25:9 26:3,10
let's 10:16 21:15
23:4,24
lethal 20:5 22:2
levels 17:23
lieu 5:14
lieutenant 14:13,14
Likewise 8:2
Line 4:5,8,12,15
list 10:13
little 15:8
look 18:3
looked 13:8
looking 14:11

looks 18:2
lot 8:3

**M**

major 14:11 23:8
23:15 24:10
manner 5:21
manuals 10:6,7,9
marked 3:10 4:14
13:4
matter 5:16 8:16
27:7
mean 19:20
meaning 9:3
means 27:22
mechanics 20:22
25:18
met 19:8
minor 15:7
mistake 25:10
misunderstand
21:3
misunderstanding
21:5
misunderstood
21:10
moments 24:21
Monaghan 7:15
morning 26:7
Morton 2:4,5

**N**

name 6:3 7:14
23:14
nationwide 17:6
need 8:24 13:15
needs 13:16 16:13
22:1
new 1:23 10:2 16:5
none- 4:6,6,9,9,9,13
4:13,16,16
nonprofit 23:19
24:4
Notary 1:16 27:16
notes 27:6
number 3:9 21:2,5
numerous 8:13

**O**

oath 5:14 9:2
Object 12:23
Objection 20:12
objections 6:14
observations 5:20
obviously 24:11
occasions 8:13

October 12:10,14
12:21 14:1,18
15:12,18,21 22:14
23:2
office 2:8 10:5,6
16:10 18:19 24:12
officer 1:8 8:12
20:4,10 22:1
officer's 22:8
officer-involved
25:6,13
officers 7:17 11:2
official 5:24
okay 7:21 8:10,11
8:18 9:19 10:11
10:15 11:9,13,14
11:21 12:12,19
13:20,24 14:21
15:2,14 16:3
17:21 18:14,23
20:8 21:17 22:12
24:2 25:8
OM's 10:7
operations 19:23
orders 10:4
organization 17:7,9
17:13,17,22 18:8
18:11 24:3
outline 13:10
overregulation
12:9

**P**

P 1:15 27:14
P.C 2:3
PAGAN 1:8
Page 3:2,9 4:5,8,12
4:15
participating 5:8
particular 14:18
parties 5:18
party 23:18
penalty 5:17
Pennsylvania 1:2
1:23 2:5,10 7:18
9:9,17 11:1,23
12:5 14:2 19:1,6
19:12 24:5,14
perform 14:23 25:4
period 9:13 11:22
12:4
perjury 5:17
person 5:14
pertaining 19:9
pertains 21:24
24:16

Philadelphia 1:23
2:10
physically 5:10
Pike 1:23
place 17:12 18:12
19:15 20:9 21:21
22:7 24:24
plaintiff's 6:6
Plaintiffs 1:5 2:6
please 6:2
point 7:22 8:7 23:16
Police 7:18 9:9,17
11:1,23 12:5 14:2
19:1,6,12 24:6,14
policies 9:15 10:3
11:24 18:12 21:8
21:21
policy 11:2,7,23
12:1,6,7,11,17,22
13:4,7,10,12,12
13:21 14:3,24
16:7,12 17:11,16
18:9,17,17,20
19:2,8,14 20:4,9
20:13,16,19,22
21:24 22:7,17
23:21 24:16 25:5
25:18,20
policy's 21:7
potential 25:14
preparation 10:12
prepared 10:4
present 2:3,8 5:10
preventing 20:5
prior 11:4 18:17
19:13 24:17
procedures 9:15
10:3
proceed 21:15
proceeded 14:7
proceeding 5:9,11
21:12
proceedings 5:2
27:5
process 8:21 11:24
12:6,8 13:11,16
14:2,6 25:23
PRODUCTION 4:7
Professional 1:16
27:15
proposal 23:22
proposals 23:2
24:15
propose 23:20 24:4
provides 18:8
Public 1:16 27:16

**SERGEANT TYLER BURGESS**

purpose 18:9
put 10:6 14:22
  18:12
putting 20:24 21:13

**Q**

question 6:15 8:10
  12:24 20:24 21:6
  21:10
questioning 11:11
questions 4:14
  11:16 25:12
quick 22:22

**R**

RA 14:8
re-ask 8:9
re-definition 22:19
reached 23:6
read 21:4
reading 6:12
really 22:22
realm 21:20
recall 15:3,5,13
  19:17,24 22:18,20
  22:23 23:14
receive 10:13 22:15
  23:22 24:15
received 13:4
recess 24:23
record 6:4 10:17,20
  10:23 16:20
records 14:9
refer 9:8
regarding 20:2
regards 14:20
Registered 1:15
  27:15
regular 16:6
regulation 10:7
  12:9 13:16,19,22
  14:12,20 15:10
  20:2 23:10
regulations 10:9
  13:5
reiterate 11:15
remains 16:7
remember 13:14
  16:24 17:1 23:6
  23:10,12
Remote 1:12
remotely 5:12
renamed 15:5
rephrase 17:10
  18:16
reporter 1:16 6:1

27:16,24
Reporters 1:22
reporting 1:21 5:11
  5:21
represent 7:15
Representing 2:6
  2:11
reproduction 27:22
REQUEST 4:7
requesting 14:11
requirements 19:9
research 9:16 11:6
  18:6 22:15 23:21
  24:11 25:3,4
reserved 6:15
retired 23:11,16
review 12:21 14:3
  14:24 15:16,17
  16:11 18:24 25:4
  25:21
reviewed 10:8
reviewing 14:3
  21:23
reviews 16:5
revise 11:24 12:6,8
  12:10
revised 10:8 12:2
revision 10:3 12:9
  12:22 14:17 15:4
  23:20 24:4 25:19
revisions 12:16
  13:11,15 14:19
  15:11,17,20 16:1
  20:21 22:13,16,21
  23:1,3 24:15
  25:14
rewrite 22:22
rewrites 10:4
right 7:19,24 8:13
  9:19 10:15 13:24
  21:18 24:20
Rule 10:3
run 10:3

**S**

saying 25:24
screen 8:5
sealing 6:13
second 10:17 25:15
see 8:5 11:6 15:17
  21:16 23:8 25:24
send 19:21
sent 14:9,12 19:18
  19:20 20:1
sergeant 1:13 3:3
  6:17 7:7 10:24

14:14 26:4,10
setting 9:2 22:24
shooting 25:6,14
sign 18:4
signed 16:13
signing 6:12
Sir 6:21 9:6 21:20
site 18:6
situation 23:12
solely 5:24
somebody 20:19
son 7:16
South 2:4
speak 6:21 20:15
speaks 20:14
special 10:4
specific 25:13
specifics 20:15
  25:20
stand 16:23
stands 16:24 17:2
start 23:24
started 12:9
State 7:18 9:9,17
  11:1,23 12:5 14:2
  19:1,6,12 24:6,14
statement 5:5
states 1:1 13:17
stating 6:3
stenographic 27:6
stipulated 6:11
STIPULATIONS
  4:11
stop 8:8
Street 1:22 2:9
submit 24:5
subsequent 17:15
suggest 8:7 25:9,12
suggested 18:20
suicidal 19:10,16
  22:9 24:17
suicide 20:5,11
  22:10
Suite 1:22
SUMMIT 1:21
supervision 27:23
supervisor 9:22,23
SUPPORT 4:1
suppose 23:24
supposed 13:13
Sure 10:2
swearing 5:6,21
sworn 6:18

**T**

t 17:13

take 19:12
taken 1:13 27:7
talk 24:10,12
taser 15:5
technical 8:8
tell 8:4 11:10
terms 25:20
testified 6:19 8:12
testimony 5:16
Thank 26:1,6,10
things 25:21
think 13:17 15:6,8
  17:12 23:6,11,12
  25:10
Third 2:9
threatening 20:11
  22:10
time 5:20 6:15 7:22
  10:1 11:12,22
  16:20 20:1 23:11
  24:24 26:6
times 8:4
today 9:7
today's 10:12
topic 21:2
topics 10:13 15:3
totality 22:5
Training 23:7 25:16
  25:22
transcribed 6:1
transcript 5:24 27:9
  27:21
trial 6:15
trooper 14:16
trouble 7:5
try 7:24 11:4,15
trying 21:20
two 15:16
TYLER 1:13 3:3
  6:17

**U**

understand 7:23
  9:1,11 21:9,20
understanding 9:6
  9:13,24
Understood 10:11
  11:9
unit 9:15,23 10:1
  14:23 16:4,9,11
  18:7 23:3 25:17
  25:18,19
UNITED 1:1
use 11:2 12:1,7,10
  12:16,22 13:12,21
  14:3 16:6 17:11

17:15 18:20 19:1
  19:8,14 20:3,4
  21:7,23 22:1,16
  23:20 24:16 25:5
  25:16

**V**

various 17:22
verbally 5:15
video 1:12 2:3,8
Videographers
  1:22
vs 1:7

**W**

wait 8:8
waive 5:19
waived 6:13
Walnut 1:22
want 8:19,22 9:11
wanted 23:9,19
  24:4
wasn't 6:22 20:14
way 13:13,15 16:12
we'll 8:10
we're 9:2
we've 8:3
Wednesday 1:13
  27:8
weight 9:3
WEISBERG 2:3
welcome 26:9,12
went 11:7
White 23:15
witness 3:2 4:4 5:7
  5:10,15,22 6:24
  7:8 9:7 13:1 20:14
  20:18,20,23 21:2
  25:11,15 26:8,12
wondering 21:2
word 8:6 9:20
worded 16:13
work 8:9
works 18:5
wouldn't 20:18
written 11:1,23,24
  12:6 13:11
www.summitrep...
  1:24

**X**

**Y**

year 8:2 11:4
years 11:8

**SERGEANT TYLER BURGESS**

| | |
|---|---|
| **Z** | |
| **Zoom** 8:3 | |
| | |
| **0** | |
| **08037** 1:23 | |
| | |
| **1** | |
| **10:10** 1:14 | |
| **10:40** 26:16 | |
| **15-05217** 1:10 | |
| **1500** 1:22 | |
| **1600** 2:9 | |
| **1610** 1:22 | |
| **19** 1:13 27:8 | |
| **19070** 2:5 | |
| **19102** 1:23 | |
| **19103** 2:10 | |
| **1st** 11:12,19 12:13 19:7 23:4 | |

**2**
**2000** 11:4
**2011** 17:12
**2014** 9:13 11:12,19 12:4,13,20 18:16 19:7 23:4
**2016** 12:10,14,21 14:1,18 15:12,18 15:21 22:14 23:2
**2017** 11:13,20 12:5 15:24 17:12,18 18:12,18 19:7,13 20:3 21:22 22:8 23:5 24:18
**2018** 9:14
**2021** 1:14 27:8
**20th** 11:13,19 19:7 19:13 21:22 22:7 24:18
**21-plus** 11:8
**215** 1:24 2:10
**2349** 5:20
**23rd** 15:24

**3**
**30B** 9:7

**4**
**424** 1:23
**447-8648** 1:24

**5**
**560-2141** 2:10
**567-3315** 1:24

**6**

**609** 1:24
**610** 2:5
**690-0880** 2:5

**7**
**7** 2:4 3:4 21:3,5

**8**
**800** 1:24

**9**
**985-2400** 1:24

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ANGELO ARDO, et al.,         :
                             :
              Plaintiffs,    :
                             :
         vs.                 :
                             :
                             :
OFFICER EDDIE PAGAN,         :
et al.,                      :
                             :
              Defendants. :  NO. 15-05217


Remote video conference deposition of

CORPORAL KEVIN SELVERIAN, taken on Wednesday, May 19,

2021, beginning at approximately 11:00 a.m., before

Charles P. Carmody, Federally Approved Registered

Professional Reporter and Notary Public.


- - -


SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

**CORPORAL KEVIN SELVERIAN**

```
 1    APPEARANCES:

 2

 3       (PRESENT VIA VIDEO CONFERENCE)
         WEISBERG LAW, P.C.
 4       BY:  L. ANTHONY DIJIACOMO, III, ESQUIRE
               7 South Morton Avenue
 5             Morton, Pennsylvania 19070
               (610) 690-0880
 6             adijiacomo@weisberglawoffices.com
         Representing the Plaintiffs
 7

 8       (PRESENT VIA VIDEO CONFERENCE)
         OFFICE OF THE ATTORNEY GENERAL
 9       BY:   KATHY A. LE, ESQUIRE
               1600 Arch Street, Third Floor
10             Philadelphia, Pennsylvania 19103
               (215) 560-2141
11             kle@attorneygeneral.gov
         Representing the DefendantS
12

13

14

15

16

17

18

19

20

21

22

23

24
```

**CORPORAL KEVIN SELVERIAN**

```
1                        INDEX

2   WITNESS                                    PAGE

3   CORPORAL KEVIN SELVERIAN

4       Examination by Mr. DiJiacomo            7

5

6

7
                        ----------
8

9                       EXHIBITS

10  NUMBER        DESCRIPTION                   PAGE

11  (None marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**CORPORAL KEVIN SELVERIAN**

1              DEPOSITION SUPPORT INDEX

2

3

4   DIRECTION TO WITNESS NOT TO ANSWER

5   Page      Line

6   -none-    -none-

7

    REQUEST FOR PRODUCTION OF DOCUMENTS

8

    Page       Line       Description

9

    -none-    -none-    -none-

10

11  STIPULATIONS

12  Page      Line

13  -none-    -none-

14

    QUESTIONS MARKED

15

    Page      Line

16

    -none-    -none-

17

18

19

20

21

22

23

24

CORPORAL KEVIN SELVERIAN

```
 1                  ----------
 2                  PROCEEDINGS
 3                  ----------
 4
 5              Counsel, I have a brief statement
 6       that I ask you to acknowledge before
 7       swearing in the witness.
 8              The attorneys participating in this
 9       proceeding acknowledge that I am not
10       physically present with the witness and that
11       I would be reporting this proceeding
12       remotely.
13              They further acknowledge that in
14       lieu of an oath administered in person, the
15       witness will verbally declare that his or
16       her testimony in this matter is under
17       penalty of perjury.
18              The parties and their counsel you
19       consent to this arrangement and waive any
20       observations at this time or in the future
21       to this manner of reporting and swearing in
22       the witness.
23              They also acknowledge and agree that
24       the official transcript is solely the one
```

**CORPORAL KEVIN SELVERIAN**

1    transcribed by the the court reporter.

2            Counsel, please indicate your

3    agreement by stating your name and your

4    agreement on the the the record.

5                    MR. DIJIACOMO:  This is

6    plaintiff's counsel, Anthony DiJiacomo,

7    agreed.

8                    MS. LE:  This is Kathy Le,

9    counsel for defendant, I agree.

10                   ----------

11                   (Whereupon, a discussion was

12   held off the record at this time.)

13                   ----------

14

15           It is hereby stipulated by and

16   between counsel that the reading, signing,

17   sealing, certification and filing are waived, and

18   that all objections, except as to the form of the

19   question, are reserved until the time of trial.

20

21           CORPORAL KEVIN SELVERIAN,

22   having been first duly sworn, was examined

23   and testified as follows:

24

CORPORAL KEVIN SELVERIAN

```
1                    ----------

2                    EXAMINATION

3                    ----------

4

5    BY MR. DIJIACOMO:

6    Q.        Good morning, corporal.  My name is

7    Anthony DiJiacomo and I represent Angelo Ardo and

8    Jean Monaghan in a suit against two officers and

9    the Pennsylvania State Police.

10             Can you hear me okay so far?

11   A.        Yes, yes, I think so.  Everything's

12   fine.

13   Q.        All right.  Good.

14             Unfortunately, I'll tell you that

15   there's a cleaning lady here vacuuming at the

16   moment.  So if it gets too loud, just let me

17   know, all right?

18   A.        Yes, sir.

19   Q.        Sir, as an officer you've testified in

20   court on a number of occasions?

21   A.        Yes, sir.

22   Q.        Have you ever testified in a civil

23   proceeding before?

24   A.        Yes, I have.
```

**CORPORAL KEVIN SELVERIAN**

1    Q.      So you're familiar with the process?

2    A.      Yes, sir.

3    Q.      Let me just ask then, even though we're

4    here in an informal setting, you understand that

5    the oath that you just took has the same weight

6    or meaning as if you were in a courtroom before a

7    judge and a jury?

8    A.      Yes, sir, I understand.

9    Q.      And you're appearing today as a Rule 30B

10   witness on behalf of the Pennsylvania State

11   Police, correct?

12   A.      That is correct.

13   Q.      Before I delve into the questions I just

14   want to understand very briefly.

15   A.      Yes, sir.

16   Q.      My understanding is that I believe

17   you're currently a member of the use of force

18   unit of the Bureau of Training and Education.

19           Is that accurate?

20   A.      That is correct.

21   Q.      How long have you been a member?

22   A.      I'm a member of the department or as a

23   member of the unit?

24   Q.      Of the use of force unit?

CORPORAL KEVIN SELVERIAN

1    A.       Since 2016.  That's when the unit was
2    started.
3    Q.       All right.  Excellent.
4             Would you just give me a brief overview
5    of what that unit does?
6    A.       Sure.  Our unit develops use of force
7    instruction for both our cadets as well as our
8    inservice personnel, inservice personnel being
9    those members of the department that are already
10   out there doing the job.  Everybody that's on the
11   job as far as the department is concerned.
12            So we developed use of force trainings.
13   We've reviewed existing use of force trainings
14   that may need revisions or review or some type of
15   change or alteration due to new equipment, new
16   technique, new tactic, those sorts of things.  We
17   review the use of force policy as far as the
18   department is concerned.  We will provide
19   suggestive language to policy if that, in fact,
20   becomes necessary.
21            We do analysis work.  So if an outside
22   entity such as the district attorney's office or
23   the attorney general's office or a municipal
24   police agency has questions, concerns, or they

1    require an analysis relative to a use of force
2    event.  We will provide them a comprehensive
3    analysis if, again, our chain of command approves
4    us to do so.
5         So again, we do analysis work.  We do
6    presentations to, obviously, our membership as
7    far as our cadets are inservice personnel.  We do
8    presentations for civilian organizations as well
9    to better educate them concerning the realities
10   of the use of force events involving police
11   officers.  We do presentations at various
12   seminars and conferences relative to
13   professionals in the realm of law enforcement.
14        We do presentations for various legal
15   groups and legal communities.  For example, I've
16   spoken at the district attorney's conference for
17   their civil and criminal litigation units.  We've
18   presented at For Science Institute which is a
19   private organization that provides instruction
20   relative to the human factor surrounding a police
21   officer's application of force.
22        We provide presentations to, for
23   example, to the district attorney's association
24   in the Commonwealth of Pennsylvania.  We've

CORPORAL KEVIN SELVERIAN

1   provided presentations to members of the

2   Pennsylvania House of Representatives as well as

3   the Pennsylvania Senate, members of the senate as

4   well.  We have, again, provided testimony, for

5   example, relative to use of force issues before

6   the Pennsylvania Senate Judiciary Committee for

7   example.

8           So our role is rather diverse.  I think

9   the easiest way to describe what we do is we

10  provide consultation services to folks inside and

11  outside the realm of law enforcement to help them

12  better understand, again, the realities

13  surrounding a police use of force event.

14  Q.      Excellent.  Okay.

15          Sir, I think your testimony would be

16  helpful, at least from my understanding.  So

17  thank you.

18          During those review processes does the

19  Bureau of Training and Education review prior use

20  of force events within the department in

21  determining whether further education or changes

22  to education are necessary?

23  A.      That's somewhat of a broad response.  I

24  have somewhat of a broad response, I guess.  It

CORPORAL KEVIN SELVERIAN

1    can come in many ways.

2              If for example, there's an incident

3    involving one of our members where someone within

4    the department has concern or question or needs

5    guidance relative to that which occurred.  For

6    example, does it fall in line with policy?  Are

7    the tactics sound?  Is the equipment that we

8    utilize in that particular event, is it adequate

9    or do we need to look at, you know, bettering or

10   again altering the equipment that we carry or

11   use.  Those sorts of concerns can come from a

12   multitude of different sources.

13             For example, those questions or those

14   inquiries can come from our commissioner's

15   office.  They can come from the criminal

16   investigators that are doing the criminal

17   investigation of a significant use of force

18   event.  They can come from our internal affairs

19   division if again they have question or concern

20   relative to an officer's training or anything

21   related to their applications of force.  They

22   come from our risk management office within,

23   again, our Bureau of Integrity and Professional

24   Responsibility.  They can come from the office of

CORPORAL KEVIN SELVERIAN

1   chief counsel, the attorneys that represent the

2   department.

3          So the source of those questions and the

4   source of those reviews that you're citing

5   typically come as a matter of request.  And

6   again, those requests are made by individuals

7   that do, in fact, have those questions relative

8   to these incidents.

9   Q.      In the absence of a request there would

10  be no automatic review of an officer-involved

11  shooting to determine whether any educational

12  materials would need to be changed?

13  A.      By our unit in particular, is that your

14  question?

15  Q.      Yes.

16  A.      So, again, in a significance use of

17  force event, obviously, the first inquiry is

18  going to be the criminal investigative inquiry.

19  So that's going to be conducted by criminal

20  investigators, you know, in our various troops

21  located throughout the state.  Once that

22  investigation is conducted and done, and

23  typically, following a prosecutorial decision on

24  the part of the district attorney or attorney

CORPORAL KEVIN SELVERIAN

1    general that's, again, reviewing the case, our

2    internal investigation or administrative

3    investigation is put forth with full force.

4           Once that administrative investigation

5    is done, a period of time later, there is, again,

6    a critique conducted by our office of risk

7    management, and as part and parcel with that

8    critique we take part in that critique to address

9    anything relative to a training issue, an

10   equipment issue, anything that be would of

11   concern for the Bureau of Training and Education.

12   Again, those things are addressed then.

13          However, typically, in my experience as

14   these investigations unfold, if there is

15   something glaring, if there's something obvious,

16   if there's something of, you know, primary or

17   paramount concern that arises during the course

18   of either of those two investigations, either the

19   criminal or the administrative, we're made aware

20   of it then, and, again, we start to talk about

21   it, address it, see if it actually is a concern,

22   and if it is, what remedies might need to be put

23   in place, those sorts of things.

24   Q.      Between the period that the use of force

**CORPORAL KEVIN SELVERIAN**

1    unit at the bureau was created on May 20th of

2    2017, was there any questions, concerns posed to

3    that unit concerning the use of force policy as

4    it pertained to individuals with suicidal

5    ideation?

6    A.         No, sir.

7              I mean, that is always a concern dealing

8    with people with a suicidal ideation.  It's been

9    part a training in our training program for a

10   long, long period of time.

11             And I think it's important that we

12   understand or that we talk about the fact that

13   our use of force policy is pertinent to any

14   segment of the population.  So again, it requires

15   that we use reasonable force based upon the

16   totality known by the officer at the time of

17   application.  Excuse me -- digestion of that

18   information, assessment of that information, all

19   of that is part and parcel with our training

20   programs.

21             So how is that being interpreted, what

22   sort of time periods do we have to interpret

23   those things, what sorts of opportunities do we

24   have to employ various tactics, those fall

**CORPORAL KEVIN SELVERIAN**

1   primarily within the training room.  The policy

2   itself requires that we use reasonable force at

3   any and all times in an effort to perform our

4   lawful or legal duties.  Again, that singular

5   standard is applicable to any segment of the

6   population, race, color, creed, sex, sexual

7   orientation, all those sorts of things.

8   Therefore, again, the policy applies to all those

9   things.  And again, particularities are relative,

10  you know, certain segments of the population or

11  certain tactics that one may want to employ, they

12  generally fall within the training program

13  itself.

14  Q.      And the use of force policy as it

15  existed on May 20th, 2017, specifically allowed

16  for the purpose of preventing suicide with less

17  than lethal force, correct?

18  A.      It allows for it.  So our policy in that

19  particular regard is separated into two distinct

20  sections.  It talks about the use of deadly

21  force.  It talks about the use of less lethal

22  force.  Less lethal force being force which under

23  the circumstance in which it's used, is not

24  likely calculated nor intended to cause death or

**CORPORAL KEVIN SELVERIAN**

1    serious bodily injury.

2          So when we're talking about the

3    specifics relative to a less lethal force option,

4    for example, we are authorized in its use to,

5    again, control an individual, stabilize an event,

6    prevent somebody from doing significant harm to

7    oneself, yes, it does it authorize it in that

8    regard.

9          To extend it over to the deadly force

10   side in a circumstance in which we're going to

11   use deadly force, we need to look at whether or

12   not the actions of the subject pose a threat of

13   death or serious bodily injury either to the

14   officer and/or somebody else other than the

15   subject themselves.  And again, that again is the

16   separation between deadly force and less lethal

17   force, I think, in the situations that you're

18   describing.

19          So again, if some of these actions --

20   again, I don't want to say no matter the actions,

21   but generally, if somebody's actions pose a

22   threat of death or serious bodily injury to an

23   officer or some other person, well, then again,

24   you know, generally, our policy authorizes the

CORPORAL KEVIN SELVERIAN

1   use of deadly force to prevent that particular

2   behavior to immediately incapacitate the

3   individual, to stop the action of the subject to

4   hopefully render the scene safe and allow us to

5   move on further with that which we need to do.

6   Q.     And when it comes to the use of deadly

7   force, it appears that it's broken down to two

8   further areas?

9   A.     Yes.

10   Q.     For the purpose of arrest or for the

11   purpose of protection?

12   A.     Correct.

13        So for purposes of arrest we are

14   authorized to use deadly force.  If it's

15   necessary to prevent or to execute an arrest or

16   prevent the escape of an individual, if there's a

17   reasonable belief on the part of the officer that

18   it's necessary.  And in conjunction with that the

19   person either committed or attempted a forceable

20   felony, or is fleeing or attempting to escape

21   while in possession of a weapon, or otherwise

22   indicates that human beings or human life or

23   inflicts serious bodily injury and was arrested

24   without delay.

CORPORAL KEVIN SELVERIAN

```
 1            So again, that's the arrest section.  So
 2    it's all predicated upon that same reasonable
 3    belief that it's necessary and it still
 4    ultimately surrounds whether or not that person
 5    poses a threat of death or serious bodily injury
 6    to, again, the officer or somebody else.
 7            And another way to look at that and the
 8    way we explain it is, you know, do you have, for
 9    example, the requisite probable cause and/or,
10    "Reasonable belief," to believe that that threat,
11    in fact, exists understanding that police
12    officers don't always have a crystal ball and we
13    can't see into the future.  We need to take those
14    limited facts in the times and environments that
15    we find ourselves in and make those discernments
16    or decisions based upon whether or not there's a
17    reasonable belief, again, that that threat, in
18    fact, exists.
19    Q.       And with regards to the arrest portion
20    of the deadly use of force --
21    A.       Yes.
22    Q.       The threat to other individuals --
23    A.       Yes.
24    Q.       Is there a given time horizon for that?
```

CORPORAL KEVIN SELVERIAN

1  A.        Could you repeat that, sir?  I'm sorry.

2  Q.        Yes.

3          I'm trying to understand the time

4  horizon for that.  Meaning, is it the threat of

5  immediate -- was it the immediate threat of harm

6  to others or the officers, is it a proximity

7  question, is there a time limitation on it?

8  A.        There's no specific time as far as one

9  minute, two minutes, five minutes, an hour, an

10 hour and a half, no, sir.  Again, it's all based

11 upon would it be reasonable to believe that that

12 threat is, in fact, imminent.

13         Again, "imminent" is the term utilized

14 within our department policy when it comes to

15 deadly force.  It doesn't, in fact, need to be

16 present at that particular exact or precise

17 moment.

18         However, based upon an officer's

19 training, experience, perception, discernment of

20 information, the surrounding circumstances, all

21 of that, again, which that officer knew, and

22 predicated some limitations maybe in regard to

23 the environment, does the police officer believe

24 that the threat is, in fact, imminent is the

**CORPORAL KEVIN SELVERIAN**

1   ultimate question and the ultimate factor when

2   looking at whether or not their force would be

3   appropriate more specifically in line with

4   policy.

5   Q.      Okay.

6           Going to the protection subcategory, if

7   you would.

8   A.      Yes, sir.

9   Q.      It obviously allows an officer to use

10  deadly force to protect himself or another

11  officer or bystanders; is that fair?

12  A.      That's correct.

13  Q.      Okay.

14          Is there any training provided to

15  officers about putting themselves in this fear of

16  danger prior to placing themselves there?

17          In other words, in a situation where

18  there are not bystanders, hostages, you have a

19  suicidal individual threatening suicide or

20  threatening harm to other officers, is there any

21  guidance provided to those officers about how to

22  approach or interact with that -- I'm sorry --

23  with that suicidal individual prior to placing

24  themselves into that sphere or area of harm?

1  A.      I would say that we provide general

2  guidance or consideration or recommendations, if

3  you want to call it that, as part of our training

4  process.

5        So in other words, anything that we do

6  in regards to our contact with an individual,

7  there's always going to be goal conflict, if you

8  want to look at it that way -- to make sure that

9  we are, you know, in essence, you know, safe, you

10  know, to the maximum or to its ultimate, you

11  know, possibility, let's say it that way.

12        You know, obviously, we wouldn't need to

13  approach anybody out there in the public or we

14  shouldn't, for example, but yet, we have to.

15        So as we move forward in the performance

16  of our duties, we try to alert our folks to

17  dangers, circumstances or tactics that might best

18  allow them to maintain as much safety as they

19  possibly can for themselves and others but yet

20  still perform the duties that they're assigned or

21  the tasks that they need to take care of.  I

22  understand that there's no textbook, there's no,

23  you know, systematic approach to some of these

24  circumstances.

**CORPORAL KEVIN SELVERIAN**

