IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO ARDO and JEAN MONAGHAN, individually and as personal representative/administrator of the Estate of her son, ANTHONY ARDO, | : : : : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 18-5217 |
| | : | |
| v. | : | |
| | : | |
| OFFICER EDDIE PAGAN, in his individual capacity as a Pennsylvania State Police Trooper, and OFFICER JAY SPLAIN, in his individual capacity as a Pennsylvania State Police Trooper, | : : : : : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                         January 26, 2023

This case involves two Pennsylvania state troopers who used deadly force against a man they knew to be suicidal and likely in possession of an explosive device. The troopers have moved for summary judgment, and the pertinent question before the court at this stage concerns the outer limits of the immunities that said state troopers may enjoy when facing a civil lawsuit stemming from their use of deadly force.

The two troopers responded to a call in May 2017 made by the mother of an emotionally disturbed man who repeatedly threatened suicide and the use of an explosive device. Upon the arrival of the man at his mother's house, the troopers blocked in the man's vehicle while he sat inside, immediately exited their patrol cars wielding guns, shouted conflicting commands at the man, and ultimately fired eight rounds at him upon seeing him move a lit lighter toward a device attached to his neck. After initially falling down in the car after being shot, the man sat back up

within four seconds. In response, one trooper, without giving any further verbal commands or confirming whether the man was still a physical threat, fired three more rounds toward him. The man died shortly thereafter from his gunshot wounds.

The man's parents brought this action on his behalf against the defendant troopers, raising a Fourth Amendment excessive force claim and three Pennsylvania state law claims— wrongful death, survival action, and assault and battery. The defendant troopers have now moved for summary judgment, raising the defense of qualified immunity with regard to the Fourth Amendment claim and state sovereign immunity with regard to the state law claims. Alternatively, the defendant troopers argue that the court should dismiss the wrongful death claim because of certain statutory language in certain sections of Pennsylvania's Sovereign Immunity Act concerning waiver and damages. For the reasons laid out in this opinion, the court must largely reject the defendants' arguments.

For one, the plaintiffs' factual allegations are sufficient enough to show a violation of a Fourth Amendment right to be free from excessive force. This holds true for the defendant troopers' actions that resulted in their initial use of deadly force as well as the one trooper's continued use of deadly force that resulted in three additional rounds fired. Furthermore, courts have clearly established the existence of the rights allegedly violated in this case at an appropriate level of specificity. Thus, the court must reject the defendants' qualified immunity defenses. Moreover, because there is enough of a factual dispute over whether the trooper who fired the three additional rounds acted within the scope of his employment, the question of whether he is entitled to state sovereign immunity should be left to a jury. At the same time, the court must find in favor of the other defendant trooper on the state law claims against him because the plaintiffs effectively abandoned said claims both during oral argument and in their

opposition brief. Lastly, because waiver of sovereign immunity is not material to this case, the court rejects the defendants' statutory argument regarding the wrongful death claim.

For these reasons, the court denies the majority of the defendants' motion for summary judgment, granting it only insofar as it applies to the state law claims against the trooper who did not fire the additional three rounds.

## I.      PROCEDURAL HISTORY

The plaintiffs, Angelo Ardo and Jean Monaghan ("Ms. Monaghan"), initiated this action on behalf of their son Anthony Ardo ("Mr. Ardo"), by filing a complaint against the defendants, Pennsylvania State Troopers Eddie Pagan and Jay Splain ("Trooper Pagan" and "Trooper Splain"—or collectively "Troopers"), on December 4, 2018. *See* Doc. No. 1. The complaint alleged generally that Troopers Pagan and Splain shot and killed Mr. Ardo on May 20, 2017, and it contained two counts: (1) wrongful death and survival action, and (2) excessive force/assault and battery.[1] On February 25, 2019, the defendants filed an answer and affirmative defenses to the complaint. *See* Doc. No. 9.

After the parties had engaged in discovery for approximately six months, the plaintiffs filed a motion to amend the complaint. *See* Doc. No. 20. After the motion was fully briefed and after hearing oral argument, the court granted the motion to amend on November 22, 2019. *See* Doc. Nos. 24, 25, 29. That same day, the plaintiffs filed an amended complaint in which they added the Commonwealth of Pennsylvania as an additional defendant, along with a third count claiming violations of the Americans with Disabilities Act ("ADA"). *See* Doc. No. 30. On January 15, 2020, pursuant to the parties' stipulation, the court dismissed the Commonwealth as

---

[1] The plaintiffs brought their excessive force claim under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, as actionable under 42 U.S.C. § 1983. This court therefore has federal question jurisdiction over the excessive force portion of Count II, with the wrongful death, survival action, and assault and battery claims falling under this court's supplemental jurisdiction because they are "so related to" the excessive force claim "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (2018).

a defendant and granted the plaintiffs' leave to again amend their complaint. *See* Doc. No. 32. Two days later, the plaintiffs filed their second amended complaint, in which they substituted the Pennsylvania State Police ("PSP") as a defendant in place of the Commonwealth. *See* Doc. No. 33.[2] The defendants filed an answer and affirmative defenses to the second amended complaint on February 16, 2021. *See* Doc. No. 63.

After completing discovery, the defendants filed a motion for summary judgment on all claims in the second amended complaint on July 15, 2021. *See* Doc. No. 76. The plaintiffs filed a response in opposition to the motion on August 16, 2021, to which the defendants replied on August 24, 2021. *See* Doc. Nos. 78–79. This court heard oral argument on the motion on October 5, 2021. *See* Doc. No. 83. While the motion was pending disposition, the plaintiffs filed a motion to reopen discovery on February 14, 2022, *see* Doc. No. 90, which this court granted on March 17, 2022, after hearing oral argument earlier that day. *See* Doc. No. 94.[3]

On June 24, 2022, the parties stipulated to the dismissal of the PSP as a defendant as well as the plaintiffs' ADA claim, leaving Troopers Pagan and Splain again as the only defendants and the original causes of action as the remaining claims. *See* Doc. No. 102. On June 27, 2022, the defendants filed a new motion for summary judgment regarding the remaining claims against them. *See* Doc No. 103. On July 13, 2022, the plaintiffs filed a response in opposition to the motion. *See* Doc. No. 105. The defendants forewent their opportunity to file a reply brief before the July 22, 2022 deadline established in this case's twelfth amended scheduling order. *See* Doc. No. 101. Accordingly, the motion for summary judgment is now ripe for adjudication.

---

[2] The second amended complaint remains the operative complaint in this matter.
[3] In addition to granting the motion to reopen, the court denied without prejudice the motion for summary judgment. *See* Mar. 17, 2022 Order at 1.