```
 1              Again, it's understanding how certain
 2     tactics can benefit you in your attempts to
 3     achieve certain lawful purposes.  But again, at
 4     the end of the day it's a matter of, you know,
 5     recognizing based upon the specifics of this
 6     incident what would be, you know, the best tactic
 7     based upon the information I have at this moment
 8     in time to, again, achieve the ultimate, you
 9     know, goal which may be taking a person into
10     custody, stabilizing the situation, whatever the
11     goal might be at that particular moment in time.
12     Q.       Let me digest that for a second.
13     A.       Sure.
14                        ----------
15                        (Whereupon, a discussion was
16          held off the record at this time.)
17                        ----------
18     BY MR. DIJIACOMO
19     Q.       That guidance provided to officers since
20     the use of force unit was created, would that
21     have been for inservice members provided through
22     annual trainings?
23     A.       Yes, sir.
24                        And again, what we do during the
```

CORPORAL KEVIN SELVERIAN

1   inservice trainings is we try to, you know,

2   reinforce some basic tactics.  We review the

3   legality of what they're authorized or not

4   authorized to do.

5         So it allows an opportunity -- provides

6   us an opportunity to reinforce existing teachings

7   and in cases provide some new teachings or some,

8   you know, tactics, techniques, practices that

9   they might not otherwise have been exposed to

10  during their basic training period or during

11  their basic training itself.

12        So again, I'm not quite sure that I

13  understand your question, but the inservice

14  program serves as a platform for us to review

15  some things, expose our membership to some new

16  things perhaps.  But we are always in the

17  scenario-based trainings example that we provide,

18  you know, trying to reinforce sound tactics based

19  upon the scenarios that we create for our

20  membership during the course of those exercises.

21  Q.      Are other -- are units other than the

22  use of force unit involved in repairing the

23  materials or the scenarios or education materials

24  for the annual inservice training?

CORPORAL KEVIN SELVERIAN

1    A.       Yes, sir.

2             So again, traditionally, prior to 2016,

3    or prior to 2016, yes.  Our inservice unit --

4    there's an inservice unit within with the

5    academy, the Bureau of Training and Education

6    itself was responsible for compiling and putting

7    that training together.  But again, the source of

8    the material for a lot of those trainings was

9    drawn from and has been drawn from various

10   entities within the department.

11            So again, if we're talking about a

12   particular subject where we need to rely on the

13   expertise of, you know, a particular department,

14   particular unit, a particular bureau outside of

15   the bureau within the department, then we're

16   going to rely on them for the source of

17   information.  But they're members of the training

18   and education bureau, the ones that are going to

19   provide the training for the most part.

20   Q.       Are you familiar with the scenarios that

21   were used between 2016, I suppose, and prior to

22   May 20th, 2017, in the inservice training?

23   A.       Yes, sir.

24   Q.       Did any of those scenarios involve

CORPORAL KEVIN SELVERIAN

1   individuals with suicidal ideation?

2   A.        Yes, sir.

3   Q.        Would you describe those scenarios?

4   A.        The one scenario, as I recall, was a

5   scenario in which our officers were to respond to

6   a residence.  They were told of an individual in

7   crisis or who may have been in crisis, was

8   located within a room within the residence and

9   they had to speak to him, attempt to utilize

10  crisis intervention technique or tactical

11  communication.

12          However, ultimately, during the course

13  of that scenario, the role player accessed a

14  weapon and based upon the instruction given to

15  the role player our membership would employ

16  simulated deadly force upon that individual in

17  order to stop the, again, the significant threat

18  posed by the role player or the simulated subject

19  in that circumstance.

20  Q.        And in that circumstance the individual

21  with suicidal ideations, is that individual with

22  any hostages or bystanders in that room?

23  A.        In that circumstance, no.

24          And just to clarify, the suicidal

**CORPORAL KEVIN SELVERIAN**

1    ideation, again, as far as my memory serves me at

2    this particular moment in time, it wasn't, I

3    don't think, specified as suicidal ideation.  It

4    was more along the lines of that person was

5    suffering from a crisis-type of event,

6    potentially, some sort of mental health issue.

7           But again, what's important to recognize

8    is that --

9           Excuse me one second.  I lost my train

10   of thought.

11          What's important to recognize at that

12   moment in time or with that scenario is the fact

13   that what we teach our folks is that ultimately

14   in many of these circumstances they are not

15   qualified nor do they have the time or

16   opportunity to diagnose the circumstance or

17   diagnose the individual.  You know, they look for

18   things such as rational versus irrational

19   behavior, signs and symptoms potentially of

20   somebody suffering from some sort of mental

21   health issue.

22          All of those things fall within the

23   category of crisis.  So crisis generally

24   represented by periods or behaviors that one

CORPORAL KEVIN SELVERIAN

1   would deem irrational, whereas conflict events

2   typically are more geared towards a circumstance

3   in which you would confront somebody who appears

4   to be rational but who is just choosing not to

5   obey or comply with the commands or the

6   instructions or, you know, the express desires of

7   the police officer.

8          So again, it is my -- as far as my

9   recollection is concerned that situation was

10  designed to reflect an individual who was likely

11  suffering from some sort of crisis event and I

12  would feel more comfortable categorizing it as a

13  crisis event versus suicidal ideation.  And I

14  believe that the scenario that we're discussing

15  was part of our 2017 mandatory inservice

16  training.

17         So that was 2017, and typically, we

18  conduct our mandatory inservice trainings in the

19  fall.

20  Q.     So again, I'm not quite sure as to

21  whether or not that would have come before

22  May 20th, was that the date that you referred to

23  before?

24  A.     Yes.

CORPORAL KEVIN SELVERIAN

1    Q.      Of that particular year?

2    A.      Yeah.

3    Q.      Okay.

4            You're getting ahead of me and I

5    appreciate it, and you answered a lot of my

6    questions.

7            So let me just confirm though, the

8    scenario we discussed would have been provided in

9    the fall of 2017?

10   A.      Yes, sir.

11   Q.      And from a theoretical viewpoint, are

12   officers trained to identify credible threats of

13   suicide as a symptom of a crisis?

14              MS. LE:  Objection to form.

15            You can answer if you understand the

16       question.

17              THE WITNESS:  I don't.

18            So could you please kind of thin

19       that down for me, please?

20   BY MR. DIJIACOMO:

21   Q.      We were talking about the inability of

22   an officer to diagnose an individual?

23   A.      Yes, sir.

24   Q.      From time and as well as training, I'm

**CORPORAL KEVIN SELVERIAN**

1    sure?

2    A.        Yes, sir.

3    Q.        But they're trained to recognize

4    rational versus irrational acts or statements,

5    correct?

6    A.        Correct.

7    Q.        And they're trained to look for certain

8    symptoms as well?

9    A.        Yes, sir.

10   Q.        Okay.

11             Are statements by an individual

12   threatening suicide, is that identified to

13   officers in those trainings as one of the

14   symptoms or one of the irrational signs that the

15   person's having a crisis?

16   A.        Obviously, somebody expresses outwardly,

17   is that what you're saying, is that what you're

18   trying to ask?

19   Q.        Yes.  Verbally states?

20   A.        If they verbally state and our officers

21   are aware of the statement that was made; is that

22   what you're asking?

23   Q.        Yes.

24   A.        Are they trained to consider that; is

CORPORAL KEVIN SELVERIAN

1   that what you're asking?

2   Q.      Yes.

3   A.      Yes.

4   Q.      Okay.

5           I would think it's an obvious question,

6   but I'm not trying to make it reprehensible,

7   that's all.

8   A.      I'm sorry.  Maybe I just didn't

9   understand.  I didn't know --

10  Q.      It's fair to say that through the

11  training and experience that officers have they

12  would identify a verbalized statement of suicide,

13  an attempt to commit suicide to them as a sign

14  that the individual's in crisis?

15  A.      Yes, sir.

16          I mean, again, if somebody expresses

17  that -- if somebody expresses outwardly that they

18  have a desire to significantly harm themselves,

19  yes, that would be an indicator of somebody

20  that's in crisis, yes.

21  Q.      That's during the scenario that we were

22  talking about that was provided in the fall of

23  2017?

24  A.      Yes, sir.

CORPORAL KEVIN SELVERIAN

1    Q.        I think you mentioned -- and I don't

2    recall the exact words you used.  Forgive me --

3    but that during the course of that action prior

4    to the individual, I believe, possessing or

5    presenting a firearm, they would use some type of

6    command techniques?

7    A.        Yes, sir.

8    Q.        Can you describe those command

9    techniques that they were trained on during that

10   scenario?

11   A.        Again, sir, our training is relative to

12   verbal communication, command structures, all

13   those sorts of things are trainings that have

14   come throughout their career.

15            So it started in their basic training

16   program, continued through various exposures to

17   those issues during the, you know, the inservice

18   trainings that they attended during the course of

19   their career, whether that be a mandatory program

20   or a voluntary program outside of our program.

21            So they bring to bear obviously

22   everything that, you know, they have been trained

23   to do or have experienced and found to be

24   successful during their experiences, you know, to

CORPORAL KEVIN SELVERIAN

1    that point in their career.

2            So when you say, you know, what did we

3    train them to say in that circumstance, again,

4    we're watching and we're observing their behavior

5    to see, you know, how they found it and provide

6    them maybe with some constructive criticism or

7    reinforcement depending on how they respond in

8    those particular scenarios.

9    Q.      Okay.

10           In the scenario in which an individual

11   is in a room in this house in crisis, whatever

12   that crisis may be, and he's potentially

13   possessing firearms, are the command techniques

14   being used for the purpose of deescalating the

15   situation?

16   A.      Again, deescalation, I think it's

17   important that we kind of define that so we're

18   kind of on the same page.  Deescalation is a

19   result or a goal as far as our teachings and as

20   far as which we reinforce.  It is goal or result

21   and it's characterized by an intent or an effort

22   on the part of the officer to mitigate the nature

23   of force required to control the person and/or

24   stabilize the situation.

CORPORAL KEVIN SELVERIAN

1          So it's a goal or a result categorized
2     by the intent.  Now, that goal or result is
3     always going to be significantly impacted by the
4     environment, time, distances, opportunities for,
5     you know, us to utilize various alternative
6     methods.  And by "alternative methods" I mean,
7     medicines other than the use of deadly force, so
8     on and so forth.
9          But ultimately, the most impactful, you
10    know, the thing that's most impactful -- you
11    know, the thing that's most impactful upon
12    whether we can achieve that goal or not is always
13    going to be the level of a subject's cooperation
14    and/or resistance.
15          So to your point of as far as would a
16    command of "Put the gun down," you know, be a
17    deescalation technique?  Well, it might be a
18    mitigation strategy insomuch as that he does, in
19    fact, comply with that command and put the gun
20    down, well, then we can move forward maybe with
21    some alternatives other than the use of deadly
22    force to control this individual, or again,
23    stabilize the event, or more specifically, you
24    know, stop a threat of death or serious bodily

CORPORAL KEVIN SELVERIAN

1    injury once that particular step towards that

2    particular end has been taken.

3    Q.       In the scenario in the fall of 2017

4    we've been discussing, is there a gold standard

5    on how the officers should have approached the

6    room?

7    A.       Is there a gold standard, sir?  I'm

8    sorry.

9    Q.       So let me back up.

10            When you're doing your scenario, you

11   briefed the officers on what they are aware of

12   before the scenario starts, correct?

13   A.       We give them limited information which

14   more often than not replicates the nature of a

15   true event because, again, oftentimes, we are

16   provided limited information, bits of

17   information, we're often provided that

18   information by people who tend to be in an

19   emotional state of mind as far as concern, worry,

20   you know, anger, whatever the case may be.

21            So we try to replicate how the

22   information is provided and very often the

23   information provided is, in fact, limited.

24   Especially, when you compare it to that we

CORPORAL KEVIN SELVERIAN

1   guarded through hindsight after the event itself.
2   Q.      Would you walk me through at the insight
3   training how a scenario would occur?
4   A.      Sure.
5   Q.      Meaning, starting from the classroom to
6   the critique?
7   A.      Sure.  So obviously, the scenario
8   begins.  We have safety briefings.  We make sure
9   that the role players, the instructors that are
10  conducting the students themselves are all
11  properly equipped with that which they need to
12  serve their role and function during the course
13  of the scenario.
14         So for example, the students are
15  provided with inert or simulated weaponry to,
16  again, ensure the safety, you know, of the
17  situation itself.  The role players are provided
18  with the props or the inert weaponry or items or
19  whatever it is that the role player needs to,
20  again, satisfy the requirements of that which we
21  need them to do.
22         So we have safety briefings.  We make
23  sure people are properly equipped and we have
24  staging areas where we will stage a class where

CORPORAL KEVIN SELVERIAN

1    they are to stand until it's their opportunity to

2    go through the scenario.

3              Once it's that officer's turn to go,

4    they would be taken from the staging area to the

5    training area itself.  They will be provided a

6    quick briefing on the information that is being

7    provided to them.  Once they have that

8    information they are told to engage in the

9    scenario.

10             Typically, the scenario will not be

11   stopped unless something of, you know, a

12   significant safety concern arises.  So they go

13   through.  They make their decisions in regards to

14   what they need to do.  They respond and once the

15   circumstance is over, a ceasefire or a stop

16   exercise command is uttered by the primary

17   instructor.

18             Typically, they are given some sort of

19   critique in regards to their performance during

20   the course of the scenario itself.  And then

21   they're dismissed to go back to the staging area

22   and perhaps await the next scenario or, you know,

23   await the final debriefing that we had with them,

24   you know, in an effort to make sure the teaching

1    points are, you know, reinforced and then

2    obviously, they'd be dismissed for the day.

3    Q.        Were you present for the critiques

4    provided to officers for that scenario in the

5    fall of 2017?

6    A.        No, sir.

7             So it was our responsibility to put the

8    training together, but the training is actually

9    administered in five different locations

10   throughout the state.  So we have regional

11   training centers at all four corners of the state

12   and we have our main academy in Hershey.  The

13   trainings at the training center are given by the

14   instructors at those particular locations, and

15   the training at the academy is given by our

16   operational training unit there at the academy.

17            So to your specific question:  Did I see

18   the critiques that were given?

19            I may have seen one or two as I visited

20   sites and just reviewed the process, but it

21   wasn't something that I saw on a daily basis.

22            So it's important to remember that we

23   have, you know, roughly 4,600 members, and this

24   mandatory inservice training is conducted over

**CORPORAL KEVIN SELVERIAN**

1   the period of typically several months.  So, you

2   know, this is kind of a day in/day out endeavor

3   on the part of the instructors at those

4   locations.  Again, it's somewhat of a very -- I

5   don't want to say "monumental," but a very --

6   conducted on a large scale.

7   Q.        Understood.  Okay.

8             With regards to the May 20th, 2017

9   incident, are you aware of any critiques from the

10  office of risk management concerning the policy?

11  A.        No, sir.  The critique was not conducted

12  in this case and that is a part of our

13  standardized practice that when there is a

14  litigation hold put on a particular incident, the

15  critique is typically not done until matters of

16  litigation have been complete.

17  Q.        Understood.  Okay.

18            Other than the scenario we discussed for

19  the fall of 2017 -- let me back up.

20            Did the use of force unit participate in

21  providing any scenarios for the inservice

22  training in 2016?

23  A.        There was no scenario in -- so if you're

24  asking was there a replication or did a similar

CORPORAL KEVIN SELVERIAN

1  training evolution occur in 2016 as the one we're

2  describing in 2017?

3  Q.      Yes.

4  A.      Then the answer to that question is no.

5  There was not the same scenario-based training

6  conducted in 2016, if that's your question.

7  Q.      And when you say, "the same

8  scenario-based training," are you referring to --

9  let me back up.

10          Was any scenario-based training provided

11  in 2016?

12  A.      I would have to review my record.  But

13  off the -- without my reviewing any sort of

14  training records at this moment in time, I don't

15  believe there was a scenario-based exercise as

16  part of 2016's mandatory inservice training.

17  Q.      Okay.

18          Prior to 2016 for the inservice

19  mandatory training, were scenario-based exercises

20  performed?

21  A.      We've conducted various practical

22  exercises that reinforce.  As an example, in one

23  year, during one year of mandatory inservice

24  training there were practical exercises

CORPORAL KEVIN SELVERIAN

1    regarding, you know, response to active shooter

2    circumstances, for example.  You know, there are

3    always practical exercises and drills conducted

4    relative to the application of less lethal

5    weaponry.  For example, you know, where the

6    deployment of a taser or OC and those sorts of

7    things, not only to reinforce practices but

8    there's a recertification element that we need to

9    go through in order to make sure that our

10   membership is qualified and certified to carry

11   those particular things.

12           So again, it's an myriad of different

13   programs that are offered, you know, depending on

14   the year and depending on, you know, a need, a

15   recertification need, for example, or an express

16   needs by the department in any sort of way that

17   we need to address these practice, these

18   techniques, this information, this law, this

19   procedure, whatever the case might be.

20           So every year meetings are held to

21   determine what do we need to address or what

22   should we be addressing in, you know, for

23   example, this year's -- or mandatory inservice

24   program.

CORPORAL KEVIN SELVERIAN

1    Q.        Prior to the 2017 inservice programming,

2    were any scenario-based training provided to

3    officers concerning situations in which an

4    individual would have been either in crisis or

5    verbalizing suicide without hostages?

6    A.        So again, to your example or to the

7    example I gave you previously, you know, in some

8    of the active shooter scenarios that were part

9    our officers' mandatory type of events.  Although

10   we have an active shooter situation, could we

11   conclude based upon limited bits of information

12   that that person was suffering from some sort of

13   crisis event.  You know, those things, you know,

14   always play a part.

15            So, you know, to parse out individual --

16   categories of individuals, we're looking more for

17   identification of crisis versus conflict.  Do you

18   have the time and opportunity to employ this

19   tactic versus this tactic.  What would be most

20   prudent, reasonable thing at this moment in time

21   as far as your options are concerned.

22            You know, we spent a lot of time in the

23   basic training program, you know, exposing our

24   membership to, you know, various types of

**CORPORAL KEVIN SELVERIAN**

1   scenarios, you know, in different environments,

2   traffic stop environments, domestic environments,

3   you know, street contact environments, where, you

4   know, these assessments need to be made and

5   decisions need be, you know, put forth, that are,

6   in fact, reasonable that ultimately lead to

7   appropriate response.

8         So, you know, this is something that our

9   membership is exposed to throughout the course of

10  their career, and that's not to mention the fact

11  that they also have opportunity to voluntarily,

12  you know, sign up for other programs that would

13  address various aspects of use of force.

14        For example, you know, ground defense

15  classes, or you know, tactical shooting classes,

16  or, you know, vehicle stop tactic classes where,

17  you know, there's always going to be

18  scenario-based elements in those programs forcing

19  our folks to make decisions, you know, in rapidly

20  unfolding circumstances perhaps where, again,

21  they have to rely on their training and

22  experience to drive proper performance as far as

23  that which we would expect them to do.

24  Q.      In the active shooter scenarios that

CORPORAL KEVIN SELVERIAN

1    officers are trained on prior to 2017, did those

2    scenarios always involve an active shooter with

3    risk to third parties?

4    A.        I do not recall off the top of my head,

5    sir.  I apologize.

6             We've conducted active shooter scenarios

7    as part of our MITP program which would have been

8    conducted through the Bureau of Training and

9    Education.  And we've also conducted alternate

10   active shooting training programs that have been

11   formulated, put together and directed by our

12   bureau of emergency -- bureau of emergency and

13   special operations so they would be our version

14   of swat team members.  We call them "Special

15   Emergency Response Teams."

16            So they have, again, executed trainings

17   in active shooting environments that have

18   certainly involved, you know, various

19   scenario-based exercises, but to speak to the

20   specificity of those programs, you know, I

21   wouldn't want to provide you with any information

22   based upon any sort of speculation.

23   Q.        Generally speaking, for the -- are you

24   familiar with any of the active shooter scenarios

CORPORAL KEVIN SELVERIAN

1  that were provided prior to 2017?

2  A.        Again, those provided by the cert

3  team -- again, I've seen them.  And again, what's

4  important also to understand is that, you know,

5  various adjustments to scenarios might be based

6  upon certain student need or certain environment

7  parameters.

8           So to say that they gave everybody the

9  same scenario, again, that would not be my place

10  to say because, again, I don't know the internal

11  components of how they went about conducting

12  their training.  I have seen it at various

13  locations, and in the ones that I have seen being

14  conducted, there were individuals that were

15  apparently suffering from crisis type events but

16  I don't -- again, I'm not in a position where I

17  can say that every member of the department got

18  those exact same scenarios because, again, I

19  wasn't part of the organization or execution of

20  those trainings.

21  Q.        Are you aware of any trainings prior to

22  2017 in which the focus was on an individual

23  expressing suicidal ideations -- my purpose is --

24  the question I'm asking you is:  Are you aware of

CORPORAL KEVIN SELVERIAN

1   any scenarios provided to officers in which the

2   focus was not on an active shooter where

3   bystanders are involved, but a shooter in which

4   the individual is alone and expressing suicidal

5   ideation?

6   A.       We have conducted exercises and various

7   trainings, you know, throughout the course of my

8   time in the Bureau of Training and Education

9   where, you know, we dealt with multitudes of

10  issues, I think, relative to what you're saying.

11  For example, if we ever conducted an exercise

12  where perhaps a suicidal individual had

13  barricaded themselves inside a residence.  And we

14  would talk about manners of approach and tactics

15  that need to be followed and certain policies

16  that drive, you know, our behaviors in those

17  particular regards.

18          Again, those trainings are a part of the

19  basic training program.  They've been executed

20  at, you know, at various different, you know,

21  during various different training evolutions that

22  I've been to and seen and exposed and have taken

23  part of.  So again, they are part and parcel with

24  the creation of a sound, you know, scenario-based

CORPORAL KEVIN SELVERIAN

1    program associated maybe with whatever it is

2    you're discussing.

3              For example, you know, we have high risk

4    response policies, you know, within the

5    department.  And if you're trying to reinforce,

6    you know, a particular component of that policy,

7    well, then you may discuss in a classroom or you

8    may conduct an exercise that, you know,

9    reinforces, you know, the contents of those

10   policies through, you know, again, a practical

11   exercise, you know, conducted through dialog, you

12   know, tabletop exercise, you know, an outdoor

13   exercise.

14             So, you know, these things go on

15   regularly, you know, within the bureau as they

16   relate to, you know, a variety of different

17   classes or programs that we offer.

18   Q.        Did those trainings -- were those

19   trainings provided prior to 2017 though or are

20   you talking currently?

21   A.        No, they've been provided throughout the

22   time that I've been a member of this bureau.  So

23   I've been a member of this bureau since 2003.

24             So I've seen, you know, and we've

CORPORAL KEVIN SELVERIAN

1    discussed that those issues be discussed and

2    trained and taught.  And, you know, there are

3    many different training opportunities outside of

4    that mandatory inservice training program that we

5    were talking about.

6              And also, to provide a little more

7    clarification, I simply used that active shooter

8    training as an example.  So they would all fall

9    within that same category of, you know, various

10   trainings we provide to our membership over the

11   years, to provide, you know, particular members

12   of the department with, you know, throughout the

13   years that I've seen where, you know, response to

14   these types of incidents are not only, you know,

15   taught in classroom environments, but you know,

16   scenario-based exercises are conducted in along

17   to, you know, reinforce those points.

18   Q.        What is the MITP program?

19   A.        The MITP is the mandatory inservice

20   training program.

21   Q.        Got you.  All right.

22   A.        So I've been referring to them back and

23   forth.  But they're the same thing, mandatory

24   inservice.  So that is once a year every member

**CORPORAL KEVIN SELVERIAN**

1    of the department from the rank of trooper to the

2    rank of colonel, they must attend that one-day

3    training session once a year.  And again, like I

4    said, it's conducted over a several-month time

5    period, but every member of the department must

6    attend that training that particular year, and

7    again, that's why obviously, the mandatory type.

8    Q.        Got you.  Okay.

9                     MR. DIJIACOMO:  Sir, I think

10        you're answered my questions.

11                    THE WITNESS:  Thank you.

12                    MR. DIJIACOMO:  You're welcome.

13                    MS. LE:  I don't have any

14        questions on redirect.

15              Thank you.

16                    THE COURT REPORTER:  Ms. Le, do

17        you want a copy of the transcript?

18                    MS. LE:  I do.

19              ----------

20              (Whereupon, the deposition was

21        adjourned at 11:50 a.m.)

22              ----------

23

24

**CORPORAL KEVIN SELVERIAN**

1                           CERTIFICATION

2

3

4           I HEREBY CERTIFY that the

5     proceedings and evidence are contained fully

6     and accurately in the stenographic notes

7     taken by me upon the foregoing matter on

8     Wednesday, May 19, 2021, and that this is a

9     correct transcript of same.

10

11

12

13

14
                          CHARLES P. CARMODY
15                        Federally Approved
                          Registered Professional
16                        Reporter and Notary Public

17

18

19

20

21                        (The foregoing certification
                          of this transcript does not
22                        apply to any reproduction of
                          the same by any means,
23                        unless under the direct
                          control and/or supervision
24                        of the certifying reporter.)

**CORPORAL KEVIN SELVERIAN**

**A**

**a.m** 1:13 49:21
**absence** 13:9
**academy** 25:5
  38:12,15,16
**accessed** 26:13
**accurate** 8:19
**accurately** 50:6
**achieve** 23:3,8
  34:12
**acknowledge** 5:6,9
  5:13,23
**action** 18:3 32:3
**actions** 17:12,19,20
  17:21
**active** 41:1 42:8,10
  43:24 44:2,6,10
  44:17,24 46:2
  48:7
**acts** 30:4
**address** 14:8,21
  41:17,21 43:13
**addressed** 14:12
**addressing** 41:22
**adequate** 12:8
**adijiacomo@wei...**
  2:6
**adjourned** 49:21
**adjustments** 45:5
**administered** 5:14
  38:9
**administrative** 14:2
  14:4,19
**affairs** 12:18
**agency** 9:24
**agree** 5:23 6:9
**agreed** 6:7
**agreement** 6:3,4
**ahead** 29:4
**al** 1:4,8
**alert** 22:16
**allow** 18:4 22:18
**allowed** 16:15
**allows** 16:18 21:9
  24:5
**alteration** 9:15
**altering** 12:10
**alternate** 44:9
**alternative** 34:5,6
**alternatives** 34:21
**analysis** 9:21 10:1
  10:3,5
**and/or** 17:14 19:9
  33:23 34:14 50:23
**Angelo** 1:4 7:7
**anger** 35:20

**annual** 23:22 24:24
**answer** 4:4 29:15
  40:4
**answered** 29:5
  49:10
**Anthony** 2:4 6:6 7:7
**anybody** 22:13
**apologize** 44:5
**apparently** 45:15
**APPEARANCES**
  2:1
**appearing** 8:9
**appears** 18:7 28:3
**applicable** 16:5
**application** 10:21
  15:17 41:4
**applications** 12:21
**applies** 16:8
**apply** 50:22
**appreciate** 29:5
**approach** 21:22
  22:13,23 46:14
**approached** 35:5
**appropriate** 21:3
  43:7
**Approved** 1:14
  50:15
**approves** 10:3
**approximately** 1:13
**Arch** 2:9
**Ardo** 1:4 7:7
**area** 21:24 37:4,5
  37:21
**areas** 18:8 36:24
**arises** 14:17 37:12
**arrangement** 5:19
**arrest** 18:10,13,15
  19:1,19
**arrested** 18:23
**asking** 30:22 31:1
  39:24 45:24
**aspects** 43:13
**assessment** 15:18
**assessments** 43:4
**assigned** 22:20
**associated** 47:1
**association** 10:23
**attempt** 26:9 31:13
**attempted** 18:19
**attempting** 18:20
**attempts** 23:2
**attend** 49:2,6
**attended** 32:18
**attorney** 2:8 9:23
  13:24,24
**attorney's** 9:22

10:16,23
**attorneys** 5:8 13:1
**authorize** 17:7
**authorized** 17:4
  18:14 24:3,4
**authorizes** 17:24
**automatic** 13:10
**Avenue** 2:4
**await** 37:22,23
**aware** 14:19 30:21
  35:11 39:9 45:21
  45:24

**B**

**back** 35:9 37:21
  39:19 40:9 48:22
**ball** 19:12
**barricaded** 46:13
**based** 15:15 19:16
  20:10,18 23:5,7
  24:18 26:14 42:11
  44:22 45:5
**basic** 24:2,10,11
  32:15 42:23 46:19
**basis** 38:21
**bear** 32:21
**beginning** 1:13
**begins** 36:8
**behalf** 8:10
**behavior** 18:2
  27:19 33:4
**behaviors** 27:24
  46:16
**beings** 18:22
**belief** 18:17 19:3,10
  19:17
**believe** 8:16 19:10
  20:11,23 28:14
  32:4 40:15
**benefit** 23:2
**best** 22:17 23:6
**better** 10:9 11:12
**bettering** 12:9
**bits** 35:16 42:11
**bodily** 17:1,13,22
  18:23 19:5 34:24
**brief** 5:5 9:4
**briefed** 35:11
**briefing** 37:6
**briefings** 36:8,22
**briefly** 8:14
**bring** 32:21
**broad** 11:23,24
**broken** 18:7
**bureau** 8:18 11:19
  12:23 14:11 15:1

25:5,14,15,18
  44:8,12,16 46:8
  47:15,22,23
**bystanders** 21:11
  21:18 26:22 46:3

**C**

**cadets** 9:7 10:7
**calculated** 16:24
**call** 22:3 44:14
**care** 22:21
**career** 32:14,19
  33:1 43:10
**Carmody** 1:14
  50:14
**carry** 12:10 41:10
**case** 14:1 35:20
  39:12 41:19
**cases** 24:7
**categories** 42:16
**categorized** 34:1
**categorizing** 28:12
**category** 27:23
  48:9
**cause** 16:24 19:9
**ceasefire** 37:15
**center** 38:13
**centers** 38:11
**cert** 45:2
**certain** 16:10,11
  23:1,3 30:7 45:6,6
  46:15
**certainly** 44:18
**certification** 6:17
  50:1,21
**certified** 1:21 41:10
**CERTIFY** 50:4
**certifying** 50:24
**chain** 10:3
**change** 9:15
**changed** 13:12
**changes** 11:21
**characterized**
  33:21
**Charles** 1:14 50:14
**chief** 13:1
**choosing** 28:4
**circumstance**
  16:23 17:10 26:19
  26:20,23 27:16
  28:2 33:3 37:15
**circumstances**
  20:20 22:17,24
  27:14 41:2 43:20
**citing** 13:4
**civil** 7:22 10:17

**civilian** 10:8
**clarification** 48:7
**clarify** 26:24
**class** 36:24
**classes** 43:15,15
  43:16 47:17
**classroom** 36:5
  47:7 48:15
**cleaning** 7:15
**colonel** 49:2
**color** 16:6
**come** 12:1,11,14,15
  12:18,22,24 13:5
  28:21 32:14
**comes** 18:6 20:14
**comfortable** 28:12
**command** 10:3
  32:6,8,12 33:13
  34:16,19 37:16
**commands** 28:5
**commissioner's**
  12:14
**commit** 31:13
**committed** 18:19
**Committee** 11:6
**Commonwealth**
  10:24
**communication**
  26:11 32:12
**communities** 10:15
**compare** 35:24
**compiling** 25:6
**complete** 39:16
**comply** 28:5 34:19
**component** 47:6
**components** 45:11
**comprehensive**
  10:2
**concern** 12:4,19
  14:11,17,21 15:7
  35:19 37:12
**concerned** 9:11,18
  28:9 42:21
**concerning** 10:9
  15:3 39:10 42:3
**concerns** 9:24
  12:11 15:2
**conclude** 42:11
**conduct** 28:18 47:8
**conducted** 13:19
  13:22 14:6 38:24
  39:6,11 40:6,21
  41:3 44:6,8,9
  45:14 46:6,11
  47:11 48:16 49:4
**conducting** 36:10

45:11
**conference** 1:11
  2:3,8 10:16
**conferences** 10:12
**confirm** 29:7
**conflict** 22:7 28:1
  42:17
**confront** 28:3
**conjunction** 18:18
**consent** 5:19
**consider** 30:24
**consideration** 22:2
**constructive** 33:6
**consultation** 11:10
**contact** 22:6 43:3
**contained** 50:5
**contents** 47:9
**continued** 32:16
**control** 17:5 33:23
  34:22 50:23
**cooperation** 34:13
**copy** 49:17
**corners** 38:11
**corporal** 1:12 3:3
  6:21 7:6
**correct** 8:11,12,20
  16:17 18:12 21:12
  30:5,6 35:12 50:9
**counsel** 5:5,18 6:2
  6:6,9,16 13:1
**course** 14:17 24:20
  26:12 32:3,18
  36:12 37:20 43:9
  46:7
**court** 1:1,21,21 6:1
  7:20 49:16
**courtroom** 8:6
**create** 24:19
**created** 15:1 23:20
**creation** 46:24
**credible** 29:12
**creed** 16:6
**criminal** 10:17
  12:15,16 13:18,19
  14:19
**crisis** 26:7,7,10
  27:23,23 28:11,13
  29:13 30:15 31:14
  31:20 33:11,12
  42:4,13,17 45:15
**crisis-type** 27:5
**criticism** 33:6
**critique** 14:6,8,8
  36:6 37:19 39:11
  39:15
**critiques** 38:3,18

39:9
**crystal** 19:12
**currently** 8:17
  47:20
**custody** 23:10

———————
**D**
**daily** 38:21
**danger** 21:16
**dangers** 22:17
**date** 28:22
**day** 23:4 38:2 39:2
**deadly** 16:20 17:9
  17:11,16 18:1,6
  18:14 19:20 20:15
  21:10 26:16 34:7
  34:21
**dealing** 15:7
**dealt** 46:9
**death** 16:24 17:13
  17:22 19:5 34:24
**debriefing** 37:23
**decision** 13:23
**decisions** 19:16
  37:13 43:5,19
**declare** 5:15
**deem** 28:1
**deescalating** 33:14
**deescalation** 33:16
  33:18 34:17
**defendant** 6:9
**Defendants** 1:9
  2:11
**defense** 43:14
**define** 33:17
**delay** 18:24
**delve** 8:13
**department** 8:22
  9:9,11,18 11:20
  12:4 13:2 20:14
  25:10,13,15 41:16
  45:17 47:5 48:12
  49:1,5
**depending** 33:7
  41:13,14
**deployment** 41:6
**deposition** 1:11 4:1
  49:20
**describe** 11:9 26:3
  32:8
**describing** 17:18
  40:2
**Description** 3:10
  4:8
**designed** 28:10
**desire** 31:18

**desires** 28:6
**determine** 13:11
  41:21
**determining** 11:21
**developed** 9:12
**develops** 9:6
**diagnose** 27:16,17
  29:22
**dialog** 47:11
**different** 12:12 38:9
  41:12 43:1 46:20
  46:21 47:16 48:3
**digest** 23:12
**digestion** 15:17
**DiJiacomo** 2:4 3:4
  6:5,6 7:5,7 23:18
  29:20 49:9,12
**direct** 50:23
**directed** 44:11
**DIRECTION** 4:4
**discernment** 20:19
**discernments**
  19:15
**discuss** 47:7
**discussed** 29:8
  39:18 48:1,1