## II.     FACTUAL BACKGROUND

Mr. Ardo is the plaintiffs' son. *See* Defs.' Statement of Undisputed Material Facts in Supp. Defs.' Mot. for Summ. J. ("Defs.' Facts") at ¶ 3, Doc. No. 103-1; Pls.' Resp. to Defs.' Statement of Undisputed Material Facts ("Pls.' Resp.") at ¶ 3, Doc. No. 105-1. Troopers Pagan and Splain are employed with the PSP. *See* 2d Am. Compl. at ¶¶ 6, 7, Doc. No. 33; Defs.' Answer to 2d Am. Compl. at ¶¶ 6, 7, Doc. No. 63. On May 20, 2017, Troopers Pagan and Splain responded to an incident involving Mr. Ardo that ultimately resulted in Mr. Ardo's death by use of deadly force against him. *See* Defs.' Facts at ¶ 2; Pls.' Resp. at ¶ 2.

The incident began at approximately 7:55 a.m., at which time Ms. Monaghan called 9-1-1 and spoke with PSP Police Communications Officer Leonard Behler ("PCO Behler"). *See* Defs.' Facts at ¶ 14; Pls.' Resp. at ¶ 14. Ms. Monaghan informed PCO Behler that Mr. Ardo had texted his father suicidal threats. *See* Defs.' Facts at ¶ 15; Pls.' Resp. at ¶ 15. She also informed him that Mr. Ardo had come to her house earlier that morning, in violation of a Protection From Abuse ("PFA") order she had against him. Defs.' Facts at ¶ 15; Pls.' Resp. at ¶ 15. Ms. Monaghan asked PCO Behler to have the police "pick [Mr. Ardo] up" and "put him [in] the hospital," though PCO Behler later informed her that the police could not track Mr. Ardo's location. *See* Defs.' Facts at ¶¶ 17–18 (second alteration in original); Pls.' Resp. at ¶¶ 17–18. At all times during this initial call, Trooper Splain was next to PCO Behler and heard his side of the call, receiving a summary after the call ended. *See* Defs.' Facts at ¶ 19; Pls.' Resp. at ¶ 19.

At approximately 8:22 a.m., Ms. Monaghan called back PCO Behler to inform him that she had contacted the suicide prevention hotline, which advised her that she could have Mr. Ardo involuntarily committed. *See* Defs.' Facts at ¶¶ 20–21; Pls.' Resp. at ¶¶ 20–21. Accordingly, she again asked PCO Behler to have the police find Mr. Ardo so she could commit him. *See* Defs.'

Facts at ¶ 21; Pls.' Resp. at ¶ 21. Again, Trooper Splain was next to PCO Behler during this call and received a summary of it after the call ended. *See* Defs.' Facts at ¶ 22; Pls.' Resp. at ¶ 22.

A couple minutes later, PCO Behler called Mr. Ardo's cellphone and spoke with him. *See* Defs.' Facts at ¶ 23; Pls.' Resp. at ¶ 23. Throughout the call, Mr. Ardo expressed anger toward his mother and threatened to commit suicide through various methods, including injecting himself with antifreeze, cutting his throat or wrist, lighting his car on fire, and taping a "quarter stick around [his] neck and blow[ing] [his] . . . head off." Defs.' Facts, Ex. 9, May 20, 2017 Tr. of PCO Behler Calls Between 8:55 a.m. and 10:08 a.m. at ECF pp. 2–3, Doc. No. 103-10. After this, PCO Behler asked Mr. Ardo for his location, to which he responded, "I'm not hurtin [sic] nobody else except myself. Alright?" *See id.* at ECF p. 3. The call ended soon after with Mr. Ardo stating, "Yeah, so you can pick me up and fucking 302 me! Good luck. Try to find me before I blow my fucking head off! Don't call me no more," to which PCO Behler responded with "Ok. Very good." *See id.* at ECF p. 4. Trooper Splain sat next to PCO Behler during this call and received a summary of it from PCO Behler. *See* Defs.' Facts at ¶ 27; Pls.' Resp. at ¶ 27. Specifically, PCO Behler told Trooper Splain that Mr. Ardo had stated he planned to "blow his head off, or . . . something to that effect," and that "when you see the smoke on the mountain or when you see the fire on the mountain, you'll know it's done." Defs.' Facts at ¶ 28; Pls.' Resp. at ¶ 28.

At approximately 8:37 a.m., PCO Behler dispatched Trooper Pagan to Ms. Monaghan's house after informing him about Ms. Monaghan's PFA order, Mr. Ardo's suicidal threats, and Ms. Monaghan's desire to have Mr. Ardo involuntarily committed. *See* Defs.' Facts at ¶¶ 29–30; Pls.' Resp. at ¶¶ 29–30. PCO Behler also informed Trooper Pagan that Trooper Splain would meet him at Ms. Monaghan's house. *See* Defs.' Facts at ¶ 30; Pls.' Resp. at ¶ 30. Within the next

half hour, Troopers Pagan and Splain arrived at Ms. Monaghan's house and awaited Mr. Ardo's potential arrival. *See* Defs.' Facts at ¶¶ 32–35; Pls.' Resp. at ¶¶ 32–35. During this time, PCO Behler continued his effort to ping Mr. Ardo's cellphone, to no avail. *See* Defs.' Facts at ¶ 31; Pls.' Resp. at ¶ 31. Eventually, Mr. Ardo called Ms. Monaghan asking her for money, prompting the Troopers to suggest that she offer him some money to get him to come to her house so that they could apprehend him. *See* Defs.' Facts at ¶¶ 36–37; Pls.' Resp. at ¶¶ 36–37. Ms. Monaghan followed the Troopers' suggestion and offered money to Mr. Ardo over the phone, which resulted in Mr. Ardo agreeing to come to the house. *See* Defs.' Facts at ¶ 39; Pls.' Resp. at ¶ 39. Nevertheless, during this call,[4] Mr. Ardo also issued a warning to Ms. Monaghan, stating "I'm gonna [sic] put something around my neck. If there are cops there, I'm gonna [sic] blow myself up." Defs.' Facts, Ex. 6, Tr. of May 20, 2017 Monaghan Interview at ECF p. 17, Doc. No. 103-5.

Understanding that Mr. Ardo was suffering a mental health crisis, Troopers Pagan and Splain planned to apprehend Mr. Ardo upon his arrival at Ms. Monaghan's house and get him committed. *See* Defs.' Facts at ¶ 42; Pls.' Resp. at ¶ 42. The Troopers also considered arresting him for violating his mother's PFA order. *See* Defs.' Facts at ¶ 42; Pls.' Resp. at ¶ 42. To carry out these plans, the Troopers moved their patrol cars behind Ms. Monaghan's house so that they would not be visible to Mr. Ardo as he approached the house. *See* Defs.' Facts at ¶¶ 44–46; Pls.' Resp. at ¶¶ 44–46. During this time, Trooper Splain informed PCO Behler and another state trooper that Mr. Ardo may have an "improvised explosive device" strapped to his neck. *See* Defs.' Facts at ¶ 48; Pls.' Resp. at ¶ 48.