**discussing** 28:14
  35:4 47:2
**discussion** 6:11
  23:15
**dismissed** 37:21
  38:2
**distances** 34:4
**distinct** 16:19
**district** 1:1,2 9:22
  10:16,23 13:24
**diverse** 11:8
**division** 12:19
**DOCUMENTS** 4:7
**doing** 9:10 12:16
  17:6 35:10
**domestic** 43:2
**drawn** 25:9,9
**drills** 41:3
**drive** 43:22 46:16
**due** 9:15
**duly** 6:22
**duties** 16:4 22:16
  22:20

———————
**E**
**easiest** 11:9
**EASTERN** 1:2
**EDDIE** 1:8
**educate** 10:9
**education** 8:18

11:19,21,22 14:11
  24:23 25:5,18
  44:9 46:8
**educational** 13:11
**effort** 16:3 33:21
  37:24
**either** 14:18,18
  17:13 18:19 42:4
**element** 41:8
**elements** 43:18
**emergency** 44:12
  44:12,15
**emotional** 35:19
**employ** 15:24 16:11
  26:15 42:18
**endeavor** 39:2
**enforcement** 10:13
  11:11
**engage** 37:8
**ensure** 36:16
**entities** 25:10
**entity** 9:22
**environment** 20:23
  34:4 45:6
**environments**
  19:14 43:1,2,2,3
  44:17 48:15
**equipment** 9:15
  12:7,10 14:10
**equipped** 36:11,23
**escape** 18:16,20
**Especially** 35:24
**ESQUIRE** 2:4,9
**essence** 22:9
**et** 1:4,8
**event** 10:2 11:13
  12:8,18 13:17
  17:5 27:5 28:11
  28:13 34:23 35:15
  36:1 42:13
**events** 10:10 11:20
  28:1 42:9 45:15
**everybody** 9:10
  45:8
**Everything's** 7:11
**evidence** 50:5
**evolution** 40:1
**evolutions** 46:21
**exact** 20:16 32:2
  45:18
**Examination** 3:4
  7:2
**examined** 6:22
**example** 10:15,23
  11:5,7 12:2,6,13
  17:4 19:9 22:14

24:17 36:14 40:22
  41:2,5,15,23 42:6
  42:7 43:14 46:11
  47:3 48:8
**Excellent** 9:3 11:14
**Excuse** 15:17 27:9
**execute** 18:15
**executed** 44:16
  46:19
**execution** 45:19
**exercise** 37:16
  40:15 46:11 47:8
  47:11,12,13
**exercises** 24:20
  40:19,22,24 41:3
  44:19 46:6 48:16
**EXHIBITS** 3:9
**existed** 16:15
**existing** 9:13 24:6
**exists** 19:11,18
**expect** 43:23
**experience** 14:13
  20:19 31:11 43:22
**experienced** 32:23
**experiences** 32:24
**expertise** 25:13
**explain** 19:8
**expose** 24:15
**exposed** 24:9 43:9
  46:22
**exposing** 42:23
**exposures** 32:16
**express** 28:6 41:15
**expresses** 30:16
  31:16,17
**expressing** 45:23
  46:4
**extend** 17:9

———————
**F**
**fact** 9:19 13:7 15:12
  19:11,18 20:12,15
  20:24 27:12 34:19
  35:23 43:6,10
**factor** 10:20 21:1
**facts** 19:14
**fair** 21:11 31:10
**fall** 12:6 15:24
  16:12 27:22 28:19
  29:9 31:22 35:3
  38:5 39:19 48:8
**familiar** 8:1 25:20
  44:24
**far** 7:10 9:11,17
  10:7 20:8 27:1
  28:8 33:19,20

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

CORPORAL KEVIN SELVERIAN

34:15 35:19 42:21
43:22
**fear** 21:15
**Federally** 1:14
50:15
**feel** 28:12
**felony** 18:20
**filing** 6:17
**final** 37:23
**find** 19:15
**fine** 7:12
**firearm** 32:5
**firearms** 33:13
**first** 6:22 13:17
**five** 20:9 38:9
**fleeing** 18:20
**Fleming** 1:23
**Floor** 2:9
**focus** 45:22 46:2
**folks** 11:10 22:16
27:13 43:19
**followed** 46:15
**following** 13:23
**follows** 6:23
**force** 8:17,24 9:6,12
9:13,17 10:1,10
10:21 11:5,13,20
12:17,21 13:17
14:3,24 15:3,13
15:15 16:2,14,17
16:21,22,22,22
17:3,9,11,16,17
18:1,7,14 19:20
20:15 21:2,10
23:20 24:22 26:16
33:23 34:7,22
39:20 43:13
**forceable** 18:19
**forcing** 43:18
**foregoing** 50:7,21
**Forgive** 32:2
**form** 6:18 29:14
**formulated** 44:11
**forth** 14:3 34:8 43:5
48:23
**forward** 22:15
34:20
**found** 32:23 33:5
**four** 38:11
**full** 14:3
**fully** 50:5
**function** 36:12
**further** 5:13 11:21
18:5,8
**future** 5:20 19:13

**G**

**geared** 28:2
**general** 2:8 14:1
22:1
**general's** 9:23
**generally** 16:12
17:21,24 27:23
44:23
**getting** 29:4
**give** 9:4 35:13
**given** 19:24 26:14
37:18 38:13,15,18
**glaring** 14:15
**go** 37:2,3,12,21
41:9 47:14
**goal** 22:7 23:9,11
33:19,20 34:1,2
34:12
**going** 13:18,19
17:10 21:6 22:7
25:16,18 34:3,13
43:17
**gold** 35:4,7
**Good** 7:6,13
**ground** 43:14
**groups** 10:15
**guarded** 36:1
**guess** 11:24
**guidance** 12:5
21:21 22:2 23:19
**gun** 34:16,19

**H**

**half** 20:10
**Hammonton** 1:23
**harm** 17:6 20:5
21:20,24 31:18
**head** 44:4
**health** 27:6,21
**hear** 7:10
**held** 6:12 23:16
41:20
**help** 11:11
**helpful** 11:16
**Hershey** 38:12
**high** 47:3
**hindsight** 36:1
**hold** 39:14
**hopefully** 18:4
**horizon** 19:24 20:4
**hostages** 21:18
26:22 42:5
**hour** 20:9,10
**house** 11:2 33:11
**human** 10:20 18:22
18:22

**I**

**ideation** 15:5,8 26:1
27:1,3 28:13 46:5
**ideations** 26:21
45:23
**identification** 42:17
**identified** 30:12
**identify** 29:12 31:12
**III** 2:4
**immediate** 20:5,5
**immediately** 18:2
**imminent** 20:12,13
20:24
**impacted** 34:3
**impactful** 34:9,10
34:11
**important** 15:11
27:7,11 33:17
38:22 45:4
**in/day** 39:2
**inability** 29:21
**incapacitate** 18:2
**incident** 12:2 23:6
39:9,14
**incidents** 13:8
48:14
**INDEX** 3:1 4:1
**indicate** 6:2
**indicates** 18:22
**indicator** 31:19
**individual** 17:5 18:3
18:16 21:19,23
22:6 26:6,16,20
26:21 27:17 28:10
29:22 30:11 32:4
33:10 34:22 42:4
42:15 45:22 46:4
46:12
**individual's** 31:14
**individuals** 13:6
15:4 19:22 26:1
42:16 45:14
**inert** 36:15,18
**inflicts** 18:23
**informal** 8:4
**information** 15:18
15:18 20:20 23:7
25:17 35:13,16,17
35:18,22,23 37:6
37:8 41:18 42:11
44:21
**injury** 17:1,13,22
18:23 19:5 35:1
**inquiries** 12:14
**inquiry** 13:17,18
**inservice** 9:8,8 10:7

23:21 24:1,13,24
25:3,4,22 28:15
28:18 32:17 38:24
39:21 40:16,18,23
41:23 42:1 48:4
48:19,24
**inside** 11:10 46:13
**insight** 36:2
**insomuch** 34:18
**Institute** 10:18
**instruction** 9:7
10:19 26:14
**instructions** 28:6
**instructor** 37:17
**instructors** 36:9
38:14 39:3
**Integrity** 12:23
**intended** 16:24
**intent** 33:21 34:2
**interact** 21:22
**internal** 12:18 14:2
45:10
**interpret** 15:22
**interpreted** 15:21
**intervention** 26:10
**investigation** 12:17
13:22 14:2,3,4
**investigations**
14:14,18
**investigative** 13:18
**investigators** 12:16
13:20
**involve** 25:24 44:2
**involved** 24:22
44:18 46:3
**involving** 10:10
12:3
**irrational** 27:18
28:1 30:4,14
**issue** 14:9,10 27:6
27:21
**issues** 11:5 32:17
46:10 48:1
**items** 36:18

**J**

**Jean** 7:8
**Jersey** 1:23
**job** 9:10,11
**judge** 8:7
**Judiciary** 11:6
**jury** 8:7

**K**

**Kathy** 2:9 6:8
**KEVIN** 1:12 3:3

6:21
**kind** 29:18 33:17,18
39:2
**kle@attorneygen...**
2:11
**knew** 20:21
**know** 7:17 12:9
13:20 14:16 16:10
17:24 19:8 22:9,9
22:10,11,12,23
23:4,6,9 24:1,8,18
25:13 27:17 28:6
31:9 32:17,22,24
33:2,5 34:5,10,11
34:16,24 35:20
36:16 37:11,22,24
38:1,23 39:2 41:1
41:2,5,13,14,22
42:7,13,13,15,22
42:23,24 43:1,3,4
43:5,8,12,14,15
43:16,17,19 44:18
44:20 45:4,10
46:7,9,16,20,20
46:24 47:3,4,6,8,9
47:10,11,12,12,14
47:15,16,24 48:2
48:9,11,12,13,14
48:15,17
**known** 15:16

**L**

**L** 2:4
**lady** 7:15
**language** 9:19
**large** 39:6
**law** 2:3 10:13 11:11
41:18
**lawful** 16:4 23:3
**Le** 2:9 6:8,8 29:14
49:13,16,18
**lead** 43:6
**legal** 10:14,15 16:4
**legality** 24:3
**let's** 22:11
**lethal** 16:17,21,22
17:3,16 41:4
**level** 34:13
**lieu** 5:14
**life** 18:22
**limitation** 20:7
**limitations** 20:22
**limited** 19:14 35:13
35:16,23 42:11
**line** 4:5,8,12,15
12:6 21:3

**lines** 27:4
**litigation** 10:17
  39:14,16
**little** 48:6
**located** 13:21 26:8
**locations** 38:9,14
  39:4 45:13
**long** 8:21 15:10,10
**look** 12:9 17:11
  19:7 22:8 27:17
  30:7
**looking** 21:2 42:16
**lost** 27:9
**lot** 25:8 29:5 42:22
**loud** 7:16

_____

**M**
**main** 38:12
**maintain** 22:18
**management** 12:22
  14:7 39:10
**mandatory** 28:15
  28:18 32:19 38:24
  40:16,19,23 41:23
  42:9 48:4,19,23
  49:7
**manner** 5:21
**manners** 46:14
**marked** 3:11 4:14
**material** 25:8
**materials** 13:12
  24:23,23
**matter** 5:16 13:5
  17:20 23:4 50:7
**matters** 39:15
**maximum** 22:10
**mean** 15:7 31:16
  34:6
**meaning** 8:6 20:4
  36:5
**means** 50:22
**medicines** 34:7
**meetings** 41:20
**member** 8:17,21,22
  8:23 45:17 47:22
  47:23 48:24 49:5
**members** 9:9 11:1
  11:3 12:3 23:21
  25:17 38:23 44:14
  48:11
**membership** 10:6
  24:15,20 26:15
  41:10 42:24 43:9
  48:10
**memory** 27:1
**mental** 27:6,20

**mention** 43:10
**mentioned** 32:1
**methods** 34:6,6
**mind** 35:19
**minute** 20:9
**minutes** 20:9,9
**mitigate** 33:22
**mitigation** 34:18
**MITP** 44:7 48:18,19
**moment** 7:16 20:17
  23:7,11 27:2,12
  40:14 42:20
**Monaghan** 7:8
**months** 39:1
**monumental** 39:5
**morning** 7:6
**Morton** 2:4,5
**move** 18:5 22:15
  34:20
**multitude** 12:12
**multitudes** 46:9
**municipal** 9:23
**myriad** 41:12

_____

**N**
**name** 6:3 7:6
**nature** 33:22 35:14
**necessary** 9:20
  11:22 18:15,18
  19:3
**need** 9:14 12:9
  13:12 14:22 17:11
  18:5 19:13 20:15
  22:12,21 25:12
  36:11,21 37:14
  41:8,14,15,17,21
  43:4,5 45:6 46:15
**needs** 12:4 36:19
  41:16
**new** 1:23 9:15,15
  9:16 24:7,15
**none-** 4:6,6,9,9,9,13
  4:13,16,16
**Notary** 1:15 50:16
**notes** 50:6
**number** 3:10 7:20

_____

**O**
**oath** 5:14 8:5
**obey** 28:5
**Objection** 29:14
**objections** 6:18
**observations** 5:20
**observing** 33:4
**obvious** 14:15 31:5
**obviously** 10:6

13:17 21:9 22:12
  30:16 32:21 36:7
  38:2 49:7
**OC** 41:6
**occasions** 7:20
**occur** 36:3 40:1
**occurred** 12:5
**offer** 47:17
**offered** 41:13
**office** 2:8 9:22,23
  12:15,22,24 14:6
  39:10
**officer** 1:8 7:19
  15:16 17:14,23
  18:17 19:6 20:21
  20:23 21:9,11
  28:7 29:22 33:22
**officer's** 10:21
  12:20 20:18 37:3
**officer-involved**
  13:10
**officers** 7:8 10:11
  19:12 20:6 21:15
  21:20,21 23:19
  26:5 29:12 30:13
  30:20 31:11 35:5
  35:11 38:4 42:3
  44:1 46:1
**officers'** 42:9
**official** 5:24
**oftentimes** 35:15
**okay** 7:10 11:14
  21:5,13 29:3
  30:10 31:4 33:9
  39:7,17 40:17
  49:8
**once** 13:21 14:4
  35:1 37:3,7,14
  48:24 49:3
**one-day** 49:2
**ones** 25:18 45:13
**oneself** 17:7
**operational** 38:16
**operations** 44:13
**opportunities**
  15:23 34:4 48:3
**opportunity** 24:5,6
  27:16 37:1 42:18
  43:11
**option** 17:3
**options** 42:21
**order** 26:17 41:9
**organization** 10:19
  45:19
**organizations** 10:8
**orientation** 16:7

**outdoor** 47:12
**outside** 9:21 11:11
  25:14 32:20 48:3
**outwardly** 30:16
  31:17
**overview** 9:4

_____

**P**
**P** 1:14 50:14
**P.C** 2:3
**PAGAN** 1:8
**page** 3:2,10 4:5,8
  4:12,15 33:18
**parameters** 45:7
**paramount** 14:17
**parcel** 14:7 15:19
  46:23
**parse** 42:15
**part** 13:24 14:7,8
  15:9,19 18:17
  22:3 25:19 28:15
  33:22 39:3,12
  40:16 42:8,14
  44:7 45:19 46:18
  46:23,23
**participate** 39:20
**participating** 5:8
**particular** 12:8
  13:13 16:19 18:1
  20:16 23:11 25:12
  25:13,14,14 27:2
  29:1 33:8 35:1,2
  38:14 39:14 41:11
  46:17 47:6 48:11
  49:6
**particularities** 16:9
**parties** 5:18 44:3
**penalty** 5:17
**Pennsylvania** 1:2
  1:22 2:5,10 7:9
  8:10 10:24 11:2,3
  11:6
**people** 15:8 35:18
  36:23
**perception** 20:19
**perform** 16:3 22:20
**performance** 22:15
  37:19 43:22
**performed** 40:20
**period** 14:5,24
  15:10 24:10 39:1
  49:5
**periods** 15:22
  27:24
**perjury** 5:17
**person** 5:14 17:23

18:19 19:4 23:9
  27:4 33:23 42:12
**person's** 30:15
**personnel** 9:8,8
  10:7
**pertained** 15:4
**pertinent** 15:13
**Philadelphia** 1:22
  2:10
**physically** 5:10
**Pike** 1:23
**place** 14:23 45:9
**placing** 21:16,23
**plaintiff's** 6:6
**Plaintiffs** 1:5 2:6
**platform** 24:14
**play** 42:14
**player** 26:13,15,18
  36:19
**players** 36:9,17
**please** 6:2 29:18,19
**point** 33:1 34:15
**points** 38:1 48:17
**police** 7:9 8:11 9:24
  10:10,20 11:13
  19:11 20:23 28:7
**policies** 46:15 47:4
  47:10
**policy** 9:17,19 12:6
  15:3,13 16:1,8,14
  16:18 17:24 20:14
  21:4 39:10 47:6
**population** 15:14
  16:6,10
**portion** 19:19
**pose** 17:12,21
**posed** 5:2 26:18
**poses** 19:5
**position** 45:16
**possessing** 32:4
  33:13
**possession** 18:21
**possibility** 22:11
**possibly** 22:19
**potentially** 27:6,19
  33:12
**practical** 40:21,24
  41:3 47:10
**practice** 39:13
  41:17
**practices** 24:8 41:7
**precise** 20:16
**predicated** 19:2
  20:22
**present** 2:3,8 5:10
  20:16 38:3

presentations 10:6
  10:8,11,14,22
  11:1
presented 10:18
presenting 32:5
prevent 17:6 18:1
  18:15,16
preventing 16:16
previously 42:7
primarily 16:1
primary 14:16
  37:16
prior 11:19 21:16
  21:23 25:2,3,21
  32:3 40:18 42:1
  44:1 45:1,21
  47:19
private 10:19
probable 19:9
procedure 41:19
proceeding 5:9,11
  7:23
proceedings 5:2
  50:5
process 8:1 22:4
  38:20
processes 11:18
PRODUCTION 4:7
Professional 1:15
  12:23 50:15
professionals
  10:13
program 15:9 16:12
  24:14 32:16,19,20
  32:20 41:24 42:23
  44:7 46:19 47:1
  48:4,18,20
programming 42:1
programs 15:20
  41:13 43:12,18
  44:10,20 47:17
proper 43:22
properly 36:11,23
props 36:18
prosecutorial 13:23
protect 21:10
protection 18:11
  21:6
provide 9:18 10:2
  10:22 11:10 22:1
  24:7,17 25:19
  33:5 44:21 48:6
  48:10,11
provided 11:1,4
  21:14,21 23:19,21
  29:8 31:22 35:16

35:17,22,23 36:15
  36:17 37:5,7 38:4
  40:10 42:2 45:1,2
  46:1 47:19,21
provides 10:19
  24:5
providing 39:21
proximity 20:6
prudent 42:20
public 1:15 22:13
  50:16
purpose 16:16
  18:10,11 33:14
  45:23
purposes 18:13
  23:3
put 14:3,22 34:16
  34:19 38:7 39:14
  43:5 44:11
putting 21:15 25:6

———— Q ————
qualified 27:15
  41:10
question 6:19 12:4
  12:19 13:14 20:7
  21:1 24:13 29:16
  31:5 38:17 40:4,6
  45:24
questions 4:14
  8:13 9:24 12:13
  13:3,7 15:2 29:6
  49:10,14
quick 37:6
quite 24:12 28:20

———— R ————
race 16:6
rank 49:1,2
rapidly 43:19
rational 27:18 28:4
  30:4
reading 6:16
realities 10:9 11:12
realm 10:13 11:11
reasonable 15:15
  16:2 18:17 19:2
  19:10,17 20:11
  42:20 43:6
recall 26:4 32:2
  44:4
recertification 41:8
  41:15
recognize 27:7,11
  30:3
recognizing 23:5

recollection 28:9
recommendations
  22:2
record 6:4,12 23:16
  40:12
records 40:14
redirect 49:14
referred 28:22
referring 40:8
  48:22
reflect 28:10
regard 16:19 17:8
  20:22
regarding 41:1
regards 19:19 22:6
  37:13,19 39:8
  46:17
regional 38:10
Registered 1:14
  50:15
regularly 47:15
reinforce 24:2,6,18
  33:20 40:22 41:7
  47:5 48:17
reinforced 38:1
reinforcement 33:7
reinforces 47:9
relate 47:16
related 12:21
relative 10:1,12,20
  11:5 12:5,20 13:7
  14:9 16:9 17:3
  32:11 41:4 46:10
rely 25:12,16 43:21
remedies 14:22
remember 38:22
Remote 1:11
remotely 5:12
render 18:4
repairing 24:22
repeat 20:1
replicate 35:21
replicates 35:14
replication 39:24
reporter 1:15 6:1
  49:16 50:16,24
Reporters 1:21
reporting 1:21 5:11
  5:21
reprehensible 31:6
represent 7:7 13:1
Representatives
  11:2
represented 27:24
Representing 2:6
  2:11

reproduction 50:22
request 4:7 13:5,9
requests 13:6
require 10:1
required 33:23
requirements
  36:20
requires 15:14 16:2
requisite 19:9
reserved 6:19
residence 26:6,8
  46:13
resistance 34:14
respond 26:5 33:7
  37:14
response 11:23,24
  41:1 43:7 44:15
  47:4 48:13
responsibility
  12:24 38:7
responsible 25:6
result 33:19,20 34:1
  34:2
review 9:14,17
  11:18,19 13:10
  24:2,14 40:12
reviewed 9:13
  38:20
reviewing 14:1
  40:13
reviews 13:4
revisions 9:14
right 7:13,17 9:3
  48:21
risk 12:22 14:6
  39:10 44:3 47:3
role 11:8 26:13,15
  26:18 36:9,12,17
  36:19
room 16:1 26:8,22
  33:11 35:6
roughly 38:23
Rule 8:9

———— S ————
safe 18:4 22:9
safety 22:18 36:8
  36:16,22 37:12
satisfy 36:20
saw 38:21
saying 30:17 46:10
scale 39:6
scenario 26:4,5,13
  27:12 28:14 29:8
  31:21 32:10 33:10
  35:3,10,12 36:3,7

36:13 37:2,9,10
  37:20,22 38:4
  39:18,23 45:9
scenario-based
  24:17 40:5,8,10
  40:15,19 42:2
  43:18 44:19 46:24
  48:16
scenarios 24:19,23
  25:20,24 26:3
  33:8 39:21 42:8
  43:1,24 44:2,6,24
  45:5,18 46:1
scene 18:4
Science 10:18
sealing 6:17
second 23:12 27:9
section 19:1
sections 16:20
see 14:21 19:13
  33:5 38:17
seen 38:19 45:3,12
  45:13 46:22 47:24
  48:13
segment 15:14 16:5
segments 16:10
SELVERIAN 1:12
  3:3 6:21
seminars 10:12
senate 11:3,3,6
separated 16:19
separation 17:16
serious 17:1,13,22
  18:23 19:5 34:24
serve 36:12
serves 24:14 27:1
services 11:10
session 49:3
setting 8:4
several-month 49:4
sex 16:6
sexual 16:6
shooter 41:1 42:8
  42:10 43:24 44:2
  44:6,24 46:2,3
  48:7
shooting 13:11
  43:15 44:10,17
side 17:10
sign 31:13 43:12
significance 13:16
significant 12:17
  17:6 26:17 37:12
significantly 31:18
  34:3
signing 6:16

CORPORAL KEVIN SELVERIAN

**signs** 27:19 30:14
**similar** 39:24
**simply** 48:7
**simulated** 26:16,18
  36:15
**singular** 16:4
**sir** 7:18,19,21 8:2,8
  8:15 11:15 15:6
  20:1,10 21:8
  23:23 25:1,23
  26:2 29:10,23
  30:2,9 31:15,24
  32:7,11 35:7 38:6
  39:11 44:5 49:9
**sites** 38:20
**situation** 21:17
  23:10 28:9 33:15
  33:24 36:17 42:10
**situations** 17:17
  42:3
**solely** 5:24
**somebody** 17:6,14
  19:6 27:20 28:3
  30:16 31:16,17,19
**somebody's** 17:21
**somewhat** 11:23,24
  39:4
**sorry** 20:1 21:22
  31:8 35:8
**sort** 15:22 27:6,20
  28:11 37:18 40:13
  41:16 42:12 44:22
**sorts** 9:16 12:11
  14:23 15:23 16:7
  32:13 41:6
**sound** 12:7 24:18
  46:24
**source** 13:3,4 25:7
  25:16
**sources** 12:12
**South** 2:4
**speak** 26:9 44:19
**speaking** 44:23
**special** 44:13,14
**specific** 20:8 38:17
**specifically** 16:15
  21:3 34:23
**specificity** 44:20
**specifics** 17:3 23:5
**specified** 27:3
**speculation** 44:22
**spent** 42:22
**sphere** 21:24
**spoken** 10:16
**stabilize** 17:5 33:24
  34:23

**stabilizing** 23:10
**stage** 36:24
**staging** 36:24 37:4
  37:21
**stand** 37:1
**standard** 16:5 35:4
  35:7
**standardized** 39:13
**start** 14:20
**started** 9:2 32:15
**starting** 36:5
**starts** 35:12
**state** 7:9 8:10 13:21
  30:20 35:19 38:10
  38:11
**statement** 5:5
  30:21 31:12
**statements** 30:4,11
**states** 1:1 30:19
**stating** 6:3
**stenographic** 50:6
**step** 35:1
**stipulated** 6:15
**STIPULATIONS**
  4:11
**stop** 18:3 26:17
  34:24 37:15 43:2
  43:16
**stopped** 37:11
**strategy** 34:18
**street** 1:22 2:9 43:3
**structures** 32:12
**student** 45:6
**students** 36:10,14
**subcategory** 21:6
**subject** 17:12,15
  18:3 25:12 26:18
**subject's** 34:13
**successful** 32:24
**suffering** 27:5,20
  28:11 42:12 45:15
**suggestive** 9:19
**suicidal** 15:4,8
  21:19,23 26:1,21
  26:24 27:3 28:13
  45:23 46:4,12
**suicide** 16:16 21:19
  29:13 30:12 31:12
  31:13 42:5
**suit** 7:8
**Suite** 1:22
**SUMMIT** 1:21
**supervision** 50:23
**SUPPORT** 4:1
**suppose** 25:21
**sure** 9:6 22:8 23:13

  24:12 28:20 30:1
  36:4,7,8,23 37:24
  41:9
**surrounding** 10:20
  11:13 20:20
**surrounds** 19:4
**swat** 44:14
**swearing** 5:7,21
**sworn** 6:22
**symptom** 29:13
**symptoms** 27:19
  30:8,14
**systematic** 22:23

————————
**T**
**tabletop** 47:12
**tactic** 9:16 23:6
  42:19,19 43:16
**tactical** 26:10 43:15
**tactics** 12:7 15:24
  16:11 22:17 23:2
  24:2,8,18 46:14
**take** 14:8 19:13
  22:21
**taken** 1:12 35:2
  37:4 46:22 50:7
**talk** 14:20 15:12
  46:14
**talking** 17:2 25:11
  29:21 31:22 47:20
  48:5
**talks** 16:20,21
**taser** 41:6
**tasks** 22:21
**taught** 48:2,15
**teach** 27:13
**teaching** 37:24
**teachings** 24:6,7
  33:19
**team** 44:14 45:3
**Teams** 44:15
**technique** 9:16
  26:10 34:17
**techniques** 24:8
  32:6,9 33:13
  41:18
**tell** 7:14
**tend** 35:18
**term** 20:13
**testified** 6:23 7:19
  7:22
**testimony** 5:16
  11:4,15
**textbook** 22:22
**thank** 11:17 49:11
  49:15

**theoretical** 29:11
**they'd** 38:2
**thin** 29:18
**thing** 34:10,11
  42:20 48:23
**things** 9:16 14:12
  14:23 15:23 16:7
  16:9 24:15,16
  27:18,22 32:13
  41:7,11 42:13
  47:14
**think** 7:11 11:8,15
  15:11 17:17 27:3
  31:5 32:1 33:16
  46:10 49:9
**third** 2:9 44:3
**thought** 27:10
**threat** 17:12,22
  19:5,10,17,22
  20:4,5,12,24
  26:17 34:24
**threatening** 21:19
  21:20 30:12
**threats** 29:12
**time** 5:20 6:12,19
  14:5 15:10,16,22
  19:24 20:3,7,8
  23:8,11,16 27:2
  27:12,15 29:24
  34:4 40:14 42:18
  42:20,22 46:8
  47:22 49:4
**times** 16:3 19:14
**today** 8:9
**told** 26:6 37:8
**top** 44:4
**totality** 15:16
**traditionally** 25:2
**traffic** 43:2
**train** 27:9 33:3
**trained** 29:12 30:3
  30:7,24 32:9,22
  44:1 48:2
**training** 8:18 11:19
  12:20 14:9,11
  15:9,9,19 16:1,12
  20:19 21:14 22:3
  24:10,11,24 25:5
  25:7,17,19,22
  28:16 29:24 31:11
  32:11,15 36:3
  37:5 38:8,8,11,13
  38:15,16,24 39:22
  40:1,5,8,10,14,16
  40:19,24 42:2,23
  43:21 44:8,10

**45:12 46:8,19,21**
  48:3,4,8,20 49:3,6
**trainings** 9:12,13
  23:22 24:1,17
  25:8 28:18 30:13
  32:13,18 38:13
  44:16 45:20,21
  46:7,18 47:18,19
  48:10
**transcribed** 6:1
**transcript** 5:24
  49:17 50:9,21
**trial** 6:19
**trooper** 49:1
**troops** 13:20
**true** 35:15
**try** 22:16 24:1 35:21
  30:18 31:6 47:5
**trying** 20:3 24:18
  30:18 31:6 47:5
**turn** 37:3
**two** 7:8 14:18 16:19
  18:7 20:9 38:19
**type** 9:14 32:5 42:9
  45:15 49:7
**types** 42:24 48:14
**typically** 13:5,23
  14:13 28:2,17
  37:10,18 39:1,15

————————
**U**
**ultimate** 21:1,1
  22:10 23:8
**ultimately** 19:4
  26:12 27:13 34:9
  43:6
**understand** 8:4,8
  8:14 11:12 15:12
  20:3 22:22 24:13
  29:15 31:9 45:4
**understanding**
  8:16 11:16 19:11
  23:1
**Understood** 39:7
  39:17
**unfold** 14:14
**unfolding** 43:20
**Unfortunately** 7:14
**unit** 8:18,23,24 9:1
  9:5,6 13:13 15:1,3
  23:20 24:22 25:3
  25:4,14 38:16
  39:20
**UNITED** 1:1
**units** 10:17 24:21
**use** 8:17,24 9:6,12
  9:13,17 10:1,10

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**CORPORAL KEVIN SELVERIAN**

11:5,13,19 12:11
12:17 13:16 14:24
15:3,13,15 16:2
16:14,20,21 17:4
17:11 18:1,6,14
19:20 21:9 23:20
24:22 32:5 34:7
34:21 39:20 43:13
**utilize** 12:8 26:9
34:5
**utilized** 20:13
**uttered** 37:16

_____
**V**
**vacuuming** 7:15
**variety** 47:16
**various** 10:11,14
13:20 15:24 25:9
32:16 34:5 40:21
42:24 43:13 44:18
45:5,12 46:6,20
46:21 48:9
**vehicle** 43:16
**verbal** 32:12
**verbalized** 31:12
**verbalizing** 42:5
**verbally** 5:15 30:19
30:20
**version** 44:13
**versus** 27:18 28:13
30:4 42:17,19
**video** 1:11 2:3,8
**Videographers**
1:21
**viewpoint** 29:11
**visited** 38:19
**voluntarily** 43:11
**voluntary** 32:20
**vs** 1:6

_____
**W**
**waive** 5:19
**waived** 6:17
**walk** 36:2
**Walnut** 1:22
**want** 8:14 16:11
17:20 22:3,8 39:5
44:21 49:17
**wasn't** 27:2 38:21
45:19
**watching** 33:4
**way** 11:9 19:7,8
22:8,11 41:16
**ways** 12:1
**we're** 8:3 14:19
17:2,10 25:11,15

28:14 33:4,4,17
35:17 40:1 42:16
**we've** 9:13 10:17,24
35:4 40:21 44:6,9
47:24
**weapon** 18:21
26:14
**weaponry** 36:15,18
41:5
**Wednesday** 1:12
50:8
**weight** 8:5
**WEISBERG** 2:3
**welcome** 49:12
**went** 45:11
**witness** 3:2 4:4 5:7
5:10,15,22 8:10
29:17 49:11
**words** 21:17 22:5
32:2
**work** 9:21 10:5
**worry** 35:19
**wouldn't** 22:12
44:21
**www.summitrep...**
1:24

_____
**X**

_____
**Y**
**Yeah** 29:2
**year** 29:1 40:23,23
41:14,20 48:24
49:3,6
**year's** 41:23
**years** 48:11,13

_____
**Z**

_____
**0**
**08037** 1:23

_____
**1**
**11:00** 1:13
**11:50** 49:21
**15-05217** 1:9
**1500** 1:22
**1600** 2:9
**1610** 1:22
**19** 1:12 50:8
**19070** 2:5
**19102** 1:22
**19103** 2:10

_____
**2**
**2003** 47:23

**2016** 9:1 25:2,3,21
39:22 40:1,6,11
40:18
**2016's** 40:16
**2017** 15:2 16:15
25:22 28:15,17
29:9 31:23 35:3
38:5 39:8,19 40:2
42:1 44:1 45:1,22
47:19
**2021** 1:13 50:8
**20th** 15:1 16:15
25:22 28:22 39:8
**215** 1:23 2:10

_____
**3**
**30B** 8:9

_____
**4**
**4,600** 38:23
**424** 1:23
**447-8648** 1:23

_____
**5**
**560-2141** 2:10
**567-3315** 1:23

_____
**6**
**609** 1:23
**610** 2:5
**690-0880** 2:5

_____
**7**
**7** 2:4 3:4

_____
**8**
**800** 1:23

_____
**9**
**985-2400** 1:23

Page 57

EXHIBIT 6

# Jean Monaghan Interview



EXHIBIT

1

9/17/19

DEF0000264

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Smith: | Ma'am, just have a seat. |
| Everk: | You okay? |
| Monaghan: | Hmm, hmm. |
| Smith: | Ma'am, just so you know, this room is audio and visually recorded, okay. |
| Monaghan: | Okay. |
| Everk: | Do you have any questions before we start? |
| Monaghan: | No. |
| Everk: | Okay. We want to go back. Uh, talking to Trooper Smith about what happened, uh, I guess, when did he start to go downhill? Uh, was it his ex-girlfriend, maybe they broke up? Was that |
| Monaghan: | That's when it started. When it escalated, throughout a couple weeks that she was gone. |
| Everk: | Alright, ok. |
| Monaghan: | And then the last week it was, it was overwhelming. He was just screaming and yelling. |
| Everk: | He was never like that before? |
| Monaghan: | No. I mean he had, I mean, I'll back up there. He's had issues for a long time with drug use. But this was the worst that I've ever seen him. |
| Everk: | What was his drugs, that he, what was his drug of choice? |
| Monaghan: | I think it was heroin. |
| Everk: | Ok. Was he on anything else? |
| Monaghan: | Well, he wa, as I mentioned, he did go to the clinic on a daily basis. A methadone clinic. |
| Everk: | Ok. |
| Monaghan: | New Directions. |
| Everk: | Ok. Was he into pills or anything like that, with alcohol, or |
| Monaghan: | There, he never drank alcohol, it was, it was pills. And, and I could tell right away if he took pills 'cause then he got, he got real angry and, and you know very agitated. |

1

DEF0000265

Video Transcription
5/20/2017
Jean Monaghan

Everk:        Ok.  And the drug use picked up over the last two months?

Monaghan:     I, I would say it escalated, yeah.

Everk:        Okay, and then

Monaghan:     'Cause he lost an awful lot of weight too, he was just all over the place.

Everk:        Was he working at all?

Monaghan:     Well, yeah he was, he worked on the farm.  He's the one who kept the farm you know
              weed wacked and, um helped me there.

Everk:        Is that ac, I mean across the street from you, where the horses are, is that yours too?

Monaghan:     Yeah.

Everk:        Ok, I didn't know.  I wasn't sure if that was yours.

Monaghan:     Hmm, hmm.  We kept it together.  We kept it well groomed.

Everk:        Hmm, hmm.  Now, as you said, it escalated within the last week:

Monaghan:     Hmm, hmm.

Everk:        What happened, do you think, changed his demeaner?

Monaghan:     He was looking, he just had it in his head that I made an awful lot of money there, you
              know, on the farm collecting rents.  But what he didn't realize was the expenses.  That
              money came in but then the expenses went out and he just had it in head that I made a
              lot of money and it just wasn't that way.  So, I paid him what I thought I could and um
              he just didn't think it was enough.

Everk:        Did he, did he have any money, besides that saved or is he using it, was it

Monaghan:     No, oh no.

Everk:        He needed more money

Monaghan:     The more money, the more money he got the worse he got.

Everk:        To buy more drugs?

Monaghan:     Yeah, so now, yeah, so now, you know he, he was expecting a settlement 'cause he,
              cause somebody hit him with a car, uh damaged his car and he was put in the hospital
              so he's waiting, he was waiting for a settlement you know and it was, and it's slow
              coming.  I don't know, I don't what happens now.

2

DEF0000266

Everk:     Hmm, hmm.

Smith:     Do you know where that collision happened?

Monaghan:  On, on, uh, I think it's Broadhead Road there. Um, coming out of the clinic, coming, coming, if you turned right and, and was headed down toward 191.

Everk:     Okay.

Monaghan:  It happened somewhere in there.

Everk:     And how long ago was that?

Monaghan:  Probably a year.

Everk:     Okay, and what was injured during that?

Monaghan:  Wow, he had, he had surgery on his leg. Um, he was all bruised up, and um.

Smith:     So, he was on the medications for pain too, right then,

Monaghan:  Yeah,

Smith:     from the hospital, the doctors?

Monaghan:  hmm, hmm

Everk:     And what medication was that?

Monaghan:  I don't, don't know.

Everk:     Did he bang his head too, during that?

Monaghan:  He did. Um, you know he had, he had lacerations on his head. He had um, he, uh, they had to um reinforce his knee so they had to have, uh, he had to have surgery on that.

Everk:     And that, the, the car that he had at the house, that's his car?

Monaghan:  That's his car. The car that had the accident, he had a Crossfire.

Everk:     Okay. Now in the last week, uh, I guess when you said it started escalating, what started, like what was said, and how did it keep escalating through the week?

Monaghan:  Well, he was, he was, the whole gist of the thing was he was looking for more money from me. And, and um, you know he could, he could only work a couple hours, but what he did, I mean he did very well and he did acquire, he did get a lot done.

3

Video Transcription
5/20/2017
Jean Monaghan

Smith:      What did he do, what did he do for you on the farm?

Monaghan:   Kept the, the lawns manicured and

Smith:      Okay.

Monaghan:   Um, it was, it was all landscaping work

Smith:      Gotcha.

Everk:      How much did you actually pay, how much did he get paid.

Monaghan:   Well, I, you know he only worked a couple hours on a daily basis which was about three, um, and then I gave him $150 a week. It wasn't, and, and of course then, you know, I, I felt that, he was living in my house free.

Smith:      Right. Okay.

Everk:      Makes sense. He's, how old is he?

Monaghan:   47

Everk:      47

Smith:      You had mentioned to me, uh, that you didn't care too much for his uh, his recent ex-girlfriend, what was her name again?

Monaghan:   Lisa Deremer.

Smith:      Deremer, and you didn't' have an address or phone number for her?

Monaghan:   No.

Smith:      Um, was he mad at you about that, in anyway?

Monaghan:   Hmm, hmm (shakes head)

Smith:      Do you remember why they broke up?

Monaghan:   Well, what happened there was, you know, he was, he was out working. She stayed, she stayed in the room all day. God knows what she was doing between the bedroom.

Smith:      Did she use drugs too?

Monaghan:   Well, she was at the methadone clinic also

Smith:      Okay.

4

DEF0000268

Video Transcription
5/20/2017
Jean Monaghan

Monaghan:     and she was an alcoholic.

Smith:          Okay, okay.

Monaghan:     So, what happened was while he was out working, she's upstairs thinking that he's sleeping with the woman downstairs, one of my tenants. So, what happened there was um, they, they got into an argument over it I guess and then she left and then she got on Facebook, um with the tenant downstairs accusing her of sleeping with Tony. And I said don't you dare bring her back here.

Smith:          What's that tenant's name?

Monaghan:     Um, Debra Zoe. I don't, I don't want, I don't want my tenants involved.

Smith:          No

Everk:          No

Monaghan:     I don't want my tenants involved.

Smith:          No, it's not like that.

Everk:          No, no.

Monaghan:     Ok.

Everk:          We're getting the entire background of the whole, the whole situation. So, besides um this week, he wanted more money from you.

Monaghan:     mmm, hmm.

Everk:          What else did uh, he want from you?

Monaghan:     That was the gist of it. I mean he just, he had it in his mind that I was treating him like the "n" word. I mean he was in my face with that saying you treat me like a nigger and you know you pay, don't pay me what I'm worth and, it, it was a go around and that was stuck in his brain for a week and a half. And that's all I heard every day.

Everk:          And, then that's why you got the PFA, you were scared or?

Monaghan:     Well, what happened was he, he came down and he threatened me. He said you're gonna go and stay in a hotel the way I had to stay in a hotel. I'm going down to the courthouse to pull a PFA on you and then we'll see. They'll be here. So, I thought, oh my God, then I called Jack, I said that's what he's going to do, so.

Smith:          Now this was all over money?

5

DEF0000269

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Monaghan: | This was all over money. |
| Smith: | Ok. |
| Monaghan: | And then he said, he said "you don't want to pay me what I'm worth, I'm going to go down there, file that, and then, and then, while you're out of here I'm going to rob you blind." And I got scared. |
| Smith: | Where did you go for the PFA, Easton.? |
| Monaghan: | Down to, down to the courthouse in Easton. So, I went right down there and I, I filed. |
| Smith: | Did he ever get to file too? |
| Monaghan: | Pardon me? |
| Smith: | Do you know if he filed a PFA ? |
| Monaghan: | It was, his name was on the, the roster there where you have to sign in, but he never filed. |
| Smith: | Gotcha, ok. |
| Monaghan: | Because then he called me back and then he said "well I was in there to file but I didn't." |
| Smith: | What day was that, that he went down to the PFA office in Easton? |
| Monaghan: | What's today Saturday, Thursday. |
| Smith: | Thursday. |
| Everk: | What time did you go on Thursday, for the PFA. |
| Monaghan: | Might have been around noon time. |
| Smith: | Now, was that for threats that happened on Thursday morning or for threats that happened on Wednesday, that he was going to rob you, and, and you know and all this stuff? |
| Monaghan: | Well, that was when he went down to file, that's what he told me. |
| Smith: | So, Thursday morning this happened, started. |
| Monaghan: | Yeah. |
| Smith: | Ok. |

6

DEF0000270

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | And he told you this by phone or by text? |
| Monaghan: | No, he was right in my face. |
| Everk: | Oh, in person. |
| Monaghan: | Oh, yeah. |
| Smith: | So, his intention was, to essentially, if I'm understanding correctly, Thursday morning, he's yelling at you, he's going to get this PFA against you, get you kicked out of your house so you stay in a hotel and then while you're there he's going to take your money and rob you out. |
| Monaghan: | *Nodding.* |
| Smith: | Ok, makes sense. |
| Everk: | And then Friday, that's when, or Thursday afternoon, is when the PFA was served. When Northampton County Sheriff's office came? |
| Monaghan: | Yes, it, it, it was served, well then maybe it might have been Friday because they came |
| Smith: | The same day? |
| Monaghan: | I'm just losing track of time here.  I'm pretty sure it was yesterday. |
| Smith: | Ok. |
| Everk: | Do you know what time, about? |
| Monaghan: | They came about 5, 5:30. |
| Smith: | So, this all happened on Friday then? |
| Monaghan: | I'm, I'm, yeah, yeah, I think it happened Friday. |
| Smith: | Ok. |
| Everk: | Now, was he able, when the Sheriffs came, did he say anything to you at that point, not the sheriffs, but uh, Anthony? |
| Monaghan: | Well, no, they scooted me away.  They, they wanted to talk with him separately, so they took him out front and talked with him.  And then they, they, the two sheriff went up to his room with him and, and I walked over by the staircase and they of course found his marijuana.  And he told them, "she just put that here because she's an alcoholic", meaning me.  And they had, you know he came down with it in his hand. |

7

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | And what, who, the sheriff's officer came down with it? |
| Monaghan: | (nodding) |
| Everk: | And what did the sheriff's officer do with it? |
| Monaghan: | I don't know, he took it. |
| Everk: | Do you know what sheriffs were out, I mean we're gonna find all this out. |
| Monaghan: | I, I'm sorry (shaking head no) |
| Everk: | That, that's find. We can get all that, I'm just, um |
| Monaghan: | One was a female though. |
| Everk: | Ok. And that's all he said to you is that, uh, that you, you're an alcoholic and you put the marijuana there, didn't yell at you like why're doing this? |
| Monaghan: | Well, no he told, no he wasn't, he, he didn't direct that at me. I heard it from him because he was up in his room with the two sheriffs. And then he said, "she just put that in here cause she's an alcoholic". |
| Everk: | Alright, but he didn't, even when he came downstairs he didn't confront you or anything like that? |
| Monaghan: | No, he went out the front door. |
| Everk: | Ok. And you had no contact with him, um when he left with, the house with the sheriffs? |
| Monaghan: | He left, he left, he, the sheriffs got him out of there. But then, then five o'clock this morning he came back for some clothing because he was cold. |
| Smith: | About what time did the sheriffs serve him and remove him from your house? |
| Monaghan: | It might have been about five, five-thirty. |
| Smith: | Okay. |
| Everk: | So, he came back at five a.m. this morning. And he told you that, to get clothes cause he was cold? |
| Monaghan: | Hmm, hmm and he wanted the, the, um, for his car, um |
| Everk: | Title? |
| Monaghan: | Yeah the title for his car. |

8

DEF0000272

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | Did he say why he wanted the title? |
| Monaghan: | He wanted to sell the car, for money. |
| Everk: | And then, what time did he leave after five a.m., was he there for a while? |
| Monaghan: | No, he was there maybe three or four minutes. |
| Everk: | Ok. |
| Monaghan: | But he was very erratic. |
| Everk: | What was he wearing when he came over? Do you remember anything like that? |
| Monaghan: | When he came in the house he had a red t-shirt on and jeans. |
| Everk: | No jacket? |
| Monaghan: | No. |
| Everk: | Ok. And that was the whole conversation? Wanted the title for the car? |
| Monaghan: | that's |
| Everk: | He, he didn't get it, right? |
| Monaghan: | Yeah, he did. |
| Everk: | Oh, you gave him the title? |
| Monaghan: | No, I didn't have it, he had it up in his room. |
| Everk: | Oh, didn't have it. Ok, he left and there was no other conversation? |
| Monaghan: | But then he tried to call several times. Then he, then he texted his, his father, but the father had already gone out for the morning and um his step-mother got the, the text saying he was going to take a bunch of pills and shoot his veins filled with um, antifreeze. |
| Everk: | Alright, so |
| Monaghan: | so that's when she and I got together on the phone and you know tried to work something out together, you know some kind of help. |
| Everk: | So, he tried to call you several times, in the morning. |
| Monaghan: | Hmm, hmm. |

9

DEF0000273

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | What, you, you know what time? |
| Monaghan: | Uhhhh, well, it was, um, right after he left at five o'clock. |
| Everk: | So it was right after or |
| Monaghan: | Yeah, there were two phone calls after that. |
| Everk: | and do you have those phone calls on your phone, like what time? |
| Monaghan: | hmm, hmm |
| Everk: | All the missed calls. |
| Monaghan: | there's one, two, three |
| Everk: | Let me see. |
| Monaghan: | He's the, the 484, 90, 903 |
| Everk: | These are all...Now these ones yesterday at night, what were they?  Uhhhhh |
| Monaghan: | I left it ring. |
| Everk: | What's the red |
| Monaghan: | Maybe I shouldn't |
| Everk: | What's the red, the green |
| Monaghan: | One is coming in, one is going out.  I think.  Hey, I had a flip phone up until last Christmas. |
| Everk: | Ok, so we'll just say the nineteenth.  So, if it says missed, it's obviously missed call. |
| Monaghan: | Hmm, hmm. |
| Everk: | If it's the red, I'm assuming this is an incoming where you would have picked up. |
| Monaghan: | Probably, or he left a voice message |