At 10:07 a.m., Mr. Ardo arrived and parked in front of Ms. Monaghan's house. *See* Defs.' Facts at ¶¶ 52–53; Pls.' Resp. at ¶¶ 52–53. Inside the house, Troopers Pagan and Splain

---

[4] The defendants state that this interaction actually happened in a separate call following Ms. Monaghan's initial call with Mr. Ardo to offer him money. *See* Defs.' Facts at ¶ 39. For the court's present purpose, this factual discrepancy does not matter.

waited for Mr. Ardo to enter, but began to suspect that he may attempt to "get away" after he remained sitting in his car for a couple minutes. *See* Defs.' Facts at ¶¶ 54–55; Pls.' Resp. at ¶¶ 54–55. Mr. Ardo then called Ms. Monaghan and insisted that she come outside rather than he come inside, stating "I see a police officer and I'm just gonna ignite this thing" at the end of the call. *See* Defs.' Facts at ¶ 77; Pls.' Resp. at ¶ 77. Fearing the possibility of Mr. Ardo leaving and bringing an explosive device to a more heavily populated area, the Troopers went to their patrol cars. *See* Defs.' Facts at ¶¶ 55–56; Pls.' Resp. at ¶¶ 55–56. Shortly thereafter, Trooper Pagan radioed Trooper Splain, first asking Trooper Splain to "block [Mr. Ardo] off" and then stating, "He's moving towards my way. I'm gonna [sic] jump in the road." *See* Defs.' Facts at ¶ 57; Pls.' Resp. at ¶ 57.

Following this exchange, Trooper Pagan drove to the front of Mr. Ardo's vehicle, blocking it head-on. *See* Defs.' Facts at ¶ 58; Pls.' Resp. at ¶ 58. At the same time, Trooper Splain drove his patrol car and stopped it a short distance behind Mr. Ardo's vehicle, effectively blocking Mr. Ardo from driving away. *See* Defs.' Facts at ¶ 60; Pls.' Resp. at ¶ 60. The Troopers then exited their patrol cars and immediately drew their weapons; Trooper Pagan later stated that he believed Mr. Ardo's running vehicle posed a threat at this time. *See* Defs.' Facts at ¶¶ 59, 61; Pls.' Resp. at ¶¶ 59, 61; Pls.' Statement of Additional Material Facts ("Pls.' Add'l Facts") at ¶ 8, Doc. No. 105-2.[5] The two Troopers began shouting somewhat conflicting commands at Mr. Ardo: While both Troopers ordered Mr. Ardo to show his hands, Trooper Splain simultaneously directed Mr. Ardo to get out of his vehicle. *See* Defs.' Facts at ¶ 61; Pls.' Resp. at ¶ 61; Pls.' Add'l Facts at ¶¶ 9–10. Trooper Pagan then approached Mr. Ardo's vehicle with his weapon in a

---

[5] In addition to their response to the defendants' statement of undisputed material facts, the plaintiffs filed a statement of additional material facts. *See* Doc. No. 105-2. While the defendants have filed no response to this statement, the court finds it proper to cite to these additional material facts, as they are based on evidence found in the record.

low ready position—i.e., not pointed directly at Mr. Ardo—and repeated commands for Mr. Ardo to show his hands. *See* Defs.' Facts at ¶ 62; Pls.' Resp. at ¶ 62. As Trooper Pagan reached approximately three or four feet from Mr. Ardo's vehicle, Mr. Ardo turned toward Trooper Pagan with a "maniacal smile," lit up a lighter, and began to light a fuse attached to a device near his neck. *See* Defs.' Facts at ¶ 62; Pls.' Resp. at ¶ 62. Although Trooper Splain did not see a fuse or device, he saw a flame in Mr. Ardo's vehicle and asked Trooper Pagan if Mr. Ardo had any device on him, to which Trooper Pagan responded with a yes. *See* Defs.' Facts at ¶ 63; Pls.' Resp. at ¶ 63; Pls.' Add'l Facts at ¶ 16. At no point during this time did Trooper Pagan perform any de-escalation techniques. *See* Pls.' Add'l Facts at ¶ 13.

After seeing the lit lighter in Mr. Ardo's hand, Trooper Pagan fired two shots toward Mr. Ardo while rapidly retreating away from his vehicle in case any blast occurred. *See* Defs.' Facts at ¶ 64; Pls.' Resp. at ¶ 64. Trooper Pagan later indicated that he fired these rounds out of a belief that his life, Trooper Splain's life, Mr. Ardo's life, and the surrounding property were all in danger. *See* Defs.' Facts at ¶ 65 (citing Ex. 1, Trooper Pagan Aug. 22, 2019 Dep. Tr. at 41:5–10, Doc. No. 103-2).[6] During this same time, Trooper Splain fired six shots toward Mr. Ardo.[7] *See* Defs.' Facts at ¶ 66; Pls.' Resp. at ¶ 66. Trooper Splain later explained that he fired the shots because he believed Mr. Ardo was attempting to light an explosive device that would have harmed the Troopers. *See* Defs.' Facts at ¶ 67 (citing Ex. 5, Trooper Splain Interview ("Splain Interview") at 27, Doc. No. 103-6);[8] Pls.' Resp. at ¶ 67.[9]

---

[6] Although the plaintiffs denied this statement of fact, they did so essentially on relevancy grounds and not because Trooper Pagan did not testify as such at his deposition. *See* Pls.' Resp. at ¶ 65.

[7] The defendants explain that Trooper Splain fired multiple shots because his police training taught him that it was necessary to do so to hit an intended target in a vehicle, as the first few shots would deflect after breaking the vehicle's glass windows. *See* Defs.' Facts at ¶ 68; Pls.' Resp. at ¶ 68.

[8] The defendants have attached two documents identified as exhibit 7 to their statement of facts. *See* Doc. Nos. 103-6, 103-8. It appears that the first of these documents should be properly identified as exhibit 5, as that is how the defendants reference it and it is the fifth document attached to the statement. *See* Defs.' Facts at ¶ 67 (citing exhibit

The remainder of the facts are documented on a mobile video recording[10]: Following the Troopers' eight initial shots, Mr. Ardo fell over and disappeared from Trooper Splain's line of sight, prompting him to approach Mr. Ardo's vehicle to try and see him. *See* Defs.' Facts at ¶ 69; Pls.' Resp. at ¶ 69. Within three or four seconds of the Troopers' initial shots, Mr. Ardo began to sit back up within the vehicle. *See* Defs.' Facts at ¶ 70; Pls.' Resp. at ¶ 70. At this time, Trooper Splain gave no verbal commands to Mr. Ardo. *See* Pls.' Add'l Facts at ¶ 24. Instead, before Mr. Ardo even fully sat up, Trooper Splain immediately fired three more shots toward him within a two-second timespan. *See* Defs.' Facts at ¶ 71; Pls.' Resp. at ¶ 71; Pls.' Add'l Facts at ¶¶ 19–22. Trooper Splain did not see any rekindled flame inside Mr. Ardo's vehicle before taking these shots. *See* Defs.' Facts, Ex. 2, Trooper Splain Aug. 23, 2019 Dep. Tr. ("Splain Dep. Tr.") at 26:1–4, Doc. 103-3. Trooper Splain could not see Mr. Ardo's face or hands either. *See id.* After the three shots, Mr. Ardo slumped down again and remained motionless, leading Trooper Splain to believe that one of the bullets had hit him. *See* Pls.' Add'l Facts at ¶ 25.