| Everk: | It shows |
| Monaghan: | I think there're several voice messages |
| Everk: | Ok, so that might be the voice message |
| Monaghan: | Yeah, could be, I didn't collect them. |

10

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | He called a bunch of times, yesterday I mean, at least. |
| Monaghan: | And I'm sure they were just ranting and raving phone calls looking for the money and sometimes I just can't handle that. |
| Everk: | And you didn't' check any of the voicemails? |
| Monaghan: | No. |
| Everk: | Alright. Now this one |
| Monaghan: | It's hard for a parent to watch their child do stuff like that. And it's hard for a parent to hear that. |
| Everk: | Hmm, hmm |
| Monaghan: | It's bad enough that he was in my face, and that was just. |
| Everk: | Do you think this morning, and I'm just trying to figure out your phone. Like at nine oh five a.m. two minutes and twenty-three seconds I would think that you actually talked to him. |
| Monaghan: | Well wait a minute, well wait a minute. That might have been when the police were there trying to, to, to get him to come home. |
| Everk: | Oh, okay, I gotcha. Yeah, this one looks like it's outgoing, I think. Do you think that would be outgoing? |
| Smith: | Yeah. If you want Mike, I'll just have one of the COs take a picture of those. |
| Everk: | oh, we could do that. That would, there's no one here though right. |
| Smith: | I think Haines is here. |
| Everk: | Ok, well |
| Smith: | We'll see whose here and |
| Everk: | Yeah. Would you mind if we took a picture of the screens, and uh, missed, 10:09, 39 seconds, incoming, 10:11, 35 seconds, outgoing. Alright, um yeah, does he text you at all? |
| Monaghan: | I don't text. |
| Everk: | Ok, you just got out of the flip phone stage. |
| Monaghan: | That's right. If you want to talk to me, talk to me. |

11

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | That's fine. |
| Monaghan: | I can't get that texting shit. |
| Everk: | Now, how would, your, uh, your voicemails, would they be |
| Monaghan: | they're all on there. |
| Everk: | Uh, how does it work? Is it, is it under his name only, is it in the voicemail, or do you have a voicemail box? |
| Monaghan: | There's a voicemail box on there. |
| Everk: | Ok. |
| Monaghan: | I mean, you can, you can retrieve the voicemails that are on there. |
| Everk: | Ok, that's what I, I was looking to see how many actual voicemails, which, just to make sure the voicemails I think they are. |
| Monaghan: | Here. |
| Everk: | Ten. Ok. There it is. Ok. Yeah, there's a bunch. Alright, um, I mean we would like to also tape, the voi, his, what he's saying. You don't even know what he said yet. And I don't know if, you know. |
| Monaghan: | I don't want to hear it though either. |
| Everk: | Ok. Wha, whi, which |
| Monaghan: | I'm sure he was just ranting and raving. You can't get a word in edgewise. And threatening to |
| Everk: | Today, we, we talked, when we were talking to you at the house, uh, the point where you called, you called cris, you called suicide hotline at one point. |
| Monaghan: | His step-mother called suicide hotline to give us more information because we, I originally called here. And, and um, the officer apparently said that he really couldn't do anything because he didn't know where he was. And then I called his step-mother back and then um she said "well I'm gonna call the hotline." And then she did and then she relayed the message, the information to me and then I got back to the, the police officer here. |
| Everk: | Ok |
| Monaghan: | And um, that's when things started rolling. |
| Everk: | And what's his step-mother's name? |

12

DEF0000276

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Monaghan: | Pat |
| Everk: | Pat, what's the last name? |
| Monaghan: | Ardo. |
| Everk: | Ardo, ok. And they live in |
| Monaghan: | they live in Schnecksville. |
| Everk: | Schnecksville, ok. I'm trying to, and your ex-husband's name |
| Monaghan: | Is Angelo Ardo. That's the first |
| Everk: | That's who |
| Monaghan: | No, that's the first one. |
| Everk: | Ok. |
| Monaghan: | This one's the second. |
| Smith: | Is he, is he a second, your son, or a junior. |
| Monaghan: | No, no |
| Smith: | Ok. |
| Monaghan: | No. But he is, he is, um, um, my first husband's his biological father. |
| Smith: | Oh, I'm sorry, I misunderstood. |
| Everk: | You called the step-mom in Schnecksville, which is your first husband |
| Monaghan: | First husband's wife. |
| Everk: | Ok. Bear with me, I'm trying to think. |
| Monaghan: | Sometimes I have to stop and think. |
| Everk: | And that's his biological father? |
| Monaghan: | Hmm, hmm. |
| Everk: | Ok. So, he, he actually called the step-mom Pat and |
| Monaghan: | I think first he texted her, |

13

DEF0000277

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | text, ok. |
| Monaghan: | and then, and then she picked up the text, which was that he was going to take a punch of pills and shoot antifreeze into his veins and then, then anybody wouldn't have to worry about him. |
| Everk: | Ok, has he, has he tried to commit suicide before? |
| Monaghan: | It's my understanding, and I can't confirm it, but I, I, he, he tried to hang himself when he was living up in Wilkes-Barre. |
| Everk: | And how long ago was that? |
| Monaghan: | Maybe about ten years ago. |
| Everk: | Ok, nothing at your house though, no, no signs. He never said anything about it? |
| Monaghan: | Does he, does he says things yeah, you know. |
| Smith: | Do you know if the police were called to that, hanging? They were not? |
| Monaghan: | No, uh, no, uh, I don't know, |
| Smith: | You don't know. Ok. |
| Monaghan: | that I don't know. Because one of the neighbors saw him and they cut him down. That was the story I got. |
| Smith: | Ok. |
| Everk: | So, the police probably were called, I would think. |
| Monaghan: | Probably. |
| Everk: | Most likely. Now, back then he wasn't living with you, did he have a drug problem back then? |
| Monaghan: | Yeah. |
| Everk: | Ok, is that why he was not living with you or? |
| Monaghan: | No, he just had a girlfriend up there and he went up there and lived with her. |
| Everk: | Do you know where he lived in Wilkes-Barre? |
| Monaghan: | Um, it was in the, one of the resort areas up there. Ha, Har Harvey's Lake. |

14

DEF0000278

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | Ok. And then after uh, during today with Pat, he, he said that about shooting antifreeze in his veins. |
| Monaghan: | Hmm, hmm. |
| Everk: | He called you at some point? |
| Monaghan: | Hmm, hmm. |
| Everk: | And what did he say to you? |
| Monaghan: | Well, uh, like I said, he wanted, he wanted more money and uh, and I, I uh just refused to give it to him. And then the police were there and they said I might want to get him here. So, I did that. I said I called him back and then I said, if you need some, I changed my mind, I'm gonna give you a little money. You know, then he, then he started again. What are you gonna give me, ten dollars, twenty dollars? Um, and then, and then that's when he said, he said, "don't fuck with me mom". He said, "I'm gonna put something around my neck. If there are cops there, I'm gonna blow myself up". |
| Smith: | Did he say "something", or did he say what it was? Like, did he say "I'm gonna put something around my neck" or did he say "I'm |
| Monaghan: | I knew he had fireworks, cause, the heavy-duty M-8, are they M-80's |
| Everk: | M-80's, quarter sticks, half sticks. |
| Monaghan: | Right. |
| Everk: | How about anything, uh, did he say, uh, whatever device he was going to have, was there anything in it, nails or did he mention anything about that? |
| Monaghan: | I don't know that. He didn't say that. |
| Everk: | Ok. |
| Monaghan: | He said if I see a cop I'm gonna blow myself up. |
| Everk: | And you know he had these types of fireworks, you know? |
| Monaghan: | Yeah. |
| Everk: | Um, and at the house, uh, I mean we went through the suicide hotline, obviously the two troopers came to the house. When he called and you guys talked that he's going to blow himself up, the two troopers were inside your house at that time? |
| Monaghan: | *(nodding)* |

15

DEF0000279

Video Transcription
5/20/2017
Jean Monaghan

**Everk:** Ok, and then

**Monaghan:** But they had the car hidden.

**Everk:** In the back?

**Monaghan:** Yeah, and then what happened was he pulled up to the house and then he called me back on the phone and he said I'm not stupid. Come out here, I'm not coming in there you probably have cops in there. And I said no I don't. And he said don't fuck with me mom, I'm gonna, you know I see a police officer and I'm just gonna ignite this thing. And, and the, the, one of the cops went out the front door cause he had pulled up on the street out there and ran to get the other car and, and they kind of cornered him there. And he said ok, mom, and he ignited that thing and all I heard were, were the things exploding. They were trying to get him out of the car.

**Everk:** Alright and, and, I didn't want to talk to you too much about it. You, uh, you, you're, you're gonna read stuff in the paper, you're going hear stuff on the news, ok. He did have something around his neck.

**Monaghan:** Yeah.

**Everk:** Alright, he was going to be doing that. I'm not all on the details yet. They're going to do an autopsy. But he was also, our guys, the, the two guys that were there, one of them or if not both, at this point we do not know, shot him also.

**Monaghan:** Oh, my good, goodness

**Everk:** He was, he was lighting what was around his neck.

**Monaghan:** Oh my God.

**Everk:** And I think, we don't' know until we get everything, there were some other words said, neighbors also heard, there was time, you know, telling him to get down. Did you hear anything, what was being said from the officers outside?

**Monaghan:** All I heard the officers screaming show me your hands, show me your hands. And apparently then he ignited whatever was around his neck.

**Smith:** Did you see him do that?

**Monaghan:** I couldn't see in the car, but I was by the window. I had to, then I just turned around and ran back cause I knew what he was doing.

**Smith:** Where were, where were the troopers when you saw them giving him commands

**Monaghan:** They were right out, the, the, he, Tony pulled up right on the roadside of my house and the, uh shades were up.

16

DEF0000280

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Smith: | Ok. |
| Monaghan: | And then one of the troopers came around from the back of the house, around the pool area there, and , and stopped him and there was, there, the other one was in back of him. And then all I heard him say was ok, ok, mom and he ignited that thing. |
| Everk: | You were on the phone with him at this point. |
| Monahan: | Yes. |
| Smith: | You, you heard it light? |
| Monaghan: | No, he said ok mom and he hung up and then a split second later I heard it, I heard the explosion in the car. |
| Smith: | Ok. |
| Everk: | Was there |
| Monaghan: | And the police, the police couldn't be any nicer. They, they, they did have their pistols drawn. I don't, I can't confirm the fact that they shot it. I don't know that because I heard that going off in the car and I just, I couldn't look at him like that. |
| Everk: | Nor should you. He's putting you in a situation that he shouldn't as a son. But I, I want, I wanted to tell you, at the house from the preliminary reports, one or if not both, but at least one, he was shot. |
| Monaghan: | I didn't know that. |
| Everk: | Ok, and, and, you'll, you'll hear about it. Um, it'll, it'll come out. You'll, you'll read something on the news. Um, there's very limited information out there at this point to people. Um, so, what people think, or think what happened, no one's gonna know. |
| Smith: | Any real information you're going to get from us. |
| Everk: | So, they'll do, they're gonna do an autopsy and so forth, uh, I think on Monday. |
| Smith: | They usually do it, yeah. |
| Everk: | On Monday, um, and through our investigation, we're, we're, we're taking the car that was out there. Um, we're gonna actually bring that back to the Bethlehem barracks. And that's where I'm out of, this is the Belfast barracks. Um, and what we'll do is we'll get a search warrant cause it's his car, it's in his name. And we'll, to search the car um for any evidence and so forth. Uh, the big thing, especially in your house, is there any other black powder, any other devices, drugs. Obviously, there was drugs at one point, is there needles, |
| Monaghan: | Yeah, I don't know. |

17

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | and I have no idea at this time yet, cause we're here. The things I want to do, we're trying to get his back ground leading up to this incident to cause this. Um, and try and like, uh I don't know what the messages, uh say but I would think. |
| Monaghan: | Uh, uh dollars to donuts it's just screaming and ranting and raving and I just you know at times I just can't deal with that. |
| Smith: | Did, did he keep these firework or explosive type devices in his vehicle or did you see him grab them? |
| Monaghan: | Some were in the room.  See he and, his cousin works off of fireworks and um. |
| Smith: | Where does sell out of, like flea market or does he have a business? |
| Monaghan: | They, they have a business. |
| Smith: | Where's that at? |
| Monaghan: | Uh, he's on the road, I don't know. |
| Smith: | Ok. |
| Monaghan: | I don't know. |
| Smith: | What's his cousin's name? |
| Monaghan: | Brian Ehret. |
| Smith: | Do you have his phone number by any chance? |
| Monaghan: | I don't, I don't know.  He's just, he keeps to himself.  I don't even know where he lives. |
| Smith: | Ok. |
| Everk: | Brian, you said Arat? |
| Monaghan: | Ehret, E-H-R-E-T. |
| Everk: | E-H-R-E-, ok.  And he sells fireworks. |
| Monaghan: | Hmm, hmm |
| Smith: | And that's his cousin? |
| Monaghan: | Hmm, hmm |
| Smith: | Ok. So, you say he does, he does keep them in the car though? |

18

DEF0000282

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Monaghan: | Well, if he were selling them, yeah, I mean he'd have them in the car. |
| Smith: | No, no, I mean your, your son, he keeps them in the vehicle? |
| Monaghan: | Yeah, well, no, no there are some in his room right now. |
| Smith: | Ok. |
| Everk: | Does he make his own? |
| Monaghan: | Make his own?  No. |
| Everk: | Play around, maybe, do something with black powder |
| Monaghan: | No, I think they, no, no, these are already packaged up and what not. |
| Everk: | Do you have, do you have any questions?  This, we're sort of been asking you, what, we'll give you a chance |
| Monaghan: | I don't, I don't have questions, I just don't understand how somebody can do this.  I mean I tried to get him help.  That was the whole purpose of having the police there today.  And, now, do I question, I mean, was |
| Smith: | No, ma'am.  That's, no |
| Monaghan: | I mean was that the right thing to do at that point? |
| Smith: | don't do that to yourself. |
| Everk: | That's, yeah, you're |
| Monaghan: | I think he might've been headed in that direction no matter what. |
| Everk: | And to get him outside, they, obviously, they're not going to let him come in the house if he's telling you right on the phone that he's gonna blow himself |
| Monaghan: | Yeah, yeah |
| Everk: | blow himself up.  They're not, as the two guys were there, they're not gonna allow him to come in and let that happen in front of you. |
| Monaghan: | No, that's why they, that's why they did buzz, and they went out and they you know cut him in, blocked him in. |
| Everk: | and you don't know what he has. |
| Monaghan: | I don't. |

19

DEF0000283

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | There's other, you know, other people in the area.  If he goes, drives somewhere, does this and hurts somebody else, you have no idea.  So, to put it back on yourself, as a mother I can see what you're doing, but you shouldn't be.  You didn't put yourself in that situation.  He's a, he was a grown man. |
| Monaghan: | Mmm, hmm.  But he had the, I think, he's been doing drugs for so long I just think he had the mind of a fifteen or sixteen-year old.  I mean he just, this is the worst I've ever seen.  He just doesn't think right. |
| Smith: | After you heard those explosions did you go outside? |
| Monaghan: | I did not, no.  Cause then they, what, what I did see was that, that they did pull him out of the car. |
| Everk: | And then what did you see after that? |
| Monaghan: | Nothing, I just |
| Everk: | your turned away? |
| Monaghan: | I, I, I don't want to remember my son like that. |
| Everk: | You going to be ok with your, uh, I don't know is name.  Is it your ex-husband outside? |
| Monaghan: | Yeah, that's the second one.  Yeah, he raised, he, he, you know, we, we been, we were together a long time and the kids were really young. |
| Smith: | Ultimately, your goal today, to get your son back to the house before this tragedy happened, |
| Monaghan: | Yeah |
| Smith: | was to get him |
| Monaghan: | Right to get him |
| Smith: | some sort of drug help? |
| Monaghan: | Yeah because he wasn't going to do it on his own. |
| Smith: | Ok. |
| Monaghan: | and then, then threatening the suicide like that.  You know, uhhh, we just got together and, and thought that that would probably be the best thing to do? |
| Everk: | And who was that, you and the two police officers |
| Monaghan: | No, the, |

DEF0000284

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | and the suicide hotline? |
| Monaghan: | the, the, the step-mother, and my first husband, and also the police. |
| Everk: | to get him back to the house? |
| Monaghan: | Yeah. |
| Everk: | Ok. You did nothing wrong. |
| Monaghan: | No, I don't, I don't believe I did, |
| Everk: | No, you did not. |
| Monaghan: | I was trying to help him. |
| Everk: | And, and he would have gotten the help, if he, but obviously |
| Monaghan: | There, there has to be something twisted for you to do something like that. |
| Everk: | And he, he's already did it ahead of time and he's tellin, you know, |
| Monaghan: | He had to |
| Everk: | he's changed. You know he was coming to the house to get money. |
| Monaghan: | He was com, he was coming to the house with that apparatus around his neck. |
| Everk: | Right. |
| Monaghan: | I mean, because once he saw the police officers, you know, he lit that thing. |
| Everk: | So, there, there, was, either way and it could have been you he could have hurt. |
| Monaghan: | Yeah, well see cause he was so far out of the, the sense of reasoning, um, you know, that's, I just got afraid. |
| Everk: | Do you have anything else? |
| Smith: | is there any services or anyone we could call for you or anything you need from us any way we can help you at all, at this time. |
| Monaghan: | No, nope, Jack will be with me. My daughter's coming later. |
| Everk: | And your, how old's your daughter? |
| Monaghan: | How old? |

21

DEF0000285

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | Yeah. |
| Monaghan: | 44 |
| Smith: | Who was living in the house? |
| Monaghan: | Me, and Tony. |
| Smith: | Just, just you and Tony. |
| Everk: | And your daughter, did she have contact with Tony, did she have |
| Monaghan: | Very few only because you know she has a little girl and um, you know, as, as long as he was straight, you know she didn't mind being around him but, you know she didn't want the baby to see him all bugged up. |
| Everk: | Protecting her baby. |
| Smith: | What's your daughter's name? |
| Monaghan: | Gina Marie Ardo. It's, her's is G-I-N-A. |
| Smith: | Did Anthony ever have any children? |
| Monaghan: | No. |
| Everk: | And you have Gina's phone number? |
| Monaghan: | Yes. |
| Everk: | Ok, is that |
| Monaghan: | It's 484-894-4204 |
| Everk: | Is she from the area? |
| Monaghan: | Um, yeah, she lives up on uh Sullivan Trail. |
| Everk: | Ok, and is, where's your ex-husband live at?  Is he from the area too?  The, the one that's outside. |
| Monaghan: | The second one.  He lives in Allentown on Livingston Street. |
| Everk: | Ok, and, and right now I don't know where, we're, we're at up at the house, um but obviously, I'd rather have you not go back right away or I don't know if you can go to your daughter's for a little bit and we can call you. |
| Monaghan: | I'd like to go back home if I can. |

22

DEF0000286

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Everk: | Ok, I, I just want to call up there before anything |
| Monaghan: | Ok, ok. |
| Smith: | You could wait in the lobby or go grab a coffee or whatever and come back, you know, cause they're gonna be a little while, definitely.  I don't know, like he said, we don't know where there at right now. |
| Everk: | Cause when we do this, obviously, the house, they were doing up in his room right away.  Now, I don't know what, until we, we're done, make a phone call.  Outside, they're gonna do certain things then that, that's gonna take a little bit longer.  Um, but, obviously, you can go in the house at that time. |
| Monaghan: | Hmm, hmm. |
| Everk: | I just want to make sure and I didn't know if you wanted to go in the house right away.  I didn't know your thought there. |
| Monaghan: | If I can, I'd like to go back. |
| Everk: | Ok, that's fine.  We want you happy.  Um, is this, this is your only phone, right your means. |
| Monaghan: | *(nodding)* |
| Everk: | Ok.  I'm trying to uh, uh we'll try to get pictures of your phone.  I'm trying to figure out maybe how we can do the voicemails.  I, I would like to get the voicemails off of there, I just have no idea how to do it. |
| Smith: | We'll work on it. |
| Everk: | We, can't, we wouldn't be able to do it right now.  Or, or, some kind of audio thing from it. |
| Monaghan: | Hmm, hmm |
| Everk: | But for now, just hold on to that, um, we're not going to be taking it today.  When we get to that point maybe take pictures.  But we want to talk to your ex-husband.  Are you going to be ok out there? |
| Monaghan: | Hmm, hmm. |
| Everk: | Ok, do you need anything to drink, |
| Monaghan: | Nope, I'm fine, thanks. |
| Everk: | Anything?  Coffee? |

23

DEF0000287

Video Transcription
5/20/2017
Jean Monaghan

| | |
|---|---|
| Monaghan: | Nope, thank you. |
| Everk: | But let me uh, this number on the back, this is my direct line at work.  Ok, and I'm, I'm at the obviously I told you at the Bethlehem barracks. |
| Monaghan: | Ok. |
| Everk: | And I'll be the one that will be doing the actual investigation and same with everybody else will be helping me but for the report wise, it will be mine. |
| Monaghan: | Ok. |
| Everk: | So, if you have questions, if you want something, need something, uh give me a call, uh if I'm not there, I'll get your voicemail and I'll give you a call. |
| Monaghan: | Ok. |
| Everk: | Thank you very much. |
| Smith: | Thank you for your time.  Can you, just at a minimum, wait in the lobby for a second so I can make sure it recorded? |
| Monaghan: | Ok. |

DEF0000288

EXHIBIT 7

SP 7-0019 (9-99)

PENNSYLVANIA STATE POLICE
## RIGHTS WARNING AND WAIVER

INCIDENT NO.: PA2017-516047

NAME: *1310*      DATE: 06/16/17      PLACE: PA State Police - Belfast Barracks
My name is Trooper Michael EVERK of the Pennsylvania State Police.
(OFFICER'S NAME)

You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.

## WAIVER

I fully understand the statement warning me of my rights and I am willing to answer questions. I do not want an attorney, and I understand that I may stop answering questions any time during the questioning. No promises have been made to me, nor have I been threatened in any manner.

X _____
SIGNATURE

WITNESS(ES)

_____      _____
SIGNATURE OF WITNESS(ES)                              SIGNATURE OF OFFICER





DEF0000186



**Incident #: PA2017- 516047**
**Trooper Jay SPLAIN Interview**

EVERK:    June 16, 2017 at uh, 1-0-9 p.m. Uh, we're at the Pennsylvania State
          Police, Belfast Barracks. Uh, my name is Trooper Michael Everk out of
          the Pennsylvania State Police Bethlehem Barracks. Uh, Trooper
          Raymond Judge is here from the State Police at Bethlehem Barracks.
          Um, Trooper Jay Splain and his attorney, Gary Asteak. Um, we're here in
          reference to the police involved shooting on May 20th of Anthony Ardo at
          1382 Good Rd. in Lower Mount Bethel Township, Northampton County.
          Um, I'm gonna read the Rights and Waiver beforehand, ok?

          You have the absolute right to remain silent. Anything you say can and
          will be used against you in a court of law. You have also the right to talk
          to an attorney before and have an attorney present with you during
          questioning. If you cannot afford to hire an attorney, one will be
          appointed to, and represent you without charge before questioning if you
          so desire. If you decide to answer any questions, you can stop at any
          time you wish and cannot be forced to continue. Uh, to you fully under,
          uh understand this statement and you want to talk, and your attorney's
          here?

SPLAIN:   Yes, I understand the statement and I'm ready and willing to talk.

EVERK:    And no promises have been made or been threatened in any manner?

SPLAIN:   That's correct.

EVERK:    Can you state your, uh, full name and your rank?

SPLAIN:   Jay David Splain. My rank is Trooper First Class.

EVERK:    And how, how long have you been employed by the Pennsylvania State
          Police?

SPLAIN:   Approximately 13 years.

EVERK:    And where are you currently stationed?

SPLAIN:   Troop M, Belfast, Patrol Section.

EVERK:    And were you stationed in any other stations before that?

SPLAIN:   Uh, Troop M, Bethlehem in the Patrol Section.

1

DEF0000187

EVERK:     Ok.  And what year did you come to the Belfast Barracks?

SPLAIN:    Uh, I believe it was, 2011, if I'm not mistaken.

EVERK:     Ok.

SPLAIN:    I've been there about five years.

EVERK:     Then we'll go back to the date of this incident.  You were working on May 20, 2017?

SPLAIN:    Yes, I was.

EVERK:     And how were you attired that day?

SPLAIN:    I was uh, dressed in full uniform.

EVERK:     Uh, what was your shift on that date.

SPLAIN:    My shift was 0700-1500.

EVERK:     And were you in a marked patrol vehicle that day?

SPLAIN:    Yes, I was.

EVERK:     Do you know what car number?

SPLAIN:    Yes, M6-14.

EVERK:     And were you dis, were you dispatched to a call at 1382 Good Rd., in Lower Mount Bethel Township?

SPLAIN:    Uh, I was not dispatched, but I uh, I was going to say I dispatched myself to assist the trooper that had been assigned the call.

EVERK:     Ok.  When the call was assigned where were you at, at that time?

SPLAIN:    I was in the communication's desk room.

EVERK:     And who were you with?

SPLAIN:    Uh, the police communications operator, Leonard Behler.

EVERK:     And what did you know, uh, about any call to 1382 Good Rd. at that time?

DEF0000188

SPLAIN:    At that time, I knew that the, uh, homeowner, property owner at 1382, uh, Ms. Jean Monaghan, had contacted PSP Belfast to report that, uh, she'd gotten a PFA against her, her son, uh, Mr. Ardo. I believe it was the day prior and he had shown up on the morning of the 20th, May 20th, around 5 o'clock in the morning. She also stated that, uh, her son, Mr. Ardo had substance abuse issues, drug history, and that he was making suicidal threats and statements. Um, and thi, this was around 8 o'clock in the morning when she first called.

EVERK:     And who told you this?

SPLAIN:    Uh, this was information I gathered from, I was sitting right next to our dispatcher, Leonard Behler, when he took the first call from Ms. Monaghan. Um, so I was not, I did not listen in on the call, I just you know was privy to PCO Behler's side of the conversation and then, um, after the call ended, he kind of gave me a quick rundown of what was going on.

EVERK:     When you say first call, was there a second call then?

SPLAIN:    Yes.

EVERK:     Is that from Jean Monaghan?

SPLAIN:    Yes.

EVERK:     And did Mr., uh, PCO Behler say anything about that call?

SPLAIN:    Um, yes, again, I was still seated next to him in the communications room and uh, he stated that Mrs. Monaghan was not, didn't seem to be happy with the response she got from PCO Behler after the first call. Um, basically she was concerned about the suicidal statements that her, her son, Mr. Ardo was making and was looking for help and uh, getting him, I'm assuming 302'd, involuntarily committed. Um, but she had no idea where he was currently at, at that point in time. As far as we knew, she said the last time she'd seen him was when he showed up at that house and violated the PFA at 5 o'clock that morning. And now this is three hours later, um, when she's calling to report it.

EVERK:     Ok. Uh, after the second phone call, um what happened next.

SPLAIN:    I believe the second, after the second phone call, um, sh, Mrs. Monaghan stated that she had gotten in touch with the suicide prevention hotline and that they told her that her son could be involuntarily committed. And, again, PCO Behler explained to her, it was like, that's correct. He can be involuntarily committed but we have to be able to find him first, and you

3

DEF0000189

know we have no idea where he's at. You being his mother don't know where he is. Um, basically the best thing to do is put a um, I believe a SCOPE message out to the patrol units to, you know be on the lookout for, for Mr. Ardo and/or his vehicle and if anybody happens to run across him, to do a welfare check on him. And proceed from there, once, you know, once he's located, if he's located.

EVERK:     Ok. Were you there at the desk for any other conversations that Lenny had with, or uh, PCO Behler had with uh, Mrs. Monaghan or anyone else?

SPLAIN:    Um, I don't recall, uh any further conversations, uh after that second call that Mrs. Monaghan placed here. Uh, with, with her, I do know that uh, during her second call here, uh, PCO Behler obtained Mr. Ardo's cell phone number from uh, Ms. Monaghan and uh, he then called Mr. Ardo's cell phone after he got off, as soon as he got off the phone with the mom. Uh, and uh, Mr. Ardo answered the phone. Again, I only got PCO Behler's, I only heard PCO Behler's side of the conversation. I was not listening in on the call, um, I was just sitting, seated next to him, listening to what he was saying, you know, and his responses to whatever Mr. Ardo was saying. Um, and

EVERK:     Did PCO Behler tell you anything about the phone call, besides what you were hearing?

SPLAIN:    Yes, uh, after the call ended, um, PCO Behler asked several times for Mr. Ardo to uh, tell us where he was currently located at. Um, Mr. Ardo refused and uh, he made suicidal statements to PCO Behler over the phone. The, I think he, PCO Behler told me that, that Ardo said he was going to blow his head off, or something, something to that effect. And, uh, I, I remember hearing PCO Behler's, you know looking back on it then, PCO Behler's response to uh, those statements was I don't advise doing that, um and PCO Behler also related that Mr. Ardo claimed that his mother was growing pot on the property at 1382 Good Rd. and um, the, PCO Behler said that the conversation ended with Mr. Ardo stating um, when you see the, it was either the, I don't know if he said, when you see the smoke on the mountain or when you see the fire on the mountain, you'll know it's done. And then that, he hung up.

JUDGE:     What um, you said you were at the desk that morning, that Saturday morning. What, what was your, were you performing any specific function or

4

SPLAIN:     Um, that, uh, well, it was a, a uh, rainy Saturday morning. I had several reports that I wanted to get done, um, so at that point I had just finished eating my uh breakfast and then I uh was going to take a quick run down to my assigned patrol zone for that day, which is on 35, which is Williams Township, West Easton Borough, and Glendon Borough. Um, and it, it was you know then, the process of me finishing my breakfast and uh, checking on PCO Behler just to see if anything was going on, um, because uh, Trooper Pagan, who was assigned zones 33 and 34, which covers Upper Mount Bethel and Lower Mount Bethel Townships, uh, he had a single vehicle crash, uh that came in, I think it was between, I think it was, I want to say it was around 7:30. I know it wasn't, it was right after the shift started. Um, so I was just kinda checking in on what his status was and um, then again, once you know, once I was done doing that, I was, my plan was to get in my car and do a quick check of my patrol zones and find somewhere to start typing my reports.

JUDGE:      Ok. Now, the two phone calls from Mrs. Monaghan, you were there for the entirety of those conversations,

SPLAIN:     Yeah

JUDGE       that she had with PCO Behler?

SPLAIN:     Yes, I was.

JUDGE:      And, and the same thing with the phone call uh, with Mr. Ardo?

SPLAIN:     Yes.

JUDGE:      Ok.

EVERK:      So, you said you self, you dispatched yourself to 1382 Good Rd. Have you ever been to that address before?

SPLAIN:     Never.

EVERK:      Uh, you ever heard of uh, Jean Ardo,

SPLAIN:     No.

EVERK:      Uh, even through the patrol unit or any other issues there?

SPLAIN:     No.

EVERK:      Talking about it.

5

SPLAIN:    No, I'd never even heard of that road, um, I had, I had to look up the, the address on my GPS, cause I was like do we even have a Good Rd. in Lower Mount Bethel? I never heard of it.

EVERK:    And what about Anthony Ardo, never heard of him before?

SPLAIN:    No.

EVERK:    Never dealt with him or heard someone on station talking about it?

SPLAIN:    No. Never.

EVERK:    And did uh, PCO Behler didn't say anything that if he knew we'd been there or dealt with Anthony before too?

SPLAIN:    No, I don't think he did.

JUDGE:    You said you were self, you self-dispatched. You took it upon yourself to, to go up to

SPLAIN:    Yeah, I was thinking about the way I phrased that, cause now that we have, with the new CAD system there's a self-dispatch, you know function, um within that system. No, what I meant was I took it upon myself, being the senior ranking trooper at that time, um, the weekend supervisor was Corporal Mark Sysco, uh, but his scheduled shift for that day was noon to 8 p.m. So, uh, me being the senior ranking trooper and uh, the fact that um, I was also the next closest trooper to the call geographically, uh and the fact that after the conversation that PCO Behler had with Mr. Ardo, he was definitely uh, suicidal, distraught, uh, in need of help. That's when I decided that uh, I should assist Trooper Pagan um, at the uh, the mother's residence. Um, my thing at the time was, that, not being familiar with the property, the residence, cause I'd never been there before, um, initially my plan was to, I was just gonna kind of canvas the area around the property, the, the roadways, while Trooper Pagan took the report from the mother and I was going to keep an eye out for Mr. Ardo's car. Um, but once, once I got on scene and saw the size of the property, the rural area it was in, um, and the fact that Mr. Ardo had already been there once this morning, in violation of the PFA, I decided that the, for officer safety reasons I, it would be best for me to go into the residence and uh, kind of act as a second pair of eyes for Trooper Pagan so he could focus on his interview with the mom, and um, I could, my plan was to you know, just keep an eye out, um, outside in case Mr. Ardo would happen to reappear at the residence or even just drive by.

DEF0000192

EVERK:      When you arrived at Jean Monaghan's residence, where, where did you
            initially parked.

SPLAIN:     I initially parked, there's um, a, a horseshoe driveway on the, the
            northeast corner, in the front of the house. Um, I wouldn't call it the, it's
            not like the main driveway, um that goes between the house and the, it's
            like a barn. Um, on the, it's on the west side. Um, when I initially arrived,
            I didn't see Trooper Pagan's patrol vehicle. Um, so I, I parked in the
            horseshoe driveway and walked across the front yard, going from east to
            west. Uh, just trying to determine where Trooper Pagan was at, I didn't
            know if he was talking to the mom outside of the house, inside the house.
            Then I, I saw his patrol vehicle. Then I noticed there was uh, a door on
            the house that seemed like it was, it would be the front door of the house
            facing north, facing Good Rd. But there was also, I saw, there's a door
            on the west side of the house. So, I was trying to decide which door I
            should either try knocking on or entering through to, to uh locate Trooper
            Pagan and Ms. Monaghan and ended up being, I went back to the front
            door on the north side of the house that faces Good Rd. And I, just as I
            was walking up to it, I could hear voices, Trooper Pagan inside and
            noticed the, the door, door was slightly ajar and just as I went to open it, I
            believe it was Trooper Pagan who said, from inside, hey come on in. So,
            that's when I entered. Closed the door behind me and he, it appeared
            that Trooper Pagan was pretty much just wrapping up his uh, interview
            with the mother. At which point, I uh, noticed that the, the front door that I
            entered through had a, the top half of the door was a window and had a
            blind over it, that was covering the window. So, I, for officer safety
            reasons, decided to open the blind so that I could watch out the window
            and keep an eye out for Mr. Ardo. Um, if he should, would choose to
            reappear, or like I said, to just drive by. So, that's what I, opened up the
            blinds, I kept watch out the window, and Trooper Pagan finished up his,
            his conversation with Ms. Monaghan.

JUDGE:      And this is the door that faces north, faces Good Rd. It's the door that
            leads into the kitchen?

SPLAIN:     Yes.

EVERK:      Was Jean, uh, Monaghan the only one there, was there anyone else in
            the house?

SPLAIN:     There was nobody in the house that, that I was aware of or, or had seen.

EVERK:      And did you over hear the conversation with Trooper Pagan and Ms.
            Monaghan?

7

SPLAIN:   No, I mean it was uh, I could just tell, it, it seemed like he was wrapping things up, getting ready to leave, just based on the conversation. I don't remember the specifics of it, nothing really stuck out in my mind at that point. And again, my concern was letting, letting Trooper Pagan handle the interview part and for me to be there as back up and to, to keep an eye out, my main focus was to keep an out for Mr. Ardo.