Within a minute of the final three shots, Trooper Pagan radioed for an EMS. *See* Defs.' Facts at ¶ 74; Pls.' Resp. at ¶ 74. Trooper Splain then removed Mr. Ardo, motionless but still breathing, from his vehicle. *See* Defs.' Facts at ¶ 75; Pls.' Resp. at ¶ 75. Trooper Splain began the process of applying bandages approximately five and a half minutes after the shooting. *See* Pls.' Resp. at ¶ 75. With Mr. Ardo removed from the vehicle, the Troopers observed an "aerial mortar"—a.k.a., a firework[11]—attached to the collar of his shirt. *See* Defs.' Facts at ¶ 83; Pls.'

---

5). Since this document appears to be misidentified, the court has used the proper reference to avoid confusion by citing to two exhibit 7s.

[9] The plaintiffs do not dispute that Trooper Splain provided this reasoning during his police interview regarding the incident with Mr. Ardo; instead, they dispute the relevancy of his reasoning and the legitimacy of his subjective fears. *See* Pls.' Resp. at ¶ 67.

[10] The mobile video recording did not begin until after the Troopers' initial eight shots. *See* Pls.' Add'l Facts at ¶ 5.

[11] *See Aerial Mortars*, CANNON FUSE, https://cannonfuse.com/pyro-projects-aerial-mortars-small.html (last visited Dec. 12, 2022) ("An Aerial Mortar is basically a tiny tube that shoots a small tube projectile, called a 'shell,' high into the sky. The shell can contain a whistle, star, smoke bomb, or other firework effect.").

Resp. at ¶ 83. Other state troopers also recovered a BIC lighter from the front passenger floor of Mr. Ardo's vehicle. *See* Defs.' Facts at ¶ 84; Pls.' Resp. at ¶ 84. Mr. Ardo ultimately died from the Troopers' use of force.

### III.   DISCUSSION

### A.   <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (per curiam) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v.*

*Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.   Analysis

The defendants' operative motion for summary judgment contains three arguments. First, they argue that they are entitled to judgment on the plaintiffs' excessive force claim because they are protected by qualified immunity. Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Mot. for Summ. J.") at ECF pp. 6–17, Doc. No. 103. Specifically, they claim that (1) their use of force was reasonable, and (2) they did not violate clearly established law. *See id.* Second, they contend that they are entitled to judgment on the plaintiffs' state law claims because Pennsylvania law grants them sovereign immunity from said claims. *See id.* at 17–21. Lastly, should this court allow the plaintiffs' state law claims to proceed, the defendants argue that they are at least entitled to judgment on the plaintiff's wrongful death claim because Pennsylvania law bars such a claim in this specific matter. *See id.* at 22. The court will analyze each of these arguments in turn, beginning with the defendants' qualified immunity defense.

### 1.     Federal Claims – Qualified Immunity

The Troopers assert that they are protected from the plaintiffs' excessive force claim under the doctrine of qualified immunity. This immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A qualified immunity inquiry thus contains two prongs: "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021). If the court cannot answer both prongs in the affirmative, qualified immunity applies. The court has the discretion to examine either prong first in its analysis. *See Pearson*, 555 U.S. at 236.

Here, two qualified immunity inquiries are necessary, as the plaintiffs allege two distinct instances of use of deadly force in this matter—the initial eight shots fired by the Troopers and the final three shots fired by Trooper Splain. *See* 2d Am. Compl. at ¶ 27. The plaintiffs allege that both instances constituted excessive force, violating Mr. Ardo's rights under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. *See id.* at ¶ 48. Nevertheless, because Mr. Ardo was neither in pretrial detention nor incarcerated at the time of the shootings, only the Fourth Amendment is applicable to the plaintiffs' excessive force claim. *See Shockley-Byrd v. Zambrana*, No. 18-cv-4845, 2019 WL 2226128, at *2 n.3 (E.D. Pa. May 22, 2019) ("The Fourth Amendment protects against excessive force during an investigatory stop, arrest, or other 'seizure,' the Fourteenth Amendment protects pretrial detainees, and the Eighth Amendment protects inmates from the excessive use of force by prison guards during post-conviction incarceration." (citation omitted)); *see also Graham v. Connor*, 490 U.S. 386,

395 & n.10 (1989) (discussing context of incident determines applicable Amendment to excessive force claim under section 1983).

Accordingly, for both respective instances of use of deadly force, the court first analyzes whether the plaintiffs' alleged facts demonstrate that the Troopers—or in the instance of the final three shots, Trooper Splain—violated Mr. Ardo's Fourth Amendment rights. Namely, the court asks whether the Troopers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them." *Jefferson*, 21 F.4th at 78 (quoting *Graham*, 490 U.S. at 397). Second, the court examines whether the allegedly violated rights in either instance of use of deadly force against Mr. Ardo were clearly established at the time of occurrence. Ultimately, the court finds that a jury could reasonably conclude that the Troopers' alleged conduct was not objectively reasonable and that the allegedly violated rights had been clearly established at the time that they killed Mr. Ardo. Consequently, the court must reject the defendants' qualified immunity defenses.

### a.   The Initial Eight Shots (and the Preceding Approach)

#### i.   *Constitutional Violation Prong*

The court must first assess whether the plaintiffs' factual allegations support the claim that Troopers Pagan and Splain violated Mr. Ardo's Fourth Amendment right to be free from excessive force. Excessive force claims are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. The operative question in excessive force cases is "whether the totality of the circumstances justified a particular sort of search or seizure," e.g., a use of deadly force.[12] *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

---

[12] The "totality of the circumstances" could include any myriad of factors, including, but not limited to, (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether [the suspect] actively is resisting arrest or attempting to evade arrest by flight," (4) "the physical injury to the [suspect]," (5) "the possibility that the persons subject to the police action are themselves

The court analyzes this question "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Because this inquiry is so fact-dependent, "[t]he reasonableness of the use of force is normally an issue for the jury." *Jefferson*, 21 F.4th at 79 (quoting *Rivas*, 365 F.3d at 198).