EVERK:    Ok. Obviously, you didn't leave the house right away.

SPLAIN:   No.

EVERK:    What took place inside the house while the three of you were in there?

SPLAIN:   Just as we were starting to make our way out of the house from the kitchen, through the mud room, uh, to the uh front door, Mrs., uh, Ms. Monaghan's cell phone rang. And she said it's him should I answer it. And, myself and Trooper Pagan both said yeah, answer it, see if you can find out where he is. Um, actually let me backtrack. Um, before that, before her phone rang, as we were leaving, I said, it dawned on me the statement that Ardo had made over the phone to PCO Behler, about the fire on the mountain and knowing it's done after we, once we see that. Um, because once I'd gotten there, arrived on the scene, saw the layout of the property and I noticed there's a large hill that goes up behind the barn, uh, next to the residence. And I kind of questioned in my mind, is that the mountain, you know that he was referring to. Um, so I, as we were leaving, I said, this dawned on me and I said, I asked Mrs. Monaghan, I said you know our PCO had a conversation with Anthony and Anthony made this statement about when you see the fire on the mountain you know it's done. Does that mean anything to you? And she, she looked at me, and kind of, like was surprised and said is he still, I wonder if he's still on the property. And I, I said, I said there's a large hill out her behind the barn and residence, is that the mountain he's referring to and I believe she said something about he, he can hang out up there, there's a, she said there's a trail that goes up there and at that point we started inquiring about is there a way, like we could our vehicles up there if need be, you know, to, to check for him. And while we were in the middle of that conversation then, is when her, her phone rang, and um, she said it's him, should I answer it?

EVERK:    And, during that phone call, did you listen in on the phone, did you hear the phone call or was it just between him and her.

8

SPLAIN: Um, I believe initially it, it started as, as, uh, just him and her but then without us asking her to, uh, she put it on speaker phone so we all could hear it. Cause, um, Mr. Ardo was kind of going on a rant about how his mom ruined his life, he, he was like all the stuff I've done for you and this is what you do to me and, um, I'm assuming he was referring to the PFA cause he had to sleep outside in the cold rain, that, that previous night and um he also mentioned um that he was going to get a gun and blow his head off and he brought up the uh pot plants on the property, which Mrs. Monaghan's reaction, she kind of seemed, or at least acted surprised to hear about pot plants being on the property and you know he insinuated um, cause she asked him, she's like, you know, where are the pot plants at and he wouldn't tell her. He basically said you know that'll be your problem to deal with once I'm gone as far as proving that it was mine and not yours. Um and then the uh, conversation ended before, he, he asked his mom for some money. She refused and then I believe he hung up on her. The conversation ended without us being able to determine his location. He never said where he was at.

EVERK: Did mom ever say he had a gun?

SPLAIN: Um, I be, I believe before I left station here, I ha, I asked PCO Behler to find out from mom, you know if he, if he had any weapons to her knowledge. And she stated the, the only firearm that was in the house was hers and that firearm was accounted for.

EVERK: Ok.

SPLAIN: I believe Trooper Pagan verified that as well. Um, while he was there taking the report from mom.

EVERK: Ok and what happened after the first phone call?

SPLAIN: Um, the, uh after the first phone call he, he, he hung up so then um, I asked Mrs. Monaghan, I said would you mind, wait a minute or two, call Anthony back and tell him you'll offer him some, some money, just enough to get through the next day or two as long as he promises to get some help, um, and try and find out where he's at. She, you know, with, without hesitation, said sure, ok. Um, we waited, you know, probably about a minute. She called him back. He answered. Um, she said hey, you know, I'll, I'll give you some money and he basically said ok I'll be by. And that was it. Again, he didn't, he didn't' state where he was coming from or how long it would be or where he was at currently.

EVERK: And was that the last conversation between him and her on the phone?

9

SPLAIN:     No, um, there was a, uh, another conversation, probably about 20, 30 minutes later.

EVERK:      And that conversation, did you hear that conversation?  You said she put it on speaker for the first one?

SPLAIN:     Yes, she um, I was actually in, she was in the kitchen and I was in the, the sitting room that's just off to the side of the kitchen on the, the, like the northeast corner of the house.  Um, when she took the call, she immediately put it on speaker phone on her own accord and came walking towards the room that I was in holding the phone out in front of her with him on speaker phone.

EVERK:      And what was said during that conversation?

SPLAIN:     During that conversation, uh, again, Mr. Ardo seemed highly agitated, upset, and he, he was saying that, he was telling his mom that if her offering him money was some sort of a set up or a trick that he was going to have a bomb around his neck filled with nails and that he would blow his fucking head off and make his mom watch and he also said if there's, if there's any police, if he sees any cops he's going to blow his fucking head off.

EVERK:      And that's all he said, was there anymore?

SPLAIN:     Um, at, at that point his mom started to walk away from me.  She still had it on speaker phone and she was just trying to reassure him, you know, calm down, it's, it's not a trick, just you know, just come get the money and uh, that was pretty, that was it.  That's all I remember hearing and the conversation ended.

EVERK:      Ok and Trooper Pagan, he would have heard the same conversation?

SPLAIN:     I, I don't know cause, um, he was a lot deeper in the room, kind of around like the corner of the room, uh, cause he was maintaining a watch position through the front and side windows on the north side of the house, the first floor.  The north side and um the east side.  Basic, pretty much all the windows that were in that, that sitting room that uh, just off the kitchen that he and I were in.

EVERK:      After this uh, this third phone conversation between Anthony and Jean, that you heard, uh, was there more calls?  What happened next?

10

DEF0000196

SPLAIN:     Um, there's actually, she attempted to get a hold of him once before that, uh, but he, he didn't answer his phone. It rang, she had it on speaker phone, again completely on her own accord. Um, and it rang four or five times and went to voicemail. Um, and I think she just said it's mom, call me back. Then, I'm sorry, what was your, your question?

EVERK:      After that, the call where talking about blowing himself up, did she call him back?

SPLAIN:     Not that I'm aware of.

EVERK:      Was there any other conversations between him and her?

SPLAIN:     Uh, I know that once he showed up at that house, um, just before myself and Trooper Pagan ran out of the house to run our patrol cars, um I heard her phone rang and she said it's him. Um, but that was it, we, we ended up running out of the house shortly after that.

EVERK:      Ok.

JUDGE:      Was that, that I guess third phone call, where he mentions that he's gonna have a bomb around his neck with nails attached to it. Was that the only reference he made to an explosive that you're aware of.

SPLAIN:     Yes, that's the, the only one I heard of.

JUDGE:      And that's to include any conversation he would have had with Mr., with Lenny, the PCO, PCO Behler?

SPLAIN:     Yes, yeah, I don't recall Lenny mentioning anything about a, a bomb.

JUDGE:      Ok. And you kind of touched on this, but um, you, you said that when you got to the house.

SPLAIN:     Hmm, hmm.

JUDGE:      Um, and Trooper Pagan had preceded you, he had been there already and he was speaking

SPLAIN:     Yes.

JUDGE:      to, to Mrs. Monaghan. Um, you took it upon yourself, to, to you know, I guess conduct, surveil the outside of the house so he could, you know, complete his task.

SPLAIN:     Yes, yes.

11

DEF0000197

| JUDGE: | What was the impetus for that?  Why did you do, why did you feel the need to do that? |
|---|---|
| SPLAIN: | Uh, just cause I wanted to be completely aware of my surroundings. Um, I didn't want to be ambushed by Mr. Ardo.  Um, uh that's common practice, it's eh, anytime I'm taking a report with circumstances similar to this, uh, whether it's somebody who's suicidal or domestic where, you know the aggressor has left, or another half has left, um and I'm on scene, I want to be as aware as possible of my surroundings to make sure that, you know that the other half doesn't end up showing up and ambushing me.  Um, cause I know that uh, the last trooper that we lost was killed while conducting, ambushed, murdered while conducting a PFA violation investigation.  And that's, this was a PFA violation, you know as well as a mental health evaluation um, issue, so. |
| JUDGE: | Ok.  And, and the ruse that, when you asked her to see if he would come there by offering him the money that had been demanding, that ruse, was that your idea or Trooper Pagan's idea? |
| SPLAIN: | I, I think, I think it was my, I'd say it was my idea. |
| JUDGE: | Ok. Alright.  And what was your intention, what was your intention at that point, should he, should the ruse succeed, and, and you got him back there.  What was the, what was your intention at that point? |
| SPLAIN: | Uh, my, my intention at that point was to arrest him and get him involuntarily committed. |
| JUDGE: | Ok. |
| SPLAIN: | And, uh as far as the, the PFI, PFA violation went, you know, that's something that could, you know file, charges could be filed later.  My main focus at that point was the, the suicide threats and getting him the help he needed mentally. |
| JUDGE: | Ok.  Sorry to hijack that. |
| EVERK: | No, that's.  So, we left off where uh, you were, the car pulled up in front of the house, or is that what you said? |
| SPLAIN: | Yeah, I, I, kind of jumped ahead there just because of your question about any other phone calls between Mr. Ardo and his mother, but that's the only other one that I was aware of. |
| EVERK: | Ok.  As you were walking out of the house you heard the phone ring.  Um |

12

SPLAIN:   No, it's uh

JUDGE:    Why don't we go back,

SPLAIN:   Yeah.

JUDGE:    We go back to the point where um, she called him

SPLAIN:   Right.

JUDGE:    said, I'll give you the, give you money. He agreed to come back.

SPLAIN:   Hmm, hmm.

JUDGE:    Then what?

SPLAIN:   Uh, then it was uh, a waiting game. We had no idea how long it was
          going to take him to get there cause we had no idea where he was.
          Again, we didn't know if he was possibly somewhere on the property
          cause it's such a large property in a rural area. There's many
          outbuildings, barns. It's a working horse farm. Um, so at that point, uh
          me, Trooper Pagan, and Mrs. Monaghan uh, kind of simultaneously all
          said to each other, well we need to hide our patrol cars because they
          were parked right out front in a high visibility area. We need to hide our
          patrol cars, um, somewhere he's not gonna see it when he approaches
          the residence. So, all three of us stepped out in the front yard area and
          uh, we were kind of independently looking, initially for the best spot to
          hide, again, I was kind of at a loss because it was a pretty open area um,
          and I'd never been there before, and uh, I guess, same with Trooper
          Pagan. And then Mrs. uh, Monaghan is the one who came up with the
          idea, she said you have my permission, you can pull your cars through
          the side yard on the, which would be the east side of the house. Um, and
          go through the side yard and down into the back yard and park behind
          the pool area. She said that's probably the most hidden spot, you know
          that's still close to the house. So, we, myself and Trooper Pagan,
          evaluated that area quickly and said yeah, we agree it does look like the
          most tactically advantageous spot to place our cars, to hide our cars. So
          we immediately drove our cars down there. We parked them so that uh,
          the, the rear bumpers of our vehicles were up ag, not up against each
          other, but back, you know, back to back pretty much so that we each
          could drive opposite directions around the west side and the east side of
          the house to get back out to Good Rd. if need be in, in a hurry, in an
          emergency situation. Whatever the case may be. Um, and I know after I,
          while I was parking my car and when I got out and was walking back to
          the house, I was taking note to the layout of the, the back yard, the side,

DEF0000199

and where, if I had to jump back in my car in a hurry and get, get back out to the roadway, what was going to be the most direct route. Um, so we, we parked the cars and the three of us went back into the house through the front door, on the, the north side of the house.

EVERK:       Now was your car turned off at that point, after?

SPLAIN:      Yes, I uh, turned my car off because I had no idea how long it was going to take for Mr. Ardo to be there and also the fact that I have a patrol rifle in my car, uh, rifle, rifle rated body armor, a ballistic helmet, um, and a lot of spare ammunition, and knowing that Mr. Ardo is suicidal, um, mentally unstable, and the distance that I was going to be now from my patrol vehicle, being, you know with me being in the house and the car being hidden in the backyard, I did not feel comfortable leaving my car running, that anybody, especially, particularly Mr. Ardo, could smash a window out from my car and have access to a fully loaded police SUV.

EVERK:       Now, was your car, when you first arrived on scene, just back it up for a second here.

SPLAIN:      Hmm, hmm.

EVERK:       When you and Eddie, er Pagan, were on scene in the beginning, were, you weren't parked in the back, was your car turned off at that point, when you got out of the car?

SPLAIN:      No, cause I was, I was parked in that small horseshoe lot, just off the front, right along the front side of the house and you know, I was able, I was able to stand, you know, right, just inside that front door on the north side of the house and see my car, and you know, it was a split second away from me, it wasn't, I didn't feel like it was out of my span of control the way I did once we re-parked them in the backyard.

EVERK:       The, the, so do you have any idea, I don't know if you were paying attention to the actual time, but about when you went out to move your car to the back?

SPLAIN:      Uh, you mean as far as from me initially getting there, how much time til we re-parked the cars. Pheww, if I had to guess, um, five minutes, ten minutes at the most.

EVERK:       So, ten minutes after you got there?

SPLAIN:      Yeah.

EVERK:       Ok.

14

DEF0000200

SPLAIN:     It, wasn't long.

EVERK:      And, sort of jumping a little bit more past that, is, after you found out, he mentioned about blowing himself up, is there any point that, that you let uh the barr, uh PCO Behler know or any other patrol units?

SPLAIN:     Yes. Yeah, I, I put it out over the radio for, uh, as updated information and I got, this is kind of, we haven't covered this yet but at this point, a ping had been done on Mr. Ardo's cell phone and it had placed him in the area of State Route 22 and Route 191. Um, so we had, at that, after that first cell phone ping, I requested that either if, a Belfast unit, if we had one available, cause there's only four of us working that uh shift. Um, either a Belfast unit if there is one available, or a PSP Bethlehem unit, or a Colonial Regional Police Department Unit head to that area and check that area for Mr. Ardo and, and his uh vehicle. Um, so, and then it was after that initial ping was when the, the phone call happened between Mr. Ardo and his mom, where he stated he was going to have a bomb around his neck with nails and that he was going to blow his head off if uh, if he saw any cops. So then I gave that updated information out that he may have an improvised explosive device around his neck and to use, obviously to use caution if contact's made with him.

JUDGE:      Did you discuss the uh, when he made that threat, that he would have an explosive device around his neck, did you discuss that with his mother at all?

SPLAIN:     I did that, I asked, I asked his mother um if she had any knowledge of Anthony ever experimenting with explosives, um pipe bombs, um and, she, she said that uh, and with a concerned look on her face, she said that he, he did play with fireworks a lot. So, at, at that point I'm thinking, ok, well, fireworks, like most fireworks are explosive, um, you know you could easily combine explosive, a bunch of explosive fireworks together or alter them to uh, you know make them into a bigger explosive device. That's not something that takes a lot of technical skill or knowledge to do. Um, so at that point, I did have a pretty legitimate concern that you know, it might not be a bluff about the bomb. That he might actually you know, might very well have something explosive, either on his person or in his vehicle.

EVERK:      So, did you know ahead of time what type of vehicle he was in?

SPLAIN:     Yes, eh, eh, I wanted to come back to that. Um, while I was still on station here at the communications desk with PCO Behler, uh, PCO Behler had obtained the uh year, make, model and color of uh Mr. Ardo's vehicle from Ms. Monaghan and PCO Behler told me it was a 1988 Buick

15

DEF0000201

Reatta, blue in color. And I remember thinking to myself what the fuck's a Buick Reatta because I'd never heard of that model of vehicle before and I'm pretty good with, with vehicle makes and models. Um, 13 years of patrol experience, um, so at that point Lenny said he had never heard of it either. So, I pulled out my cell phone. Did a quick Google image search of a 1988 Buick Reatta. It came up with the image of a red '88 Buick Reatta and I said oh, ok. I don't think I've ever seen one of those before. Um, I took a screen shot of it on my cell phone, I have an iPhone. I took a screen shot of it and then I texted Trooper Pagan, who was at this point, he was in route to uh the residence. And I sent, texted him the picture of the care and said hey, while you're in route, keep an eye out for this vehicle, except it's not red, it's blue.

EVERK:    So, when the, I had, when the vehicle showed up, who saw the vehicle outside?

SPLAIN:   We both did cause were in the process of, I think we were just about to open the front door to exit the residence. Um,

JUDGE:    And why were you exiting the residence at that time?

SPLAIN:   At that time we were exiting the residence because um after the uh, the, the cell ph, there was two cell phone pings that placed uh Mr. Ardo, as far as we knew, in the area of Rt. 22 and 191. When we asked Ms. Monaghan does he have any known associates there, is there any reason why he'd be in that area, she very quickly said oh yeah, that's real close to where his uh, I think New Beginnings methadone treatment, uh, center is. And I asked Ms. Monaghan is that uh, somewhere that he, you know how often does he visit there and she said he's there once a day every day. And I asked her what, you know, what time of day does he normally go. And she said always first thing in the morning, as soon as he gets up he goes and visits the methadone clinic. Um, so uh, it ended up being Trooper Branosky from PSP Belfast headed over to that area and shortly after he called in over the radio, we and we heard him calling over the radio that he was in that area, you know starting to look for Mr. Ardo, um and/or his vehicle. Um, very briefly after that he got back on the radio and said he was going to be out with a male matching the description of Mr. Ardo. Now in between there, um Trooper Pagan had gotten on the radio and given out an updated physical description of Mr. Ardo, which had been you know provided by his mother. Um, and so once we heard Trooper Branosky say he was going, going to be out with a male matching the description, we kind of started letting out guard down a little bit thinking alright, Trooper Branosky probably found him and then Ms. Monaghan heard the radio traffic and she asked, she said "did they find him?" I told her it sounds like they did. We were just going to wait a few more minutes to make sure, and then, then we'll get out of

16

DEF0000202

here. But then there was a long period of radio silence, and when I say long, to me it seemed long. Um, but it's like, I was expecting to hear Trooper Branosky say ok, you know it's him, I got him, or it's not. But, you know, we didn't hear anything and knowing that there might be uh an explosive device in play, myself and Trooper Pagan got pretty concerned that we weren't hearing any more radio traffic. So at that point we decided let's start making our way back to our patrol vehicles in case we need to start heading down, you know if Nate needs assistance, you know we were concerned for his safety at that point. And so, as we're walking, we were going to exit through the front door, that's the only, only door that uh that we'd use at that point. And just as we got to the door, I don't even know if, if uh, I think, I think Trooper Pagan was ahead of me. I don't even know if his, his hand was on the doorknob yet or not, but just as we're getting ready to open the door, here comes the blue Buick Reatta. Pulls down in front of the house.

SMITH        Alright just stop with that thought. It's a good place to stop. We have to switch discs, ok?

JUDGE:       Ok, thank you

EVERK:       I gotta take a leak too.

JUDGE:       Ok, let's take 5

             END OF FIRST RECORDING

SPLAIN:      I said I don't want to get shot in the back of the head I want to be able to see out, and then she, she's like, I can see like a light bulb went off in her head like it made sense to her that was it but, um, she did make that com, she was pretty confused like what the hell is this Trooper doing messing with my blinds. Because I couldn't, I didn't get it open on the first, it took me a couple of tugs and I'm like looking at it and finally got it open. That's when she is like are we decorating now. So I don't know if thats

EVERK:       Yeah, so let him start the tape back up

SMITH:       Ok, you are recording again

EVERK:       It's 1400 hours on June 16, 2017 and we are starting back up the interview. Um, Trooper Splain, anything prior to when uh Mr. Ardo arrived at the house, is there anything you want to explain or did you forget to tell.

17

DEF0000203

SPLAIN:   Yes, I just uh didn't get a chance to finish my train of thought when I previously brought up the statement that Mr. Ardo had made to PCO Behler over the phone about when you see the fire on the mountain, you'll know it's done. Um, when I had brought up that comment to Mrs. Monaghan uh at her residence and asked her, you know does that have any significance, significance to you and, and she questioned if uh the mountain reference was, you know, to the, the hill that's uh behind the house and barn. I then uh immediately became concerned that that was potentially uh an arson threat. I was thinking that uh possibly Mr. Ardo was thinking about since he'd been kicked out of the house basically, you know, by the PFA that he possibly would burn the house down and then kill himself, or and/or the barn or you know. Um, in, in my mind it just seemed like it, it could've potentially been an, a arson uh you know threat, that uh, he was going to use fire, you know not just to kill himself, but to uh also destroy the property since he couldn't, wasn't allowed to be there anymore. I was just trying to put myself in his irrational frame of mind and just to apply meaning to it and that's what I came up with.

EVERK:   So, when he, now we'll go up to when he arrived at the house and you and uh Trooper Pagan were walking outside, what happened at that point?

SPLAIN:   So, as soon as we're getting ready to go out the door, Mr. Ardo pulls up on Good roll, Good Road. He's heading east on Good Road uh as he approaches the house. Parks right in front of the house. Pretty much straight out from the front door on the north side.

JUDGE:   Now, you're saying this is Mr. Ardo, how do you know this?

SPLAIN:   Well, I didn't know this for certain at the time, but later I determined it was him. But the, so I'll say Mr. Ardo's vehicle pulled up to the front of the house and stopped just as we were getting ready to open the front door and exit. Uh, myself and Trooper Pagan both exclaimed, "it's him" and doubled back, like you know, we're almost tripping over each other trying to back up through the mud room and kitchen area um to make our way back to our, our predetermined positions that we had taken up in the sitting room just off the side of the kitchen. Cause the uh, the, the plan was, you know we asked the mom, Mrs. Monaghan, when he arrives, let him come in the house and try and get him to come into the kitchen because there's you know, the kitchen was a large enough area that if we needed to go hands-on with him or you know if he put up some kind of a fight or resistance, it would be a, a better, larger area to uh, uh maneuver in and work in versus if he only, you know came through the front door and stopped in that, that small mud room entry way area. I, I, didn't want to have to potentially wrestle and fight with somebody in a, in a closet basically. Um, and uh that being the plan, I did, I did advise mom

18

to do a quick safety sweep of the kitchen to make sure that there was no large kitchen knives or any other items he could potentially use as a weapon, um that he would have access to. At which point, she immediately grabbed two large chef knives out of the, that were laying in the kitchen sink. She pulled them out of the sink, opened up the dishwasher, threw them in the top rack and shut the dishwasher. Um, and then, you know I just did a quick look around myself. I, I didn't see anything else um. I, I also, while we were waiting, I was trying to make conversations to keep things, you know, light and not so serious. I, I asked her, I said, "is there any nicknames or names that Anthony prefers to be called by". Cause I'm thinking in my head if he shows up you know and he's agitated, um you know, if, if he's got a nickname that, you know his best friends or you know close associates refer to him as, maybe that's something that can de-escalate the situation or you know that I can just talk to him on a level that you know, refer to him by you know whatever special nickname he has that'll maybe kind of help calm him down. Um, that, that was my intention. But mom said that no, he just, just Tony is what he goes by.

EVERK:      So, when you, when you say you see, you both saw him pull up in front of the house, did you get out the front door?

SPLAIN:     No, um, I don't think, I don't think we even had the front door, I think as far as we got was uh Trooper Pagan might have had his hand on the doorknob getting ready to open the door. Like it was that close, but I don't think we ever, I don't think we ever actually opened the door. It was, we were like a split second from opening the door when he, well when the car, his car, Buick rolls up and stops.

EVERK:      And how did you see the car?

SPLAIN:     Through the, because I'd opened the, the, the blind on that, that window for that door and you could see straight out, you know he parked pretty much directly out from that, that door. And uh, partially on the roadway and partially in like the front, the front lawn area. So, and we, like as soon as we saw the car we you know started back pedaling and we both, you know, out loud said, "it's him" and Trooper Pagan got on his radio quick. I don't know if it went through, cause radio reception is kind of spotty in that area. Uh, Trooper Pagan at least attempted to notify station that hey he's here.

JUDGE:      At that point, could you see any occupant, or occupants of the vehicle?

19

DEF0000205

SPLAIN:     No, I, I don't remember being able to see, um, see directly into the vehicle because there's um low hanging trees, um, that I would've had to probably almost get down like on my knees, on that level to see underneath the low hanging tree branches. Um, but you know, you, you could clearly see the car and it was you know a, a 1988 Buick Reatta is very distinct, you don't see a whole lot of those, so, that's, we assumed instantly, you know, hey it's him.

JUDGE:      Ok, and you were actually leaving at that time to go back up Trooper Branosky.

SPLAIN:     Because

JUDGE:      Alright, so you haven't received information that the person that he had stopped was not

SPLAIN:     Right, at that point we had not received any

JUDGE:      Ok

SPLAIN:     updated information that it was not him.

JUDGE:      Ok.

EVERK:      And what happened after you guys back pedaled into the mud room?

SPLAIN:     So, we back pedal, we retreat to our initial positions that we had been in in that, a sitting room in the northeast side of the house, just off the side of the kitchen. Which, um, and then his, his mother, Mrs. Monaghan, she walked back through the kitchen and went into the, I want to call the living room that goes, you know straight, straight back out of the kitchen into the rear of the residence.

JUDGE:      That's the one that overlooks the pool?

SPLAIN:     Yeah, it's a, a, it's a, the, the walls are like all windows, huge viewing windows. Um and I remember, you know, in that moment, um thinking you know I'm impressed that she's remembering our original plan and appears to be sticking with it. Um, because, you know I'm assuming she's going deeper into the house to make sure that Mr. Ardo comes into the kitchen at least. Like we had discussed. Um, so, I, um, at that point, uh Trooper Pagan and I were looking out the, the front windows, somewhere on the north side of the house that, for a view of uh, of the Buick. And the Buick was just sitting there running and um, you, pretty sure at that point we could, we could see um that there was one person in it. Um, it was a dark overcast rainy day, um the uh, there was shade

20

from the trees as well. So, the lighting was not great. Plus the reflection of the, the overcast lighting off the windshield and the, the rain drops that had, that were on the windshields, water beads. Um, you couldn't make out a face, but you could see there's, what appeared to be, one dark male figure, um, in, in the driver's seat of the vehicle um, and, and that was it. Um, the, the windows were up, the vehicle was running, no one ever exited the vehicle. Didn't hear any car doors open or shut. Um, it, it just sat there for 30 seconds maybe and I remember thinking at that point, like great, he's probably gonna make his mom walk the money out to him. He's not even gonna get out of the car. So at that point then my mind's racing about, ok should we, do we let mom, if that's the case, do we let mom take the money out to him. Um, and then hopefully he leaves and then we run out, bolt out to our cars and try to do a traffic stop on him. Um, do we try and get mom to call him and get him to come into the house. Should one of us stay here in the house and one of us run out to the patrol car and get ready in case you know he ends up somehow spotting us or just getting the feeling that somethings not right and decides to just take off. Uh, but before my mind could finish processing all those different possible options and what I thought the best, best option would be, I hear the mom's cell phone ring and she says, "it's him". Now at that same point in time, the Buick goes, starts going in reverse. Backing up Good Road, um, going west on the eastbound side of the roadway and Trooper Pagan and I are both watching it through the window and I'm like, you know I'm thinking to myself where's he going and then I realize well, the main driveway, what I consider the main driveway entrance was behind him. So, I'm thinking alright maybe he's just going to back up to the main drive entrance and turn right, right into the driveway, come park in the driveway. Um, the problem was if he got any, once backed up past that driveway entrance, because of the trees with the low hanging branches and shrubbery at the end of the driveway and in the front yard, um, you couldn't see the vehicle anymore once he backed past the drive entrance, which he did. So, I gave it a couple seconds, thinking well, you kind of have to back past it in order to pull into it. We waited a couple seconds, but then he never actually pulled into the driveway. So, at that point, he's out of our site. I don't know if he has done a, a, a u-turn and left or what's going on. So, Eddie and I, sorry, Trooper Pagan, simultaneously kinda looked at each other and like let's bolt to the cars. So, we go out the side door to that, that sitting room area, which is the, that door is located on the east side of the house. So, that opens right out into the side yard. We bolted out that, through the back yard, through the pool area, to our patrol vehicles, jump in them. We both had a, a, I can't speak for Trooper Pagan, but I know I had to put the key in my ignition, start my car back up, and then uh I immediately pulled forward, heading west, around the west side of the house, which links up with, with what I consider the main driveway and heads right out, uh, it's a slight incline up, and then right up on to Good Rd. As I'm

21

DEF0000207

coming up the driveway, I'm about halfway up the driveway and I see the Buick traveling east now on Good Rd., like reapproaching the residence and I'm thinking, oh crap, he's now gonna be pulling in the driveway. He's coming at me, he's going to be coming at me head-on, and we're, we're like on top of each other. I threw my emergency lights on and at that point the Buick kind of straightens out and drives past the driveway entrance, starts to pull off to the side, to the, like into the front yard area, the edge of the roadway. And at that point, I follow, I come out of the, exit the driveway and stop my patrol vehicle on an angle kind of facing northeast, trying to like block the roadway as best I could. I mean it was wide enough if he wanted to throw it in reverse and back around me he could've. But, um, I uh, I did the best I could as quickly as I could to try and block the roadway off and then at the same time, Trooper Pagan came around from the east side of the house and came at Mr. Ardo's Buick you know, head-on and ended up stopping, you know facing it, facing the Buick head-on maybe, I don't know if maybe five yards off the front bumper, you know they were facing each other. I mean I can keep going, I don't know if, unless you want to stop me and ask questions.

EVERK: I just want to back up here. When he shows up at the house, um, what, I'm trying to figure out like a timeline here. Is uh, you said Trooper Pagan may have said on the radio that the car's here, you don't know if it got out. Um, when, how long does this take place? Was it 30 seconds, one minute, uh, this whole, from when he arrived to I would say when he, when you guys were in your cars?

SPLAIN: When he pulled up til when we were jumping in our cars, I would say it was probably, it was probably only like two or three minutes. It was, it was quick. Yeah, I would say three minutes at the most. That's being, I think that's probably being generous.

JUDGE: And you, and you both went to your cars because he was no longer in your line of sight.

SPLAIN: Yeah, we no longer had a visual on him, didn't know, you know, what he was, where he'd gone or what he was doing so. At that point, I was anticipating a traffic stop or a pursuit with him. Uh, I'm thinking that he's driving, you know I'm picturing you know, he's driving away from the residence at that point. You know, heading west on Good Rd.

EVERK: Alright. And I, I listened to the radio tapes and, and times and so forth. That's why, that's why I'm asking. It's, it's very short period of time. Um did Eddie call, do you know if Trooper Pagan tried to call over the radio more than once out, that, that he was on scene.

SPLAIN: That, I don't, no I don't know that. I don't recall that.

22

EVERK:      Alright.  So, after, after you said where you positioned your cars, you both
            stopped your cars blocking him, what happened?

SPLAIN:     Uh, as soon as, soon as I got my, my uh car in park and Eddie was,
            sorry, Trooper Pagan, was simultaneously parking his, his vehicle, I
            immediately exited my patrol vehicle, drew my service weapon, um
            pointed in the direction of the Buick and started shouting verbal
            commands, "show me your hands, show me your hands, let me see your
            hands" um and at that point in time I observed that there's only occupant
            of the vehicle was what appeared to be a male uh driver.  Um, want me
            to keep going or?

EVERK:      Yeah, keep going.

SPLAIN:     Um, he, after, I probably said it three or four times, you know, "show me
            your hands, show me your hands, let me see your hands", uh, no
            compliance.  I could see, all I could see of him because of my position, I
            was I want to say maybe three, three yards or so off of the rear bumper of
            the Buick on the driver's side.  Um, between my patrol vehicle and the
            rear of the Buick, and because of the seatback of the driver's seat of the
            Buick and the headrest, pretty much all I could see of um whom I'm
            assuming is Mr. Ardo, and certainly from what I can see at this point,
            matches the description that, that I had been given at that point.  All I
            could see is his head and a little bit of the tops of his shoulders.  Um, he
            never complied with my commands to show me your hands and stick his
            hands up in the air, but I could see a lot of small furtive movements
            between like his head and shoulders.  I couldn't tell what he was doing,
            all I could tell was that he was moving, and not following my commands.
            Um, after the, the failed compliance with the "show me your hands, show
            me your hands" then I gave the commands "get out of the car, get on the
            ground, get out of the car, get on the ground".  I said it at least twice.
            Um, again, no uh, no compliance.  The, the driver's door never opened,