Looking at the totality of the circumstances here, the plaintiffs' factual allegations—both as raised in their second amended complaint and as supported by the record established in discovery—create enough of a genuine dispute of material fact that a reasonable jury could conclude that Troopers Pagan and Splain used excessive force against Mr. Ardo when they fired eight shots toward him. To be sure, when looking exclusively at the immediate cause of the Troopers' use of deadly force—Mr. Ardo's seeming attempt to detonate an explosive device—it is hard to view their actions as anything other than reasonable. After all, such an explosion could have presented a threat to not only Mr. Ardo's life, but to the Troopers' lives as well. Nevertheless, Mr. Ardo's detonation attempt and the Troopers' subsequent use of deadly force did not occur in a vacuum. Indeed, "[a] proper Fourth Amendment analysis requires [the court] to assess not only the reasonableness of [the Troopers'] actions at the precise moment of the shooting, but the 'totality of circumstances' *leading up to the shooting*." *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (emphasis added). Thus, if Troopers Pagan and Splain engaged in unreasonable behavior prior to the shooting that "proximately caused" the

---

violent or dangerous," (6) "whether the action takes place in the context of effecting an arrest," (7) "the possibility that the suspect may be armed," and (8) "the number of persons with whom the police officers must contend at one time." *Jefferson¸* 21 F.4th at 79 (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004); *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020)).

initial use of deadly force against Mr. Ardo, *id.*, the Troopers would still have violated Mr. Ardo's Fourth Amendment rights, even if the use of deadly force would have otherwise been reasonable in the moment.

Here, the court is persuaded by the factual allegations and supporting record that a jury could reasonably find that the Troopers approached Mr. Ardo's vehicle in an unreasonable manner that proximately caused the Troopers to fire eight initial shots at Mr. Ardo. To begin, Troopers Pagan and Splain were both made aware by PCO Behler that Mr. Ardo was suffering a mental health crisis and had expressed suicidal threats. Moreover, the Troopers knew prior to Mr. Ardo's arrival at Ms. Monaghan's house that Mr. Ardo would likely have, in Trooper Splain's words, an "improvised explosive device strapped to his neck" and that "he would light it if he saw any policy officers." *See* Defs.' Facts at ¶ 48; Pls.' Resp. at ¶ 48. While this knowledge may have justified the Troopers' decision to block in Mr. Ardo's vehicle to mitigate the risk of him driving off into a more public area,[13] there is a genuine debate to be had over whether the Troopers' behavior following this move could be defined as reasonable.

For instance, both Troopers immediately drew their weapons upon exiting their patrol cars, despite knowing that they were dealing with an emotionally disturbed person. Likewise, Trooper Pagan testified that he did not perform any de-escalation techniques whatsoever in his interaction with Mr. Ardo.[14] Rather, both Troopers shouted at Mr. Ardo to show his hands all

---

[13] The plaintiffs do not seem to contest this. *See* Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n Br.") at 13, Doc. No. 105 ("This plan and operational decision was reasonable under the circumstances." (quoting Ex. A, Doc. No. 105-3, at ECF p. 7)).

[14] The defendants have not identified—and the court could not locate—any evidence in the record showing that Trooper Splain attempted to de-escalate the situation, either. In fact, Trooper Pagan's deposition testimony suggests that neither trooper engaged in de-escalation:

> Q:    In this incident, no de-escalation techniques were performed; correct?
> . . . .
> [Pagan:] It was -- the situation did not dictate to go to that point.
> Q:    And thus none happened?

while Trooper Splain also ordered him to get out of his vehicle. Lastly, despite knowing that Mr. Ardo likely had an explosive device in his vehicle, the Troopers not only neglected to take cover behind their patrol cars, but instead approached the vehicle all while holding their weapons and directing their competing demands at Mr. Ardo. Combined, these actions support the plaintiffs' claim that the Troopers acted unreasonably in their approach toward Mr. Ardo. And while the court recognizes that it must not judge the Troopers' actions with "20/20 vision of hindsight," *Graham*, 490 U.S. at 396, practices such as calm communication, maintaining distance, and avoiding a threatening demeanor when dealing with an emotionally disturbed person are widely accepted by trained police officers, especially in scenarios such as here in which the police were provided with ample warning about the person's emotional state and the violent risk they may pose.[15] The plaintiffs' factual allegations and the current record before the court indicate that neither Trooper Pagan nor Trooper Splain applied such practices when dealing with Mr. Ardo.

The crucial question, then, is whether the manner in which the Troopers approached Mr. Ardo proximately caused the initial use of deadly force against him. To find such proximate cause, the court must consider "the 'foreseeability or the scope of the risk created by the predicate conduct,' and . . . conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *County of Los Angeles v. Mendez*, 581 U.S. 420, 431 (2017) (quoting *Paroline v. United States*, 572 U.S. 434, 444–45 (2014)). Here, the court

---

Pagan:   Yes.

Splain Dep. Tr. at 52:12–20.

[15] International Association of Chiefs of Police training provides that, when dealing with emotionally disturbed persons, police officers should, among other things, "avoid physical contact," "move slowly and do not excite the disturbed person," "talk to the disturbed person . . . and let him 'ventilate' his feelings to you," and avoid "threaten[ing] [the] disturbed person." Pls.' Opp'n Br., Ex. A, Oct. 22, 2019 Rep. of R. Paul McCauley, Ph.D. at ECF pp. 9–10, Doc. No. 105-3. The PSP are seemingly trained to engage in de-escalation when confronting a suicidal person. *See, e.g.*, Pls.' Opp'n Br., Ex. D, PSP May 9, 2017 Incident Rep. at ECF p. 2, Doc. No. 105-6 (describing encounter that PSP had with suicidal man brandishing gun, during which trooper "engage[d] him with dialogue to deescalate the situation").

finds that there was indeed a direct relation between the Troopers' conduct in approaching Mr. Ardo and the eight shots that were then fired toward him. For one, recall that Ms. Monaghan's house was not in a densely populated area. Moreover, the Troopers had successfully blocked in Mr. Ardo's vehicle before they got out of their respective patrol cars to confront Mr. Ardo. Accordingly, until the Troopers began approaching Mr. Ardo's vehicle, Mr. Ardo presented a physical threat to no one other than himself. And once the Troopers approached Mr. Ardo, the physical threat grew to include no additional persons but the Troopers. It therefore stands to reason that had the Troopers not approached Mr. Ardo, who they knew to be emotionally disturbed and potentially wielding an explosive device, and had instead maintained their distance, taken cover, and attempted to de-escalate the situation, they would not have been put in a position in which they felt it necessary to shoot Mr. Ardo. Put differently, a reasonable officer could have foreseen that approaching a suicidal person carrying an explosive device all while visibly wielding a gun and shouting commands at said person could likely result in a situation in which the suicidal person attempts to ignite the device, thus placing the officer's life at risk and necessitating the use of deadly force. Consequently, the court finds present here the requisite proximate cause necessary to conclude that the plaintiffs have sufficiently alleged that Trooper Pagan and Trooper Splain violated Mr. Ardo's Fourth Amendment right to be free from excessive force.