            um all the windows on the car were up, um and at that point, Trooper,
            Trooper Pagan, when he initially exited his patrol vehicle, you know
            because he was head-on facing Mr. Ardo's vehicle, Trooper Pagan, his
            initial position he took up was um just off the front passenger side bumper
            of the Buick.  And as I'm giving commands, I'm cognizant of where
            Trooper Pagan's standing and it's going through my mind, you know
            we've got a bad crossfire situation here, if, if this turns into a gun fight.
            Um, and I'm just getting ready to yell to Trooper Pagan, you know, "hey,
            move", but Trooper Pagan realized you know the same thing at the same
            time on his own and ended up repositioning himself.  He moved between
            his car, his patrol vehicle and the Buick, between the two front bumpers,
            you know he headed over towards the driver's side of the vehicle then.
            Um, and positioned himself on the driver's side, I'd say about 90 degrees

23

DEF0000209

off the like, right off the driver's door. And Trooper Pagan has his service weapon out as well, and at that point I asked Trooper Pagan, "does he have something?" Meaning, do you see a weapon, a bomb, a gun or whatever and Trooper Pagan's eyes got as huge as, huge as saucers and he looks at me, I make brief eye contact with him. He looks at me and his eyes are huge and he's got this look of sheer terror on his face and he says YES! And no sooner did yes roll off of Trooper Pagan's tongue and I see, I assume it was the left hand because it was on the left side of Ardo's body, but it could have been, looking back now, it could have been his right hand if he was reaching across himself. I see a hand in a clenched fist, uh, come up on the left side of Mr. Ardo's head and neck area and I see a lighter spark and a flame. And at that point I yelled "shoot him!". And I don't know who fired first or if we both fired simultaneously but myself and Trooper Pagan opened fire. Um, Trooper Pagan fired two rounds. I remember seeing his two shell casings, um as well as hearing the reports of his shots, but I remember seeing in my peripheral vision his shell casings glinting in the air cause they're silver colored. Um, and at that point I fired six rounds in rapid succession through the uh rear windshield of the Buick on the, the driver's side.

EVERK:    The, the uh, I just want to clarify here. You yelled at Pagan do you see some, uh does he have something. Um, and you said in your mind if it's a device or I don't know what you say.

SPLAIN:   Yeah, it's some, any kind of a weapon.

EVERK:    Would Eddie have known what you were talking about, 'er Trooper Pagan.

SPLAIN:   Yes, yeah, he would've known. Cause, if he wouldn't have known, I would've been more specific, but we were all, we were on the same page, you know, he was fully aware of everything just like I was. You know, the, the threat of the, the a bomb and he had heard you know the statements about you know, I'm gonna get a gun and blow my head off and um

EVERK:    Ok, and when was, was uh Pagan, before, even before that, was he making verbal commands too?

SPLAIN:   I believe he was repeating my commands, like I gave the commands first and then Trooper Pagan also repeated the same command, at, at least once that I can remember.

JUDGE:    You said that you were positioned off to the driver's side, um, if, if the driver, if Mr. Ardo was the hub of a clock, what, what degree, like were you at five o'clock, were you at 4 o'clock?

24

DEF0000210

SPLAIN:     Ok, so Mr. Ardo is 11 o'clock, like the dead center of the front end of the vehicle is 12.

JUDGE:      Ok.

SPLAIN:     So the driver's seat will be 11 we'll say.  Um, I would say I was probably at 7.

JUDGE:      Ok.

SPLAIN:     7 o'clock.  Yeah, 7.

JUDGE:      Ok, and you said the verbal commands that you, you gave, and I don't want to put words in your mouth, um, but you did mention that, "show me your hands"

SPLAIN:     Yes.

JUDGE:      And then later on at least twice you said?

SPLAIN:     "get out of the car, get on the ground".

JUDGE:      Ok.  At any time did you identify yourself as a police officer or say state police, or police, or state trooper at all.

SPLAIN:     Honestly, I'm not sur, I want to say I think I did say "State Police, let me see your hands, show me your hands", but I, that, that part I don't, I don't remember for certain.  I just remember shouting the commands.

JUDGE:      If, if, if um, if base, well let me ask you this, based on where Trooper Pagan um was positioned initially, up on the passenger's side corner

SPLAIN:     Right.

JUDGE:      Um, I don't think we touched on this but, you were in full uniform, was he also in full uniform?

SPLAIN:     Yeah.

JUDGE:      And was he also in a marked unit?

SPLAIN:     Fully marked. SUV

JUDGE:      Ok, would he have passed in front of, you said he went between his car and Mr. Ardo's?

25

DEF0000211

SPLAIN:     Yes.

JUDGE:      Alright.  So, he passed in between the cars, presumably through

SPLAIN:     Directly in front of

JUDGE:      his field of vision?

SPLAIN:     Yeah.

JUDGE:      OK.

SPLAIN:     And, um, I had my emergency lights on, on my vehicle as well, and the angle that my vehicle was parked, you know across the roadway behind Mr. Ardo's Buick, um, there definitely should not have been any question that, you know he should have been able to see all of the markings on the fully marked unit because of the car being on an angle versus a regular traffic stop, which kind of, all you can see is the front end and the lights on the top.

JUDGE:      Ok.

EVERK:      Did he say anything, as you were commanding did you hear him say anything?

SPLAIN:     No.

EVERK:      And when you said you can see a spark or flame, did you say you saw that through the back window?

SPLAIN:     Yes.

EVERK:      You said you were at 7 o'clock, so are you seeing through the back window?

SPLAIN:     Yeah, I'm looking through the rear windshield.

EVERK:      Rear windshield, ok.

JUDGE:      You said, and, and I'm not, we don't want to presume anything.  What, you said that once you saw the flame and the spark

SPLAIN:     Hmm, hmm.

JUDGE:      Why, why did you tell Trooper Pagan to shoot?

26

DEF0000212

SPLAIN:     Because when I asked Pagan does he have something, the reaction Trooper Pagan gave me with just the look on his face and in his eyes, and the way that he also um, he started backing away from the vehicle as he's saying, "YES", that combined with Mr. Ardo's statement that he was going to have a bomb filled with nails around his neck and that he would blow himself up in front of his mom and if he saw any cops he would blow himself up, all those things combined together, at that point in time, I believed he was lighting a bomb and that we were all going to be blown up.

JUDGE:      Ok. So, by telling Trooper Pagan to shoot and you shooting yourself, what was it you hoped to accomplish?

SPLAIN:     To immediately stop his action of lighting a bomb.

JUDGE:      Ok. When, you said that, you, you think Trooper Pagan fired two shots?

SPLAIN:     Yeah, I know he fired at least two.

JUDGE:      At least two.

SPLAIN:     That's what I remember.

JUDGE:      Ok. And I think you said you fired…

SPLAIN:     Six

JUDGE:      Six shots

SPLAIN:     Initially, yes.

JUDGE:      Is that, are you sure of that fact?

SPLAIN:     Um, I, I didn't know exactly how many until I re-watched the MVR footage prior to this, this interview today. Um, but I did know that if I would've had to guess before watching the MVR footage, I, I would have said four or five shots. Um, I can explain the reason

JUDGE:      Well, I was going to say, why four or five shots? Why not one shot? Why not emptying your service weapon?

27

DEF0000213

SPLAIN:     Ok. Uh the reason why I fired the six shots, uh, is because I, based on my training and research, I know that anytime you're shooting through auto glass and/or automobile sheet metal doors, it requires multiple rounds, um, to hit your intended target because of uh, you have multiple issues of bullet deflection, based on the angle of the auto glass, the, as well, is compounded with the angle that the shot is coming from so the position of the shooter, um, you have issues with bullet jackets separating as they pass through auto glass and auto sheet metal, um, so and all these factors end up deflecting your bullets and not necessarily hitting where you're aiming. So, being that I was firing through the glass, I knew that my first couple rounds, I wasn't counting on them hitting my intended target. I was counting on them as pretty much creating an opening or hole through the glass that then the following rounds would be able to pass through freely without any interference and strike my intended target without being deflected.

JUDGE:      Did you see any reaction or was there, did you, did you make any conclusions as to whether or not any of your rounds hit the target.

SPLAIN:     Um, I assume that I did because, I, the, the reason why I stopped after six rounds, I had 11 in my weapon, there's 10 in the magazine and one in the chamber to start with. The reason why I stopped is cause as I, as I'm firing, Mr. Ardo starts leaning to his right across the passenger seat, and I'm tracking him as I'm firing and as he disappears, he disappears from my view. At which point I cease firing because I no longer have a target to fire at. And, I'm assuming I either hit him and you know that's why he went down or he's taking cover. So, um at that point I can no longer see him now from where I'm at. So, initially I start moving, side stepping to my right because I was going to approach the vehicle then on the passenger side. Uh, and my think, the reason why I did that was because if Mr. Ardo would pop back up, um, and he had a gun, since that was mentioned, I'm assuming that he's most likely gonna be aiming and firing where he last knew where I was at. Which was on the driver's side. So, initially my intention was to approach the vehicle on the passenger side and as I star, just as I started to do that I realized if I do that, Eddie and I, Trooper Pagan and I are going to be in a crossfire situation again. So, I reverse, I start coming back again towards the driver's side. I start, as I'm, I think I only took one or two steps out, up along the side of the car approaching the driver's door. And at that point, Mr. Ardo immediately pops right back up and he doesn't have his hands up. He doesn't say, you know, ok, ok, I give up. And I immediately re-engaged with three rounds, a quick three round burst. Um, because I was still in fear that he, he did not appear to be incapacitated in any way and I was still in fear that you know we were all going to be blown up. So, he still had full function, as far as I was able to tell just based on how quickly he sat up and you know there was no hands in the air or you know, um and,

DEF0000214

and no statements at that point, which I would have been able to hear him because I was very close, at that point, to the vehicle. As well as having the, the back window shot out. Well, not completely shot out, but you know I had a decent sized hole from my rounds passing through the rear windshield that if he would have said anything I don't see any reason why I wouldn't have heard it.

EVERK:   Instead of, when Eddie came out to the side, you were behind him and you said shoot, or when you saw Eddie's eyes get real big

SPLAIN:   Hmm, hmm.

EVERK:   Uh, you think he has a device. Why engage him? What would be your reasoning? Why not, let's back away from this or take off?

SPLAIN:   The reason why I decided to engage him versus trying to uh retreat was because based on my department training, minimum safe distance from any suspicious package or suspected explosive device is three hundred meters. I was maybe five yards from Mr. Ardo. I cannot cover three hundred meters sprinting in a split second if he decides to you know detonate his device. Um, I also, I can't get in my patrol car in a split second and drive three hundred meters away in even a couple seconds. So, at that point, it was, it's a do or die situation where if I'm, I believe I'm about to be blown up, seriously injured or killed, um, I'm not gonna die running away. I'm gonna at least die trying to do something about it.

EVERK:   Do you have any more questions about the

JUDGE:   When you uh, well just to go back. You said you fired, was it three more rounds?

SPLAIN:   Yes.

JUDGE:   And that was when he popped back up?

SPLAIN:   That was, yeah, yeah,

JUDGE:   Ok.

SPLAIN:   and it was only about um three seconds between my first six rounds, him going down, and him coming back up and me firing, um.

JUDGE:   At any time, and I, I don't want to get ahead, but at any time up until that point did Mr. Ardo make any attempts as far as you could tell, did you hear him say anything? Did he make any motions whatsoever?

29

DEF0000215

SPLAIN:     No.

JUDGE:      Any, any efforts at communication with you or, or either Trooper Pagan that you could tell?

SPLAIN:     No, he did not.

JUDGE:      Ok.

EVERK:      And, and blocking him in, verse letting him go at that point, the reasoning?

SPLAIN:     Um, it wasn't necessarily, it wasn't, um, I didn't know how Trooper Pagan was going to approach. Uh, I at least knew that, I can at least do my best to block the area behind him, um cause, again, at least, if, if, if he's gonna try and flee in his vehicle and it ends up being a pursuit, at least I know it's most likely going to be going away from and you know he's not going to be backing up. Because I have that route blocked as best as could. Again, if he wanted to he could've. I didn't have the entire roadway blocked off. My car's not that long. Um, but it, it just in the split second that I had to make that call it just seemed like the best options. Because again, I didn't know how Trooper Pagan was going to position his vehicle.

EVERK:      Ok. And then after, um, and you fired your three more shots, uhhh, did you attempt first aid? What happened after that?

SPLAIN:     (inaudible) my uh, it would have been rounds seven, eight, and nine, uh just paused briefly. I could see at that point that um, he had kind of, went, slumped in the seat and went limp. Wasn't uh, wasn't moving and was kind of listing a little bit towards his, his right side. Um, gave commands, don't move, don't move. I approached the driver's door. I, I uh grabbed the door handle. It was unlocked. Popped the door open, at which point, you know, I could see there's, Mr. Ardo's hands. Didn't see anything in his hands. Immediately noticed a strong smell of blood. He was bleeding profusely from his uh nose and mouth. There's a lot of blood on the back of his head. Uh, cause he was leaning to his right, there was a large pool of blood forming, kind of, like in, I guess like in the area between the two front seats, that area. The center console if you want to call it that. There's blood spatter on the uh the inside of the front windshield and, and dashboard. Um, and then at that point, and I also see that he's got a device with a fuse on it around his neck. It was actually the, the fuse was tied through the hole and his shirt collar. He was wearing, it was like a waffle knit, I think it was brown, it was a dark colored waffle knit, like long john type shirt, thermal shirt. And um, so at that point I could tell, he's struggling to breathe. He's still alive. His eyes are open. He, gurgling blood. I'm telling him don't move. I then decided

30

DEF0000216

you know we need to get him out of the car in order to start administering first aid and also to continue to assess whether he has any other devices on him or any other weapons, you know like a gun in his waistband, a pocket or whatever. So, I, I uh grab a hold of his uh, left sleeve in the shoulder area and he was wearing a ball, I think it was a black ball cap. So I kind of grabbed that, like the top of his head cause I was trying to find the least blood soaked spot on his person to grab him to pull him out of the car. And so I grabbed his left shoulder and top of his head and pull him out. He falls to his left side onto the ground. He, he stated you know through gurgled blood that, um "I can't breathe" or "can't breathe. Cause my initial plan was you know, as soon as I got him on the ground, try to get him handcuffed, try to get him secured so he wouldn't be able to access what was around his neck or any other weapons that I had found yet on this person. But once he said he couldn't breather I immediately abandoned the plan to get him handcuffed and just figured I could control his hands and arms you know just physically myself. Um, and I rolled him, instead of putting him on his face down, to handcuff him behind his back, I rolled him on to his left side in a, what I considered a modified recovery position that were taught in like first aid. To try and assist with his, with his breathing. That's the best position for somebody who's injured and having difficulty breathing, is the position on their side. So at that point, once he's on his side, um, blood's just continuing to just pour out of his nose and mouth. Um, I started just doing a visual assessment of looking at his clothing, his body, just trying to see if anything stands out as far as like he might have a gun under his shirt, or you know in his waistband or uh, any other explosive devices on him. Uh, I didn't see anything and I'm also trying to still figure out what the hell is around his neck, uh as far, you know is it still a danger to us. You know, is it something I can move if need be without setting it off or um. So, after doing that assessment, I determined that to the best of my ability, it appeared the only thing he had on him was the, the uh explosive around his neck. Umm, I could feel, because I'm holding onto his, his uh right arm, I ended up bending that, getting it positioned behind him to control that and he's kind of, he was laying, cause he's laying on his left side, he's laying on his left arm so that's, you can't really do too much with that. And I can just feel like, like there's not any tension in his muscles like he's fighting or he's going to try to resist at all. Um, so then at that point, I uh, decided alright, I believe it's safe enough for us to start administering first aide. I asked Trooper Pagan to uh retrieve the first aid kit out of his patrol vehicle. Um, and then I also realized that I had my, my tactical, my patrol gloves on at that time, which are just like a synthetic leather and canvas. Um, so they're not blood, they're not going to protect me from blood exposure. So, at that point I stood up. I took my patrol gloves off, reached in my left trouser pocket and I had, I always keep two pairs of latex gloves in my left trouser pocket. So, I, I pulled those out and put them on. Trooper Pagan didn't have any so I gave the second pair to

31

him. Um, got gloved up. I ran back over to my car. Threw my patrol gloves on the hood of my car and retrieved the individual first aid kit out of the driver's door pocket of my car. Uh, ran back up to Mr. Ardo. I got the uh, the uh trauma shears out of the first aid kit. I could see a, a bullet entry wound on the rear of his left shoulder. Um, so at that point I decided to use the shears to cut the back of his shirt, to remove his shirt, so I could, so I could better address and evaluate if that was his only wound or if there's other bullet holes, bullet wounds that I hadn't seen. I get the shirt cut off and, by the way, the department trauma shears suck. Um, and finally get the shirt cut off of him with a lot of aggravation and all I see is, on his back, is the entry wound on his left, back of his left shoulder. He also had some super, what I considered at the time, to be superficial wounds across the entire portion of his upper shoulder area, which Trooper Pagan noticed it too and asked what that was and um, it appeared to be like glass shards from my rounds turning the auto glass into high speed projectiles and um appeared to be just superficial, a bunch of like uh, maybe a hundred, small puncture marks, um, from the many glass shards hitting him in the back as well. Uh, so at that point Trooper Pagan removed the combat gauze out of the uh first aid kit, handed it to me and I immediately started packing the combat gauze into the entry wound on Mr. Ardo's left rear shoulder. I was also, uh, while doing that I continued to look at his uh, his head because I was pretty certain that he had a wound somewhere on his head too. Um, because that's where I'd been aiming and uh, there was a lot of blood on the backside of his head. I didn't immediately see any obvious holes or entry, eh, bullet entry wounds on his head, but uh, I did end up finding, a short time later, a volunteer fire fighter, who's a lieutenant uh, with uh, Lower Mount Bethel Fire Company. He's an EMT as well. He showed up on scene uh prior to EMS and said "Hey, I'm an EMT. What do you guys need?" And, and I said yeah we could use your help and it was, once he was there and doing his assessment on Mr. Ardo that's when I located the uh bullet entry wound underneath Mr. Ardo's left ear. Um,

JUDGE: How did, how did that, that uh EMT happen to come across

SPLAIN: he

JUDGE: Did you or Trooper Pagan request

SPLAIN: Oh, you, well yeah. Immediately after I fired my last, my final three rounds and then I got on my portable radio and um said shots fired, send EMS. Um, so he had, he uh, this fire fighter/EMT he heard go out over county radio cause he has county radio in his, his vehicle, his personal vehicle. Um, and I guess, I'm assuming based on where he was at, at that point in time, he was much, he knew versus going to the station and getting on a truck and coming, he knew it would be a lot quicker if he just

DEF0000218

went in his personal vehicle, came directly to the scene. I mean, and he has, he has blue lights on his vehicle. So, um, cause we initially thought it was fire police showing up. Cause we were gonna turn him away and just tell him, to block, keep the intersection blocked down there with Lower South Main Street and Good Road. But that's when he, he, I heard him yell, "I'm an EMT. Can I help?" And we were like, yes, come on help us out. So.

JUDGE:     Ok. Did, did, did anyone request an ambulance service prior to shots being fired at all. I know sometimes police will

SPLAIN:    No

JUDGE:     request one if their contemplating a 302 commitment.

SPLAIN:    Yeah, well, we, we never did because um, we had no clue where he was at. We weren't expecting um, initially we weren't expecting to uh, to have contact with him. But then once you know we came up with the idea of having him come to the residence to get money um from his mother, we still weren't anticipating anything like this. So, maybe it was an over sight and we should have contacted EMS and at least have them on stand by, but again, we didn't if he was going to show up. We didn't know how long it was gonna, if he was, he could've still been on the property for all we knew and he could've been there two seconds and you know ambulance wouldn't have been anywhere near. So, eh, um, just with all the unknowns, we didn't, we didn't think to uh request EMS.

JUDGE:     Ok.

EVERK:     Do you have any more questions with the uh, from the shooting, previous?

JUDGE:     What, what do you mean?

EVERK:     I was going to ask some other questions but

JUDGE:     Did Mr. Ardo make any statements other than the I can't breathe? The comment after he had been shot. Were there any statements, did he make any statements whatsoever? I mean, obviously he was talking to his mom on the phone, but I'm talking about

SPLAIN:    Yeah.

JUDGE:     once he arrived on scene, you knew he was on scene.

33

DEF0000219

SPLAIN:    No, no, no once from the point he arrived on scene to the point we were administering first aid, uh, he never made any statements to uh, to us or anybody else that I know of.

JUDGE:    Up until the time that EM, the EMT showed up, the volunteer fire fighter showed up on scene, other than yourself, Trooper Pagan, and Mrs. Monaghan, did you see anyone else on the property?

SPLAIN:    Yes.  There was a woman that Trooper Pagan and I both kind of crossed paths with, when, after we initially repositioned our cars in the back yard behind the pool.  As we were walking back up the driveway to go into the house, um the, say like in the middle of the driveway, there was a woman that was walking across the driveway and she asked is everything alright cause I think we kind of surprised her.  Two troopers in uniform all of a sudden appear from the back side of the house and as we're walking up the driveway and uh Trooper Pagan answered, he said, "Yeah, we're just visiting, no big deal" and that was it.  She just continued on her way.  I didn't take note of where she actually ended up going.  Also, while I was initially responding there, as I was driving up to the residence, I noticed there was horses out in the pasture.  I remember seeing a male in the one pasture and then the pasture that's directly across the street from the house on Good Road, um, there was, I remember seeing a female leading a group of, I want to say it was like three, four, five horses, uh, through the pasture.  Um, there was, I mean there was a lot of vehicles around I remember.

SMITH:    Just wrap up your thought.  It's time to switch tapes again

JUDGE:    Okay

EVERK:    You stopping it now

SMITH:    He can finish his thought then give me a thumbs up and then just wait 10 seconds to stop the tape

SPLAIN:    But yeah, I did notice it was a working horse farm.  It was a Saturday morning so people were at the farm dealing with their horses and I did see other people around and, and a lot of other vehicles as well.

JUDGE:    Did you, you or Trooper Pagan have the opportunity to identify those people?

SPLAIN:    No.

34

DEF0000220

EVERK:     Alright, we'll stop here for a minute.  Um, its 1450 hours and we're going to turn of the tape and Trooper Smith's going to turn off the other tape.

           END OF SECOND RECORDING

EVERK:     It's 2:58 p.m. on June 16, 2017 for the beginning of the third recording.

EVERK:     I just have some off related questions.  Uh, after uh EMS came and so forth, did you or any member of our department of the State Police secure the scene?

SPLAIN:    Um, Trooper Stepanski was the uh first one to arrive on scene, you know, other than us, myself and Trooper Pagan.  Once he arrived on scene, uh, he, he took control uh, as far as uh, and the fire company had already taken upon themselves setting up crime scene tape because I remember Trooper Stepanski asking, pretty sure, yeah asking us, or asking me, how much of the, like what area needs to be taped off.  And, I said just this immediate area right here is where everything happened.  Um, I know he uh he ended up starting the crime scene entry log.  Um, uh Trooper Branosky got there shortly after Trooper Stepanski and um I spoke with Trooper Branosky and told him at that point I'd seen three or four people standing um just west of the uh driveway entrance, the main driveway, uh, up, like near the barn, standing near the edge of the roadway looking at the scene and I immediately pointed them out to Trooper Branosky and said "hey, I said we might have potential witnesses up there.  Go get their info and statements, see if they're witnesses or not".  I think I said I don't know if they saw anything or heard anything, but just go talk to them.

EVERK:     Did uh, Stepanski was there, Branosky.  You are, you didn't see any one else, no evidence was removed, nothing was altered?

SPLAIN:    The only thing that was altered was the uh, the uh firefighter EMT that showed up on scene first to assist us, um, I think his first name is Steve, Stephen.  He asked for permission to move the device because when he decided to start CPR, he said hey, I gotta move this thing to do CPR, is that alright?  I said yeah, that's fine, just, don't lose, I said it's evidence so, he said it's fine I'm just going to set it down right down here in the grass by the edge of the roadway.

JUDGE:     Is there any reason that you thought that at that point it was safe to manipulate the device around his neck?

35

SPLAIN:     The, the, the, it hadn't blown up at that point, the fuse wasn't lit. I didn't see anything like, that like uh, a trip wire attached to it, like if you removed it, it would set itself off. You know based on my limited knowledge and interaction with it, um, it appeared at that point in time the only way it was going to explode as far as I could tell, is if you put fire to the fuse and lit the fuse. So, at that point I said yeah, yeah, it's fine. Go ahead and move it. Do what you gotta do.

JUDGE:      Ok.

EVERK:      during the shift, on May 20th prior to the incident, during the incident, you weren't under or were you under the influence of any drugs or alcohol?

SPLAIN:     No.

EVERK:      Ok, uh, what was your shift the day before? Do you remember?

SPLAIN:     Um, pretty, day before? Um, I think I was day shift that day as well. I'm not certain though.

EVERK:      Do you remember, did you get adequate sleep that night?

SPLAIN:     Yes, probably about, well with a two year old and a seven month old at home, a good night's sleep is five hours, five and a half hours. Um, anywhere from five to six hours is a full night's sleep for me at this point.

EVERK:      And uh, is there anything, any subject or piece of information that myself or Trooper Judge didn't ask you about or you feel we missed?

SPLAIN:     Um, no, I mean, other than the fact, I don't know if I, if I made this uh clear or not, you know I was mainly concerned about preventing the suicide. You know that was my first concern with Mr. Ardo. Second concern, which, you know, I wasn't going to be the arresting officer, but you know the second issue was the PFA violation. Um, and you know it's also concern for the safety of his mother, um, and her property. Cause again, going back to the where I thought that the statement he made about the fire on the mountain possibly being an arson threat, or cloaked arson threat, you know I was definitely concerned about the safety and welfare of his mother's property and herself as well. Especially after hearing him on the phone blaming her for all of his problems and uh and stating he was you know if he was going to blow his head off, he was going to make her watch it. You know, like, it was like he wanted to punish her. So um all those things combined, I was definitely concerned for, I was there to protect her as well.

EVERK:      And you've had Use of Force Training with State Police?

36

DEF0000222

SPLAIN:   Yes.

EVERK:    Ok.  And in the course of your duties, in the past, you've worked 13 years, uh, have you ever had to use deadly force in the, as part of your duties?

SPLAIN:   Yes, I have.

JUDGE:    And that was investigated?

SPLAIN:   Yes, it was.

JUDGE:    Ok.

EVERK:    Where, where were you stationed at that time?

SPLAIN:   I was at Bethlehem.  PSP Bethlehem.

EVERK:    And the uh, who would've been the criminal investigator?

SPLAIN:   That would be Trooper Bellesfield and uh Trooper Egan.  I believe Trooper Bellesfield was the lead on that one.  Trooper Egan was assisting.

EVERK:    I don't have any more.  Do you have any?

JUDGE:    I don't think so.  Mr. Asteak?

AZTEC:    These are your questions gentlemen.

EVERK:    Have you answered all the questions, uh, given you today, completely and honestly today?

SPLAIN:   Yes.

EVERK:    Ok.  It is 3:06 p.m.  Going to turn off the tapes.

37

DEF0000223

TPR.
EDDIE PAGAN

Interview

DEF0000224

SP 7-0019 (9-99)

PENNSYLVANIA STATE POLICE
## RIGHTS WARNING AND WAIVER

INCIDENT NO.: PA2017-516047

ME: 1253 PRS     DATE: 06/20/17          PLACE: PA State Police - Belfast Barracks
My name is Trooper Michael EVERK of the Pennsylvania State Police.
(OFFICER'S NAME)
You have an absolute right to remain silent and anything you say can and will be used against you in a court of law.  You also have the right to talk to an attorney before and have an attorney present with you during questioning.  If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire.  If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.

### WAIVER

I fully understand the statement warning me of my rights and I am willing to answer questions.  I do not want an attorney, and I understand that I may stop answering questions any time during the questioning.  No promises have been made to me, nor have I been threatened in any manner.

SIGNATURE

WITNESS(ES)

SIGNATURE OF WITNESS(ES)                              SIGNATURE OF OFFICER

DEF0000225

# EXHIBIT 8

SP 7-0019 (9-99)

PENNSYLVANIA STATE POLICE

# RIGHTS WARNING AND WAIVER

INCIDENT NO.: PA2017-516047

TIME: 1253 HRS    DATE: 06/20/17    PLACE: PA State Police - Belfast Barracks

My name is Trooper Michael EVERK of the Pennsylvania State Police.

(OFFICER'S NAME)

You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.

## WAIVER

I fully understand the statement warning me of my rights and I am willing to answer questions. I do not want an attorney, and I understand that I may stop answering questions any time during the questioning. No promises have been made to me, nor have I been threatened in any manner.

SIGNATURE

WITNESS(ES)

SIGNATURE OF WITNESS(ES)

SIGNATURE OF OFFICER



EXHIBIT

A

8-22-19 EK

PENGAD 800-631-6989

DEF0000225

**Incident #: PA2017-516047**
**Date: 06/20/17**
**Trooper Eddie PAGAN interview**

*Video*

| | |
|---|---|
| EVERK: | It says 1254 |
| JUDGE: | You starting it? |
| EVERK: | I'm just trying to get, trying to figure out the |
| MINOTTI: | Here? |
| JUDGE: | Yeah. |
| PAGAN: | Where we usually? |
| EVERK: | You can sit right there. |
| JUDGE: | Mike's gonna be doing most of the talking so |
| PAGAN: | Ok, so I'll be head on with Mike. |
| EVERK: | I think Matt's going to let us know when he starts here. |
| JUDGE: | I'll just make sure he has it going. |
| PAGAN: | It's just gonna be you inside? |
| EVERK: | What? |
| PAGAN: | Just you inside here? |
| EVERK: | No, Ray's coming. |
| MINOTTI: | You sure John doesn't have a team of guys come in here through the fucking *(inaudible)* |
| EVERK: | It might be recording. |
| MINOTTI: | Huh. |
| PAGAN: | Yeah. |
| MINOTTI: | What did you say? |

1

DEF0000226

EVERK:      I said it might be recording already.

MINOTTI:    Oh

JUDGE:      It's running already.

MINOTTI:    I didn't know how many people were going to be in here.

EVERK:      Nah.

MINOTTI:    So it's just you two?

EVERK:      Yes.

MINOTTI:    We're not waiting for anybody else.

JUDGE:      Nope.

MINOTTI:    Ok, I wasn't sure.

JUDGE:      This is it.

MINOTTI:    Ok, no problem.

*Audio and Video*

PAGAN:      Oh, you have like two different audios?

EVERK:      It's just a backup, just in case.

PAGAN:      Hahaha, yeah.

EVERK:      It's June 20th at 1253 p.m. I'm here with, uh Trooper Eddie Pecan, Pagan, his attorney, Mark Minotti, Trooper Raymond Judge, and myself, Trooper Michael Everk. Uh, we're here today to discuss incident number PA 2017-516047. It's into the officer involved shooting of an Anthony Ardo. Uh, before we start, uh, Eddie, I'm gonna just read you your rights real quick. You have the absolute right to remain silent. Anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge for any questioning, if you so desire. If you decide to answer any questions, you may stop anytime you wish and cannot be forced to continue. Do you understand the statement of Warnings and Rights that I read you?

2

| | |
|---|---|
| PAGAN: | Yeah, I do. |
| EVERK: | And you can stop uh answering any questions at any time and no promises have been made, nor have you been threatened in any manner. |
| PAGAN: | *Nods yes.* |
| EVERK: | I'll just have you sign. Mark, will you sign this? |
| MINOTTI: | Sure. |
| EVERK: | Right there. Thanks. Alright, can you state your full name? |
| PAGAN: | First name, Eddie, E-D-D-I-E. Last name, Pagan, P-A-G-A-N. No middle name. |
| EVERK: | And what's your rank? |
| PAGAN: | Um, a trooper. |
| EVERK: | Alright, how long have you been employed by the Pennsylvania State Police? |
| PAGAN: | Approximately almost 4, 4 years. |
| EVERK: | Ok, and where are you currently stationed at? |
| PAGAN: | Um, Troop M, um, Belfast. |
| EVERK: | Ok, how long have you been at the Belfast barracks. |
| PAGAN: | Approximately eight or nine months. |
| EVERK: | And where were you at before that? |
| PAGAN: | Troop M, Bethlehem. |
| EVERK: | Alright. Back on May 20, 2017, were you working? |
| PAGAN: | Yes, I was. |
| EVERK: | Alright. How were you attired that day? |
| PAGAN: | I was in full uniform. |

3

DEF0000228

EVERK:     And what vehicle were you in?

PAGAN:     I was um operating a marked patrol car, Car 8.

EVERK:     Alright, is that a uh

PAGAN:     It's a SUV.

EVERK:     Ok.  And at, at some point were you dispatched to a 1382 Good Rd. in Lower Mount Bethel Township, Northampton County?

PAGAN:     Yes, I was.  Approximately at 850 hours, 849.

EVERK:     And what was the call?

PAGAN:     It came in as a See Officer um, for a male making suicide threats towards his mother.

EVERK:     And who were you told this by?

PAGAN:     Dispatcher, PCO Lenny Behler.

EVERK:     And that's the only information he pro, provided on the call?

PAGAN:     Um, over the radio, yes.  I called him at station to get a little bit more details in regards to the call and he explained um, in more detail what was going on, as far as the threats that he was making towards his mom and, and the calls that he made himself towards, um Anthony Ardo.

EVERK:     What did, uh PCO Behler exactly tell you?  Do you remember?

PAGAN:     I don't recollect exact wording, but pretty much he said that the mom had called saying that he had made threats and, about hurting himself and upon him calling Ardo himself, um, he did not want to tell him where he was at and related to him that he wanted to hurt himself as well.

JUDGE:     You mean when PCO

PAGAN:     Behler, yes.

JUDGE:     Behler?

PAGAN:     PCO Behler, um, he, this was told to PCO Behler by Anthony himself and he related that to me over the phone.

EVERK:     Ok.  Where, where were you at before you were dispatched to

4

DEF0000229

| | |
|---|---|
| PAGAN: | I was actually just finishing up a non-reportable crash. |
| EVERK: | Alright.  Have you ever been to, uh 1382 Good Rd. previously? |
| PAGAN: | Never.  I never even driven that road before. |
| EVERK: | Have you heard of uh, Jean Monaghan or Anthony Ardo? |
| PAGAN: | No. |
| EVERK: | Have anybody, his name or her name come up in the barracks. |
| PAGAN: | Negative. |
| EVERK: | Ok. |
| JUDGE: | While you were in route |
| PAGAN: | Hmm, hmm (nods head yes) |
| JUDGE: | Up, until the time that you arrived on scene, did anybody contact you other than PCO Behler |