It should be said that the court is taking no position as to whether Trooper Pagan or Trooper Splain *actually* acted reasonably in their approach toward Mr. Ardo's vehicle. The court has simply concluded that the plaintiffs' factual allegations and the accompanying record produce enough support for such a finding. A factfinding jury should therefore be the body to

decide this issue, not the court. *See Jefferson*, 21 F.4th at 79 ("The reasonableness of the use of

force is normally an issue for the jury." (quoting *Rivas*, 365 F.3d at 198)).

ii.     *Clearly Established Prong*

Moving on to the second prong of the qualified immunity analysis, the court must now

consider whether law pertaining to the allegedly violated right "was clearly established at the

time of the violation." *Id.* at 80. This itself requires a two-part inquiry:

> First, we must define the right allegedly violated at the appropriate level of
> specificity. This requires us to frame the right in light of the specific context of
> the case, not as a broad general proposition. Second, we must ask whether that
> right was "clearly established" at the time of its alleged violation, *i.e.*, whether the
> right was sufficiently clear that a reasonable official would understand that what
> he is doing violates that right. This is an objective (albeit fact-specific) question,
> where an officer's subjective beliefs . . . are irrelevant.

*Id.* at 81 (alteration in original) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir.

2021)). Ultimately, the court finds the existence of clearly established law here.

To begin, to appropriately define the right alleged in this case, the court borrows from a

decision by the Court of Appeals for the Tenth Circuit that dealt with remarkably analogous

factual allegations.[16] Specifically, in *Allen v. Muskogee, Oklahoma*, the Tenth Circuit denied

summary judgment for four individual police officers involved in the killing of a suicidal man.

*See* 119 F.3d 837, 840–41 (10th Cir. 1997). Similar to this case, the officers in *Allen* arrived at

the victim's home knowing that the victim was suicidal and armed with a gun; the victim was

also sitting in his vehicle when the officers arrived. *See id.* at 839. Rather than engaging in de-

escalation, the officers immediately approached the victim in an attempt to grab his gun, leading

---

[16] While this court is not bound by the Tenth Circuit, the court finds that the Tenth Circuit has persuasively defined a
particular right—as further spelled out in the next paragraph—that is both relevant and specific enough for this case.
Accordingly, while *Allen v. Muskogee, Oklahoma* and *Estate of Ceballos v. Husk* are not binding authority on this
court, the court views the cases as appropriate guideposts to assist it in its own duty to "define [Mr. Ardo's] right
allegedly violated at the appropriate level of specificity." *Jefferson*, 21 F.4th at 81 (quoting *Peroza-Benitez*, 994 F.3d
at 165).

to an altercation that resulted in the use of deadly force against the victim within ninety seconds of the officers' arrival. *See id.* The Tenth Circuit reversed the district court's grant of summary judgment for the officers and the city because, in its words, "[t]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.* at 840 (alteration in original) (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995)); *accord Johnson*, 837 F.3d at 350 ("A proper Fourth Amendment analysis requires us to assess not only the reasonableness of [the officers'] actions at the precise moment of the shooting, but the 'totality of circumstances' leading up to the shooting.").

Since the Tenth Circuit's decision in *Allen*, courts have routinely cited to it when conducting qualified immunity analyses in cases similar to this one. *See infra* pp. 22–23. Given these similarities, this court defines the right in this case to be the same as that explored in *Allen*:

> [A]n officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property.

*Estate of Ceballos v. Husk*, 919 F.3d 1204, 1219 (10th Cir. 2019) ("*Allen* clearly established that constitutional right.").[17] The court finds this definition neither too general nor too specific, and quite applicable to Mr. Ardo's scenario, given that he was behaving irrationally, had been confined to Ms. Monaghan's property, and carried a weapon of "short-range lethality" (to the extent that a firework can be defined as a weapon).

---

[17] Because the Tenth Circuit decided *Estate of Ceballos v. Husk* approximately two years following Mr. Ardo's death, the court is not citing the case as support for this right being "clearly established" at the time of the defendant troopers' alleged violation of Mr. Ardo's Fourth Amendment rights. The court cites it merely as a useful and succinct recitation of the specific right established in *Allen*.

The question then becomes whether this right had been "clearly established" by May 20, 2017, the day of Mr. Ardo's death. To determine this, the court first turns to "factually analogous Supreme Court precedent, as well as binding opinions from [the Third Circuit.]" *Jefferson*, 21 F.4th at 81 (quoting *Peroza-Benitez*, 994 F.3d at 165). If none exist, the court examines "whether there exists a 'robust consensus of cases of persuasive authority in the Courts of Appeals,'" as well as "take[s] into account district court cases, from within the Third Circuit or elsewhere."[18] *Id.* (quoting *Peroza-Benitez*, 994 F.3d at 165–66).

Here, the court finds no particularly analogous Supreme Court or Third Circuit precedent. Nevertheless, when looking to other circuit and district courts, there is, for one, the *Allen* decision, which has been cited and acknowledged in numerous qualified immunity decisions outside the Tenth Circuit between 1997 and 2017.[19] *See, e.g.*, *Cunningham v. Gates*, 312 F.3d 1148, 1154 (9th Cir. 2002) (recognizing "danger creation theory" applied by *Allen* court); *Pena v. Leombruni*, 200 F.3d 1031, 1034 (7th Cir. 1999) (recognizing but distinguishing right established in *Allen*); *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010–12 (E.D. Wis. 2014) (citing to *Allen* and other cases in its "clearly established" analysis that ultimately concludes that "an officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct")); *Buchanan ex rel. Estate of*

---

[18] Many district courts within the Third Circuit have relied solely on decisions from other circuits to find "clearly established law." *See, e.g.*, *Gonzalez v. N.J. Dep't of Child. & Fams.*, 545 F. Supp. 3d 178, 211–13 (D.N.J. 2021); *Bayer v. Monroe Cnty. Child & Youth Servs.*, No. 3:04–CV-2505, 2007 WL 3034009, at *12 (M.D. Pa. Oct. 15, 2007), *rev'd on other grounds*, 577 F.3d 186 (3d Cir. 2009); *Patterson v. Armstrong Cnty. Child. & Youth Servs.*, 141 F. Supp. 2d 512, 540–41 (W.D. Pa. 2001).

[19] Post-2017, other federal courts have continued to recognize the right established in *Allen* when denying qualified immunity. *See, e.g.*, *Pottorff v. City of Fresno*, No. 1:16-1593-DAD-SKO, 2020 WL 4437606, at *13 (E.D. Cal. Aug. 3, 2020) (citing *Estate of Ceballos* and *Allen*). While these cases bear no weight on whether the right had been clearly established for the sake of this case, they do signal that courts continue to turn to the right set out in *Allen* when conducting qualified immunity analyses. It is also worth noting that the Supreme Court briefly discussed *Allen* in its 2021 qualified immunity case, *City of Tahlequah, Oklahoma v. Bond*. While the *Bond* Court never explicitly endorsed *Allen* in its opinion, it did not disagree with *Allen* either, instead distinguishing the case before it from *Allen* because the officers in *Bond* had attempted to de-escalate the situation before them. *See* 142 S. Ct. 9, 12 (2021) ("[T]he facts of *Allen* are dramatically different from the facts here. . . . We cannot conclude that *Allen* 'clearly established' that [the petitioners'] conduct was reckless or that their ultimate use of force was unlawful.").

*Buchanan v. Maine*, 417 F. Supp. 2d 45, 68 (D. Me. 2006) (recognizing but distinguishing right established in *Allen*).