| PAGAN: | Behler, no. |
| JUDGE: | to tell, to provide you with any more information about Mr. Ardo or the incident itself? |
| PAGAN: | I, I don't think so.  I don't recall so. |
| JUDGE: | Ok. |
| EVERK: | When you arrived at, uh 1382 Good Rd., who did you meet with? |
| PAGAN: | I met with the mother, Jean Monaghan. |
| EVERK: | Was there anyone else home at the house at that time? |
| PAGAN: | No, she was by herself. |
| EVERK: | Ok.  And what did, uh Jean Monaghan tell you? |
| PAGAN: | Well, she went on to tell me what happened the day before, which she said that she had gotten a PFA against Anthony Ardo.  Um, the day prior he was served by the Sheriff's Department and that he violated the PFA |

5

DEF0000230

the morning of the 20th, approximately 6 o'clock in the morning when he came to the house and started causing a ruckus looking for paperwork for his car, or such. And in the process of looking for the paperwork he began a verbal tirade toward, towards her.

EVERK: And at some point, did uh, Trooper Splain, was he also on scene?

PAGAN: Well, Trooper Splain did not arrive on scene immediately, uh with me. He came af, he came approximately fif, ten or fifteen minutes after I have arrived on scene. Well, I don't know, I can't tell you exactly how, how long he was, but I was there first.

EVERK: And she told you all this, uh

PAGAN: She told,

EVERK: before Trooper Splain arrived?

PAGAN: Yes, she told me this prior to Trooper Splain arrival.

EVERK: And then what happened. What, what else did, uh Jean Monaghan tell you after that?

PAGAN: Um, she, she told me about the uh PFA. She told me about him showing up in the morning in violation of the PFA. She told me how he left, and he call, he ended up calling her again at approximately 8 o'clock in the morning, she said and that's when he started making threats to her, towards himself, to her and over the phone. Saying that he's gonna shoot and he's gonna blow his head off, pretty much.

JUDGE: Did he get, did, did Mrs. Monaghan provide you with more detail, other than he's, did he say how he was going to blow his head off, or was, was he more specific to Mrs. Monaghan?

PAGAN: No, he, he, she just told me that he was saying he was, he's gonna get a gun, he's gonna blow himself, his head off and that everything that's happening to him is because of her and she, he referenced something about marijuana plants on the property. Saying that he's gonna get her back for doing this to her, to him, which I'm assuming is getting the PFA and getting him kicked out of the house.

EVERK: While you were at the house, did you, uh try to make contact with Anthony Ardo?

6

DEF0000231

PAGAN:      No. Uh, I was, I was just trying to get basic information about Ardo's whereabouts, and possible whereabouts and information that might help me get a hold, get a hold of him, physically.

EVERK:      Did, did anyone get a hold of Anthony Ardo while you were at the house?

PAGAN:      No, the only person that spoke to Ardo was, um PCO Behler, over the phone. The mom ended up speaking to him in the phone, in front of me, after, but we're going step by step.

EVERK:      Ok.

PAGAN:      Yeah.

EVERK:      So, when you say the, the mom was speaking with him while you were there,

PAGAN:      Yeah.

EVERK:      did, was that, uh, did he call or did she call him?

PAGAN:      He called her. So, what happen, what happened was, I was speaking to the mom. She was telling me all the details. When Trooper Splain arrived on scene I informed Trooper Splain of what, what the mom had told me and Trooper Splain informed me of what had happened with the call toward, towards the dispatchers. While Trooper Splain was on scene, the mom received a phone call and she looked at us and she tells me, "it's him, he's calling." So, that's when we tell her, "well, pick up the phone. Just talk to him. Do not let him know we're here." And that's when she, that's when she starts speaking to him over the phone. And he further made threats, in the phone on speaker, that Trooper Splain and myself overheard.

JUDGE:      Ok. What were those threats?

PAGAN:      He went, pretty much everything the mom had told us about his comments about getting her back. Uhh, about the alleged marijuana growth, whatever he was talking about. And him blowing hisself was all made on the phone again. He said, he said, he's, he's, he's gonna, he's gonna get her back for what she did to him. He's um, he's gonna get a gun, or buy a gun and he's gonna blow his head off. And then he, he said that at approximately 905 hours cause I remember exactly cause I looked at my watch when he said that.

EVERK:      Now, when you say on, on speaker, did uh, did you put the phone on speaker for her or did she do it?

7

DEF0000232

PAGAN:      No, she, she, she did all that.

EVERK:      Did anyone ask her to do it?

PAGAN:      I, I asked her to put it on speaker.

EVERK:      And was that the only phone call that, that was made between Jean

PAGAN:      No, there was another phone call that happened later on. I mean, I don't
            know if you guys want me to say the whole story and then you guys just
            jump in and ask me questions. Cause it might answer all the questions
            you guys have. I don't, I don't know cause I feel like I'm missing, I'm, I'm

EVERK:      Ok, if there's something were missing you let,

PAGAN:      Ok.

EVERK:      you can let me know. I'm just

PAGAN:      Alright, yeah.

EVERK:      We're just trying to fill in blanks here also.

PAGAN:      Ok, perfect.

EVERK:      Um, so, after that phone call, you said around 905, what happened next?

PAGAN:      So, when the, when, when he made, when he made a phone call, while
            she was talking to him, I was trying to get her attention, but she was just
            so focused on the phone. I was trying, like, like with hand gestures,
            trying to tell her, like tell him to come over here, tell him to come over
            here. But she didn't, she didn't, obviously she didn't hear that. She didn't
            see me. She was just so focused on the phone. Um, when she hanged
            up the phone, we, we spoke to her like well maybe if you get him over
            here, you know then we, we can get him the help he needs. And in my
            mind I'm thinking we're gonna arrest him for the PFA violation or possibly
            get him 302 committed cause he made threats to harm himself over the
            phone, which I've heard, which I heard in person. So, she goes like
            "yeah, that's a good idea." So, I, I told her, we told her, "just tell him
            you're gonna give him money." Cause we're assuming, we're assuming,
            he wants, he wants drugs cause she had related to us that he's been a
            drug abuser for the past 20 years. So, she's like "ok, yeah, that sounds
            like, yeah, ok, I'll do that." So, then that's when she gets on the phone
            and she calls him and he goes off again with verbally abusive language
            that he was using towards her. And once she brings up, once she brings

8

DEF0000233

up the whole thing about giving him money, he just stops and he, he just quickly agrees. He, she tells him like, "I just, just if you want money, just come and get money. I just want to make sure you don't' hurt yourself." And he quickly just, you could just, you could just hear in his voice, he just stopped and he's like ok, I'll be there. It was just like so quick. It's like that's what he wanted in a way. That's, that's what I gathered from that whole conversation. Which it was, so we were like ok, alright. So, he's gonna come over her cause he wants, he wants money for drugs. So, at that point, uh that's when Trooper Splain and I started asking the mom, is there any way that we could park the cars somewhere on the property where he might not see them. In the barn or anything so that way if he's coming home and we're in the house, he doesn't see us and takes, and take off. Alright, cause now our concern is make, make sure we get hands on him because he's a danger to himself. We don't want him to hurt himself. So, that's when the mom told us, like there's no place to hide the car except, except behind the, uh the back of the house. So, then Trooper Splain and I decided to take our cars, park them behind the house, shut 'em off so that way in case he does see the cars we have rifles in the car. We don't, we want to make sure nobody breaks into our car and takes a state cruiser for a joy ride. So, so we parked the cars near the residence and then that's when I told, I told Trooper Splain we should park the cars back to each other so that way if you have to go this way you have access and if I have to go this way you have, I have access so we don't get crossed up in the same thing, cause in case, we don't have to do any backing maneuvers, we just, just straight, straight going out. Cause it's a two-way road so we don't know which way, you know which way he was coming. The mom wasn't sure either. So, we parked our cars. We shut off our cars. We go inside the house. We come up with a plan. Hid inside the house, as far as, where we're gonna, where we gonna be hiding in case he does come. Who's gonna, who's gonna do what, in, in as far as apprehending him and the plan that we came up with is that Trooper Splain was going to use um, t, t, a Taser, if, if it came to that and I was going to use lethal force. But pretty much, the plan, the plan, the plan was pretty much, I'm gonna go hands on, Trooper Splain is going to keep eye and, and back me up. But that was gonna be, pretty much be the plan to get ahold of him inside the house.

EVERK:     Let's back up a little bit here. On the phone call, when you said verbally abusive, just explain, I don't know what was said, what was said on the phone.

PAGAN:     Ok, yeah, well he just kept repeating the, the, the whole, the red, the rhetoric, that she had told me prior. Um, you did this to me, your, um, I'm gonna get you back. You ruined my life. Nobody has been there for you but me. I can't tell you exactly what he said, but it's more along those lines. It's like, it's like every time you needed me I have been there and

9

DEF0000234

you're doing this to me so because of you I'm gonna blow my head off. I want you, I want you to know it's your fault and pretty much like stuff to like kind of get her to feel like it's her fault and not his fault for whatever he's, he was planning on doing, or allegedly plan on doing.

EVERK:   So, the plan that you and Trooper Splain came up with is to have him enter the house?

PAGAN:   Yes, correct, cause he was gonna come and, he's gonna come in, get money from the mom so once he comes in, it's gonna be surprise! You're under arrest for the PFA violation and you're also gonna get 302 committed.

EVERK:   Ok, and you said that uh, the plan was to go hands on or Splain use the Taser?

PAGAN:   Correct.

EVERK:   And then, uh, you mentioned about lethal force.

PAGAN:   Well, we, we tried to cover all the basis. We, we, I, I, I never in a million years would have thought that this would've turned out to use a lethal force, but it's just, it's just kind of like covering all your basis. You know, it's just being tactical minded in case he does like put on force, in case he does have a weapon like, he, cause he said he's going to blow his head off with a gun. We asked the mom, does he own a gun and the mom said no, the only gun that they have was her gun, which was, which was by her bed, which she confirmed it was still there. But, you never know if he could've got a gun from somewhere else or if he had a gun that she didn't know about. So, it's kind of, it's kind of just prepare in case he does, he does have a, a, a gun of some, of some kind.

EVERK:   Was there any more phone calls after that between Jean and Anthony?

PAGAN:   Yes, yes there was. Well, after Splain and I came with the plan, I positioned myself on the side of the house where I was monitoring the road coming towards the house and Splain was monitoring um, from the kitchen with the mom. He was with the mother in the kitchen, monitoring the other side of the road coming this way. So, we were separated in the house but we could hear each other, we could talk to each other from the house. So, it's a pretty small house where the echo travels and you could hear each other. You could actually have a conversation. So, as I'm in, I'm in the other room on my knees. I was actually on my knees by the rug and hiding behind some plants, just kind of find a comfortable spot to keep a look out for this guy. I heard the phone ring and the mom is like "oh, he's calling again, he's calling again." So, then um, she,

10

Trooper Splain, ok, alright, pick it up.  When he um, when she picks up the phone, that's when Ardo gets on, I could hear him on speaker.  I could hear him say oh, just, and just, and just, I don't know the exact words, but just so you know, if the cops are there, I have a bomb that I'm gonna attach to my neck and I'm gonna blow myself and everybody up with and it has nails.  That was his, his pretty much what he said, bomb with nails and it's gonna be tied around his neck and everybody's gonna get blown up, that was pretty much the comment he made towards the mom on the phone.

JUDGE:     and you heard this?

PAGAN:     I heard, I heard this from the speaker from the other room.  I was, cause I would say it's a living room.  I don't know, it's kind of like a living room slash bedroom.  It's like a living room that had like a sofa there, I could tell somebody sleeps there.  It was just, it was a weird

EVERK:     And this, this, just to clarify, uh, the room you're talking about, was that the one, is it with all the windows towards the back of the house out of the kitchen?

PAGAN:     No, no, so if you, if you, if you remember the house, when you come in the main entrance by the kitchen, there's a, there's a door right there to your left.  That was locked.  Well, that door leads to like that living room slash bedroom area.  You can also get to that room by going around that, around the rooms.  It's like two entrances to that door.

JUDGE:     By the stairway?

PAGAN:     Yes, it was actually right by the stairway, I was right by the stairway.  Like the stairway was right toward my back and I was facing the road.

JUDGE:     So, you were monitoring the road as it goes down to the main road. What is that, uh?

EVERK:     Lower Main Street, or Main Street.

PAGAN:     Yes, something, I don't, I don't remember.  Like I said, I've never driven

JUDGE:     And Jay would have been monitoring the road, Good Road as it went up the hill past the other barns?

PAGAN:     Correct.

JUDGE:     Ok.

11

DEF0000236

PAGAN:      Yeah, so he was monitoring the barns coming towards the house and I was monitoring the main road coming towards the house.

JUDGE:      Ok.

PAGAN:      So, we were kind of like watching both, both sides.

EVERK:      Now this, this third phone call

PAGAN:      Hmm, hmm (nods head yes)

EVERK:      Um, was there

PAGAN:      Second phone call.

EVERK:      Second?

PAGAN:      Oh, yeah, I'm sorry third. She called him, and he called, but he called back.

EVERK:      Was any of this relayed to, uh PCO Behler on desk or over the radio?

PAGAN:      What do you mean?

EVERK:      Uh, any information that you found out uh, in reference to the, the bomb, the nails, uh

PAGAN:      Well, when I spoke to PCO Behler, it was pretty much all quick and short to the point. I got, I got most of my information of what happened at desk from Trooper Splain when he came on scene. That's when he mentioned, he mentioned the threats he made, the threats he made on the phone to PCO Behler about hurting himself, not wanting to, to divulge his location and then he also made a mention of a smoke in the mountains, um type remark, which I had no idea what that meant. Smoke in the mountains, I don't know what, I don't know what he was planning on doing. But going, going back, once he made, once, once he made that whole threat of blowing himself up with the nails and stuff like that, that's when the whole smoke in the mountain think kind of like hit and clicked in my head and I'm thinking was he planning on blowing himself up in the mountains before the mom actually got him to come back for money. It was just my, my brain was just wracking like different scenarios.

JUDGE:      Did you talk to PCO Behler after your initial dispatch and then you, you know speaking to him on the radio saying you arrived on scene? At all?

12

DEF0000237

PAGAN:    Uh, I don't recall. I might of, I might of because the radios were pretty bad, like reception was in and out. So, I might have called him, I might have. I can't, I can't recall.

JUDGE:    Ok.

EVERK:    Ok, and after this, uh third phone call, uh what transpired next?

PAGAN:    With the whole, well, be, um, at one point PCO Behler got over the radio and he mentioned a possible location for, um Ardo. It might have been somewhere on Orchard Street. I don't, I don't know how he got that information, so we asked the mom does Orchard Street sound familiar to you? And she was like "yes, that's where we used to live before." And we're like is there any possible way that he might be up there? And she's like "it's possible." So, at that point, um Trooper Branosky got on the radio saying, well we told Behler, get Branosky to go over there. Take, have him take a drive over there cause the mom described the vehicle as a 1988 blue Buick Reatta, which is a pretty rare car to see around. It just sticks out like a sore thumb. So, just have him take a drive by over there. If he sees the car, just notify us so that way we, we know where he's at, you know and apparently, the address was not too far from the actual place of residence of the mother. So, that's when um, Trooper Branosky started heading, started heading that way.

EVERK:    And then what happened next? Did Trooper Branosky get to the house?

PAGAN:    No, he didn't. Cause as we were waiting, as we were waiting in the house, I'm still in the other room on my knees, waiting, just keeping an eye on the road cause I don't want this guy to sneak up on us and, and we don't see him coming to the door. So, I'm just holding my position at all times. I refused to leave that position because I'm, just officer safety, cause you don't want people to sneaking up into the house and you're unaware. Cause you're talking about something it's not relevant. So, as we, as we were, as we were holding our positions waiting for Ardo to show up PCO Behler gets over the radio and he's, I guess they had pinged his phone and he described the location as Rt. 22 and 191, in that area. So, we asked the mom, well, is there, is he heading somewhere that you know, that you might know where he's heading? And she's like "well, 22 and 191, that's where his methadone clinic is at." And then, and I believe it was New Directions Clinic. "I think is the name" she told me. And I was alright, that makes sense, that makes sense. And I'm like does he go to the clinic and she tells us "yes, he goes religiously every morning, never fails." Goes every morning towards that clinic. Now it's around 9 o'clock in the morning. I don't know what time they open, but I'm figuring oh yeah that makes a lot of sense. He goes every day, and he never fails, it's early in the morning so he's probably, he's probably in

13

DEF0000238

that clinic getting um, getting his methadone, and getting his, his drugs or his medicine. Um, at which point, Branosky, um gets on the radio and says that he's gonna head down there to canvas the area. Um, Branosky heads over, heads over there and we're still waiting in the house cause we still don't know where he's at. The ping could've came from there but he, he could be making his way back home. We don't know. So, we're, we're staying with the mom just to make sure he doesn't show up. Um, so Branosky goes over there. Apparently, um Branosky calls out on scene with the um with this gentleman, with Ardo, he gets over the radio, he calls it out. I didn't hear, I didn't hear that transmission and when uh Jay heard that transmission so we tell the mom, it looks like one of our troopers is out with him over there. And the mom was like, "oh, ok, well just so you know, he has a long, he has long hair, ponytail, he looks homeless." Kind of giving us a description. So, I get on the air and I tell, I tell, um the description over the air and that's when Lenny tells me oh, Nate is out, Nate is out with um with a possible, with a possible person and whatnot. And when uh, and that's when we asked him well, you going to send back up there and he said yeah locals have been notified. So, ok, so we tell the mom, alright it looks like they might be out with him. Then um PCO Behler or Trooper Fleming, I don't know which one, gets on the radio again and says oh we just pinged the phone again for a second time and he's still showing in the same area, 22 and 191. So, that's, we're like, well then he's over there. They're sending people over there. He called out with this person, he has him. So, we told the mom, it looks like they have him, we're just going to stay here and just make sure that um, once he gets in custody then we'll take off cause then we're no longer needed over here. We have everything we need from you in regards to his information. We're just going to wait here until we actually call on the radio saying oh he's in custody and then we'll take off. Then mom was like, "oh, ok." At that point she, she made a comment to me, she's saying, saying that her fear is that her son will do something to hurt himself in front of her to kind of get pay back at her. So, and, and it just, it just baffled me cause if somebody so close would make that comment, she knows a lot more about him than we do. If she, if she, if he's done stuff to led her to believe that he wants to hurt himself in front of her, that's concerning. So, that was always in the back of my mind. So, as she was mentioning this stuff, I kind of wanted to diffuse the situation so we started talking about her house, the property, cause she has a beautiful property and she has, she has some beautiful windows in the back and I remember clearly it had um bird poop on the window. And just to diffuse the situation I brought up my house, how my wife made me clean the, the windows the week prior. Something like that and how big of a pain they are. And she started, she started laughing, oh yeah, you know, yes it's, whatever. Then she started talking about the property and that's when she started talking about financial, financial issues with the house. How that's where they moved to Orchard Street and that's when

14

it clicked, oh Orchard Street is where he used to live.  That's how Lenny found the, uh the connection.  Telling me how real estate deals fell through and stuff like that and pretty much describing financial hardship, which made, led me to believe, well he's been on, he's been a drug addict for 20 years.  She made comments about how everybody's gotten him in trouble.  He's always been, like gotten like PFA's, everybody's gotten PFA's against him.  Girlfriends and what not, but she's been the only person.  But now lately he's gotten really, really bad.  So, I'm thinking, you know financial hardships, now there's no money, now he's acting out cause he wants more drugs.  So, it kind of like, in the back of my mind I'm thinking maybe she's the one supplying his, his habit.  I don't know, it's just, it's just the way my, my mind thinks, and I don't, I don't think that's relevant but, whatever.  So, as I'm distracting her talking about the property, how beautiful the property is, I just hear, I just hear a car and tires just come to a halt right in front of the door by the kitchen area, and at that time, I already had let my guard down cause I'm thinking alright they're gonna get him soon.  He's no, he's about thirty minutes away, and he's not right here so let's break down.  I'm no longer on my knees looking through the window.  I was in pain from, from being on my knees the whole time.  He's, he's going to get caught in a matter of seconds now, let's just start breaking down, letting my guard down, talking to the mom.  Well, sure enough his car just shows up.  Now I see this old car, blue in color, which matches the description and I, and I, and I kind of like, not yell to the mom, but I get her attention, is that him!  And she goes "yes, that's him, that's him."  So Splain and I kind of like, jumped out of, jumped out of sight and went back to the original places where we were gonna be at in case he does come in.  So, I'm keeping an eye on him.  I was hiding by the stairs, I was hiding by the stairs cause there's a window you can that you also look through to the outside in front of the house.  So, I could see the front, the front hood of the car.  I can't see him, but I can see the front hood of the car.  The car's still running.  I don't hear any door shutting.  I don't, I don't see him coming out or whatnot.  So, Jay and I were like let's, let's hold position, wait until he comes inside and go with the plan as, as originally thought out.  So, we're there and he's not coming out.  It felt like an eternity.  He's not coming out of the car.  So, I'm thinking to myself does he know, does he see our cars out back.  Does he know that we're here, like what is going on?  Why is he not, why is he not coming out?  Does he want, the mom to bring him the money outside cause he's in such a rush to get somewhere.  Like, we didn't know.  Well, I was, as I was keeping an eye on the car, you see the car just goes in reverse, like abrupt, like he's about to take off.  So, I'm like, I scream at Jay, I don't think he's coming in.  I think he's leaving.  We gotta stop this guy, we gotta, we gotta, we gotta get him before he takes off, cause if he goes and he runs into somebody, he's on drugs.  I'm assuming, I'm assuming he went to a methadone clinic.  I'm assuming he didn't wait to take the dose after the fact.  So, he's probably high on, on

DEF0000240

drugs, driving DUI. Might, might run into somebody head on, kill somebody while on drugs. We gotta get this guy. So, we went originally with the plan. We went out the back door, cause there's a back door where he can't see us coming out. We got in our cars, and I, and I, let me go back. When he showed up, I quickly let dispatch know he's here, he's here, he's here, just so they could know that he actually showed up. I wanted to make sure everything is over the radio because, you know, this guys supposed to be elsewhere but he's showing up over here. I want them to know he's not over there, he's over here. So, I get on the radio he's here, he's here. We, we, we hide waiting for him. He's not coming out. He starts backing up abruptly. We think he's gonna leave. So, we come out, we come out back. Jay and I jump in the cars. Turn my car on and then go around the house. I get on the radio, let's pinch him in, let's pinch him in. So, as we pinch him in, as I get around the corner, Jay was already behind him with his lights on. Now, I'm, if you see the back, the back terrain of the house, it's kind of like all hilly, cause when I had to park there I had to be careful so I'm like cutting the wheel and stuff like that. And I'm thinking turn the lights on. But I can't turn the lights on because I'm use to using the steering wheel so I'm like I'll do that after the fact. So, as I get, as I get in front of him his car starts moving. So, I'm like oh my God, he's gonna, he's gonna run me over to try, to try and, to try and get away. So, I kind of like repositioned my vehicle again and he just stops. That's when I jump out the car and I press my um, my mic button in my lapel, that, which will activate the recording and act on scene. I hit that. I come out, we had, I come out guns drawn because the car's still kind of moving so I don't want, I don't want this guy trying to run me. I can't see him, I can't see him through the windshield because it was, it was foggy, it was foggy that day. It was overcast, it was under a tree and it looked like it was, like that fog that you get inside a car when, when it's too hot and the weather's different from outside and you gotta like clear up, it's the kind of fog that I saw so I really couldn't see him. All I see him, he's going like this, like he's doing a shimmy.

JUDGE: Well, let me, let me stop you here just so I have the proper perspective.

PAGAN: Ok.

JUDGE: When you came out and you positioned your vehicle to pinch him in.

PAGAN: Yeah, hmm, hmm *(nods head yes)*.

JUDGE: How was your vehicle positioned in regard to his?

PAGAN: Alright, I don't know if you want to use phones.

16

JUDGE:     Well, just describe it.

PAGAN:     So, his car was, his car was facing the, facing straight ahead

MINOTTI:   at you?

PAGAN:     Yeah, facing me, facing the main road.

JUDGE:     Ok.

PAGAN:     So, when I come out, when I come out I'm still like kind of half way in the road like this and my vehicle is kind of pointing this way and that's when his vehicle started kind of like moving.  So, then I just, just kind of like cut the wheel and it just like, like pinched him like this.

JUDGE:     Yeah.

PAGAN:     So, it was, it was, eh, I don't' really know the angels, but it was kind of like right in front of him.  So, if he was gonna, so if he was gonna go, he was not gonna hit me on my side.  He was probably gonna hit me on the passenger side, which is a lot safer than getting head on, and if he's gonna go, he's gonna go.  There's nothing I'm gonna do to be able to stop him.

JUDGE:     Ok.  So, when you, how far away was your vehicle from his?

PAGAN:     About ten yards.  I'm not sure, I don't really recall the distance.

JUDGE:     Ok.  Ten yards is thirty feet.

PAGAN:     Yeah, about, yeah

JUDGE:     Ok, that sound about right?

PAGAN:     Yeah.

JUDGE:     Now his vehicle is facing yours?

PAGAN:     Yeah, his vehicle is facing mine, yes.

JUDGE:     And is he in the driver's position?

PAGAN:     He's, he's still in the driver's positon.  I don't know whether the cars in park or not.  I just know the car was kind of like inching the first time, which caused me to get a better position of the parking, sorry, which

17

caused me to get a better position of the parking before I exited my vehicle. I didn't' want to exit my vehicle and get run over.

JUDGE: So, he's, your vehicle is in his field of vision?

PAGAN: Yes, correct.

JUDGE: Alright.

PAGAN: He, he could, he could see my vehicle

JUDGE: Looking out his windshield he could see you?

PAGAN: Oh, yeah, he could see me head on. There's no way, I was not on his blind side, nothing. He was, he saw, he saw my marked patrol car right in front of his.

JUDGE: Ok.

PAGAN: It's, it's, you, it's undistinctable. You could see, you could tell it's a police car right in front of you. There's no way, there's no, there's no confusion about that.

JUDGE: Alright.

EVERK: And you couldn't see him completely through his front windshield

PAGAN: No, correct,

EVERK: at that point?

PAGAN: correct. I couldn't see him complete through his windshield. All I saw him is going like this. So, once, once I was, once I was there, I see Trooper Jay, Trooper Splain come out. And he's, he's also in the back and he had his gun drawn. Now, I'm over here and we're right in front of the vehicle. I look at him and I'm like if this guy tries to run me over and we have, and, and we have to use deadly force, I don't want to get caught between a gun fight and get hit. So, let me, let me do what we call a tactical L and just go to the side. So, when I did a tactical L, I ran across my car as fast as I can and then I, then I, then I engage him again, keeping my eyes on him. Shouting, let me see your hands, let me see your hands. We screamed, it felt like an eternity, we were screaming that. We screamed so many times, honestly it could have been at least 20 times we screamed let me see your hands.

JUDGE: So, you were positioned more to passenger side front?

18

DEF0000243

PAGAN:      No, his driver's side.

JUDGE:      Prior to doing your, moving to the tactical L.

PAGAN:      I was positioned right in front of him, directly in front of him.

JUDGE:      Alright, so you were directly in front of him.

PAGAN:      Correct.

JUDGE:      And then you moved off to the side.

PAGAN:      Yes, correct.

JUDGE:      To his driver's side.

PAGAN:      Yes.  So, this, this, if you could use this light as the driver, my car is here, I'm here.  I run across.

EVERK:      Between the two vehicles?

PAGAN:      Yes.

EVERK:      Ok.

PAGAN:      Yeah, I didn't go around my vehicle, no.  Which, it wasn't the smartest thing, but I didn't want to, I didn't want to lose, lose visual of him.

JUDGE:      When, when did you draw your firearm?

PAGAN:      As soon as I came out the car.

JUDGE:      Out of the car, ok.

PAGAN:      Yeah, cause his car was still moving,

JUDGE:      Ok.

PAGAN:      So, I uh made sure he's not trying to run me over to get away.

JUDGE:      Ok.

PAGAN:      Hmm, hmm (*nods head yes*)

JUDGE:      When did you first notice him moving?

19

DEF0000244

PAGAN:     As soon as I came out of the vehicle. I, like I said, I saw a silhouette of him going like this, but I can't tell what he was doing. I can't tell, he was going like this, or what he was doing. Which that, which that was my, my thought, cause when I came across, his vehicle was stopped. We're screaming at him, let me see your hands, let me see your hands. He's not responding, he's not, he's, he's not doing anything to show the actual hands. He's just like this. So, we kept screaming, screaming, screaming, screaming. He's not responding so I'm thinking he might have his hands up like this. Cause some people exaggerate, some people like get like shy. So, like they see us the get like ohhh. So, I can't really tell which, which one he was doing. I don't know if he, I can't see if he was raising his hands or what he was doing. All I know is he was shaking. So, as I'm in the side, I start creeping up, I start, let me see your hands, let me see your hands. Cause the side window is also foggy. So, I couldn't really see through the, through the side window, it's foggy as well. So, I'm like let me see your hands, let me see your hands. And I just kept going forward cause he wasn't, he wasn't really moving. He was just like this. I'm saying like this because I saw his shoulder's tense. I didn't really, I couldn't see his hands. So, as I, as I'm moving forward and Jay's still behind, I'm trying to get a better, a better view of him and I, for whatever reason, I couldn't see inside the car. I'm like I'm, I was, I was, I thought after the fact I guess I gotta get my money back from my Lasik cause it's not working. I couldn't really see him. So, when I get close, when I get close to him, he, he's like this. He turns to me, he smiles at me. You could see his, you could see his, you could see his um, his like here. I guess the fog was like here so you could only see like his head. He turns at me, he smiles at me and then he turns the lighter on. When he turns the lighter on, that's when I could see everything, everything in the car. And I see a device stuck to his neck, like he was trying to hold his neck and the fuse in his other hand. And he goes and he lights it up, he tries to, he tries to like light it up right in front of me, as he's looking at me. He's kind of like, I don't want, I don't want to curse, but it was kind of like screw you, hahaha you're coming with me type look. It was like a menacing look, like, like my, my chills came down my spine. As I was coming close, Jay's screaming do you see something, do you see something. That's when he, he hit the whole lighter and then when I saw the lighter I'm like YES! I'm like YES! And that's, that's, my whole body just like fucking, I'm sorry, I don't want to curse, but my whole body just like, I felt this chill inside me and I knew exactly what that fuse is. I've seen fuses in my life. Couldn't really tell what he had in, in there but I saw a fuse and his look was like screw you, you're coming with me and that's when, everything just happened so fast and Jay screamed "Shoot him!" and that's when I was already retreating and taking, taking aim and then I let my rounds go and I ran. I, I, I got out of sight and that's when Jay continued to shoot. And then once we hit, once we, once we hit him,

20

we see him going down. So, when we see him going down I stop. At this point I was close to the, I was close to the, the edge of the grass area, I, I, I would say. That's cause when I saw him

JUDGE: Across the road or?

PAGAN: Like this, this, this, this is the driver here. When I got close to him and when I saw them, he was literally like this far from me. That's how, that's how close I had to get to be able to see inside the car. Like, like if he was outside the car, I probably could have reached out and hit, and hit, and smacked him in his head. That's how close he was when I, when I saw him do this. So, as I run back, as I ran back and let my, let my rounds go, I got to the area, that's when I see him drop. But then he gets, he gets back up. And that's when Jay, Jay hit him again. And then it's at this point, I'm like alright if this guy, if this guy's leaning over trying to light this up, ohh, we're done! So, we're kind, we're kind of looking, and kind of like trying to get away and that's when Jay, Jay approached the vehicle and, and "let me, get out the car! Let me see your hands! Get out the car! And when he opened the thing he was kind of like leaning. Alright so then Jay grabbed him, brought him out and that's when the first thing I did was like look, I was looking at his hands to see if he still had the lighter, and, and looked at his neck. That's when I saw the fuse and the device, um, the bomb tied around his neck area. And I saw smoke and my thought is like holy shit this thing is on still. Like this thing is about to blow. But then, it turns out, once we moved it, it turns out the smoke was coming out of him. So, then it was like alright. And Jay was looking for the lighter, it's like, like do you see the lighter? I'm like no, it's not in his hands. I'm like it has to be somewhere, like, alright, it's not in his hands.

JUDGE: Did you see the lighter after he initially tried to ignite it?

PAGAN: Once, I saw the lighter in his hands when he, when he lit it.

JUDGE: He was trying to ignite the fuse?

PAGAN: When he, when he was trying to ignite it. After we shot him and got him out the car, I didn't, I have no idea where the lighter is.

JUDGE: Ok.

PAGAN: Yeah.

JUDGE: At any time, did he open the door or roll down his windows?

PAGAN: Never.

21

DEF0000246

JUDGE: Ok.

EVERK: Did he, did he ever, the command, you guys were giving him multiple commands, did he

PAGAN: He was not responding.

EVERK: His hands, he never spoke to you at all?