Furthermore, other circuit courts and district courts within the Third Circuit have found that police officers can violate a person's Fourth Amendment rights when their need to use deadly force arose from their own unreasonable behavior. *See, e.g.*, *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."); *Neuburger v. Thompson*, 305 F. Supp. 2d 521, 528 (W.D. Pa. 2004) (stating that officer's unreasonable actions creating need to use deadly force "may render the eventual use of deadly force by the officer unreasonable in violation of the Fourth Amendment" (quoting *Grazier v. City of Philadelphia*, 328 F.3d 120, 129 (3d Cir. 2003) (Becker, C.J., dissenting))), *aff'd*, 124 F. App'x 703 (3d Cir. 2005). While such cases may speak about Fourth Amendment rights in more general terms than the right this court defined above, they still appear comparable enough to reinforce the notion that the right alleged here had been clearly established in law by the time that the Troopers used deadly force against Mr. Ardo.

Overall, there is enough support in the caselaw to demonstrate that, should the plaintiffs' factual allegations be true, Troopers Pagan and Splain violated a clearly established Fourth Amendment right of Mr. Ardo. The Troopers potentially engaged in reckless behavior that created their need to fire the initial eight shots against Mr. Ardo. Moreover, Mr. Ardo was "an irrational suspect . . . armed only with a weapon of short-range lethality and . . . confined on his [mother's] property." *Estate of Ceballos*, 919 F.3d at 1219 (relying on *Allen*). Accordingly, because neither prong has been met in this qualified immunity analysis with regard to the eight initial shots fired by Troopers Pagan and Splain, the defendants have failed to meet their "burden

of establishing [their] entitlement to qualified immunity at summary judgment" *Jefferson*, 21 F.4th at 80. Therefore, the court will deny the defendants' qualified immunity defense against the plaintiffs' excessive force claim relating to the initial eight shots.

b. <u>The Final Three Shots</u>

Even ignoring the initial eight shots, the court still finds that Trooper Splain is not entitled to qualified immunity on account of the final three shots he fired at Mr. Ardo. To reach this conclusion, the court employs the same two-pronged qualified immunity analysis used above.

i. *Constitutional Violation Prong*

First, the court analyzes whether the plaintiffs' factual allegations support the claim that Trooper Splain violated Mr. Ardo's Fourth Amendment right to be free from excessive force by firing the final three shots. "Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) (describing such incidents as use of excessive force). The plaintiffs contend that Mr. Ardo did not pose any threat to the Troopers following the initial eight shots, and that Trooper Splain was therefore unjustified in his continued use of deadly force. *See* Pls.' Opp'n Br. at 19. Accordingly, should the factual allegations and supporting record indicate that Mr. Ardo ceased being a physical threat to the Troopers before Trooper Splain fired three final rounds toward him, the first prong must fall in favor of the plaintiffs.

After reviewing all relevant materials, the court finds that the plaintiffs have effectively alleged that Trooper Splain violated Mr. Ardo's Fourth Amendment rights when he fired his final three shots. The court premises this conclusion largely on what can be seen in the mobile

video recording taken at the time of the confrontation: Following the initial eight shots, Mr. Ardo slumped down into his seat. Within four seconds, Mr. Ardo began sitting back up at a fairly normal, unstartling pace—at this same time, Trooper Splain took three steps toward Mr. Ardo's vehicle. Upon seeing Mr. Ardo getting up, Trooper Splain failed to give any verbal commands to him (e.g., "Show me your hands."). Rather, Trooper Splain immediately fired three more rounds toward Mr. Ardo, seemingly striking him in the process. Trooper Splain later testified that he had seen no rekindled flame inside Mr. Ardo's vehicle before taking these shots; he could not, in fact, see Mr. Ardo's face or hands at all.

Collectively, these facts are sufficient to support the notion that Trooper Splain had acted unreasonably in his latter use of deadly force. For instance, it is highly debatable that Mr. Ardo remained or appeared to remain any threat to the Troopers within the four-second span following the initial eight shots, as he had fallen over following the receipt of gunfire and, from the Troopers' perspective, may have very well sustained a serious injury either from the bullets themselves or the shattering of glass caused by said bullets.[20] Indeed, without seeing any rekindled flame or any other signs of Mr. Ardo attempting to ignite an explosive device, it is difficult to understand why Trooper Splain would have felt the need to use further deadly force against him within such a short amount of time. Compare Trooper Splain's actions to those of the defendant police officers in the Third Circuit case *Lamont v. New Jersey*, in which said officers continued firing shots into a victim after he had already been struck by seven bullets and fallen to the ground. *See* 637 F.3d at 184–85. The Third Circuit ultimately found that those

---

[20] The record does not clarify whether any of the initial eight bullets struck Mr. Ardo, instead stating only that Mr. Ardo sustained bullet wounds under his ear and on his shoulder as well as additional wounds caused by glass shards. *See* Splain Interview at 32. Regardless, it would seem reasonable for an officer to assume in the moment that a person is likely injured in some capacity after being shot at eight times while inside a vehicle.

factual allegations were enough to render the defendants' qualified immunity defense "inapposite." *Id.* at 185. This court reaches the same conclusion here.

ii.    *Clearly Established Prong*

After finding that the plaintiffs have shown a constitutional violation, the court must now inquire as to whether "the law was clearly established at the time of the violation." *Jefferson*, 21 F.4th at 80. The answer, nevertheless, is relatively straightforward in this instance. To begin, the court defines the right using the following words of the Third Circuit: "[A]n officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others." *Lamont*, 637 F.3d at 185. Next, the court finds that this right was clearly established and widely accepted by the Supreme Court, the Third Circuit, and other circuits throughout the nation at the time of Mr. Ardo's death. *See, e.g.*, *id.*; *Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Perez v. Suszczynski*, 809 F.3d  1213, 1222 (11th Cir. 2016) (citing *Garner*); *Ellison v. Lesher*, 796 F.3d 910, 916 (8th Cir. 2015) (same); *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (same). Thus, with the second prong of the qualified immunity analysis met, Trooper Splain is not entitled to qualified immunity from the plaintiffs' excessive force claim with regard to the three final shots he fired at Mr. Ardo.

As a final note, the court does not deny qualified immunity in this case lightly. The court recognizes the great importance of the doctrine in "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 815. Nor is it lost on the court that it is not the court's role to second guess police officers' decisions with the benefit of hindsight vision. Qualified immunity is not, however, absolute. There exists a

limit, and that limit has been breached in this case. The plaintiffs may hence bring their excessive force claims before a jury.

### 2.    State Law Claims

The court now turns to the defendants' argument that the court should grant them summary judgment as to the plaintiffs' state law claims—wrongful death, survival action, and assault and battery. The defendants first argue that the court should dismiss all state law claims because they are entitled to Pennsylvania sovereign immunity. *See* Mot. for Summ. J. at ECF pp. 17–21. Alternatively, they contend that, at the very least, the court should dismiss the wrongful death claim because state law bars collection of wrongful death damages by non-spouse plaintiffs in cases against Commonwealth defendants. *See id.* at 21.