PAGAN: Never.

EVERK: Ok.

JUDGE: When you were telling him to, to uh, show his hands

PAGAN: Hmm, hmm (*nods head yes*)

JUDGE: and then also to, to get out of the car,

PAGAN: Hmm, hmm (*nods head yes*)

JUDGE: do you remember if you or Trooper Splain ever identify yourselves as State Troopers or Police Officers?

PAGAN: Ah, ah, we didn't identify ourselves, I don't, I don't, I don't remember myself identifying myself as state trooper. I don't' remember Splain doing it as well but you got, you got, you got a marked vehicle behind you with a red, with red and blue lights on. You got another vehicle that comes head on, I mean not head on but comes right in front of you, you could obviously see my side, it's a, it's a fully marked patrol car and then get in front of you, and then you see this guy, you see me come out in full uniform, you know what a police officer is. You know, and, and the fact that, the fact that he made a threat towards his mom saying oh the police better not be there, he's prepared to have the police there too. In my, after the fact, I'm thinking. So, he knows what we are, there's no, there's no misting what we were. You know, so

JUDGE: So, you don't think that there was, there was any way he wouldn't have known you were a police

PAGAN: No! No.

JUDGE: Ok.

PAGAN: No.

22

DEF0000247

EVERK:      When you pulled in front of him, just back up a few seconds here.  Uh, you mentioned about the mic, did you activate your lights on the uh patrol car?

PAGAN:      No, I didn't activate my, my lights on because when I got in front of him, the steering wheel was already cut, and now if you, you're familiar with the steering wheel, it's the, the right thumb, all the way to the last button, you press up, then I believe it's one, two, three.  I think that, that the number three button, when you press it up, lights come on, mic comes on.  That was all discombobulated, it was all mixed around because the steering wheel was turned.  So, my, my, my line of thinking is like I'm not gonna mess around with this, with this button and take my eyes off this person when I could, when I've trained myself to actually activate my, my uh, my um, my MVR with the mic.

EVERK:      Ok, that's what I was going to ask.

PAGAN:      Yeah.

JUDGE:      You said you had difficulty seeing into, into the vehicle?

PAGAN:      Yes.

JUDGE:      Um, and it was because of fog, or, or some sort of condensation or moisture on the windows.

PAGAN:      It was, it was either fog, well I don't, I don't think it was fog, I think it was condensation from inside the vehicle.  Um, it was overcast that day.  It was raining that day.  And also we were underneath some trees.

JUDGE:      Ok.

PAGAN:      So, I don't know

JUDGE:      Do you know if the windows had any sort of tint to them.

PAGAN:      I couldn't tell you.

JUDGE:      Ok.

PAGAN:      I couldn't tell you if there, I, I, know I could see.  That's, that's all I know.  I know I can see or can't see.

MINOTTI:    Originally you couldn't see.

PAGAN:      Yeah

23

DEF0000248

MINOTTI: But then you had a better view of it.

PAGAN: Yeah, yeah. Now that I think about it, after we brought him out of the car, I, I don't recall seeing tints on the window either.

JUDGE: Ok.

PAGAN: I don't think there was tints.

JUDGE: Now you said that you fired your, your uh issued weapon.

PAGAN: Correct. My issue weapon, yes, correct.

JUDGE: Your Sig?

PAGAN: Hmm, hmm (nods head yes)

JUDGE: Ok. Um, do you remember how many times you fired that.

PAGAN: No. Honestly, when on scene, on scene I don't, didn't even remember shooting at first. I actually recalled this after days off. It's been like a month exactly now since this happened. It took me a couple days to actually realize, like remember when I shot. Because my train of thought, on scene was I never decocked my weapon. I didn't shoot, I didn't shoot. There was no way, there was no way I shot. You know. I knew I wanted to cause I was trying to, I was trying to put the threat, um, to stop the threat and get to safety. That was my, that was my, that was my concern.

JUDGE: Ok. When you say stop the threat, what do you mean by that?

PAGAN: Stop him from lighting the fuse and give me enough space to get out of dodge.

JUDGE: Alright.

PAGAN: Either, whatever happens first, haha, you know. If I thought, if I thought I was fast enough to run away from a bomb, then yeah, but I don't think, I don't think anybody's, fast enough to get away from a bomb.

JUDGE: Ok. Now I know that you had mentioned to the, to the mom earlier, when he said that he was going to get a gun and blow his head off.

PAGAN: Hmm, hmm. (nods head yes)

JUDGE: Um, the mom said that he did not have a gun to her knowledge?

24

DEF0000249

PAGAN:      Correct.

JUDGE:      And she, you said that she confirmed that the gun was in the house.

PAGAN:      She confirmed, she said she only has, there's only one weapon in the house that she knows of and it's her handgun.

JUDGE:      Ok.

PAGAN:      That she keeps by her bed.  I asked her, well is that gun still here.  And she's like "oh yeah, I checked it's still here".

JUDGE:      Ok.

PAGAN:      I didn't see it myself, but she confirmed that, that she had checked after he had left so she knows it's still in the house.

JUDGE:      Alright, so but she didn't check when you guys were there?

PAGAN:      No, she didn't check when we were there.  But she confirmed that she had checked after he had left and made those threats to her.

JUDGE:      That morning,

PAGAN:      Yes.

JUDGE:      when he had violated the PFA?

PAGAN:      Hmm, hmm (nods head yes), correct.

JUDGE:      Alright, when he had made mention on the phone about getting a bomb, the police were there?

PAGAN:      No, no he didn't mention getting a bomb, he mentioned he had a bomb.

JUDGE:      He had a bomb, ok.

PAGAN:      Yeah.

JUDGE:      Uh, did, did she talk or did she elaborate or did you ask her whether or not

PAGAN:      I was in

JUDGE:      he had the capability to get a bomb?

25

DEF0000250

PAGAN:      I was in the other room. I couldn't really hear the conversation.

JUDGE:      Ok.

PAGAN:      I mean Jay might have spoken to her about that, but I can't, I really couldn't hear. At this point, I'm still, I'm still holding my pose, making sure he's not coming from the main street.

JUDGE:      Alright, so prior to him getting there, and you observing this device around his neck and the lighter,

PAGAN:      Hmm, hmm (nods head yes)

JUDGE:      did you have any knowledge about what bomb, what kind of explosive he may or may not have?

PAGAN:      Negative, negative.

JUDGE:      Ok.

PAGAN:      To be honest with you, I, I didn't believe him. I, I, I, people make threats like that and, and, I will learn from this in my life, my, my career, never underestimate anybody. But my thing is who the heck has a, a bomb with nails hanging around. You know, and my, I, I miss, I miss, I underestimated him. I didn't think anybody would have that. I didn't think. Who would have that besides a suicide bomber or some kind of terrorist bomber? Like that's my thought, who would have this?

JUDGE:      Did, you had mentioned also, too that after, after firing the rounds, um, someone opened the door.

PAGAN:      Yes, that was Trooper Splain.

JUDGE:      That was Trooper Splain.

PAGAN:      Correct.

JUDGE:      So as far as, as you know and I don't want to put words in your mouth, this guy didn't try to open the door

PAGAN:      No.

JUDGE:      after rounds were fired or anything?

PAGAN:      No.

DEF0000251

JUDGE:       Ok.

PAGAN:       No, we, we, we waited a couple seconds before we approached the car and tried to open the door.

JUDGE:       Ok.

EVERK:       After, now that you remember that you did fire your weapon

PAGAN:       Hmm, hmm (*nods head yes*)

EVERK:       Um, you said he fell, went down in the car

PAGAN:       Hmm, hmm (*nods head yes*)

EVERK:       and he popped back up

PAGAN:       Hmm, hmm (*nods head yes*)

EVERK:       What made you not fire after that point.

PAGAN:       Oh, at this point, I'm trying to get, I'm trying to get out of dodge. I'm trying, I'm trying to get, I'm trying to get out of sight.

EVERK:       Were you still in fear for your life at that point? Or were you in fear for your life at that point?

PAGAN:       I was in fear for my life when he initially, um, lit that up and after he popped up again and, and popped it up, and, and, and popped up cause you know, you, you don't know if he's possibly trying to light that up again. I know, when I was in the academy we, we went through um, uh bomb exhibition and these bombs were these small little bombs were detonated like about a hundred, two hundred yards away from us and you could, you could just still feel the concussion of all these bombs. So, you could just image glass and shatter and whatever else he has in there, nails and, and bolts and whatever coming your way. There's no way you're, there's no way you're gonna out run that. There's no way you're gonna, if you survive that you're gonna be in ugly shape. Cause our vests are, are meant to stop hand, hand gun calibers, I don't think they're rated for, for explosive devices.

JUDGE:       Do you re, did he make any threats against, um anyone other than himself? As, with mom, you know when he was talking to mom or anything that you overheard?

27

DEF0000252

PAGAN: No, the whole time, the whole, the whole time initially it was all threats towards himself. And after the mom, in hindsight, when the mom made that comment about her fear is that he's, that he's gonna, he's gonna do something to himself in front of her to get, to for kind of as pay back to get back at her. Like, I, eh, eh, yeaeh. Kind of just towards, it's just towards him. He's, he's just gonna, he's just gonna hurt himself, you know to hurt her emotionally. That, that was the whole thing that I got from the conversations until he made a call saying about the bomb and the neck and I'm gonna blow myself, my, blow my head off with nails, and everything and everybody else, that type deal.

JUDGE: Ok. So then, now he's talking about collateral damage

PAGAN: Correct.

JUDGE: Killing himself and now there's gonna be collateral damage.

PAGAN: Correct.

JUDGE: Alright.

PAGAN: And, and his, his specific words is, if the cops are there, which, which it says in itself, the cops are the trigger. If the cops are there, he's gonna blow everybody up. Which, in essence, is a threat towards us.

EVERK: After, uh, uh, you said, Trooper Splain opened the door

PAGAN: Hmm, hmm (nods head yes)

EVERK: pulled him out of the car, did you or Trooper Splain give first aid?

PAGAN: Uh, yeah, that, that's, I'm, cause we're talking about the whole shooting. Alright, so once, once we, we took, we took Ardo off the, we pulled him out of the car, well, not we. Splain pulled him out of the car, I was just kind of keeping, keeping eyes for any possible lit fuses or any other kind of weapons that he might have. Cause whose to say that he had a bomb, he had a bomb and just came out with a gun. You know, you never know so it's just more of officer safety. Once we pulled him out, we verified that he didn't have anything in, anything in his hands or anything that is a danger to us. That's when I ran to my car and I opened the trunk and I was trying to look for the first aid kit. Now I couldn't find the first aid kit. I don't know if it's because of the adrenaline. Like I don't, I really don't know. So, the first thing is, I saw a stack, a stack of blue napkins. And I was like these look sterile. This will do until we get EMS over here cause once the shots went off, I got on the radio and called shots fired, shots fired. We both got on the radio, send EMS, expedite immediately,

28

DEF0000253

you know get em over here. That was pretty much, like get em here now. So, when I ran to the car and I got this, um this stack, my concern was like find the holes, and let's, let's plug em up til the, til the EMS gets here, more advanced medical personnel. And when I got that, Splain actually went to his car and, and, and got a, a IFAK kit and that's when we, we started taking off the combat gauze and we were, we looked, we turned, ripped his shirt off, was looking for bullet wounds and stuff like that. We found a wound, I forget which side of the shoulder. I would say it was the right side, and I might be confusing, but we saw the hole and that's when we took the gauze and just started shoving the gauze in there to stop the bleeding and then, I, I remember like looking for bullet wounds in his head. I was like feeling through his head and I couldn't find anything. At that point, um, gentleman with blue lights came in. I was trying to stop him, like dude, like we're gonna preserve this scene, but he was like I'm EMS, I'm EMS, I'm EMS. I'm like alright, the more hands the better, cause you know, I might be missing something that he knows and he might be missing something that I know. So, let's work on this guy. Let's get him the help that he needs.

JUDGE:     Did you uh, prior to that EMT showing up

PAGAN:     Hmm, hmm (*nods head yes*)

JUDGE:     did you see anyone else at the house, outside of the house during, after your, your initial response to the house. Was anyone else around, any, any, any other

PAGAN:     Yes, yes.

JUDGE:     Who.

PAGAN:     When uh we got to the house it was, it was just the mom. Now I didn't know that the barn next door slash house. I didn't know what it was. I didn't know that she rent, that she rent, well that she rents that property. Well, she ended up telling us after the fact, when she was talking about the financial hardships, saying that oh they, they rent. So now, when we parked our cars out back, to make sure he didn't see, we were coming down and this lady comes down and she's like is everything ok, in those, in those effects. And we're like yeah, we're just visiting. I was just trying to deescalate, I didn't want to get anybody, I dint' want to get anybody concerned. So, at this point we're thinking, you know, he's gonna come in, we're gonna grab him and we're gonna 302 him. You know, our typical 302 commitment that we've done dozens of times.

JUDGE:     Ok. Do you know who this woman was at all?

DEF0000254

PAGAN:     No idea.

JUDGE:     Ok.

PAGAN:     No idea.

JUDGE:     White, black, Hispanic?

PAGAN:     White woman, like an, regular average build for a woman, for today's generation. You know, not skinny, no fat. Um, I think she might have been blonde, I'm not sure. You know, she, she looked like she was in her thirties, mid to high thirties. Early forties, who knows.

JUDGE:     Alright, did, did she say anything else or, other than

PAGAN:     No, she's just like ah, ok, and she just went about her business. I don't know if I, I don't know if she was arriving or if she was like looking out the window and saw the cars earlier and wanted to, wanted to inquire what was going on.

JUDGE:     Do you know if she was there during the actual shooting?

PAGAN:     I have no idea.

JUDGE:     Ok. Um, did you or Jay, uh Trooper Splain contact an ambulance prior to this?

PAGAN:     No, we didn't. No.

JUDGE:     Ok. Is that something that you would normally do if you anticipated a 302 commitment or?

PAGAN:     Well, we, it's, it's either or. We'll call em beforehand. Well the reason I didn't' want to call them is because he was not there and why have an ambulance dispatched to our location where he's not at. Also, um, we thought he was elsewhere. Cause now, now we were, we were, we were to get hands on him like we'd contact EMS, we have him detained. We could, we could stay with him a couple minutes til they get there. It's not an issue. Usually we'll detain a person. We talk to them, talk some sense into them, like listen you know, like these people are here for you. Speak to the doctors, get, get out what you have inside. All that anger, all, all those feelings, get them out. Cause it works. Trust the process. It's kind of the spiel that we usually give to people that, need help, type situations. Like I said, it's all, it's all based on the circumstances of how everything going on. He's not there so I'm not going to call EMS for somebody that's not there.

30

EVERK:      I want to back up a little bit here just to clarify. When, uh you see him in the car, you, you said you see him light the lighter. Um, which, do you remember which hand the lighter was in?

PAGAN:      Right hand.

EVERK:      Ok.

PAGAN:      I remember he had the right hand, fuse in the left hand. He turns around he's kind of like, ha ha, like screw you. He's, he had that smirk, he was just like hahahaha. It was just like, it was chilling. I mean it sounds like something out of a cartoon movie or a, a horror flick, but that's exactly how it happened.

EVERK:      and then when he was out of the car,

PAGAN:      Hmm, hmm *(nods head yes)*

EVERK:      Um, on the ground,

PAGAN:      Hmm, hmm *(nods head yes)*

EVERK:      Was the, uh, the device you're talking about, was that still around his neck?

PAGAN:      It was still around his neck. Like I said, I don't think, I don't think I was specific there. We looked, we looked at his neck. I saw the smoke. We moved it, you know, we removed it of his neck and then we, we threw it to the side, away from him.

EVERK:      Who removed it?

PAGAN:      I, actually, I'm not sure. It might have been Splain. It might have been Splain at this time.

EVERK:      When it was removed, was the EMS guy on scene yet?

PAGAN:      Uuum, when it was removed he wasn't on scene I believe. Cause when he got there we told him, listen that's there, don't touch it, pretty much. That, this part, this part of the whole thing is when it gets wrinkled, gets all foggy with me, as far as the timeline events or who removed what, little things like that. Because at that point my adrenaline was just so bad. I couldn't sleep for like the first two days and just still pumping away. So, take it with a little skepticism as far as the order cause I don't really remember well.

31

DEF0000256

EVERK:      Do you have any more questions about the actual

JUDGE:      Yeah, you were, you, when you got out of the car initially,

PAGAN:      Hmm, hmm (*nods head* yes)

JUDGE:      when you pinched him in, when you flanked him,

PAGAN:      Hmm, hmm (*nods head yes*)

JUDGE:      when you and Jay flanked him, Trooper Splain, did, you said you got out, you got out of the car with your gun drawn?

PAGAN:      Well, not with my gun drawn, I wouldn't draw my gun inside car, but

JUDGE:      Ok.

PAGAN:      I'm assuming you're saying like I got out

JUDGE:      Once you got out

PAGAN:      I drew it, yeah.

JUDGE:      Ok.  Um, once you saw him trying to light the fuse, did you consider any, any less lethal?

PAGAN:      No.

JUDGE:      Ok.

PAGAN:      No.  It's just, no.

JUDGE:      Alright.

PAGAN:      I mean, his window, his window was, his window was closed so it was like mmm, playing devil's advocate, if you want to go through, if you want to go through the whole process of everything you have on your belt.  Like if I use the baton, by the time I break the window that things gonna be lit up.  If I use, if I was going to use Taser, the windows closed, it's not gonna go through and let's say God forbid, I hit the actual device and it makes it explode.  So, so that's, that's no go.  Mace is not gonna work, you know.  So, anything you have on your belt is not going to work.

JUDGE:      Ok.

32

DEF0000257

PAGAN:      You know.  And even, even you want to think about it too, even the, even the lethal force itself might not work cause he could still light it up whilst he's getting hit.  So.

EVERK:      Ok.

PAGAN:      I mean, I didn't think that through, I didn't that through, it's just more reaction, but if you want to play devil's advocate and try to justify the, the other stuff we have in our belt, none of it would've worked.

EVERK:      Ok.  Just some other questions here.  The, the previous day, uh Friday, do you remember what you worked?

PAGAN:      Did I work the 3-11 shift?  I know that, I know the day of the 20th, that wasn't my initial scheduled shift.  That shift I switched with Trooper Jay Singley.  Um, I try, I switched with him because he wanted, it was the weekend, he wanted to see his kids play sports.  You know, I don't have kids, he has kids so why wouldn't I work that for my fellow trooper, let him enjoy his kids you know.  That would be selfish of me.  I have no plans, let him, I'll work the morning shift for him and let him, let him enjoy his kids.

EVERK:      You don't remember the previous day, if you were day shift, middle shift?

PAGAN:      I don't.

EVERK:      Ok.

PAGAN:      I, I, yeah I don't remember.  I would say I double backed into that shift for him.

EVERK:      Ok, well, if you double backed, do you remember how many hours of sleep you got?

PAGAN:      (shakes head no) Usually when I double back I only get like six hours of sleep.  Usually.

JUDGE:      Other than, you said you handled a non-reportable crash.

PAGAN:      I was handling a non-reportable crash when um, when this call came it, cause as I was about to clear, that's when um, dispatch was oh we have something else, well as I pressed clear, um, clear from the scene, I guess Lenny was like looking at the scene waiting for me to clear.  As soon as I cleared, it was like hey Pagan I have something for you.  And, I press clear and I'm not totally clear.  I'm just making myself available in case something else pops in.  Because I'm almost done.

33

JUDGE:     Did you handle any other calls that morning?

PAGAN:     No, um, my initial call was the, was the crash, the non-reportable crash and immediately after that crash I was sent to this incident.

EVERK:     Ok. And then during the time of this incident,

PAGAN:     Hmm, hmm (*nods head yes*)

EVERK:     uh, during your shift prior to that, uh, that morning, were you under the influence of any drugs or alcohol.

PAGAN:     No. I, I only drink once a year and it's, it's always on New Year's.

EVERK:     And then after the uh, the shots were fired, EMS came and so forth, did you or any other, uh person in the State Police, was the scene secured?

PAGAN:     Yes, w, w, when the whole thing happened and EMS was showing up, fellow troopers that we had, that we had on shift that day showed up on scene and helped like secure the scene right away.  And I know that some of the fire fighters were trying to help us out and Splain was telling them, you know cover this, cover this and after all the higher ups showed up they took over completely.  We just hands off.

JUDGE:     When, when Jay asked you, cause he was positioned behind the car, to the, to the rear of Ardo's vehicle, he asked you does he have something.

PAGAN:     He was, he was asking simultaneously when he was lighting the, the, the

JUDGE:     Ok, when he said something

PAGAN:     Well he said

JUDGE:     did you know, you knew what he meant?

PAGAN:     He said, he said shoot him

JUDGE:     No, no, no,

MINOTTI:   Listen, listen

JUDGE:     when he said, when he said does he have something

PAGAN:     Yes

34

DEF0000259

| JUDGE: | You told, you told us earlier that you said |
|--------|----------------------------------------------|
| PAGAN: | Yes, |
| JUDGE: | he does |
| PAGAN: | yes, yes |
| JUDGE: | right |
| PAGAN: | Yes. Well, it was, we didn't use exact words, but he, we like were kind of in the same, we knew, cause I don't, I don't know how we communicated with each other, I mean we haven't know each other for that long but it's like we were on the right page, the same page. We knew exactly what it was. |
| JUDGE: | In the context of the incident you were handling. |
| PAGAN: | Yes, exactly. |
| JUDGE: | Are you, you're saying it was understood that |
| PAGAN: | Yes, it was understood that it, that it was something that was a threat towards us. |
| JUDGE: | Ok. |
| PAGAN: | Cause if he asked, if he asked me does he have something and it's not a threat, I'm not going to say yes and risk, and risk him taking action that was not justifiable. Now if he would've had, if he would've had a pen to his neck, I would've been like, I would like, he has a pen, he has a pen, he has a pen to his neck, back off, give him space. But, you know, I'm not gonna say Yes, Yes, Yes, if he, if he has something that's no harm to us. You know. It's kind of, it's kind of universally understood I guess. |
| EVERK: | And then, you've been a trooper for almost four years. |

*Video stopped, Audio only:*

| EVERK: | Have you ever used, uh deadly force? |
|--------|--------------------------------------|
| PAGAN: | No. Never. |
| JUDGE: | Have you ever had occasion to use, uh anything more than verbal commands to affect an arrest, or get, to get someone in compliance |

DEF0000260

before?  Have you had to use hands on?  Have you had to use your Taser, your ASP Baton?

PAGAN:   I've used my, used my Taser, but it wasn't against a person, it was against two pit bulls that were attacking me.

*Knock on door*

JUDGE:   Ok.  I guess we're running out of tape.

EVERK:   Yeah.  It's June 20th at 1:54 p.m.

VILLANO:   It stopped

JUDGE:   Oh, it did stop?

EVERK:   I'm going to turn off the tape and the audio/video is also turned off.

EVERK:   He's gonna start that, and then it's going to take like 30 seconds to boot up.  Just like the car.

PAGAN:   You know, I was going to make that reference (*inaudible*)

VILLANO:   It's recording.

EVERK:   Alright, it's June 20th at 1:59 p.m.  Going to start the second recording here.

JUDGE:   Alright.  I think when the last, the first part of the recording ended, I asked you if you had any opportunity in your four-year career to use anything other than verbal commands to affect an arrest.

PAGAN:   Hmm, hmm

JUDGE:   Or to bring someone in to compliance or you know follow your lawful orders.

PAGAN:   Hmm, hmm

JUDGE:   Uh, were there occasions where

PAGAN:   Well I've used verbal commands to affect um arrests and, and stuff before.  Um, as far as using any of my tools in my belt, I've only used by Taser once in my career and it wasn't against a human, it was against two lose pit bulls that were trying to attack me.

36

DEF0000261

JUDGE:     OK.

PAGAN:     That was about the only time.

JUDGE:     And, and, and the same thing, have you ever been investigated by police, any police agency since you've been a police officer, for any type of use of force incident?

PAGAN:     Negative.

JUDGE:     Ok.

EVERK:     Is there any questions you feel I should ask you?  Or something we're missing here?

PAGAN:     No, I mean I pretty much said the whole story of what happened and what was going through my mind pretty much.  When the whole incident occurred.

EVERK:     And while you were, back when you were at the scene, towards the end, uh, no evidence, no one removed any evidence?

PAGAN:     No.

EVERK:     The scene wasn't altered in any way when you were there?

PAGAN:     No.

EVERK:     Ok.

JUDGE:     Did Trooper Splain, we asked you if you had any prior contact or any prior knowledge of Mr. Ardo and you answered in the negative

PAGAN:     Negative, yeah.

JUDGE:     You said you had not.

PAGAN:     Negative

JUDGE:     Did Trooper Splain indicate to you at any time when he, he was at the scene, that he knew who this Anthony Ardo was or had any dealings or had been to that house before?

PAGAN:     No.

37

DEF0000262

JUDGE:     Ok.

EVERK:     That's all I have.

JUDGE:     I don't have anything either.

EVERK:     Ok, it's 2:01 p.m.  I'm going to stop the recording.

MINOTTI:   How long do you have to go?

JUDGE:     Three year, uh three years in September.

MINOTTI:   Three years left?

JUDGE:     Yeah.

EVERK:     It's still recording.  Just, I know the tape stopped here, but it's still recording.  Um, where it cut off at, before your question.  Um, uh, it covered, but during the course of your four-year career, you never had to use deadly force?

PAGAN:     Never.

EVERK:     Ok.  That's where

MINOTTI:   You, you, oh, did that get cut off when you asked him that before?

EVERK:     Yes.

MINOTTI:   Ok.

PAGAN:     Just want to make sure it was on record.

JUDGE:     The department is looking into the possibility of getting a uniformed recording, audio and visual recording equipment for

DEF0000263

# EXHIBIT 9

Desk_PH_Right_2017-05-20_07_55_41

| | |
|---|---|
| PCO Behler: | State Police, Belfast. PCO Behler. |
| County: | Hey Behler. It's County. I'm transferring over a caller at 1382 Good Rd. for her son, who is uh, suicidal, but they don't know where he is. Jean? |
| Jean: | Yes |
| County: | Go ahead, talk to the State Police. |
| Jean: | Ok. |
| County: | Thank you, bye bye. |
| Jean: | Thank you. |
| PCO Behler: | Yes, ma'am? |
| Jean: | yeah, he's suicidal. He texted his father. I had to get a, um, a POD, or, oh, I'm just a nervous wreck. Um |
| PCO Behler: | Ok, what's your name first of all? |
| Jean: | My name is Jean Monaghan. |
| PCO Behler: | M O |
| Jean: | M O N A G H A N |
| PCO Behler: | And Good Rd., where's that at ma'am? |
| Jean: | It's in Lower Mount Bethel township. It's, uh, 2 miles outside of Martins Creek, between Martins Creek and Bangor. |
| PCO Behler: | And what's your phone number? |
| Jean: | 610-533-9011 |
| PCO Behler: | How old's your son? |
| Jean: | 47. |
| PCO Behler: | 47 years old? |
| Jean: | Yep. |
| PCO Behler: | What's his name? |
| Jean: | Anthony Ardo |
| PCO Behler: | Where's he live at? |
| Jean: | Well, he was living here. I had to get a, a protection order on him yesterday. |

1

| | |
|---|---|
| PCO Behler: | Ok, so you got a PFA on him? |
| Jean: | Yeah. |
| PCO Behler: | Ok, why, why was a PFA |
| Jean: | Well, because he was so strung out on drugs and he was trying to extort money from me and blackmail me. |
| PCO Behler: | Ok. So, he has a drug history, correct?  What's his date of birth? |
| Jean: | Yeah. Um, uh, August 5th 1969. |
| PCO Behler: | Ok, were we over there to take a report at all? |
| Jean: | Sorry? |
| PCO Behler: | Were we at your address before for a report or anything? |
| Jean: | Um, no. |
| PCO Behler: | Ok.  Um, and he texted his father? |
| Jean: | Yeah. |
| PCO Behler: | And what did it state on the father?  What did it state on the text? |
| Jean: | Well, he, he said he was going to take a bunch of pills and inject antifreeze into his veins and then nobody would have to worry about him anymore. |
| PCO Behler: | Um, kay. |
| Jean: | I mean, he has a, he has a little bit of a history.  Every time he's gotten, ah, ah, gotten into a situation he's always come home.  I'm his freakin life line. |
| PCO Behler: | Ok, and that's |
| Jean: | And now |
| PCO Behler: | Ok.  So, when's the last time that you had contact with him? |
| Jean: | Well, he came here at five o'clock this morning and, and needed the title for his car and, also warmer clothing and then he left. |
| PCO Behler: | Ok, I'm writing all this down.  Ok, when did he text his father stating that he's gonna take a bunch of pills and take |
| Jean: | Well, they just got the text this morning. |
| PCO Behler: | What time ma'am? |
| Jean: | Um, I, she didn't say.  I can call her back and find out.  That, that |
| PCO Behler: | Who got the text? |
| Jean: | That, well, he, he did text his father.  Um, his step-mother picked it up. |

2

| | |
|---|---|
| PCO Behler: | Oh, so his step-mother picked it up?  And where does the father and step-mother live ma'am? |
| Jean: | They live out in um, Schnecksville. |
| PCO Behler: | And you have no idea where Anthony is at this point in time? |
| Jean: | I have, I have no idea.  I wouldn't know where he would go.  He's always come home, you know.  And that's not the case, well, I uh, I just don't know where he would be. |
| PCO Behler: | Ummm kay.  Um, what's his uh, what kind of description you have for me, height, weight? |
| Jean: | Well, he's tall, um, he's about, he's about 5'll |
| PCO Behler: | Ok |
| Jean: | Right, right now he's weighing about 150 pounds, he's lost a tremendous amount of weight. |
| PCO Behler: | Ok. |
| Jean: | He has long, light blonde, or light brown hair, um and he drives a 1988 Reatta made by Buick. |
| PCO Behler: | Buick Reatta? |
| Jean: | Yeah. |
| PCO Behler: | Ok.  Uh, at five o'clock this morning did you come, uh see him at all? |
| Jean: | Well, he came in cause he wanted his title |
| PCO Behler: | uh, huh |
| Jean: | and his clothes and then he left right away. |
| PCO Behler: | Ok. |
| Jean: | Which is a violation of the protection order. |
| PCO Behler: | Ok, well that's something you can make a, you can make note of and let the courts know when you go back down to uh, |
| Jean: | Ok |
| PCO Behler: | to County Court.  Ok, um and all's he said, he's going to take a bunch of pills and take antifreeze and he left, right? |
| Jean: | Hm, well he, when he texted uh his father, that's the message he left. |
| PCO Behler: | Yeah, what color |
| Jean: | He's called me several |
| PCO Behler: | what color's his Buick? |

3

| | |
|---|---|
| Jean: | Uh, blue |
| PCO Behler: | Ok.  Ok, I mean we can put out a SCOPE message if found to contact you if you want us to do that.  Um, like you said, there is a drug history.  If he does come back let us know.  I mean, there's not a missing person or anything like that.  He's forty-seven years old. |
| Jean: | Right, well yeah, exactly. |
| PCO Behler: | So, I mean, we could put out a message stating "if come across, uh, please have him, please contact you at this address.  Please note, there is a PFA against Mr. Ardo with Ms. Monaghan."  We can do that. |
| Jean: | Ok, you can't pick him up and put him the hospital? |
| PCO Behler: | How we gonna pick him up?  We don't even know where he is. |
| Jean: | Ok.  Ok. |
| PCO Behler: | I mean we have no clue where he is.  Should he |
| Jean: | Yeah. |
| PCO Behler: | come back to your residence or his father's residence, uh, if you wish to commit him that's fine.  You can call emergency squad and commit him.  If he wishes to commit himself, so be it.  Uhhh, that's pretty much out of police hands unless something happens where he's in an accident or anything like that.  Then it would, then the police would take necessary means. |
| Jean: | Ok. |
| PCO Behler: | But 'til now, we have no clue where he is.  How we gonna go pick him up and put him away? |
| Jean: | I thought you might be able to to, tap into his cell phone? |
| PCO Behler: | No, we can't, we can't track a phone. |
| Jean: | Oh, ok.  Alrighty. |
| PCO Behler: | Alright? |
| Jean: | Um, and, and, and you are who? |
| PCO Behler: | I'm PCO Behler.  B E H L E R. |
| Jean: | Ok, thank you so much. |
| PCO Behler: | You're welcome. |
| Jean: | Um, bye bye. |
| PCO Behler: | Bye. |

*10*

ATTACHMENT

PAGE __4__

*90*

DEF0001638

Desk_PH_Right_2017-05-20_08_22_10

| | |
|---|---|
| PCO Behler: | State Police, Belfast.  PCO Behler. |
| Jean: | Uh, yeah, this is Jean Monaghan calling back. |
| PCO Behler: | Yes, ma'am? |
| Jean: | Um, yeah, we, we called uh the suicide hotline and they had mentioned that, that you can do an involuntary commitment, and IVC. And, they, and, and that hotline did say that you guys can do something. |
| PCO Behler: | Ok, what, I don't, what do, what can we do besides send that message? |
| Jean: | Well, send the message and if you find his car and you find him, then, then commit him. |
| PCO Behler: | Well, yeah, if we, if we find the drugs on him.  I mean five o'clock this morning he left, correct? |
| Jean: | No, he stopped back because I got the, the |
| PCO Behler: | Ok, what time, what time did he leave?  Cause you called me at 8 o'clock, correct? |
| Jean: | Well, uh, no, it was a little earlier than that. |
| PCO Behler: | Ok. |
| Jean: | It was about 7:30. |
| PCO Behler: | Ok. |
| Jean: | So, yeah, so, I haven't seen or, or he keeps calling but I'm not answering the phone. |
| PCO Behler: | What's his cell phone number? |
| Jean: | It's um, 484 |
| PCO Behler: | Hmm, hmm. |
| Jean: | 903 |
| PCO Behler: | Ok |
| Jean: | 4519 |
| PCO Behler: | Ok, so he keeps calling you but you're not answering your cell phone? |
| Jean: | Well, no |
| PCO Behler: | Ok. |

1

ATTACHMENT _10_

PAGE _5_ OF _90_

DEF0001639

| | |
|---|---|
| Jean: | That, again, is in violation. |
| PCO Behler: | Well, ok.  So, my, my question is to you, ma'am, and I'm not gonna be rude to ya, if you're concerned for his welfare, and now he's violating the PFA, now you want the police to try to find him and commit him?  Am I correct in saying that? |
| Jean: | Yes. |
| PCO Behler: | Ok.  I'll give him a call and see where he is. |
| Jean: | Ok. |
| PCO Behler: | Alright? |
| Jean: | Are you gonna call me back? |
| PCO Behler: | Yeah, sure.  If you pick up your phone, I'll call you back. |
| Jean: | Yes, well, ok. |
| PCO Behler: | Ok. |
| Jean: | Yes. |
| PCO Behler: | Yep. |

2

10

DEF0001640

EXHIBIT 10

Desk_PH_Right_2017-05-20_08_22_10

| | |
|---|---|
| PCO Behler: | State Police, Belfast.  PCO Behler. |
| Jean: | Uh, yeah, this is Jean Monaghan calling back. |
| PCO Behler: | Yes, ma'am? |
| Jean: | Um, yeah, we, we called uh the suicide hotline and they had mentioned that, that you can do an involuntary commitment, and IVC. And, they, and, and that hotline did say that you guys can do something. |
| PCO Behler: | Ok, what, I don't, what do, what can we do besides send that message? |
| Jean: | Well, send the message and if you find his car and you find him, then, then commit him. |
| PCO Behler: | Well, yeah, if we, if we find the drugs on him.  I mean five o'clock this morning he left, correct? |
| Jean: | No, he stopped back because I got the, the |
| PCO Behler: | Ok, what time, what time did he leave?  Cause you called me at 8 o'clock, correct? |
| Jean: | Well, uh, no, it was a little earlier than that. |
| PCO Behler: | Ok. |
| Jean: | It was about 7:30. |
| PCO Behler: | Ok. |
| Jean: | So, yeah, so, I haven't seen or, or he keeps calling but I'm not answering the phone. |
| PCO Behler: | What's his cell phone number? |
| Jean: | It's um, 484 |
| PCO Behler: | Hmm, hmm. |
| Jean: | 903 |
| PCO Behler: | Ok |
| Jean: | 4519 |
| PCO Behler: | Ok, so he keeps calling you but you're not answering your cell phone? |
| Jean: | Well, no |
| PCO Behler: | Ok. |

1

ATTACHMENT _10_

PAGE _5_ OF _90_

DEF0001639

| | |
|---|---|
| Jean: | That, again, is in violation. |
| PCO Behler: | Well, ok. So, my, my question is to you, ma'am, and I'm not gonna be rude to ya, if you're concerned for his welfare, and now he's violating the PFA, now you want the police to try to find him and commit him? Am I correct in saying that? |
| Jean: | Yes. |
| PCO Behler: | Ok. I'll give him a call and see where he is. |
| Jean: | Ok. |
| PCO Behler: | Alright? |
| Jean: | Are you gonna call me back? |
| PCO Behler: | Yeah, sure. If you pick up your phone, I'll call you back. |
| Jean: | Yes, well, ok. |
| PCO Behler: | Ok. |
| Jean: | Yes. |
| PCO Behler: | Yep. |

2

ATTACHMENT

PAGE ___6___ OF ___90___

*10*

DEF0001640