As a preliminary matter, the court will grant the defendants' motion for summary judgment on the state law claims insofar as they apply to Trooper Pagan. In their opposition brief, the plaintiffs only discuss Trooper Splain in their section discussing their state law claims. *See* Pls.' Opp'n Br. at 43–48. This decision reflects the plaintiffs' indication during oral argument that they wish to continue pursuing their state law claims only against Trooper Splain. "[A] non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended." *Hudson v. Cheyney Univ. of Pa.*, Civ. A. No. 14-2552, 2018 WL 6603870, at *6 n.12 (E.D. Pa. Dec. 14, 2018) (citations omitted). Consequently, the court treats the plaintiffs' lack of response to the defendants' state law arguments with regard to Trooper Pagan as an abandonment of their state law claims against him.

At the same time, the court must let the plaintiffs' state law claims stand against Trooper Splain. To explain, the court will first turn to the defendants' broader state sovereign immunity defense, and then address the narrower issue of the plaintiffs' wrongful death claim.

a.   <u>State Sovereign Immunity</u>

The defendants' state sovereign immunity argument rests on the statutory language of 1 Pa. C.S. § 2310, *see* Mot. for Summ. J. at ECF pp. 17–18, which states that "[Pennsylvania] officials and employees acting within the scope of their duties[] shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. C.S. § 2310. Presently, Pennsylvania's Sovereign Immunity Act only waives sovereign immunity for Commonwealth officials in nine specific circumstances, none of which are applicable to this case. *See* 42 Pa. C.S. § 8522(b). Accordingly, because Trooper Splain is a Commonwealth official, and because the defendants believe that Trooper Splain acted within the scope of his employment throughout his encounter with Mr. Ardo, the defendants maintain that Trooper Splain is protected by Pennsylvania sovereign immunity in this case.

The status of Trooper Splain's sovereign immunity turns on whether he did indeed act within the scope of his employment. This is not, nevertheless, a question that is ordinarily answered by the courts. Instead, "whether a particular act of an employee is within the scope of [their] employment is ordinarily a question of fact for the jury. . . . [T]he *only exception* to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute." *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019) (emphasis added) (internal citations omitted). In addition, in the context of a state trooper being sued for use of force, "if the act of assault, although a means of accomplishing an authorized result, is done for personal

reasons or in an *outrageous manner*, it is not done within the scope of the employment." *Id.* at 1073 (emphasis added) (quoting *Lunn v. Boyd*, 169 A.2d 103, 104–05 (Pa. 1961)).

Here, there are enough "inferences . . . in dispute" regarding the facts surrounding Trooper Splain's final use of deadly force against Mr. Ardo to reject his sovereign immunity defense. Namely, the court cannot conclude with certainty that Trooper Splain did not act in an "outrageous manner" and thus outside the scope of his employment. *See id.* at 1068, 1073. As previously discussed in the qualified immunity analysis above, there are enough particular facts supported in the record to conclude that Trooper Splain acted unreasonably when firing three final rounds at Mr. Ardo[21]—e.g., his lack of verbal commands, the swiftness with which he continued to use deadly force, and the fact that he did not see Mr. Ardo reattempt to ignite his explosive device. Consequently, the court rejects at this summary judgment phase Trooper Splain's sovereign immunity defense against the plaintiffs' state law claims. The jury will instead be the ones to decide whether Trooper Splain acted within the scope of his employment.

b.    Wrongful Death Claim

Finally, the defendants argue that the court must at a minimum grant them summary judgment on the plaintiffs' wrongful death claim. *See* Mot. for Summ. J. at ECF pp. 21. To arrive at this conclusion, the defendants point to 42 Pa. C.S. § 8528(c), *see id.*, which limits the types of damages recoverable in cases in which sovereign immunity has been waived to the five following types: past and future loss of earnings and earning capacity, pain and suffering, medical and dental expenses, loss of consortium, and property losses. *See* 42 Pa. C.S. § 8528(c);

---

[21] While the Pennsylvania Supreme Court uses the word "outrageous" whereas the qualified immunity inquiry in Fourth Amendment cases rests on whether an officer behaved in a "reasonable" fashion, there is not enough difference between these two words to think that one requires a greater factual burden to demonstrate than the other. *Compare Outrageous*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/outrageous (last visited Jan. 17, 2023) ("shocking and morally unacceptable"), *with Unreasonable*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/unreasonable (last visited Jan. 17, 2023) ("not fair or acceptable").

*see also* 42 Pa. C.S. §§ 8522(a), 8528(a) (limiting application of section 8528(c) to only specific instances of waiver of sovereign immunity). The defendants contend that loss of consortium is the only type of damages in section 8528(c) that is relevant to the plaintiffs' wrongful death claim. Thus, because "[d]amages for loss of consortium are available only to spouses," *Dep't of Pub. Welfare v. Schultz*, 855 A.2d 753, 755 (Pa. 2004), the defendants assert that the plaintiffs— Mr. Ardo's parents—have no viable path to recover wrongful death damages.

The problem with this argument is that it only holds ground when a statutory waiver of sovereign immunity is at play. Here, there is no such relevant waiver. Rather, the question confronted is whether Pennsylvania sovereign immunity protects Trooper Splain at all—a question that, as explained above, the jury will have to decide. The court therefore cannot agree with the defendants at this stage that the plaintiffs cannot recover wrongful death damages under this loss-of-consortium theory. Should a jury, for instance, determine that Trooper Splain had in fact acted outside the scope of his employment, and that in turn sovereign immunity is inapplicable to this case, the plaintiffs could, as Mr. Ardo's parents, recover damages beyond loss of consortium, such as "damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death." 42 Pa. C.S. § 8301(c). On the other hand, should a jury find that Trooper Splain acted *within* the scope of his employment, then sovereign immunity will apply and judgment will be entered in favor of Trooper Splain on the plaintiffs' wrongful death claim. Overall, because waiver is not an issue in this case, it is immaterial whether the plaintiffs could recover loss of consortium for the death of Mr. Ardo. The court must therefore deny the defendants' final portion of its motion for summary judgment.

## IV.     CONCLUSION

For the aforementioned reasons, the court will deny the majority of the defendants' motion for summary judgment. The plaintiffs' factual allegations and the evidence of record sufficiently show that Troopers Pagan and Splain violated Mr. Ardo's Fourth Amendment right to be free from excessive force, both in their initial use of deadly force and in Trooper Splain's continued use of it. Furthermore, the court has identified clearly established law to support the existence of such a right in both scenarios. Regarding the plaintiffs' state law claims, the question of Trooper Splain's state sovereign immunity must be left to the jury, as there is enough of a factual dispute to substantiate the claim that he acted outside the scope of his employment. Nevertheless, the court will enter judgment in favor of Trooper Pagan with regard to the state law claims against him because the plaintiffs effectively abandoned those claims in their opposition brief.

The court will enter a separate order.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.